# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

ARCHIRODON CONSTRUCTION
(OVERSEAS) COMPANY LIMITED,
Spyrou Kyprianou 38 – 4154
Limassol, Cyprus,

                    Petitioner,

    v.

GENERAL COMPANY
FOR PORTS OF IRAQ,
Malik bin Dinar Street, Ma'qil Quarter
Basrah, Iraq,

MINISTRY OF TRANSPORT
OF THE REPUBLIC OF IRAQ,
Omar Bin Al Khatab Street and Bur Said Street
Baghdad, Iraq,

THE REPUBLIC OF IRAQ,
c/o Minister of Foreign Affairs
Ministry of Foreign Affairs
Al-Salhiya, Fadhil Al-Jimali Street
Baghdad, Iraq,

                  Respondents.

No. _____

---

## PETITION TO RECOGNIZE AND ENFORCE
## <u>FOREIGN ARBITRAL AWARD</u>

Petitioner Archirodon Construction (Overseas) Company Limited, by and through its

attorneys MoloLamken LLP, respectfully submits this petition to recognize and enforce a foreign

arbitral award against respondents General Company for Ports of Iraq, the Ministry of Transport

of the Republic of Iraq, and the Republic of Iraq.

## NATURE OF THE PROCEEDING

1.     This is an arbitral enforcement proceeding under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention").  Petitioner Archirodon Construction (Overseas) Company Limited ("Archirodon") seeks to recognize and enforce an arbitral award rendered in its favor against the General Company for Ports of Iraq ("GCPI") by a tribunal of the International Court of Arbitration of the International Chamber of Commerce in *Archirodon Construction (Overseas) Co. Ltd. v. General Company for Ports of Iraq*, ICC Case No. 21785/ZF/AYZ.

2.     The arbitral tribunal issued its Final Award in Geneva, Switzerland, on November 25, 2019.  The Final Award includes and incorporates a Partial Final Award dated June 4, 2019.  A duly certified copy of the Final Award, including the Partial Final Award, is attached as Exhibit A to the accompanying Declaration of Ahmed Shebl.  The Final Award directed GCPI to pay EUR €82,944,276.76 in damages as well as USD $7,490,565.74 in costs and expenses.  As of June 3, 2022, the total amount due with interest is USD $105,183,722.05.

3.     The arbitration arose out of a Contract for the Construction of the Staging Pier and Eastern Breakwater for Al Faw Grand Port in Iraq, dated November 22, 2012.  The Contract incorporated, among other documents, certain Special Conditions.  A duly certified copy of the Contract and Special Conditions is attached as Exhibit B to the Shebl Declaration.  Clause 20 of the Special Conditions provided that disputes would be settled by arbitration under the Rules of the International Chamber of Commerce in Geneva.

4.     GCPI has refused to pay any of the amounts due under the Final Award.  Archirodon therefore brings this action to recognize and enforce the Final Award against GCPI

pursuant to the New York Convention and the Federal Arbitration Act.  Archirodon further seeks to recognize and enforce the Final Award against the Ministry of Transport of the Republic of Iraq and the Republic of Iraq.  GCPI acted as an agent of the Ministry of Transport in the tender for the construction project, the formation of the contract, the construction project itself, and the dispute.  The Ministry of Transport, in turn, is an integral part and political subdivision of the Republic of Iraq itself.  The Ministry of Transport and the Republic of Iraq are therefore jointly and severally liable for the Final Award.

## **PARTIES**

5.    Petitioner Archirodon Construction (Overseas) Company Limited is a company organized and existing under the laws of Cyprus, having its registered office at Spyrou Kyprianou 38 – 4154, Limassol, Cyprus.

6.    Respondent General Company for Ports of Iraq is an instrumentality of the Republic of Iraq and a department of the Ministry of Transport, organized and existing under the laws of Iraq, with its address at Malik bin Dinar Street, Ma'qil Quarter, Basrah, Iraq.

7.    Respondent Ministry of Transport of the Republic of Iraq is an integral part and political subdivision of the Republic of Iraq, with its headquarters at Omar Bin Al Khatab Street and Bur Said Street, Baghdad, Iraq.

8.    Respondent Republic of Iraq is a foreign sovereign and may be served through its Minister of Foreign Affairs at the Ministry of Foreign Affairs, Al-Salhiya, Fadhil Al-Jimali Street, Baghdad, Iraq.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this petition to recognize and enforce a foreign arbitral award against a foreign sovereign pursuant to 28 U.S.C. § 1330(a), 28 U.S.C. § 1331, and 9 U.S.C. § 203.

10.     Respondents are not entitled to sovereign immunity because this is an action to recognize and enforce an arbitral award governed by the New York Convention, a treaty providing for the recognition and enforcement of arbitral awards to which the United States is a party.  Accordingly, this matter falls within the Foreign Sovereign Immunities Act's exception for arbitral enforcement, 28 U.S.C. § 1605(a)(6).

11.     Respondents also are not entitled to sovereign immunity because they impliedly waived their immunity by agreeing to arbitrate this dispute with Archirodon.  Accordingly, this matter falls within the Foreign Sovereign Immunities Act's waiver exception, 28 U.S.C. § 1605(a)(1).

12.     This Court has personal jurisdiction over respondents pursuant to 28 U.S.C. § 1330(b) because respondents are foreign states within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(a); respondents are not entitled to immunity for the reasons set forth above; and respondents will be duly served as set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a) and (b).

13.     Venue is proper in this district under 28 U.S.C. § 1391(f)(4); 28 U.S.C. § 1391(b)(3); and 9 U.S.C. § 204.

## STATEMENT OF FACTS

### *The Construction Contract*

14.     This dispute arises out of a November 22, 2012 Contract between Archirodon and the General Company for Ports of Iraq.  Shebl Decl. Ex. B.  In that Contract, Archirodon agreed

to design and construct a staging pier and breakwater for the Al Faw Grand Port in Iraq. Upon completion, the Al Faw Grand Port will be the largest port in the Middle East and one of the largest worldwide. The breakwater alone, at over 14 kilometers, is recognized by *Guinness World Records* as the longest breakwater anywhere in the world.

15. The Contract incorporates by reference the International Federation of Consulting Engineers' *Conditions of Contract for Plant and Design-Build* (1st ed. 1999), also known as the "FIDIC Yellow Book" and referred to in the Contract as the "General Conditions." Contract art. 2. Relevant excerpts of the General Conditions are attached as Exhibit C to the Shebl Declaration. The Contract also incorporates "Special (Particular) Conditions" that modify or replace certain General Conditions and are included in Exhibit B to the Shebl Declaration.

16. In the Contract, Archirodon agreed to complete design and construction of the staging pier and breakwater within eighteen months from the commencement date. Contract art. 3. GCPI agreed to pay Archirodon a lump sum of €204,166,506.38. *Id.* art. 4.

17. The Contract specified various circumstances in which Archirodon could recover additional costs as well as an extension of time to complete the project. General Conditions §8.4. Under Section 13.7 of the General Conditions, for example, Archirodon could recover additional costs and an extension of time for any "change in the Laws of the Country . . . or in the judicial or official governmental interpretation of such Laws . . . which affect the Contractor in the performance of obligations under the Contract." *Id.* §13.7. Under Section 4.12, Archirodon could recover costs and an extension if it "encounters physical conditions which are Unforeseeable," defined as any conditions "not reasonably foreseeable by an experienced contractor by the date for submission of the Tender." *Id.* §§1.1.6.8, 4.12. Under Section 1.9, Archirodon could recover costs and an extension for any "error in [GCPI's] Requirements" that

"an experienced contractor exercising due care would not have discovered." *Id.* § 1.9.  And under Section 19, Archirodon could recover costs and an extension for certain "Force Majeure" events.  *Id.* § 19.4.

18.    The Contract appointed an "Engineer," Technital S.p.A. ("Technital"), to oversee the project on behalf of GCPI.  Special Conditions § 1.1.2.4; General Conditions § 3.1.

19.    Clause 20 of the Special Conditions contains an arbitration agreement submitting any disputes to the International Chamber of Commerce:

> If an amicable settlement is not reached within 30 (thirty) days from the date the dispute was referred to the Parties' senior executives, then the dispute shall be finally settled by Arbitration as stated in Article 11 (Mechanism for resolving disputes after signing the contract) of the "Instructions of governmental contracts implementation no. (1)/2008."  The Arbitration shall be conducted under the Rules of the International Chamber of Commerce and the venue shall be Genève.

Special Conditions § 20.

20.    The Contract was signed for on behalf of GCPI by "Hadi Al Ameri, Minister of Transportation."  Contract at 2.

### *The Construction Delays*

21.    Archirodon faced a number of unforeseen obstacles in carrying out the construction of the staging pier and breakwater.

22.    ***First***, Archirodon encountered unexpected problems with the primary access road to the construction site.   On October 6, 2013, Technital wrote to Archirodon "strongly advis[ing]" Archirodon "not to use the Basra – Al Faw Main Road for trucks and heavy vehicles coming to [the] site."  Partial Final Award ¶ 47 (emphasis omitted).  Technital explained that the "local population" was not pleased with Archirodon's use of the road and that "the situation may escalate and protests on the road (leading to blockages) . . . may occur."  *Id.*   Archirodon

complied but noted that there were significant problems with alternative access routes:  The conditions of the other roads were not good, and checkpoints caused significant delays.  *Id.* ¶ 48.

23.    ***Second***, Archirodon encountered unexpected conditions with the soil underneath the construction site.  GCPI's tender for the project included technical information about the expected settlement of the soil at the site and the volume of construction material that would be necessary as a result.  Partial Final Award ¶ 58.  Once Archirodon built a trial embankment, however, it discovered that the soil conditions differed from what was in the tender.  *Id.* ¶ 59.  The soil settlement rates were "significantly faster than expected," resulting in "significant bulging phenomena observed during the embankment construction."  *Id.*  Technital then conducted its own analysis and "similarly concluded that the soil conditions were different from those anticipated in the tender information."  *Id.* ¶ 60.

24.    ***Finally***, from late 2013 to 2014, the Islamic State of Iraq and Syria ("ISIS") began a major offensive against the Iraqi government and made rapid territorial gains.  Partial Final Award ¶ 72.  Foreign countries from which Archirodon recruited its workforce discouraged or even prohibited their nationals from travelling to Iraq.  *Id.* ¶ 73.

25.    Archirodon sought extensions of time and reimbursement of additional costs for each of those delays.  In each instance, Technital denied the requests.  Partial Final Award ¶¶ 54-57, 69-71, 79.  When Archirodon then failed to complete construction by the deadline, GCPI imposed contractual penalties known as "Delay Damages" that reduced the overall contract price by 10%, or €20,416,650.60.  *Id.* ¶¶ 80-84.

*The Arbitration*

26.     On March 24, 2016, after the parties failed to resolve the dispute informally, Archirodon submitted a request for arbitration to the International Court of Arbitration of the International Chamber of Commerce.  Partial Final Award ¶ 7.

27.     Archirodon and GCPI each nominated an arbitrator to the tribunal.  Partial Final Award ¶ 23.  Those two arbitrators then agreed upon a third arbitrator to serve as president of the tribunal.  *Id.* ¶ 27.

28.     Over the following two years, the parties made dozens of written submissions spanning hundreds of pages.  Final Award app. 5 ¶¶ 1-117.  The parties served document requests, and the tribunal ruled on discovery disputes.  *Id.* ¶¶ 52-69.  The tribunal then held a two-week merits hearing in July 2018.  *Id.* ¶ 118.  It heard testimony from five fact witnesses and seven expert witnesses.  *Id.*  GCPI, for its part, presented two fact witnesses as well as four expert witnesses: two technical experts, a delay expert, and a damages expert.  *Id.*  The parties then made numerous post-hearing written submissions as well.  *Id.* ¶¶ 125-151.

29.     At no point did GCPI challenge the arbitral tribunal's jurisdiction to determine the dispute or the validity of the arbitration clause in the Contract's Special Conditions.  *See, e.g.*, Final Award app. 5 ¶¶ 5-6 (no jurisdictional objection in response to request for arbitration).

*The Awards*

30.     On June 4, 2019, the tribunal issued a unanimous 246-page Partial Final Award resolving the principal liability and damages issues in the case.

31.     The tribunal first rejected Archirodon's claim for damages and an extension of time based on Technital's instruction not to use the primary access road.  The tribunal agreed with Archirodon that the instruction amounted to a "Change in the Laws" within the meaning of

Section 13.7 because, even though it was not a formal order, the government expected Archirodon to comply.  Partial Final Award ¶¶ 243-251.  Nonetheless, the tribunal held that the instruction did not "affect[ ] the Contractor in the performance of [its] obligations" because there were other possible routes to the site – for example, Archirodon could have shipped construction materials by boat.  *Id.* ¶¶ 252-262.  The tribunal rejected various other challenges to the road access instruction as well.  *Id.* ¶¶ 263-287.

32.    With respect to the soil conditions, the tribunal agreed with Archirodon that the conditions were "Unforeseeable" within the meaning of Section 4.12.  After analyzing the expert testimony at length, the tribunal concluded that "an experienced contractor, at the date of tender, . . . would not have foreseen that the soil" was in the condition it was in.  Partial Final Award ¶¶ 500-508.  The tribunal also rejected GCPI's argument that Archirodon should have done more of its own testing, concluding that Archirodon's "preparation of the detailed design was carried out in a competent manner, in compliance with recognized standards of good practice and in compliance with the Claimant's obligations under the Contract."  *Id.* ¶¶ 509-537.  By contrast, the tribunal held that the unexpected soil conditions did not constitute an "error" in the tender materials under Section 1.9, nor did they give rise to a claim under Iraqi law.  *Id.* ¶¶ 588-616.

33.    Turning to damages, the tribunal awarded Archirodon $57,491,157 for the cost of additional construction material required as a result of the unforeseeable soil conditions, about 24% less than the $75.3 million Archirodon sought.  Partial Final Award ¶¶ 617-684.  The tribunal also awarded $12,884,996 for costs incurred as a result of collapses resulting from the soil conditions – again, less than Archirodon sought.  *Id.* ¶¶ 685-691.  The tribunal rejected two other categories of damages.  *Id.* ¶¶ 692-702.  And it concluded that Archirodon was entitled to a 726-day extension of time.  *Id.* ¶ 755.

34.     The tribunal rejected Archirodon's claim that ISIS's attacks in Iraq were a "Force Majeure" under Section 19.  The tribunal found that Archirodon was able to take, and did take, prudent steps to mitigate the threat to its workforce.  Partial Final Award ¶¶ 827-832.

35.     The tribunal rejected Archirodon's claim for a declaration that it finished construction within a reasonable time.  Because the tribunal had awarded only a 726-day extension, whereas the overall delay was about 1,095 days, the project was still late.  Partial Final Award ¶¶ 834-836.  For similar reasons, the tribunal refused to order a refund of the €20.4 million GCPI had withheld as Delay Damages.  *Id.* ¶¶ 837-839.  On the other hand, the tribunal awarded $21,563,154 in "prolongation" costs – additional overhead Archirodon incurred during the 726-day extension.  *Id.* ¶¶ 840-856.  The tribunal also awarded $45,993.62 plus €410,991.80 for expenses related to a letter of credit that GCPI had improperly deducted from its payments to Archirodon.  *Id.* ¶¶ 897-903.

36.     In summary, the tribunal awarded (1) $57,491,157 for additional quantities of construction materials necessitated by the soil conditions; (2) $12,884,996 for collapses related to the soil conditions; (3) $21,563,154 for prolongation costs; and (4) $45,993.62 plus €410,991.80 for the letter of credit.  Partial Final Award ¶¶ 931-934.

37.     On November 25, 2019, the tribunal issued its Final Award.  The Final Award incorporated and attached the Partial Final Award in its entirety.  It also attached an "Addendum" to the Partial Final Award that made minor computational corrections.

38.     In the Final Award, the tribunal held that Archirodon was not entitled to pre-award interest, having raised that claim too late.  Final Award ¶¶ 14-22.  The tribunal held that Archirodon was entitled to recover $6,725,565.74 in attorney's fees and expenses from GCPI, approximately half of what it sought.  *Id.* ¶¶ 23-31.8, 32.1.  The tribunal also ordered GCPI to

pay Archirodon $765,000 to reimburse Archirodon for its share of the tribunal's fees and expenses. *Id.* ¶¶31.11, 32.2.

39.     Finally, at the parties' request, the tribunal converted the U.S. dollar damages in the Partial Final Award (as corrected in the Addendum) into euros for the Final Award.  The resulting amounts were (1) €51,801,339.03 for additional materials; (2) €11,513,564.91 for collapses; (3) €19,177,475.99 for prolongation; and (4) €40,905.03 for the U.S. dollar portion of the letters of credit.  Final Award ¶31.9. Combined with the €410,991.80 for letters of credit damages already denominated in euros (Partial Final Award ¶941.4), the total damages in the Final Award were €82,944,276.76, in addition to the $7,490,565.74 in costs and expenses.

## GROUNDS FOR ENFORCING THE AWARD

### *The New York Convention*

40.     The New York Convention is an international treaty signed by over 150 countries that is designed to facilitate and expedite the recognition and enforcement of foreign arbitral awards.  *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517.  To that end, the Convention requires that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles."  *Id.* art. III, 21 U.S.T. at 2519.  The United States is a party to the New York Convention and is bound by its terms.  *See New York Arbitration Convention: Contracting States*, http://www.newyorkconvention.org/countries.   Switzerland and Iraq are likewise both parties to the Convention.  *Id.*

41.     The New York Convention's goal is "to encourage the recognition and enforcement of commercial arbitration agreements."  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).  That objective is consistent with the "emphatic federal policy in favor of

arbitral dispute resolution" – a policy that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).  In light of that strong pro-arbitration policy, confirmation proceedings are a "summary procedure." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007). "[T]he showing required to avoid summary confirmation is high" and "rests with the party resisting confirmation." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).

42.    The United States implemented the New York Convention through Chapter 2 of the Federal Arbitration Act.  That statute provides that "[t]he Convention . . . shall be enforced in United States courts in accordance with this chapter."  9 U.S.C. § 201.  It specifies:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.  The ***court shall confirm the award*** unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207 (emphasis added).    Confirmation is thus ***mandatory*** unless one of the Convention's narrow grounds for non-enforcement applies:  "[W]hen an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio*, 487 F.3d at 935.

### *Recognition and Enforcement Against GCPI*

43.    The Final Award falls within the scope of the New York Convention.  Under the Federal Arbitration Act, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention" unless it arises out of a "relationship which is entirely between citizens of the United States."

9 U.S.C. § 202. Those requirements are met. The Final Award arises out of a commercial construction contract, and no party is a citizen of the United States.

44.     Article IV of the Convention requires a party seeking recognition and enforcement of an award to submit "[t]he duly authenticated original award or a duly certified copy thereof" as well as "[t]he original [arbitration] agreement . . . or a duly certified copy thereof." 21 U.S.T. at 2519-20. Archirodon has submitted those documents. Shebl Decl. Exs. A, B.

45.     No ground for denial of recognition exists. "[T]he Convention is 'clear' that a court 'may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012). None of those grounds applies here.

46.     Article V.1(a) permits non-enforcement where one of the parties to the arbitration agreement was "under some incapacity" or where the agreement was "not valid under the law to which the parties have subjected it." 21 U.S.T. at 2520. That provision does not apply here. GCPI has never contended that it was under some incapacity when it entered into the arbitration agreement in the Contract's Special Conditions, it never challenged the validity or enforceability of that agreement, and it never disputed the tribunal's jurisdiction on any other ground. Indeed, far from contesting the tribunal's authority, GCPI at one point proposed to assert counterclaims in the arbitration. Final Award app. 5 ¶¶ 5-6.

47.     Article V.1(b) of the Convention permits non-enforcement where the party "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case." 21 U.S.T. at 2520. That provision does not apply either. GCPI participated vigorously in the arbitration for over two years, filing hundreds of pages of briefing and participating in a two-week merits hearing at which it presented multiple

fact and expert witnesses.  Final Award app. 5 ¶¶ 1-151.  GCPI never claimed that it lacked notice or an adequate opportunity to respond to Archirodon's claims in the arbitration.

48.    Article V.1(c) permits non-enforcement where the Award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration" or "contains decisions on matters beyond the scope of the submission to arbitration."  21 U.S.T. at 2520.  That provision does not apply.  The Contract's arbitration clause covers "all disputes or claims arising out of or in connection with this Contract."  Special Conditions § 20.  That broad language clearly encompasses this dispute.  GCPI never claimed otherwise.

49.    Article V.1(d) permits non-enforcement where "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties."  21 U.S.T. at 2520.  That did not happen here either.  The Contract specified that "[t]he Arbitration shall be conducted under the Rules of the International Chamber of Commerce."  Special Conditions § 20.  Those are precisely the rules the tribunal applied.  Partial Final Award ¶ 37 ("The arbitration is . . . conducted in accordance with the 2012 ICC Arbitration Rules.").

50.    Article V.1(e) permits non-enforcement where "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  21 U.S.T. at 2520.  The Award here is final and binding and has not been set aside by the Swiss courts.

51.    Article V.2(a) requires non-enforcement where "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of th[e] country" where enforcement is sought.  21 U.S.T. at 2520.  This dispute clearly would have been arbitrable under United States law.  *See* 9 U.S.C. § 2.

52.     Finally, Article V.2(b) requires non-enforcement where "recognition or enforcement of the award would be contrary to . . . public policy." 21 U.S.T. at 2520. That exception is "construed narrowly" and "applie[s] only where enforcement would violate the United States' most basic notions of morality and justice." *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 (D.C. Cir. 2017) (alteration omitted). No such circumstance is present here.

53.     The Court should therefore recognize and enforce the Final Award in its entirety against GCPI.

### Recognition and Enforcement Against the Ministry of Transport

54.     The Court should further recognize and enforce the Final Award against the Ministry of Transport. GCPI acted as the Ministry of Transport's agent in the construction project and dispute. The Ministry is therefore jointly and severally liable for the Final Award.

55.     Agency is a well-accepted basis for holding a non-party liable for an award. *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995) ("Traditional principles of agency law may bind a [third party] to an arbitration agreement."); *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 97, 100-03 (D.D.C. 2012) (similar); *see also GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1648 (2020) (holding that New York Convention does not preempt domestic third-party enforcement principles).

56.     "[A] sovereign need not exercise complete dominion over an instrumentality . . . in order to establish a relationship of principal and agent." *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000). Rather, an agency relationship exists where "the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the

subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *Id.* (citing *Restatement (Second) of Agency* § 1 (1958)); *see, e.g.*, *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 301-02 (D.C. Cir. 2005) (holding that Ukraine's State Property Fund was an agent of the State of Ukraine); *Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic*, No. 18-cv-2228, 2020 WL 1935554, at *3-9 (D.D.C. Apr. 22, 2020) (holding that Kyrgyzstan's Ministry of Transportation was an agent of the Kyrgyz Republic).

57.    All those conditions are present here.  The Ministry directly controlled the construction project throughout the process, from the initial tender through the discussions over the disputed claims.  Indeed, the Minister of Transportation signed the Contract himself.

58.    The Ministry's role was clear from the outset.  The official tender announcement stated that "[t]he **Iraqi Ministry of Transport** / General Company for Ports of Iraq (GCPI), announces the tender for the construction Contract of a port infrastructure."  Shebl Decl. Ex. D at 1 (emphasis added).  It explained that the "Ministry of transport has nominated the fully owned organisation General Company for Ports of Iraq (GCPI) to act as **implementing agency** for the tender procedure and for the implementation of the project."  *Id.* (emphasis added).  The project would be "financed by the 2012 National Budget of the Republic of Iraq."  *Id.*

59.    The Ministry reviewed and approved the construction contract itself.   The Contract was signed for on behalf of the Contracting Authority by "Hadi Al Ameri, Minister of Transportation."  Contract at 2.

60.    As the construction project proceeded, GCPI looked to the Ministry for even basic administrative steps.  On January 20, 2013, for example, GCPI wrote to the Ministry of Transport

to facilitate Archirodon's company registration in Iraq, asking it to "[p]lease approve this request from the Company to allow them to complete the required procedure which is necessary for working in Iraq."  Shebl Decl. Ex. E.

61.    When the parties met on October 15, 2015, to discuss Archirodon's request for an extension of time and reimbursement for additional costs, Ministry officials took the lead in responding.    Minutes describe that meeting as a "Meeting between ***Employer (Ministry of Transport)***, Contractor (Archirodon Construction (Overseas) S.A.) and Engineer (Technital): To discuss the Request for an Extension of Time of the Contractor for the Eastern Breakwater." Shebl Decl. Ex. F at 1 (emphasis added).  They reflect that the meeting took place at the "Offices of the Minister of Transport, Baghdad, Iraq."  *Id.*  They list as attendees "His Excellency, the Minister of Transport and representatives of the Ministry of Transport and GCPI."  *Id.*  And they show that the Minister himself led the discussion.  *See, e.g.*, *id.* ("His Excellency, the Minister of Transport of Iraq, welcomed everyone to the meeting to discuss the important issues in question."). When the parties met again two weeks later on October 27 to 29, 2015, ***seven*** different representatives from the Ministry attended, and only four from GCPI.  Shebl Decl. Ex. G at 3.

62.    After Archirodon wrote to GCPI on November 4, 2015 to request a further meeting, GCPI responded on November 18, citing the need for the Ministry's participation as a reason for delay:   "[Y]ou should consider that, contrary to your Organization, ***Ministry of Transportation and GCPI are State Organization[s]***, and the appointing of a ***senior executive empowered to bind our party*** to the decision taken during a meeting may take more than 15 days."   Shebl Decl. Ex. H at 1-2 (emphasis added).   The next week, Technital wrote with "confirmation of the appointed Executives to represent the ***Ministry of Transport*** to meet with Archirodon to attempt to reach an amicable settlement."  Shebl Decl. Ex. I at 1 (emphasis added);

*see also* Shebl Decl. Ex. J at 1 (confirming that "*His Excellency, the Minister of Transport*, has now formally appointed the persons delegated to meet with Archirodon's Senior Executive" (emphasis added)).  GCPI similarly wrote: "*[T]he Ministry of transportation* confirms that it has appointed the following Senior Executives to meet with the Contractor . . . .  The General Inspector of the Ministry, DG Planning Department, DG Legal Department, DG Technical Office and DG Contracts Department." Shebl Decl. Ex. K at 1 (emphasis added).

63.     That meeting then took place on December 10, 2015.  The minutes once again describe the meeting as a "Meeting between *Employer (Ministry of Transport)* and Archirodon Construction: To discuss the Request for an Extension of Time of the Contractor for the Eastern Breakwater" and state that the meeting took place at the "Offices of the Ministry of Transport, Baghdad, Iraq."  Shebl Decl. Ex. L at 1 (emphasis added).  The meeting was once again attended by "Representatives/Appointees of the *Ministry of Transport* and General Company for the Ports of Iraq."  *Id.* (emphasis added).

64.     GCPI confirmed the participation of Ministry officials during the arbitration.  One of its representatives testified:  "[Y]ou can see from the attendees that [the December 10, 2015 meeting] is a high committee from Ministry of Transportation.  Of course the meeting of October was attended by the Minister as well.  And then he decided to have a next meeting.  And this meeting was attended by the Deputy Minister and so many of [the] DGs from Ministry of Transportation, that reflected *the seriousness of the Ministry to find a solution at that time*."  Shebl Decl. Ex. M at 47:8-14 (July 19, 2018 hearing transcript) (emphasis added); *see also* Partial Final Award ¶¶ 421, 423 (noting Ministry participation).

65.     Those circumstances make clear that the Ministry of Transport oversaw and managed the construction project throughout the process and that GCPI was merely acting on its

behalf.  The Ministry determined the project specifications for the tender, signed the construction contract, approved decisions during construction, and participated directly and repeatedly in discussions over Archirodon's claims.  By the Ministry's own account, GCPI was merely its "implementing agency" for the project.  Shebl Decl. Ex. D at 1.  GCPI acknowledged and embraced that oversight – indeed, it told Archirodon that senior Ministry officials would need to participate in any discussions to "bind our party" and used that requirement as an excuse for delay.  Shebl Decl. Ex. H at 1-2.  The Ministry's direct oversight and control goes well beyond merely voting GCPI's stock or appointing its officers and directors.

66.    GCPI accordingly acted as an agent of the Ministry of Transport in the construction project.  The Ministry is therefore jointly and severally liable for the Final Award.

### *Recognition and Enforcement Against the Republic of Iraq*

67.    The Court should similarly recognize and enforce the Final Award against the Republic of Iraq itself.  The Ministry of Transport is an integral component of the Republic's government that performs core sovereign and regulatory functions.  It is an inseparable part of the Republic itself, not a mere agency or instrumentality.  Accordingly, the Republic is jointly and severally liable for the Final Award as well.

68.    Iraq's Constitution recognizes the Ministry of Transport's fundamentally governmental role.  Under Article 76, the Minister of Transportation is a political appointee selected by the Prime Minister.  Article 80 provides that the Minister and other members of the Council of Ministers shall "plan and execute the general policy and general plans of the State and oversee the work of the ministries and departments."  A translation of excerpts from Iraq's Constitution is attached as Exhibit A to the accompanying Declaration of Robert K. Kry.

69.    Iraqi statutory law is to the same effect.  Under Paragraph 2, Article 1, of Iraq's Law of Executive Authority (Law No. 50 of 1964), "each Ministry of the Ministries has a legal personality to exercise the rights stipulated in the Civil Code and other Laws and *each of them shall be regarded as the meaning of the word 'Government.'*"  (Emphasis added.)  A translation is attached as Exhibit B to the Kry Declaration.

70.    Other U.S. courts have concluded that similar Iraqi ministries are inseparable components of the Iraqi government.  For example, in *Wye Oak Technology, Inc. v. Republic of Iraq*, No. 1:10-CV-01182, 2019 WL 4044046 (D.D.C. Aug. 27, 2019), *vacated on other grounds*, 24 F.4th 686 (D.C. Cir. 2022), the court held that Iraq's Ministry of Defense was "an integral component of the national government itself," and that "no meaningful distinction can be drawn between [the Ministry of Defense] and Iraq."  *Id.* at *20.

71.    Similarly, in *Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22 (2d Cir. 2011), the Second Circuit held that Iraq's Ministry of Industry was an integral component of the Republic. The Ministry was "a political organ of the state," and "no meaningful legal distinction" could be drawn between the Ministry and the Republic.  *Id.* at 24.  The Ministry performed "a regulatory function" that was "quintessentially governmental."  *Id.* at 25.

72.    For the same reasons, Iraq's Ministry of Transport is an integral component of the Republic of Iraq.  The Republic is therefore also jointly and severally liable for the Final Award.

### *Post-Award Interest and Foreign Currency Conversion*

73.    The Final Award does not provide for post-award interest:  The tribunal ruled that Iraqi law did not permit it to award such interest prospectively, but did not decide whether post-award interest would be recoverable in a subsequent proceeding.  Partial Final Award ¶¶928-930.  Where an award is silent on post-award interest, courts normally grant such interest.  *See*

*Cont'l Transfer Tech. Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 163-64 (D.D.C. 2013) (interest "should normally be awarded when damages have been liquidated by an international arbitral award"), *aff'd*, 603 F. App'x 1 (D.C. Cir. 2015); *Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. 90-0169, 1992 WL 122712, at *8 (D.D.C. May 29, 1992) ("Courts have consistently allowed prejudgment interest in actions brought to confirm arbitral awards."); *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*, 737 F.2d 150, 153-54 (2d Cir. 1984) (similar).

74.    This Court has discretion over what interest rate to use.  *See Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996); *Cont'l Transfer Tech. Ltd. v. Fed. Gov't of Nigeria*, 603 F. App'x 1, 5 (D.C. Cir. 2015).  The Court should award interest at the U.S. prime rate.  *See Cont'l Transfer*, 932 F. Supp. 2d at 165 (noting "preference . . . for the use of the prime rate rather than the statutory postjudgment interest rate"); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 43 (D.D.C. 2013) (applying prime rate), *aff'd*, 794 F.3d 99 (D.C. Cir. 2015).  Interest should be calculated on a compound rather than simple basis.  *See Cont'l Transfer*, 932 F. Supp. 2d at 166 n.7 (compounding is "standard practice").

75.    While the costs portion of the Final Award is denominated in U.S. dollars, the damages portion is denominated in euros.  Final Award ¶31.9; Partial Final Award ¶941.4. Where an award is denominated in a foreign currency, courts ordinarily convert the amount to U.S. dollars at the exchange rate prevailing on the date of judgment.  *See Cont'l Transfer*, 932 F. Supp. 2d at 158 (conversion of foreign currency award into U.S. dollars at judgment "is the norm, rather than the exception").

76.    A claim calculation as of June 3, 2022 is attached as Exhibit C to the Kry Declaration.  Support for the interest rates and exchange rate are attached as Exhibits D and E.

In the event the Court grants this petition, petitioner will submit an updated claim calculation and proposed form of judgment.

### PRAYER FOR RELIEF

77.    WHEREFORE, petitioner respectfully requests an order:

a.  granting this petition;

b.  recognizing and enforcing the Final Award, including the Partial Final Award, in its entirety against respondents General Company for Ports of Iraq, the Ministry of Transport of the Republic of Iraq, and the Republic of Iraq;

c.  directing that judgment be entered thereon in favor of Archirodon Construction (Overseas) Company Limited and against respondents General Company for Ports of Iraq, the Ministry of Transport of the Republic of Iraq, and the Republic of Iraq in the amount of EUR €82,944,276.76 plus USD $7,490,565.74, as well as post-award interest on both amounts as set forth above or as otherwise provided by law, converted to U.S. dollars on the date of judgment, all such amounts comprising USD $105,183,722.05 as of June 3, 2022;

d.  awarding such other fees, costs, and interest as may be recoverable in this proceeding, including post-judgment interest as provided by law; and

e.  granting such other and further relief that the Court deems just and proper.

Dated:    June 3, 2022                         Respectfully submitted,
          Washington, D.C.


                                               ␣/s/ Robert K. Kry␣␣␣␣␣␣␣␣␣␣␣␣␣
Alexandra C. Eynon                             Robert K. Kry
*(pro hac vice motion forthcoming)*            D.C. Bar # 490545
MOLO LAMKEN LLP                                MOLO LAMKEN LLP
430 Park Avenue, 6th Floor                     The Watergate, Suite 500
New York, New York  10022                      600 New Hampshire Avenue, N.W.
                                               Washington, D.C.  20037
                                               (202) 556-2011
                                               rkry@mololamken.com

                      *Attorneys for Petitioner*