# EXHIBIT A

# SAVILLE & CO.

——— SCRIVENER NOTARIES ———

Saville Notaries LLP   11 Old Jewry   London EC2R 8DU
Tel: +44 (0)20 7776 9800   www.savillenotaries.com   mail@savillenotaries.com

Sophie Milburn   Nicholas Thompson   Robert Kerss   Andrew MacNab   Christopher Higgins*

Eleonora Ceolin*   Kyriaki Manika*   Katia Fallow

TO ALL TO WHOM THESE PRESENTS SHALL COME, I ROBERT SCOTT KERSS of the City of London NOTARY PUBLIC by royal authority duly admitted and sworn DO HEREBY CERTIFY that the photographic copy hereunto annexed is a true copy of the original **ICC international court of arbitration final award** in the matter of an **arbitration** between **ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED** and **GENERAL COMPANY FOR PORTS OF IRAQ**, I having carefully collated and compared the said copy with the said original and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London, England, this twenty ninth day of September two thousand and twenty one.





Saville & Co. Scrivener Notaries is the trading name of Saville Notaries LLP, a limited liability partnership registered in England and Wales with registered number OC420687 and with registered office at 11 Old Jewry, London EC2R 8DU

Regulated through the Faculty Office of the Archbishop of Canterbury

*General Notary



| APOSTILLE | |
|---|---|
| (Convention de La Haye du 5 octobre 1961) | |
| **1.** **Country:** <br> Pays / Pais: | United Kingdom of Great Britain and Northern Ireland |
| **This public document** <br> Le présent acte public / El presente documento público | |
| **2.** **Has been signed by** <br> a été signé par <br> ha sido firmado por | Robert Scott Kerss |
| **3.** **Acting in the capacity of** <br> agissant en qualité de <br> quien actúa en calidad de | Notary Public |
| **4.** **Bears the seal / stamp of** <br> est revêtu du sceau / timbre de <br> y está revestido del sello / timbre de | The Said Notary Public |
| **Certified** <br> Attesté / Certificado | |
| **5.** **at** London | **6.** **the** 30 September 2021 |
| á / en | le / el día |
| **7.** **by** Her Majesty's Principal Secretary of State for | |
| par / por Foreign, Commonwealth and Development Affairs | |
| **8.** **Number** <br> sous no / bajo el numero | APO-2620842 |
| **9.** **Seal / stamp** <br> Sceau / timbre <br> Sello / timbre | **10.** **Signature** A. Khan <br> Signature <br> Firma |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country

**To verify this apostille go to www.verifyapostille.service.gov.uk**



**INTERNATIONAL COURT OF ARBITRATION®** | **INTERNATIONAL CENTRE FOR ADR** | LEADING DISPUTE RESOLUTION WORLDWIDE

# AWARD

**INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**INTERNATIONAL COURT OF ARBITRATION**

33-43 avenue du Président Wilson, 75116 Paris, France
**T** +33 (0)1 49 53 29 05  **F** +33 (0)1 49 53 29 33
**E** arb@iccwbo.org   www.iccarbitration.org

# ICC INTERNATIONAL COURT OF ARBITRATION

### CASE No. 21785/ZF/AYZ

ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED (formerly known as Archirodon Construction (Overseas) Company S.A. (Panama))

(Cyprus)

**vs/**

GENERAL COMPANY FOR PORTS OF IRAQ

(Iraq)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE NO. 21785/ZF/AYZ

### ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED (CYPRUS) (FORMERLY KNOWN AS

### ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY S.A. (PANAMA))

<u>Claimant</u>

v.

### GENERAL COMPANY FOR PORTS OF IRAQ (IRAQ)

<u>Respondent</u>

**FINAL AWARD**



**TRIBUNAL**

Mr Andrew White, Q.C.

Avv. Professor Luigi Fumagalli

Dr Robert Gaitskell, Q.C. (President)

Adnan Alwi Nash

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

## I.    THE FINAL AWARD, THE PARTIES AND THE ARBITRAL TRIBUNAL

### Introduction

This Final Award is a consolidated document. Its structure is intended to satisfy Article 270 of the Iraqi Civil Procedure Law (Claimant's email of 14 October 2019), which provides as follows:

> "1.    *In accordance with this law and after collective discussion among themselves, arbitrators issue their award in writing, either unanimously or by majority. The drafting of the said decision shall be similar to that of any issued written court judgment.*
>
> 2.    *The decision shall particularly include a summary of arbitration award, statements and documents of litigants, text and reason of the decision, place and date of issue and the signatures of arbitrators".*

The Claimant has requested by its email of 25 October 2019 that, for reasons of enforceability in Iraq, since this Final Award will have appended to it, in order to satisfy Article 270, both the Partial Final Award (PFA) dated 4 June 2019, and the Addendum to the Partial Final Award, dated on the same date as this Final Award, this Final Award must refer to, and incorporate by reference, the Partial Final Award and the Addendum by the inclusion of the following words, which the Tribunal now does: "*attached to this Final Award, and fully included herein by reference, are the Partial Final Award, covering all issues except interest and costs, and the Addendum to the Partial Final Award; also included herein by reference, which corrects certain figures in the Partial Final Award*".

All matters other than claims for pre-award interest and costs are dealt with in the Partial Final Award and the Addendum thereto and so those remaining issues are now addressed below. Note that physically attached hereto as an appendix is the PFA and it contains a table of contents and a full procedural history, and sets out the relevant arbitral clause, and the Parties' respective requests for relief. Subsequent procedural steps are set out in section II of this Final Award. Also note that the particular  relief sought by the Claimant, the overall successful party, who makes a certain costs recovery below, is set out in paragraph 28 below. Further, note that although the Respondent considers that the signing procedure requested by the Claimant is unnecessary it does not object.

Seen exclusively for the legalization of
the signatures of Mr Luigi FUMAGALLI,
Mr Robert GAITSKELL and Mr Andrew
WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas
2    Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

**The Claimant**

1.    The Claimant, Archirodon Construction (Overseas) Company Limited (formerly known as Archirodon Construction (Overseas) Company S.A., Panama) ("Archirodon"), is a company organised and existing under the laws of Cyprus, having its registered office at: Spyrou Kyprianou 38 – 4154, Limassol, Cyprus. Herein the Claimant is also variously termed Archirodon and the Contractor.

2.    Archirodon is represented in these proceedings by:

Mr Ellis Baker
Ms Sam Kay
Ms Therese Marie Rodgers
Mr Karim Mariey
Address:        White & Case LLP
                5 Old Broad Street
                London
                EC2N 1DW
                United Kingdom
Telephone:      +44 20 7532 1000
Facsimile:      +44 20 7532 1001
Email:          ebaker@whitecase.com
                sam.kay@whitecase.com
                therese.marie.rodgers@whitecase.com
                karim.mariey@whitecase.com
                ICC-21785@whitecase.com

Mr Julian Bailey
Address:        White & Case LLP
                Alfardan Office Tower, 7th Floor
                P.O. Box 22027
                West Bay
                Doha, Qatar
Telephone:      +974 440 64300
Facsimile:      +974 440 64399
Email:          julian.bailey@whitecase.com

Mr Michael Turrini
Mr Luka Kristovic Blazevic
Address:        White & Case LLP
                Level 6, Burj Daman
                Al Sa'ada Street
                Dubai International Financial Centre
                P.O. Box 9705
                Dubai

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

| | United Arab Emirates |
|---|---|
| Telephone: | +971 4 381 6200 |
| Facsimile: | +971 4 381 6299 |
| Email: | michael.turrini@whitecase.com |
| | lkristovicblazevic@whitecase.com |

## The Respondent

3.    The Respondent, General Company for Ports of Iraq ("GCPI" and also referred to herein as the "Respondent"), is a government department of the Ministry of Transport in the Republic of Iraq organised and existing under the laws of Iraq. GCPI's address is: Ma'qil Quarter, Basrah, Iraq.

4.    GCPI is represented in these proceedings by:

Mr Michael E. Schneider
Dr Veijo Heiskanen
Mr Joachim Knoll
Ms China Irwin
Ms Juliette Richard
Ms Tessa Hayes

| Address: | Lalive |
|---|---|
| | 35, rue de la Mairie |
| | P.O. Box 6569 |
| | 1211 Geneva 6 |
| | Switzerland |
| Telephone: | +41 58 105 2000 |
| Facsimile: | +41 58 105 2160 |
| Email: | meschneider@lalive.ch |
| | vheiskanen@lalive.ch |
| | jknoll@lalive.ch |
| | cirwin@lalive.ch |
| | jrichard@lalive.ch |
| | thayes@lalive.ch |

## The Arbitral Tribunal

5.    The Arbitral Tribunal is constituted as follows:

5.1    Dr Robert Gaitskell, QC (President, nominated by Co-Arbitrators)

| Address: | Keating Chambers |
|---|---|
| | 15 Essex Street |
| | London |

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell** QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

WC2R 3AA
United Kingdom

| | |
|---|---|
| Telephone: | +44 20 7544 2600 |
| Facsimile: | +44 20 7544 2700 |
| Email: | rgaitskell@keatingchambers.com |

5.2    Mr Andrew White, QC (Co-Arbitrator nominated by the Claimant)

Address:    Atkin Chambers
1 Atkin Building
Gray's Inn
London
WC1R 5AT
United Kingdom

| | |
|---|---|
| Telephone: | +44 20 7404 0102 |
| Facsimile: | +44 20 7405 7456 |
| Email: | awhite@atkinchambers.com |

5.3    Avv. Professor Luigi Fumagalli (Co-Arbitrator nominated by the Respondent)

Address:    Galleria S. Babila 4/D
20122 Milan
Italy

| | |
|---|---|
| Telephone: | +39 02 7600 6765 |
| Facsimile: | +39 02 784 158 |
| Email: | lfumagalli@luzzatto.net |

## II.    **PROCEDURE**

6.    The Partial Final Award (PFA), dated 4 June 2019, appended hereto and incorporated herein by reference, as noted above, dealt with all matters save pre-award interest and costs. Please refer to that document for full details of the dispute. That PFA was, by agreement of all concerned, signed in Geneva by the full Tribunal on 4 June 2019, with each page of the main text and each page of each of the appendices, being signed. The main signature page was also stamped with the stamp created for the President of the Arbitral Tribunal for this dispute. Similarly, as noted above, the Addendum to the PFA is incorporated by reference into this Final Award. Since earlier procedural steps are fully set out in the appended PFA and the Addendum, only additional steps are noted below:

Seen exclusively for the legalization of the
signatures of Mr Luigi FUMAGALLI, Mr Robert
GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF/
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

6.1    By email of 5 June 2019 the Tribunal invited the Parties to agree a timetable on the remaining matters, leading to a Final Award.

6.2    By email of 12 June 2019 the Respondent stated that there was no justification for further submissions on pre-award interest since the Claimant had not submitted a claim for pre-award interest apart from that included in its claim for financing charges which the Tribunal dismissed in the Partial Award.

6.3    By email of 13 June 2019 the Claimant responded by stating, amongst other things:

> *"The Claimant claims, and has always claimed, pre-award interest (see, for example, para 602(3)(v) of the Statement of Case and para 604(f)(v) of the Claimant's Post-Hearing Submissions). The Tribunal has dismissed the Claimant's claim for financing charges but has expressly, at paragraph 915.3 of the Partial Final Award, not decided the Claimant's claim for pre-award interest and deferred such decision to a subsequent award. The Claimant's email of 6 March 2019, to which the Respondent refers below, simply reflects the fact that, as a matter of calculation, the Claimant has expressed its claim for financing charges and pre-award interest in the same amounts. That, however, does not somehow interlink the claims for the purposes of liability, nor does it preclude the Tribunal from considering the issue of pre-award interest, and the Tribunal has expressly and deliberately reserved the right to do so."*

7.    After the Respondent had responded to the above email the Tribunal stated in its email of 14 June 2019 that it wished the Parties to treat the dispute about whether or not the Claimant had claimed pre-award interest as an issue that needs to be addressed along with costs in the Final Award, and cover the issue in the submissions they would now produce.

8.    By email of 28 June 2019 the Parties supplied a procedural timetable leading to the Final Award, and thereafter, as shown below, supplied submissions and information in accordance with that timetable.

9.    On 12 July 2019 the Claimant produced its Submissions on Pre-Award interest. On 9 August 2019 the Respondent produced its Response to the Claimant's Submission on Pre-Award Interest.

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE. Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

10.  On 23 August 2019 the Claimant supplied its Reply Submissions on Pre-Award Interest. On 6 September 2019 the Respondent supplied its Rejoinder on Pre-Award Interest.

11.  On 20 September 2019 the Claimant produced its Updated Cost Submissions and Further Updated Schedule of costs. Also on 20 September 2019 the Respondent produced its Additional Submissions on Costs.

12.  On 30 September 2019 the Secretariat of the ICC stated that on 26 September 2019 the International Court of Arbitration of the International Chamber of commerce had extended the time limit for rendering the Final Award until 31 October 2019.

13.  On 7 October 2019 each party submitted its updated Schedule of Costs. By email of 28 October 2019 to all concerned the Tribunal declared the proceedings closed and indicated it expected to supply the draft Final Award to the ICC for scrutiny by 31 October 2019.

## III.  PRE-AWARD INTEREST

14.  The Claimant noted at paragraph 7 in its Submissions of 12 July 2019 that it had raised its claim for pre-award interest in the Request for Arbitration of 24 March 2016 in paragraph 96(c)(iv). It was also referred to in the Statement of Claim of 9 May 2017 at paragraph 602(3)(v). It was also sought in the Claimant's Post-hearing Submissions of 2 November 2018 at paragraph 604(f)(v). This latter reference states that it seeks: *"interest or financing charges on any amounts payable by GCPI to Archirodon from such date as is determined by the Tribunal until the date of the award"*. (Note that the terms 'financing charges' and 'financing costs' are used interchangeably by the Parties in their submissions.)

15.  In paragraph 8 of its Submissions of 12 July 2019 the Claimant states: *"The fact that Archirodon's claim for financing charges and its claim for Pre-Award interest were pleaded together as a matter of quantum (to avoid overlapping or duplication) is of no consequence. The tribunal dismissed the claim for financing charges but expressly recognised Archirodon's separate and distinct claim for pre-Award Interest."* The Claimant then went on to make claims for pre-award interest pursuant to Article 171 of the Iraqi Civil Code, and further or in

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE. Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

the alternative, pursuant to GC14.8 of the Contract, quoted in paragraph 22.7(i) below.

16.    As noted by the Respondent in paragraph 17 of its Submissions of 9 August 2019, the Claimant stated in email C-209 of 6 March 2019, prior to the Partial Award, in response to a question from the Tribunal, as follows: "*… the Claimant confirms that its claim for pre-award interest is included in its claim for financing charges which has been addressed by the Parties in their respective submissions. The Claimant claims financing charges/pre-award interest at a rate of 45 per annum …*."

17.    The Respondent's Submissions of 9 August 2019 at paragraph 18 note that when the Tribunal requested on 9 July 2018 that the Claimant list its claims the Claimant responded in email C-139 of 11 July 2018: "*Further to the Tribunal's request on 9 July 2018 for a summary of the sums in issue, please find attached the quantum claimed, including interest (see Claim E Financing Charges), by Archirodon …*."

18.    The Respondent's Submissions of 9 August 2019 at paragraphs 27 – 30 note that the Tribunal by email of 15 July 2018 asked the Parties to produce a Schedule of Claims, which became Schedule 6 to the PFA. In its email of 15 July 2018, the Tribunal stated that each row should contain a separate claim and that, "*[i]f any claim is omitted from the schedule it will be deemed to have been discontinued*". At row 10 in the Schedule a claim for "Financing Costs" was set out. There was no separate claim for pre-award interest.

19.    The Financing Charges claim was addressed in the PFA in paragraphs 910 to 915.3. This stated as follows:

   **"*Schedule Item 10: Financing Costs***

   *910.    The Schedule summarises the Claimant's claim as follows:*

      "*Archirodon planned for the Project to be cash positive. The Delay Events had an enormous impact on Archirodon's finances as Archirodon had to spend many millions of dollars on, amongst other things, additional materials. Consequently, Archirodon had to borrow funds to complete the Project; Archirodon is therefore entitled to claim the financing charges of these additional Costs*".

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
&Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

911.    *In the Schedule the Respondent states:*

> *"This is a global claim which must be rejected for lack of causation, as the Claimant has to date not attempted to link the financing costs claimed to each of the three alleged delay events (Nos. 2, 3 and 8), and in any event, stands to be dismissed if the Tribunal dismisses any of the three delay claims (even in part). Furthermore, this claim constitutes a claim for indirect loss which is excluded by Clause GC 17.6. Lastly, its quantification remains unsubstantiated as there is no evidence for the interest rate of 4% on which it is based".*

912.    *Financing charges appear to have been claimed on the whole of the Contract Sum rather than on the additional cost related to the soil conditions (the only one of the three primary claims upon which the Claimant succeeded).*

913.    *In any event, such financing charges are prima facie an indirect loss and so precluded by Clause 17.6. Clause 17.6 includes the following: "Neither Party shall be liable to the other Party for loss of use of any Works, loss of profit, loss of any contract or for any indirect or consequential loss or damage which may be suffered by the other Party in connection with the Contract ...".*

914.    *Accordingly, the claim fails on the basis that financing costs are considered by the Tribunal to amount to an indirect loss (Respondent's Reply to Claimant's Post-Hearing Brief, paragraph 352).*

915.    <u>*Pre-Award Interest*</u>

> *In paragraph 604(f)(v) of the Claimant's Post Hearing Brief it seeks pre-award interest.*

915.1.    *Accordingly, by email of 28 February 2019 the Tribunal raised the following question:*

> *"Q2: Pre-award interest: The Claimant's PHB at 604(f)(v) has requested pre-award interest. In the event that the Tribunal were to award such interest upon what basis do the parties contend that the calculation should be made? What particular rates and periods are proposed?"*

915.2.    *In response, on 6 March 2019 the Parties stated:*

> *"Question 2: The Claimant confirms that its claim for pre-award interest is included in its claim for financing charges which has been addressed by the Parties in their respective submissions. The Claimant claims financing charges/pre-award interest at a rate of 4% per annum for years 2013-*

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/25
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

*2016 and 4.9% per annum for 2017 up to the date of the award (see Claimant's Post-Hearing Submissions, paras 551 – 557). The Claimant's claim for financing charges/pre-award interest is calculated on the basis of simple interest. For completeness, the Claimant notes that Mr Wishart's calculation of financing costs as set out in document D93A, page 2581.1 is up to the end of June 2018 and will require updating, subject to the Tribunal's decision. The Respondent refers to its position on the merits and quantum of this claim (including the period applicable assuming that the Respondent would be responsible for Delay Events Nos. 2, 3 or 8), as set out in Section 6.4 of the Respondent's Pre-Hearing Submission and 6.5 of its Post-Hearing Submission."*

915.3.    *The Tribunal considers that the issue of pre-award interest, and all questions of commencement dates, should be deferred to a subsequent award so that the parties can address the issue in detail."*

20.    For the avoidance of doubt, the Tribunal's deferral of the issue of pre-award interest to a subsequent award, in the PFA, as noted immediately above, was not in any way a decision that there was a claim for pre-award interest other than on the basis of what was then pleaded and dismissed by the Tribunal.

21.    The Claimant's Reply Submissions of 23 August 2019, paragraph 6, contest the Respondent's assertion that the Tribunal's decision in the PFA dismissing the Finance Charges claim has a *res judicata* effect on the pre-award interest claim. The Claimant notes that the PFA specifically deferred a determination on pre-award interest to a further award. The Claimant in its paragraph 9 contests the Respondent's contention that the Claimant's claims advanced in its submissions for the Final Award are, on analysis, new claims. This is considered further below.

22.    <u>The Tribunal's Decision as regards the Claimant's Pre-Award Interest claim</u>

22.1    The Tribunal deferred the issue of pre-award interest and did not deal with it in the PFA because it was unclear what precisely was being claimed. Although the term 'pre-award interest' has appeared in the Claimant's pleadings from its Request for Arbitration onwards, up until the production of the PFA that term was always closely associated with the terms 'financing costs' or 'financing charges'. Indeed, the

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE. Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/TF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Claimant expressly emphasised the close association of 'pre-award interest' and 'financing costs/charges' when the Tribunal enquired about that item of claim. It said, for example, in its email of 6 March 2019 that its claim for pre-award interest is "*included in* its claim for financing charges". It is also noteworthy in that email that the Claimant quantified its claim thus; "*The Claimant claims financing charges/pre-award interest at a rate of 4% per annum ...*". (underling added)

22.2    The Tribunal by its email of 15 July 2018 specifically invited the Parties to identify in a schedule each of its claims or counterclaims and stated only those claims and counterclaims identified would be addressed, and any claim omitted would be deemed discontinued. The resulting Schedule 6 to the PFA contained, at row 10, a claim for 'Financing Charges'. There was no claim for pre-award interest identified. In the Tribunal's view this demonstrates that the Claimant was not advancing a separate claim for pre-award interest. Further, there were specific columns in the Schedule for the Parties to identify relevant contractual clauses (column 'e') and relevant provisions of the Iraqi Civil Code (column 'f'). However, there was no reference by the Claimant to Clause 14.8 in column 'e' or anywhere else in row 10, and in column 'f' it simply stated 'N/A' (not applicable). The Tribunal considers this a clear statement that the Claimant was not advancing any 'financing costs' claim based on Clause 14.8 and/or the Iraqi Civil Code prior to the production of the PFA.

22.3    It was only after the financing charges claim was dismissed in the PFA that the Claimant has now sought to characterise its pre-award interest claim as separate and different from its claim for financing charges. Since the PFA it seeks to rely on two bases of claim that were not mentioned prior to the PFA: a claim under Iraqi law, Article 171, and a claim under Clause 14.8 of the Contract. As the Respondent states in paragraph 6 of its Response Submissions: "*Now, after the claim for financing charges has been dismissed in the Partial Final Award, the Claimant has presented on 12 July 2019, under the heading of 'pre-award interest', two new claims, entirely different from the combined claim made previously. It took the Claimant thirteen*

Seen exclusively for the legalization of the beside signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

*pages of text and not less than forty-eight pages of tables with complex calculations to seek to justify these new claims".*

22.4    In the Tribunal's view, not only are these two new ways of the Claimant putting its claim for pre-award interest ways that were never foreshadowed prior to the PFA, but they are also unjustified. That they were never foreshadowed has already been dealt with immediately above. Further, whereas the original quantification of the claim for 'financing charges/pre-award interest' was for '4% per annum', the new claims are quantified quite differently. As the Respondent states in paragraph 13 of its 9 August 2019 Response Submissions: *"This new quantification exceeds by far what the Tribunal allowed (section 4.1 [of the Submissions]), is based on incorrect principles (Section 4.2) and relies on evidence and argument which are not on record (Section 4.3). For the Tribunal to award claims on this basis, factual evidence would have to be produced and assessed and experts would have to be heard."*

22.5    The Tribunal now determines that the Claimant's claim for pre-award interest is a new claim which it is now far too late to advance and is inadmissible. Further it would prejudice the Respondent since (as explained above) it has been deprived of any opportunity to call evidence from its quantum expert. It is strictly unnecessary to consider the new ways in which the claim has been put, but since both parties have addressed them the Tribunal now deals with them briefly below.

22.6    <u>Iraqi Civil Code, Article 171</u>

(i)    Article 171 is quoted in paragraph 11 of the Claimant's Submissions of 12 July 2019: *"Where the object of the obligation is a sum of money which was known at the time the obligation arose and the debtor delayed the payment thereof he shall be obligated to pay the creditor by way of compensation for the delay a legal interest at the rate of (4%) four percent in regard to civil matters and (5%) five percent in respect of commercial matters ... ".*

Seen exclusively for the legalization of the beside signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

(ii)     The Respondent makes the point in paragraph 11 of its Response Submissions that Article 171 has by agreement of the Parties been replaced by the contractual provisions dealing with late payment. The Tribunal accepts that contention. The Parties' agreement in that respect is evident from the fact that Clause 14.8 (quoted in paragraph 22.7(i) below) deals with the subject matter of interest on payments which, in the absence of a contractual provision on the subject, would be dealt with by Article 171. Since the Parties agreed a specific contractual clause covering the same subject matter they thereby displaced the effect of Article 171. As the Respondent notes in paragraph 43 of its Response Submissions, Clause 14.8 specifies both the applicable period and rate, so Article 171 is unnecessary and irrelevant. In any event, the requirement that: "*Where the object of the obligation is a sum of money which was known at the time the obligation arose - -*" is not satisfied since no payment became due until the PFA was produced.

(iii)    Accordingly, in the Tribunal's view the Claimant's reliance on Article 171 is unjustified.

22.7    Contract Clause GC14.8

(i)     Clause 14.8 is quoted in paragraph 21 of the Claimant's Submissions of 12 July 2019: "*If the Contractor does not receive payment in accordance with Sub-Clause 14.7 [Payment], the contractor shall be entitled to receive financing charges compounded monthly on the amount unpaid during the period of delay. This period shall be deemed to commence on the date for payment specified in Sub-Clause 14.7 [Payment] irrespective (in the case of its sub-paragraph (b)) of the date on which any Interim Payment certificate is issued. ...* " (underling added)

(ii)     The Claimant, in its paragraph 22 of its 12 July 2019 Submissions, relies particularly upon GC14.7(b), which states: "*The Employer shall pay to the Contractor: (b) the amount certified in each Interim Payment Certificate*

Seen exclusively for the legalization of the
signatures of Mr Luigi FUMAGALLI, Mr Robert
GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21789/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
13    v.
General  Company for Ports of Iraq (Iraq)

> *within 45 days after the Engineer receives the Statement and supporting documents ... ".*

(iii)    The 'financing charges' claimed prior to the PFA are described in that PFA in its paragraphs 910 – 914. As there made clear, the claim then being advanced was for financing charges on the whole Contract Sum rather than on the additional cost related to the soil conditions (the only one of the three primary claims upon which the Claimant succeeded). That claim was dismissed in paragraph 913 of the Partial Award on the basis it was an indirect loss and so precluded by Clause 17.6.

(iv)    In paragraph 12 of its Response Submissions the Respondent notes that, for the new claim in reliance on Clause 14.8, this clause provides for the Contractor to receive 'financing charges' only in case of delayed payment of amounts payable under the Contract. However, payment of the awarded amounts did not become due until the determination in the PFA. The Respondent states in its paragraph 53 that uncertified, contested amounts did not become due under Clause GC14.7. For a claim for interest under the contract to be pursued the Claimant ought to have contended that the Engineer should have included the sums claimed in the Interim and Final Payment Certificates. If such a claim had been advanced then factual evidence would have had to be called by the Claimant to support the contentions, and the Respondent could have cross examined the relevant witnesses and, if it so chose, could have called contrary factual evidence of its own. Since there was no pleading of this type the Respondent would now, if faced with such a contention, be seriously prejudiced since it has lost the opportunity to test the Claimant's evidence (if it had been called) and lost the chance to call its own evidence to the opposite effect.

(v)    Accordingly, this new claim pursuant to Clauses 14.7 and 14.8 is unjustified.

22.8    <u>Tribunal's Decision – Summary</u>

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.



**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
14 Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

In summary, the Claimant having failed to recover 'financing charges/pre-award interest' in the attached PFA, for the reasons there set out, in circumstances where it emphasised that the pre-award interest was included in the financing charges claim and was quantified in the same way, has now sought to introduce two new bases for claiming pre-award interest. The bases are Iraqi law and GC Clauses 14.7 and 14.8. It is far too late for such new claims to be advanced. Their introduction would prejudice the Respondent, who would have had no opportunity to deal with the new and complex methods of quantification the Claimant now seeks to rely upon. In any event, the new bases of claim are unjustified. In conclusion, the claim for pre-award interest is dismissed, both because it is inadmissible as being raised far too late, as explained above, and also because it is rejected on its merits, as set out, inter alia, in paragraphs 22.4, 22.5 and 22.7 above.

## IV.    COSTS

23.    The Partial Award at section X, page 241, stated that: *"Costs will be dealt with in the next award. The Parties have supplied details of their costs to date."*

24.    Each Party dealt with the question of costs in its Post Hearing Submissions, on 2 November 2018, and in its Reply Post Hearing Submissions, on 28 November 2018. In section 7 of its Post-Hearing Submissions of 2 November 2018 the Respondent stated that for costs to be recoverable they must be incurred for the arbitration and be reasonable. It went on to contend that the allocation of costs should reflect the Parties' relative successes. It asserted that the Claimant's actions increased the costs of the arbitration, and it contended there were inflated and unsubstantiated claims and inefficiencies. In its section 8 it requested that the Tribunal award compensation for the Respondent's costs.

25.    In its 28 November 2018 Reply to the Claimant's Post-Hearing Submissions, the Respondent in its section 8 referred to the ICC Rules, Article 37(1) which states: *"The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court. In accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed*

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

*by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration."*

26.    The Respondent in its Reply Submissions goes on to note in paragraph 403 that the ICC Secretariat's Guide does not include internal employee costs as recoverable, since these are part of the normal costs of running the company. In its paragraph 406 it notes that the Parties agree the Tribunal has significant discretion with respect to the allocation of costs.

27.    The Claimant's Reply Post Hearing Submissions at section X notes that there is agreement that costs follow the event. It contests that the Parties' relative successes are relevant. As regards its internal employees, it states these would not have been diverted from normal duties were it not for the arbitration. It agrees costs must be reasonable.

28.    The Claimant's paragraph 371 in its Reply Post Hearing Submissions states that it seeks the relief set out in paragraph 604 of its Post Hearing Submissions of 2 November 2018. This states in the material part:

> *"... Archirodon respectfully requests the Tribunal to: [...]*
>
> f)    *award Archirodon, and require GCPI to pay to it: [...]*
>
>> iv)    *all costs and expenses (including, but not limited to, costs payable to the Tribunal, ICC, legal fees and expenses, and experts' and witnesses' fees and expenses and other in-house personnel) incurred by Archirodon in connection with the preparation for and conduct of this Arbitration pursuant to Article 37 of the ICC Rules; and*
>>
>> v)    *interest or financing charges on any amounts payable by GCPI to Archirodon from such date as is determined by the Tribunal until the date of the Award; and*
>
> g)    *grant Archirodon such other or varied relief as the Tribunal deems just and appropriate in the circumstances."*

29.    The Claimant's 7 October 2019 Final Schedule of Costs states:

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE. Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

29.1    "In accordance with the Tribunal's directions,[1] the Claimant sets out below its final Schedule of Costs, which includes its expected expenditure in relation to the signing of the Final Award in Geneva. As directed by the Tribunal, the Claimant's expected expenditure has been calculated by reference to the Claimant's costs of attendance in Geneva for the signing of the Partial Final Award.

29.2    The Claimant has also included below an estimate of the costs of attendance of a notary to notarise the signatures of the Tribunal on the Final Award, which is (alleged by the Claimant to be) a requirement for enforceability of the Final Award in Iraq. The estimate below is based on the notarisation of two copies of the consolidated Final Award (one copy for the Claimant and one copy for the Respondent), assuming that the consolidated Final Award will be 400 pages in length.

| | Description | Total (USD) 20 September 2019 | Total (USD) 7 October 2019 |
|---|---|---|---|
| A. | White and Case LLP Professional Services | 5,371,465 | 5,376,065 |
| B. | White and Case LLP Disbursements | 199,780.91 | 201,280.91 |
| C. | Costs of the Notary for the signing of the Final Award | N/A | 10,057 |
| D. | Iraqi Counsel Costs (including disbursements) | 132,437.67 | 132,437.67 |
| E. | Delay Expert Costs (including disbursements) | 1,591,796 | 1,591,796 |
| F. | Quantum Expert Costs (including disbursements) | 3,231,311.80 | 3,231,311.80 |
| G. | Geotechnical Expert Costs (including disbursements) | 165,501 | 165,501 |
| H. | Costs related to witnesses | 70,943 | 70,943 |

---

[1] Email from the Tribunal to the Parties, dated 1 October 2019.

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

| | Description | Total (USD) 20 September 2019 | Total (USD) 7 October 2019 |
|---|---|---|---|
| I. | ICC Costs | 765,000 | 765,000 |
| J. | Tribunal's Costs | 8,000 | 8,000 |
| K. | Procedural and Merits Hearing Costs | 110,089 | 110,089 |
| L. | Costs related to the Claimant's employees (including disbursements) | 680,144 | 680,144 |
| M. | Consultancy and Technical Assistance Costs | 42,388 | 42,388 |
| | **TOTAL** | 12,368,856 | 12,385,013 |

29.3  Further, as set out in the Claimant's Schedule of Costs, the Claimant includes in its updated Schedule of Costs the Respondent's share of the costs of the screens used at the Merits Hearing for efficiency only. As accepted by the Respondent,[2] these costs constitute costs generally owed to the Claimant regardless of the Tribunal's decision on costs. These costs are:

| | Description | Total (USD) |
|---|---|---|
| A. | Respondent's share of the costs of the Screens at the Merits Hearing | 2,926.16 (2,900 CHF) |
| | TOTAL | 2,926.16 |

30.  The Respondent's 7 October 2019 Fourth Updated Schedule of Costs states, amongst other things, as follows (yellow colouring in original):

30.1  Pursuant to the Tribunal's emails of 1 and 4 October 2019, the Respondent sets out below its Fourth Updated Schedule of Costs. The revised figures, updated to include

---

[2] Respondent's Comments on the Claimant's Schedule of Costs dated 14 December 2018, para 37.

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
18    Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

costs incurred since the Third Updated Schedule of Costs of 20 September 2019, as well as an estimate of the expenditures it expects to incur in connection with the signature of the Final Award, are highlighted below. Summary of Costs Claimed:

30.2   The Respondent has incurred and estimates it will incur the following costs in connection with the Arbitration proceedings:

| Description | Amount (USD) | Amount (GBP) | Amount (CHF) |
|---|---|---|---|
| LALIVE legal fees[3] | 4'146'062.30 | | |
| LALIVE expenses[4] | 227'228.29 | | |
| ICC fees/Tribunal fees and expenses | 608'000.00 | - 11'525.00[5] | - 38'983.08[6] |
| Quantum and Delay Experts' Fees and Expenses | 835'000.00 | | |
| Technical Experts' Fees and Expenses | 145'600.00 | | |
| Expenses Related to the Case Management Conferences and the Merits Hearing | 7'431.32 | 12'462.55 | 38'983.08 |
| Expenses Related to Witness (Mr Horgan) Participation in the Merits Hearing | 8'553.93 | | |
| Expenses for GCPI's | 83'000.00 | | |

[3] LALIVE legal fees include USD 1'000 of estimated legal fees, set out at Section 2.3 below.

[4] LALIVE expenses include travel and accommodation and sundry office expenses, as well as USD 50 of estimated expenses set out at Section 2.3 below.

[5] A corresponding amount, equal to the payment made by the ICC out of the advance on costs, has been included in Expenses Related to the Case Management Conferences and the Merits Hearing item of this table (see Respondent's Second Updated Schedule of Costs, p. 8 *et seq.* (s. 3 and s. 5)).

[6] A corresponding amount, equal to the payment made by the ICC out of the advance on costs, has been included in Expenses Related to the Case Management Conferences and the Merits Hearing item of this table (see Respondent's Second Updated Schedule of Costs, p. 8 *et seq.* (s. 3 and s. 5)).

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

| Description | Amount (USD) | Amount (GBP) | Amount (CHF) |
|---|---|---|---|
| Meetings with Counsel and Attendance at the Merits Hearing | | | |
| **Total** | **6'060'875.84** | **937.55** | |

## Tribunal's Determination

31.    The Tribunal notes that the Parties agree (as noted in paragraph 27 above) that costs follow the event and agree (as noted in paragraph 26 above) that the Tribunal has significant discretion as to the allocation of costs. It also notes costs should be reasonable. In the Tribunal's view the Claimant has broadly succeeded since it had to bring proceedings to recover the substantial sums it has secured. However, the Tribunal considers that some significant account must be taken of the following matters:

31.1    The costs of the submissions on pre-award interest: these were a separate set of submissions from the main hearing submissions, and the Respondent succeeded.

31.2    It is noted that the Claimant only succeeded on one of its three heads of claim.

31.3    The Claimant's costs were very much greater than the Respondents, notwithstanding that it is normal for a Claimant, with the carriage of the action, to incur somewhat greater costs than the Respondent. It is noted from the tables above that the Claimant's legal fees were significantly greater than the Respondent's legal fees. The Tribunal only allows US\$5 million (instead of US\$5,376,065) for this item, taking account of the matters noted in this paragraph 31, including the fact that an element of those legal fees must relate to the submissions on the matters in respect of which the Claimant did not succeed.

31.4    The cost of having a notary attend the signing event has not been shown, by reference to any specific Iraqi legal requirement, to be an obligation that needs to be satisfied,

Seen exclusively for the legalization of the
signatures of Mr Luigi FUMAGALLI, Mr Robert
GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

and the Respondent has opposed this aspect of the production of the Final Award. Accordingly, the sum of US$10,057 is disallowed.

31.5    The Claimant's delay and quantum expert costs were very significantly greater than the Respondent's equivalent costs. A significant part of the evidence related to items on which the Claimant failed. It is also noted that recoverable costs need to be reasonable. Accordingly, only US$1 million is allowed (instead of US$1,591.796 + 3,231,311.80) for this item.

31.6    The Claimant seeks US$680,144 for costs related to its employees. There is little evidence to demonstrate these employees would not in any event been employed in the material period. Accordingly, this item is disallowed.

31.7    The Tribunal notes that some of the expenses of the hearing were paid from the advance on costs, at the Parties' request. The Tribunal assumes that there is no double recovery. The Tribunal also notes the Respondent's concern about expenses incurred in the signing ceremonies in Geneva, given that the Respondent does not consider these are necessary.

31.8    Thus, costs recovery for the Claimant is (in US$):

| | |
|---|---:|
| Item A: White & case LLP Professional services | 5 million |
| Item B: White & case LLP disbursements | 201,280.91 |
| Item C: Costs of notary | Nil |
| Item D: Iraqi counsel (including disbursements) | 132,437.67 |
| Items E & F: Delay & Quantum experts (including disbursements) | 1 million |
| Item G: Geotech. Expert (including disbursements) | 165,501 |
| Item H: Witness costs | 70,943 |

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas) Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

| Items I & J: ICC costs including Tribunal | Dealt with separately below since the ICC (not the Tribunal) make the determination |
|---|---|
| Item K: Hearing costs | 110,089 |
| Item L: Employees | Nil |
| Item M: Consultancy/tech. assistance | 42,388 |
| **TOTAL** | **6,722,639.58 + ICC (incl Tribunal)** |
| Plus, Respondent's share of costs of screens | US$2,926.16 |

Thus, taking all the above matters into account, the Tribunal considers that whereas the Claimant's costs are over USD12 million, it should only recover the sums shown above: US$6,725,565.74 + ICC (including Tribunal fees and expenses).

31.9    In its email of 3 October 2019, the Claimant noted that it wished the Final Award to denominate sums awarded in Euros and referred back to its email of 31 July 2019. That email of 31 July 2019 stated, inter alia, as follows:

> "*The Parties refer to para 937 of the Partial Final Award wherein the Tribunal directed that "for the purposes of the next award the parties should provide the appropriate Euro figures for the sums recovered*".

The Parties understand, and agree, that as the amounts awarded in the Partial Final Award were fixed as at the date of the Partial Final Award (4 June 2019), the exchange rate to be used to convert the amounts awarded from US Dollars to Euros is the ECB exchange rate as at the date of the Partial Final Award. On that basis, the Parties have agreed the below converted Euro figures. Without prejudice to the Respondent's objection to the Claimant's application for corrections to the Partial Final Award, the Parties have agreed the converted Euro figures for both the amounts awarded in the Partial Final Award and the amounts as set out in the Claimant's application to correct.

Seen exclusively for the legalization of the beside signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

27

| Claim | US Dollar amounted awarded (para 941 of the Partial Final Award) | EuroEquivalent | Corrected US Dollar amount as set out in Claimant's Application to Correct dated 5 July 2019 | EuroEquivalent |
|---|---|---|---|---|
| Claim B.01 | $57,491,157 | €51,130,520.28 | $58,245,425.60 | €51,801,339.03 |
| Claim B.02 | $12,884,996 | €11,459,441.48 | $12,945,852.38 | €11,513,564.91 |
| Prolongation | $21,463,154 | €19,177,475.99 | | |
| Letter of Credit Claim | $45,993.62 | €40,905.03 | | |

31.10   Accordingly, the above table establishes the Euro equivalent amounts for the sums awarded in the PFA. As regards the corrections to the PFA set out in the Addendum attached hereto, the corrected figures are given in US dollars and the equivalent amount in Euros is determined by applying the exchange rate as in the table above. For the purposes of the said sums being denominated in Euros, those are the relevant figures.

31.11   As regards the ICC's costs of the arbitration (including the Tribunal's fees and expenses) these costs were fixed by the ICC Court on 15 November 2019, as US$1,365,000.

(i)     Payments received: US$765,000 from the Claimant, and US$600,000 from the Respondent, so the total is: US$1,365,000. (Since the Claimant made a substantial recovery as noted above, the Tribunal has determined that the Claimant is entitled to recover from the Respondent the amount the Claimant contributed to the ICC.)

(ii)    Thus, the Respondent must pay to the Claimant forthwith the sum of US$765,000 in respect of this item.)

Seen exclusively for the legalization of the signatures of Mr Luigi FUMAGALLI, Mr Robert GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
23    v.
General Company for Ports of Iraq (Iraq)

**V.**    **DISPOSITIVE SECTION**

32.    Now we, the Arbitral Tribunal constituted in accordance with the Rules as noted above, having perused all the documentation relating to the present disputes, and conducted the substantive hearing in Geneva as referred to above, and having issued the PFA and the Addendum thereto, as appended hereto, do now further find, hold, decide and determine as set out below:

    32.1    As regards the Parties' costs: the Respondent must pay the Claimant forthwith the sum of US$6,725,565.74.

    32.2    As regards the ICC costs of the arbitration, the Respondent must pay to the Claimant forthwith the sum of US$765,000.

    32.3    All other claims and counterclaims are dismissed.

Seen exclusively for the legalization of the
signatures of ˆMr Luigi FUMAGALLI, Mr Robert
GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Place of Arbitration: Geneva, Switzerland.

Date: 25 November 2019

**Mr Andrew White QC**
Co-arbitrator

**Avv Professor Luigi Fumagalli**
Co-arbitrator

**Dr Robert Gaitskell QC**
President

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Seen exclusively for the legalization of
the signatures of Mr Luigi FUMAGALLI,
Mr Robert GAITSKELL and Mr Andrew
WHITE.
Geneva, 05.12.2019.

ICC Case No. 21785/ZF/AYZ

INTERNATIONAL COURT OF

ARBITRATION

OF THE INTERNATIONAL CHAMBER OF

COMMERCE

---

ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED (CYPRUS)
(FORMERLY KNOWN AS ARCHIRODON CONSTRUCTION (OVERSEAS)
COMPANY S.A. (PANAMA)

Claimant (or Contractor)

v

THE GENERAL COMPANY FOR PORTS OF IRAQ

Respondent (or Employer)

---

FINAL AWARD

---

ATTACHMENT 1:
THE PARTIAL FINAL AWARD DATED 4 JUNE 2019 AND ITS APPENDICES

---



Seen exclusively for the legalization of the
signatures of Mr Luigi FUMAGALLI, Mr Robert
GAITSKELL and Mr Andrew WHITE.
Geneva, 05.12.2019.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Seen exclusively for the legalization of the
signatures of Mr Luigi PHILIPPATTI, Mr Robert
GAITSKELL and Mr Andrew WHITE.
Geneva 05.12.2019.



**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

ICC CASE NO. 21785/ZF/AYZ

IN THE MATTER OF AN ARBITRATION

BEFORE THE INTERNATIONAL COURT OF ARBITRATION

UNDER THE 2012 RULES OF THE INTERNATIONAL CHAMBER OF COMMERCE

BETWEEN

### ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED (Cyprus)
formerly known as Archirodon Construction (Overseas) Company S.A. (Panama)

**Claimant**

-and-

### GENERAL COMPANY FOR PORTS OF IRAQ (Iraq)

**Respondent**

---

### PARTIAL FINAL AWARD

---



THIS PHOTOCOPY IS HEREBY
CERTIFIED TO BE A TRUE COPY
OF THE ORIGINAL DOCUMENT
Geneva, the

5 DEC. 2019

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

# TABLE OF CONTENTS

I.      THIS AWARD, THE PARTIES AND THE ARBITRAL TRIBUNAL ................................5

II.     PROCEDURE ................................................................................................................8

III.    ARBITRATION AGREEMENT ..................................................................................12
        The Contract for the Construction of the Staging Pier/Eastern Breakwater for Al Faw Grand
        Port in Iraq .......................................................................................................................12
        Arbitration Agreement ....................................................................................................12
        Seat of Arbitration ..........................................................................................................13
        Governing Law .................................................................................................................13
        Procedural Rules ..............................................................................................................14

IV.     DISPUTE AND ISSUES TO BE DECIDED ...............................................................14
        Background to the Dispute ..............................................................................................14
        Delay Event No. 2 ............................................................................................................17
        Delay Event No. 3 ............................................................................................................19
        Delay Event No. 8 ............................................................................................................22
        Delay Damages Levied on Archirodon ...........................................................................24
        Archirodon's Claim ..........................................................................................................26
        GCPI's Answer .................................................................................................................33
        Issues To Be Decided .......................................................................................................36

V.      ICC ...............................................................................................................................36

VI.     DELAY EVENT NO. 2 (ROAD: RESTRICTED ACCESS TO THE SITE THROUGH
        THE BASRA – AL FAW ROAD) ...............................................................................37
        A.      The Factual Background .......................................................................................37
        B.      The Position of the Claimant ...............................................................................44
        C.      The Position of the Respondent ...........................................................................57
        D.      The Evaluation of the Tribunal ...........................................................................68

VII.    DELAY EVENT NO. 3 (UNFORSEEABLE SOIL CONDITIONS) ...........................84
        Delay Event No. 3 ............................................................................................................84
        The Parties' Cases ...........................................................................................................114
        The Geotechnical Expert Evidence ...............................................................................121
        The Claimant's Claim under GC Sub-Clause 4.12 .......................................................125
        The Claimant's Claim under GC Sub-Clause 1.9 .........................................................155
        The Claimant's Claim under Articles 146(2) and 878 of the Iraqi Civil Code ...........161
        The Claimant's Claim for Additional Costs Arising out of Delay Event No. 3 ...........161
        Summary of Decisions in relation to Delay Event No. 3 ..............................................182
        The Claimant's Claim for an Extension of Time ..........................................................184
        The Evidence of the Programming Experts ..................................................................185
        Summary of the Tribunal's Decision in relation to the Claimant's Claim for an Extension of
        Time ................................................................................................................................194

VIII.   DELAY EVENT NO. 8 (FORCE MAJEURE – ISIS) ...............................................195
        Delay Event No. 8 ..........................................................................................................195
        Background to Discussion ..............................................................................................208
        Post-Hearing Materials ..................................................................................................208
        Discussion and Decision by the Tribunal .....................................................................209

IX.     COSTS CLAIMS ........................................................................................................210

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

3

Schedule Item 4: Is the Claimant entitled to a declaration that it completed the Works within a reasonable time? ............................................................................................211

Schedule Item 5: Recovery of Liquidated Damages? .........................................................211

Schedule Item 6: Prolongation? ..........................................................................................212

Schedule Item 7: Letter of Credit .......................................................................................221

    *A.*    *Summary of the Claim and its Background* ...............................................*221*

    *B.*    *The Position of the Parties* ....................................................................*225*

    *C.*    *The Evaluation of the Tribunal* .............................................................*234*

Schedule Item 8: Disruption ...............................................................................................236

Schedule Item 9: Mitigation/Acceleration ..........................................................................236

Schedule Item 10: Financing Costs .....................................................................................237

Schedule Item 11: Loss of Currency Depreciation ..............................................................239

Schedule Item 12: Head Office Overheads ..........................................................................239

Schedule Item 13: Profit ......................................................................................................240

Schedule Item 14: Sponsor Fees .........................................................................................240

Schedule Item 15: Post Award Interest ...............................................................................241

**X.**    **COSTS** ...................................................................................................................**241**

**XI.**    **OVERALL RECOVERY** .....................................................................................**241**

**XII.**    **DISPOSITIVE PART** ...........................................................................................**245**

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

## I.    THIS AWARD, THE PARTIES AND THE ARBITRAL TRIBUNAL

1.    1.1    This award is a Partial Final Award, dealing with all matters of liability and most of the financial consequences that result from liability where found. However, certain of the financial consequences (including particularly pre-award interest and costs) can only be finalised with the assistance of the Parties and their quantum experts, and so those matters will be dealt with in a subsequent award once the quantum experts and parties have been able to consider the determinations made herein.

1.2    This Partial Final Award consists of:

(i)    The main text (this document).

(ii)    Appendix 1: Agreed Chronology of Main Relevant Events.

(iii)    Appendix 2: Agreed Factual Narrative.

(iv)    Appendix 3: Claimant's List of Issues.

(v)    Appendix 4: Respondent's List of Issues.

(vi)    Appendix 5: Agreed Procedural History.

(vii)    Appendix 6: Schedule of Claims.

(viii)    Appendix 7: Joint Statement by Quantity Surveying Experts re Delay Event 3 Table of Quantities (Claim B01).

Note that the contents of the above Appendices were drafted by the Parties jointly.

1.3    The following paragraphs set out the names and addresses of the parties to the arbitration (the "Parties") and of the Arbitral Tribunal.

### The Claimant

2.    The Claimant, Archirodon Construction (Overseas) Company Limited (formerly known as Archirodon Construction (Overseas) Company S.A., Panama) ("Archirodon"), is a company organised and existing under the laws of Cyprus, having its registered office at: Spyrou Kyprianou 38 – 4154, Limassol, Cyprus. Herein the Claimant is also variously termed Archirodon and the Contractor.

3.    Archirodon is represented in these proceedings by:

Mr Ellis Baker

Ms Sam Kay

Ms Therese Marie Rodgers

**Dr. Robert Galtskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Mr Karim Mariey

Address:        White & Case LLP

                5 Old Broad Street

                London

                EC2N 1DW

                United Kingdom

Telephone:      +44 20 7532 1000

Facsimile:      +44 20 7532 1001

Email:          ebaker@whitecase.com

                sam.kay@whitecase.com

                therese.marie.rodgers@whitecase.com

                karim.mariey@whitecase.com

                ICC-21785@whitecase.com


Mr Julian Bailey

Address:        White & Case LLP

                Alfardan Office Tower, 7th Floor

                P.O. Box 22027

                West Bay

                Doha, Qatar

Telephone:      +974 440 64300

Facsimile:      +974 440 64399

Email:          julian.bailey@whitecase.com


Mr Michael Turrini

Mr Luka Kristovic Blazevic

Address:        White & Case LLP

                Level 6, Burj Daman

                Al Sa'ada Street

                Dubai International Financial Centre

                P.O. Box 9705

                Dubai

                United Arab Emirates

Telephone:      +971 4 381 6200

Facsimile:      +971 4 381 6299

Email:          michael.turrini@whitecase.com

                lkristovicblazevic@whitecase.com

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

6

**The Respondent**

4.     The Respondent, General Company for Ports of Iraq ("GCPI"), is a government department of the Ministry of Transport in the Republic of Iraq organised and existing under the laws of Iraq. GCPI's address is: Ma'qil Quarter, Basrah, Iraq.

5.     GCPI is represented in these proceedings by:

|                  |                        |
|------------------|------------------------|
| Mr Michael E. Schneider |                 |
| Dr Veijo Heiskanen |                      |
| Mr Joachim Knoll |                        |
| Ms China Irwin   |                        |
| Ms Juliette Richard |                     |
| Ms Tessa Hayes   |                        |
| Address:         | Lalive                 |
|                  | 35, rue de la Mairie   |
|                  | P.O. Box 6569          |
|                  | 1211 Geneva 6          |
|                  | Switzerland            |
| Telephone:       | +41 58 105 2000        |
| Facsimile:       | +41 58 105 2160        |
| Email:           | meschneider@lalive.ch  |
|                  | vheiskanen@lalive.ch   |
|                  | jknoll@lalive.ch       |
|                  | cirwin@lalive.ch       |
|                  | jrichard@lalive.ch     |
|                  | thayes@lalive.ch       |

**The Arbitral Tribunal**

6.     The Arbitral Tribunal is constituted as follows:

6.1     Dr Robert Gaitskell, QC (President, nominated by Co-Arbitrators)

|            |                   |
|------------|-------------------|
| Address:   | Keating Chambers  |
|            | 15 Essex Street   |
|            | London            |
|            | WC2R 3AA          |
|            | United Kingdom    |
| Telephone: | +44 20 7544 2600  |

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Facsimile:    +44 20 7544 2700

Email:    rgaitskell@keatingchambers.com

6.2    Mr Andrew White, QC (Co-Arbitrator nominated by the Claimant)

Address:    Atkin Chambers

1 Atkin Building

Gray's Inn

London

WC1R 5AT

United Kingdom

Telephone:    +44 20 7404 0102

Facsimile:    +44 20 7405 7456

Email:    awhite@atkinchambers.com

6.3    Avv. Professor Luigi Fumagalli (Co-Arbitrator nominated by the Respondent)

Address:    Galleria S. Babila 4/D

20122 Milan

Italy

Telephone:    +39 02 7600 6765

Facsimile:    +39 02 784 158

Email:    lfumagalli@luzzatto.net

## II.    **PROCEDURE**

7.    On 24 March 2016, the Secretariat of the ICC International Court of Arbitration of the International Chamber of Commerce (the "ICC" and the "Secretariat") received from Archirodon a Request for Arbitration, dated 24 March 2016. (Note: an agreed detailed Chronology of the events referred to in the Request for Arbitration, is attached hereto as **Appendix 1**.)

8.    On 8 April 2016, the Secretariat acknowledged receipt of Archirodon's Request for Arbitration.

9.    On 19 April 2016, the Secretariat sent a notification to GCPI that it had received a Request for Arbitration from Archirodon and invited GCPI's Answer to the Request within 30 days. Also on 19 April 2016, the Secretariat invited Archirodon to nominate a Co-Arbitrator by 4

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

8

10.    On 3 May 2016, the Secretariat emailed Archirodon explaining that its courier had been unable to deliver the 19 April 2016 correspondence because the address was wrong. The Secretariat requested updated contact details. On 4 May 2016, Archirodon wrote to the Secretariat explaining that it had verified GCPI's address and provided additional information.

11.    According to information provided by the Secretariat's courier, GCPI received the Request for Arbitration on 15 May 2016, such that the 30-day time limit for submitting the Answer expired on 14 June 2016.

12.    On 4 June 2016, GCPI requested soft copies of the documents so as to enable it to provide its Answer to the Request. On 7 June 2016, Archirodon provided access to a secure datasite as well as a USB key which hosted soft copies of the documents.

13.    On 12 June 2016, the Secretariat and Archirodon received GCPI's Answer to the Request, dated 11 June 2016. The Answer to the Request intimated that GCPI intended to submit a Counterclaim, and GCPI requested an extension of time of three months for the submission of its Counterclaim, the deadline at that time being 14 June 2016. GCPI agreed to the Arbitral Tribunal being composed of three arbitrators, that the language of the Arbitration be English, and that the law governing the Arbitration should be that of Iraq.

14.    On 15 June 2016, the Secretariat invited Archirodon's comments on the extension of time for GCPI to submit its Counterclaim. The Secretariat also noted that to date GCPI had not nominated a Co-Arbitrator, and granted until 22 June 2016 to do so.

15.    On 22 June 2016, before receipt of Archirodon's response regarding the Counterclaim, GCPI wrote to the Secretariat commenting that "*it seems to be fair enough that the Respondent should have enough time to prepare its own documentation for the counterclaim, undertake all contractual steps (such as the Engineer's Determination) first and then in case to submit it to the arbitral judgment*". It also responded to the extension of time for the nomination of the Co-Arbitrator explaining that as "*the Respondent is a State Body [...] final decisions are not always straightforward [...]. Therefore, the additional week proposed by the Secretariat was not enough to complete the internal procedure for the final decision*".

16.    Later on 22 June 2016, Archirodon provided its response to the request for an extension of time to submit the Counterclaim. Archirodon objected to the request for three reasons. Firstly,

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

that the three month extension was excessive; secondly, that any extension should not exceed

the usual practice (that is, an extension of 30 days which would mean an extension to 14 July 2016); and thirdly, given the nature of GCPI's anticipated Counterclaim, an extension to 14 July 2016 should be sufficient.

17.    On 24 June 2016, the Secretariat wrote to the Parties, firstly, granting GCPI until 1 July 2016 to nominate a Co-Arbitrator, and secondly, granting GCPI until 14 July 2016 to submit its Counterclaim.

18.    On 1 July 2016, GCPI sent a letter (dated 30 June 2016) explaining that it had not been able to take a final decision on the appointment of a Co-Arbitrator and so accepted that the Secretariat would appoint a Co-Arbitrator according to Article 12(4). GCPI also explained that "*it is not anymore its intention to present a counterclaim under the present Arbitration and that the overall procedure can be moved ahead from the date of present letter. However, the Employer reserves the right to present in due time its Claim for the Engineer's determination in compliance with the Contract in force*".

19.    Also on 1 July 2016, having received GCPI's letter (dated 30 June 2016), Archirodon explained that it "*would not object to the ICC granting the Respondent additional time until 15 July 2016 to appoint a co-arbitrator*". Accordingly, also on 1 July 2016, the Secretariat granted GCPI until 15 July 2016 to nominate a Co-Arbitrator.  Regarding GCPI's reservation of its position relating to the Counterclaim, the Secretariat drew their attention to Article 23(4) which limit the ability of a Party to make new claims after the Terms of Reference have been signed.

20.    On 11 July 2016, GCPI wrote to explain that, in part due to Ramadan and the subsequent Eid celebrations, it was not possible for the committee of the legal department of the Ministry of Justice to meet until after 11 July 2016.  It was not possible to guarantee that a nomination would be made by 15 July 2016.  That said, GCPI detailed three candidates which it recommended to the Secretariat should the Secretariat have to make the decision. As regards the Counterclaim issue, GCPI clarified its position by indicating it would make a counterclaim. It was also commented that GCPI had still not received the USB key and was having difficulties accessing the datasite.

21.    On 13 July 2016, the Secretariat explained that "*unless otherwise advised by 15 July 2016, we will understand that the first candidate in said list constitutes Respondent's nominated co-arbitrator. As such, upon the expiry of said time limit, we will invite Prof. Luigi Fumagalli to complete a Statement of Acceptance, Availability, Impartiality and Independence*"

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

10

22.   On 15 July 2016, Archirodon explained that it had arranged for a USB key containing electronic forms of the documents to be provided to GCPI at the Project site.

23.   On 2 August 2016, the Secretariat wrote to the Parties informing them of the confirmation by the Secretary General of Andrew White QC as the Co-Arbitrator on Archirodon's nomination and Avv. Professor Luigi Fumagalli as the Co-Arbitrator on GCPI's nomination, and provided their CVs. It was also explained that the Co-Arbitrators would be invited to nominate the president of the Arbitral Tribunal. Article 11 of the Regulations for Implementing Government Contracts is set out in extenso in paragraph 32 below and it includes the following at provision B: " … *the two arbitrators shall select a third one as head of the arbitration committee. In case this is not applicable, then the court shall select the third arbitrator. …*"

24.   On 27 September 2016, the Secretariat wrote to the Parties to explain that Sir Vivian Ramsey had been confirmed by the Secretary General as the President of the Arbitral Tribunal upon the nomination of the Co-Arbitrators. However, on 27 October 2016 the Secretariat informed all concerned that on the same day the Court had accepted Sir Vivian Ramsey's resignation, and explained that the Co-Arbitrators were invited to nominate a new President within 15 days.

25.   On 4 November 2016, the Secretariat wrote to the Parties confirming that it had received the advances on costs from both Parties.

26.   On 23 November 2016, the Secretariat informed the Parties and the Co-Arbitrators that the time limit for establishing the Terms of Reference had been extended until 28 February 2017. On 23 February 2017, the Secretariat informed the Parties and the Arbitral Tribunal that the time limit for establishing the Terms of Reference had been extended until 30 April 2017.

27.   On 8 December 2016, the Secretariat informed all concerned that on 7 December 2016 the Secretary General confirmed Robert Gaitskell QC as President of the Arbitral Tribunal upon the nomination of the co-arbitrators.

28.   Full details of the subsequent procedural steps are set out in Appendix 5 hereto. In due course, after the hearing and all subsequent submissions, the Tribunal declared the proceedings closed as regards the subject matter of this Partial Final Award. On 15 June 2017, the Court fixed the time limit for the final award until 31 October 2018. On 31 October 2018

Dr. Robert Gaitskell QC
President
ICC Case No. 21765/TO
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

the ICC stated that the Court had extended the time limit for rendering the final award until 28 February 2019. The ICC, by its email of 28 February 2019, stated that on 28 February 2019 the Court extended the time limit for rendering the final award until 29 March 2019 (Article 30(2)). On 28 March 2019, the Court extended the time limit for the final award until 28 June 2019.

## III.   ARBITRATION AGREEMENT

### The Contract for the Construction of the Staging Pier/Eastern Breakwater for Al Faw Grand Port in Iraq

29.   By an agreement dated 22 November 2012, Archirodon (described as the Contractor) was engaged by GCPI (described as the Employer) to undertake Contract FGP/C-01 (the "Contract") in relation to the design and construction of the staging pier for the Al Faw Grand Port in Iraq. The Contract Agreement was signed by the Contracting Authority, the Respondent herein, and by the Contractor, the Claimant herein.

30.   The General Conditions of the Contract are those of the FIDIC Conditions of Contract for Plant and Design-Build (for electrical and mechanical works and for building and engineering works designed by the contractor) (First Edition, 1999) (also referred to as the FIDIC Yellow Book, and described below as the "FIDIC General Conditions"), as amended by the Special (Particular) Conditions. These amended General Conditions are referred to herein as the "Special Conditions".

### Arbitration Agreement

31.   The Special Conditions amend Clause 20 (Claims, Disputes and Arbitration) of the FIDIC General Conditions. The replacement is set out at Clause 20 of the Special Conditions, and reads as follows:

> "*The Parties shall initially attempt to settle amicably all disputes or claims arising out of or in connection with this Contract.*
>
> *Failing such attempt, either Party may, by virtue of a notice to the other Party, refer the matter to the Parties' senior executives for further amicable settlement attempt. The notice shall also appoint an authorised senior executive of the notifying Party and the other Party shall respond and appoint its authorised senior executive.*
>
> *The two senior executives of the Parties shall meet within 15 days, or any other mutually agreed time, to reach an amicable settlement of the notified dispute(s). If an amicable settlement is not reached within 30 (thirty) days from the date the dispute was referred to the Parties' senior executives, then the dispute shall be finally settled by Arbitration as stated in Article 11 (Mechanism for resolving disputes after signing the contract) of the "Instructions of governmental contracts implementation no.(1)/2008". The Arbitration shall be conducted under the Rules of the International*

Dr. Robert Gaitskell QC

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

12

*Chamber of Commerce and the venue shall be Genève."*

32.    Article 11 of the Regulations for Implementing Government Contracts (issued on 1 May 2008) reads as follows:

> *"Settling Disputes after Signing the Contract:*
>
> *First - Disputes shall be resolved after signing public contracts of all kinds by using one of the following means:*
>
> A.    *Conciliation: By forming a combined committee by the disputing Parties (the contracting party, contractors, or consultants) to study the subject and agree to deal with it according to the effective laws and regulations regarding the subject of the dispute.*
>
> B.    *Arbitration: By selecting an arbitrator by each party who shall have experience and knowledge of the dispute and the two arbitrators shall select a third one as head of the arbitration committee. In case this is not applicable, then the court shall select the third arbitrator. The arbitration committee shall study the subject and all its details and the committee shall issue its final decision for settling the dispute. The losing party shall pay the arbitration expenses and the decision of the committee shall be binding after approval by the court according to the law.*
>
> C.    *Referring the dispute to the courts to issue a decision taking into account the relevant law to settle disputes.*
>
> D.    *The contracting agency may select international arbitration to settle disputes provided that the contract shall provide for this facility and when one of the Parties is a foreigner taking into account the procedural mechanism agreed upon in the contract when using this method and one of the international arbitration associations shall be selected to settle the dispute.*
>
> *Second - The contracting parties shall select the best method to settle the disputes as a result of implementing the contract as stated in item First of this article according to the contractual conditions agreed upon."*

## Seat of Arbitration

33.    Pursuant to Clause 20 of the Special Conditions, the place and seat of arbitration is Genève (Geneva), Switzerland.

34.    The Arbitral Tribunal may, after consultation with the Parties, conduct meetings at any location it considers appropriate unless otherwise agreed by the Parties. Hearings must be held at the place of arbitration, unless otherwise agreed by the Parties. The above procedure is set out in Article 18 of the Rules.

## Governing Law

35.    Pursuant to Sub-Clause 1.4 of the Special Conditions, *"[t]he Law of the Contract is the Iraqi*

Dr. Robert Gaitskell QC
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

13

*Law*", and so the Contract shall be construed and interpreted in accordance with the laws of Iraq.

36.    There is no power conferred on the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono*.

## Procedural Rules

37.    Pursuant to Clause 20 of the Special Conditions, the arbitration is to 'be conducted under the Rules of the International Chamber of Commerce'. The arbitration is therefore conducted in accordance with the 2012 ICC Arbitration Rules ("ICC Rules").

38.    The Parties have agreed that the language of the arbitration is English as reflected in the Secretariat's correspondence of 15 June 2016 (see above).    All proceedings are to be conducted in English, and all communications between the Parties and the Arbitral Tribunal must be in English.

## IV.    DISPUTE AND ISSUES TO BE DECIDED

### Background to the Dispute[1]

39.    By an agreement dated 22 November 2012, Archirodon was engaged by GCPI to undertake the Contract in relation to the design and construction of the staging pier of the Al Faw Grand Port in Iraq. Various documents were deemed to form and be read and construed together as part of the Contract. The following order of precedence is to be given to the respective documents:

  39.1    the Contract Agreement;
  39.2    the Letter of Tender;
  39.3    the Special (Particular) Conditions;
  39.4    the General Conditions (the FIDIC Yellow Book);
  39.5    the Employer's Requirements;
  39.6    the Schedules (including the Breakdown of Price); and
  39.7    the Contractor's Proposal and any other documents forming part of the Contract.

40.    The Works are explained broadly in 'Staging Pier Tender Documents: Volume 3', page 6:

  "*The main works for the construction of the Staging Pier for the* Dr. Robert Gaitskell QC
     *shall comprise:*

Dr. Robert Gaitskell QC<br>
President<br>
ICC Case No. 21785/ZF<br>
Archirodon Construction (Overseas)<br>
Company S.A. (Panama)<br>
v.<br>
General Company for Ports of Iraq (Iraq

---
[1] This factual summary reflects that contained in the Terms of Reference.

    - *A rubble mound breakwater, about 8,000m long extending from shore to approximately -6.5m msl;*[2]

    - *A reclaimed yard of approximately 4.5 ha and relative rock protection for the storage of construction materials and for the installation of a logistic camp;*

    - *The creation of two sheltered basins with quays composed of steel structures and related berthing facilities for marine equipment required for the work execution;*

    - *Dredging works of about 400,000m3 of existing sediments, part of which is necessary to enable the construction vessels to access the basins. The dredging soil will be used to build the core of the onshore portion of the breakwater, whereas the balance will be stockpiled onshore in the desiccation ponds."*

41.    Archirodon and GCPI's general obligations are set out in Articles 3 and 4 of the Contract Agreement:

        *"Article 3*    *In consideration of the payments to be made by the Contracting Authority to the Contractor as herein mentioned, the Contractor undertakes to execute and complete the works and remedy defects therein in full compliance with the provisions of the contract within the time schedule proposed of 18 months.*

        *Article 4*    *The Contracting Authority hereby agrees to pay the Contractor in consideration of the execution and completion of the works and remedying of defects therein the lump sum amount of 204,166,506.38 Euro (two hundred and four million one hundred sixty six thousand five hundred and six Euro and thirty eight cents) which includes all taxes and duties applied at the time of signature of present Contract in Iraq. [...]"*

42.    Under the Contract, an Engineer was to be appointed, *"who shall carry out the duties assigned to him in the Contract"* and who was, *"deemed to act for the Employer"*. The Engineer appointed in relation to this Contract was Technital S.p.A ("Technital").

43.    According to the Contract, Technital had various duties:

43.1    Sub-Clause 3.3 of the FIDIC General Conditions: *"The Engineer may issue to the Contractor (at any time) instructions which may be necessary for the execution of the Works and the remedying of any defects, all in accordance with the Contract."*

43.2    Sub-Clause 3.5 of the FIDIC General Conditions: The Engineer, if required, could *"agree or determine any matter"*, and *"[i]f agreement is not achieved, the Engineer shall make a fair determination in accordance with the Contract, taking due regard*

**Dr. Robert Gaitskell QC**
President
[2] -6.5m below median sea level.
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

15

*of all relevant circumstances. The Engineer shall give notice to both Parties of each agreement or determination, with supporting particulars".*

43.3   Such agreements or determinations could be related to claims for extensions of time (Clause 8.4 of the FIDIC General Conditions), and adjustments to the Contract Price on account of Variations (Clause 13.3 of the FIDIC General Conditions).

43.4   Sub-Clauses 14.6 and 14.13 of the FIDIC General Conditions provided that the Engineer shall issue interim payment certificates and final payment certificates.

44.   Pursuant to Clause 8.2 of the FIDIC General Conditions, Archirodon was required to "*complete the whole of the Works […] within the Time for Completion for the Works*". The addition to Clause 8.2 set out in the Special Conditions established that the Time for Completion was 18 months, "*calculated from the Commencement Date*". The Commencement Date was 8 December 2012, meaning that the original Time for Completion was 7 June 2014.

45.   Clause 8.4 of the FIDIC General Conditions relates to the Extension of the Time for Completion in the following terms:

> *"The Contractor shall be entitled subject to Sub-Clause 20.1 [Contractor's Claims] to an extension of the Time for Completion if and to the extent that completion for the purposes of Sub-Clause 10.1 [Taking Over the Works and Sections] is or will be delayed by any of the following causes:*
>
> *44.1   a Variation (unless an adjustment to the Time for Completion has been agreed under Sub-Clause 13.3 [Variation Procedure]),*
>
> *44.2   a cause of delay giving an entitlement to extension of time under a Sub-Clause of these Conditions,*
>
> *44.3   exceptionally adverse climatic conditions,*
>
> *44.4   Unforeseeable shortages in the availability of personnel or Goods caused by epidemic or governmental actions, or*
>
> *44.5   any delay, impediment or prevention caused by or attributable to the Employer, the Employer's Personnel, or the Employer's other contractors on the Site.*
>
> *If the Contractor considers himself to be entitled to an extension of the Time for Completion, the Contractor shall give notice to the Engineer in accordance with Sub-Clause 20.1 [Contractor's Claims]. When determining each extension of time under Sub-Clause 20.1, the Engineer shall review previous determinations and may increase, but shall not decrease, the total extension of time".*

Dr. Robert Gaitskell QC
President

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

16

**Delay Event No. 2**

46.    The construction of the breakwater requires certain materials to be imported to the Al Faw Grand Port site from Zubair.

47.    On 6 October 2013, the Engineer wrote to Archirodon in the following terms:

> *"We have been informed that due to circumstances outside of the control of this Project you are **strongly** advised that from **6am, 7th October 2013 not to use the Basra – Al Faw Main Road for trucks and heavy vehicles coming to site**. In the last number of days, including today, there have been a number of serious car accidents involving serious injuries and fatalities. While we have not been given the impression that the trucks coming to site have been the direct cause of these accidents the increase in traffic volumes due to the truck traffic may be a contributing factor.*
>
> *The local population is not pleased with the number of accidents and rightly or wrongly may accuse different parties. We are now led to believe that unless some action is forthcoming from the Local Authorities in Al Faw the situation may escalate and protests on the road (leading to blockages) or protests at Contractor Camps may occur. Thus they have requested that the trucks stop using the Main Basra- Al Faw Road from **6am tomorrow**. [...]*
>
> *Thus the GCPI, in order to maintain access, is putting in place an alternative route, indicated in black on the attached drawing. This is being arranged by the Border Police who are currently informing all checkpoints along this route. This should avoid any delays to materials being brought to site. [...]*
>
> *The Engineer or the GCPI offer the above information, provided by the Local Authorities, in good faith but cannot be responsible for any delays or damage to works and vehicles that may occur if protests on the Main Basra – Al Faw Road are to take place."*
>
> (Emphasis in original)

48.    On 22 October 2013, Archirodon replied to the Engineer's letter, explaining that they were complying with the alternative transport arrangements but had encountered some problems, namely that the trucks had not been able to pass through the Check Points until the required documentation had been acquired, and in any event the suppliers had '*complained that this road is not in good condition and refused to haul in material from the approved sources*'. Archirodon explained that it was in the process of investigating the condition of the road, but that the suppliers were refusing the use the road.

> *"To this date we could not establish proper deliveries of sand and gravel material via this new route and we are still struggling with our suppliers to find a solution, As you realize the progress of the works has been affected and delayed due to this change of transportation route and for any time or financial impact we reserve our rights to claim reimbursement and extension of construction time accordingly. This letter serves the purpose of, and satisfies, any notice requirements under the Contract or otherwise".*

Dr. Robert Galtskell, QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

17

49. As set out in Archirodon's Request for Arbitration at [40], it is Archirodon's case that, as a result of the restriction of the access to the site via the Basra – Al Faw Road, it experienced the following consequences:

49.1 delays and disruption to the supply of local materials required for the Works;

49.2 loss of productivity caused by the significant reduction in material supply;

49.3 delays to the completion of the near-shore part of the breakwater;

49.4 delays to the installation of the temporary jetty for loading local material;

49.5 a shortage of supply of local material which necessitated importing materials from the UAE resulting in significant additional costs and delay;

49.6 delays to the completion of the Quarry Run core section;

49.7 delays to the filling of the staging pier;

49.8 significant delay in the project completion;

49.9 increased costs associated with the use of local materials;

49.10 additional costs associated with repairing the alternative delivery route; and

49.11 significant prolongation costs.

50. On 14 July 2014, Archirodon wrote to Technital and GCPI explaining that "*[t]he Contractor has notified the Engineer of various events, which fall outside the direct control of the Contractor, that have caused delays and disruptions to the Contractor's work. The Contractor hereby submits supporting particulars and Request for Extension of the Time for Completion referenced 09016-EOT-02-Rev 0 due to Delay Events No. 2 to 7.*"

51. In this letter and accompanying Request for Extension of Time for Completion, Archirodon listed the alleged consequences of the change of route (in substantively similar terms to those above), and explained that these had resulted in a delay of 262 days.

52. On 31 July 2014, Archirodon wrote to Technital and GCPI submitting supporting particulars and a Request for Adjustments to Contract Price. That Request explains its purpose "*is to assess the additional Costs incurred as a result of the governing Events namely, a) Restricted Access to Project Site through Basra – Al Faw Road and b) Unforeseeable Physical Conditions – Differing Soil Conditions. The additional Costs include the direct Costs pertained to additional works, increased quantities and increased material prices in addition to the associated disruption, loss of productivity and prolongation Costs.*" Archirodon assessed the cost impact to be €60,694,759.23, meaning that the amended Contract Price would be €264,861,265.61.

18

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

53.    Further details were given by Archirodon on 3 September 2014.

54.    On 9 September 2014, Technital wrote to Archirodon to give its response to the Request for an extension of time and adjustment of the Contract Price. As regards Delay Event No. 2, Technital drew attention to Sub-Clauses 4.15(d) and (e) of the FIDIC General Conditions: *"the Employer does not guarantee the suitability or availability of particular access routes"* and *"costs due to non-suitability or non-availability, for the use required by the Contractor, of access routes shall be borne by the Contractor."* Technital was not persuaded that the context could be defined as *"rebellion, terrorism, revolution, insurrection, military or usurped power, or civil war"* (Sub-Clause 17.3 of the FIDIC General Conditions), nor as a Change in Legislation (Sub-Clauses 13.7 and 1.1.6.5 of the FIDIC General Conditions) or governmental action causing *"unforeseeable shortages in the availability of personnel or Goods"* (Sub-Clause 8.4 of the FIDIC General Conditions). The Request related to Delay Event No. 2 was rejected.

55.    On 18 September 2014, Archirodon provided a substantive response to Technital's letter dated 9 September 2014. By way of a general overview, Archirodon challenged Technital's interpretation and what Archirodon considered to be selective quoting of the Contract conditions. Archirodon emphasised that the government had suggested the alternative route in response to concerns of protests over fatalities on the road.

56.    By this letter, Archirodon requested Technital, *"being the first level of adjudication, to reconsider* [its] *opinion, consult with the Parties, act impartially and have a fair assessment of the subject requests to avoid further dispute resolution steps which may jeopardise the efforts to complete the Project smoothly and swiftly."*

57.    Much of the dialogue concerning Delay Event No. 2 was then subsumed into the ongoing dialogue concerning Delay Event No. 3 (detailed generally below). In brief, on 3 August 2015, Technital wrote to Archirodon and rejected Archirodon's Request of 28 July 2015 for an extension of time for a period of 511 days and associated costs in respect of Delay Event No. 3.

**Delay Event No. 3**

58.    The tender information produced by GCPI gave details of the expected settlement and corresponding volume of the material which would be used in the construction of the breakwater. In order to verify those details Archirodon constructed a trial embankment.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

19

59.    On 20 January 2014 and 1 March 2014, Archirodon produced a 'Trial Embankment Interpretative Report and Addendum' which detailed how the soil conditions of the Breakwater differed from those anticipated in the tender information. Archirodon concluded that: (1) there was significant bulging phenomena observed during the embankment construction; and (2) measured settlement exceeded the theoretical estimated values and the settlement rate was significantly faster than expected.

60.    On 17 March 2014, Technital issued its own report entitled 'Geotechnical Characterisation of Foundation Soil based on Observed Behaviours during Construction' which similarly concluded that the soil conditions were different from those anticipated in the tender information.

61.    It is Archirodon's case that such differing soil conditions constitute an Unforeseeable Physical Condition within the meaning of Sub-Clause 4.12.

62.    As set out in Archirodon's Request for Arbitration at [50], it is Archirodon's case that, as a result of the soil conditions being different, various adverse consequences followed:

62.1    Archirodon had to undertake additional work due to the excessive and rapid settlement of the soil, the significant bulging, and the associated collapses that occurred;

62.2    delays and disruptions to the Works; and

62.3    the need to procure a significant quantity of additional materials.

63.    On 14 July 2014 (see above) Archirodon submitted its Request for Extension of Time for Completion. As above, on 31 July 2014, Archirodon wrote to Technital and GCPI submitting supporting particulars and a Request for Adjustments to Contract Price.

64.    On 29 July 2014, Technital requested further explanations in light of Archirodon's Request for Extension of Time. On 3 September 2014, Archirodon provided those further explanations.

65.    On 9 September 2014, Technital wrote to Archirodon to give its response to the Request for an extension of time and adjustment of the contract price. As regards the referral to

Dr Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (

20

Technital "*acknowledges* [Archirodon's] *assumption that the sub-surface conditions (soil conditions) proved to be different from those conditions individuated by the Contractor at the Tender stage.*" Technital expressed some doubt as to whether the sub-surface conditions could be considered '*unforeseeable*', and expressed uncertainty with respect to Archirodon's conclusion in light of a number of factors, as set out in Technital's letter. Technital also drew to Archirodon's attention Sub-Clause 4.10 of the FIDIC General Conditions: "[t]*he Contractor shall be deemed to have obtained all necessary information as to risks, contingencies and other circumstances which may influence or affect the Tender or the Works. To the same extent, the Contractor shall be deemed to have inspected and examined the Site, its surroundings, the above data and other available information, and to have been satisfied before submitting the Tender as to all relevant matters, including (without limitation): a) the form and nature of the Site, including sub-surface conditions; b) the hydrological and climatic conditions [...]*'. In sum, Technital considered that '*no reasons may justify the acceptance of the Request and* [Archirodon] *is contractually and legally obliged to carry out the Works in accordance with the original Time for Completion's schedule bearing all the necessary costs*".

66.     On 18 September 2014, Archirodon replied to the rejection of its Request. As with its comments regarding Delay Event No. 2 (see above), Archirodon commented on Technital's allegedly selective quoting of the Contract. In addressing the doubts that the encountered conditions were 'unforeseeable' Archirodon responded that "[i]*n this case it was confirmed by the Contractor's and Engineer's reports that the encountered soil behaviour could not be foreseen from the available data at tender stage.*"

67.     On 9 December 2014, and following meetings with representatives from GCPI and other correspondence, Archirodon provided its 'Supplemental Submissions for Delay Event No. 3'. This included an estimate of the additional settlement/penetration volume based on the soil investigation.

68.     On 28 July 2015, Archirodon provided a revised calculation of the settlement/penetration based on measurements provided by an independent third party, Fugro. In this 'Supplemental Submission (2) for Delay Event No. 3', Archirodon made the following requests:

> "*In respect of Delay Event No. 3, the Contractor requests an Interim Extension to the Time of Completion of 511 days amending the Completion Date to 31 December 2015.* [...]
>
> *In respect of costs associated with Delay Event No. 3, the Contractor requests an Interim Compensation Extension of €163,262,221.82.*" (Emphasis in original)

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

21

69.    On 3 August 2015, Technital wrote to Archirodon and commented "[d]*ue to the fact that the modern investigation and analysis techniques may not be able to detect the actual geotechnical conditions, the unforeseen soil conditions could be undisputed*". However, Technital proceeded to comment that:

> "*a large part of* [the] *delay has nothing or very little to do with the unforeseen geotechnical conditions'. It is worth reminding that any time extension request should exclude the following factors falling within the responsibility of the Contractor:*
>
> - *construction activities of offshore part have started after 11 months from the project start where the initial period of execution was 18 months in total;*
>
> - *even in conditions of evident delay when the construction started, only a single front (the land one) has been activated;*
>
> - *the advantages that the encountered geotechnical conditions now give the Contractor, with regard to a reasonably efficient and faster pace for Construction, allowing for the geotechnical characteristics experienced on site and with a proper and correct step by step construction method of placing.*"

70.    As to Archirodon's claim for additional costs, Technital noted that "*the calculation of volumes and quantities within the Claim shows that figures provided are not directly related to the sole change of geotechnical conditions*" and that "a *number of factors falls certainly within the responsibility of the Contractor*". Technital also set out its objection to Archirodon's method of calculating its claim for additional costs.

71.    Technital concluded by explaining that in its "*opinion* [Archirodon's] *Request for Extension of the Time for Completion of 511 days up to 31ˢᵗ December 2015 must be rejected, as well as the associated costs, which have no grounds to be claimed if so motivated.*"

**Delay Event No. 8**

72.    Since late 2013, and in particular in mid-2014, the Islamic State of Iraq and Syria (ISIS) and aligned forces began a major offensive in Iraq against the Iraqi government. This resulted in rapid territorial gains and a spread of civil war and terrorism.

73.    On 17 June 2014, Archirodon submitted a notification to Technital pursuant to Sub-Clauses 17.3 and 17.4 of the FIDIC General Conditions. In light of "*the recent events and unrest situation in the country*" various concerns were raised "*which will seriously impact the Project*" including a total deployment ban on the deployment of overseas workers from the Philippines, and advice from the Indian Government that Indian nationals should not travel to Iraq.

22

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

leaving Iraq (which advice later became an outright ban on Indian nationals returning to their previous employment in Iraq after having been on leave in India).

74.    On 25 June 2014, Archirodon submitted a notification to GCPI pursuant to Sub-Clause 19.2 of the FIDIC General Conditions of force majeure events, namely *"the recent political and other events and/or circumstances affecting the country"*, and explained that it was *"already suffering the significant direct consequences of these far reaching events"*. The events had *"led to a shortage of skilled operatives, junior and senior staff"*. Archirodon explained that it considered *"that the circumstances referred to herein also constitute an entitlement to an extension of time pursuant to Clause 8.4, and particularly Sub-Clause 8.4(d)"*.

75.    On 2 December 2014, Archirodon submitted an 'Interim Request for Extension of Time for Completion: Delay Event No. 8 – Force Majeure' which concluded as follows:

> *"The Interim Assessment as at the end of September 2014 described herein resulted in demonstrating a significant drop in the Contractor's Efficiency to 48.13% (i.e. a loss of productivity of 51.87%) during June, July, August and September 2014 due to a shortage of manpower as a direct consequence of the Country Unrest Situation. This means that when the situation is back to normal and the construction pace is regained; the Contractor will need 64 days to compensate for the dropped efficiency and lost production. However, if the situation persists, the time required to compensate for the lost production shall increase; in addition to the effect of shifting marine operations to winter time when the productivity is even lesser. The Contractor therefore requests an Interim Extension of Time for Completion of 64 days being the time impact as at end of September 2014."*

76.    It is Archirodon's case (as set out at [62] of the Request for Arbitration) that it took several measures to mitigate the impact of the alleged force majeure event, including measures to:

76.1    ensure the safety and welfare of Archirodon's personnel including, for example, the hiring of a boat for use in case of an emergency evacuation;

76.2    contain the extensive loss of key personnel by, for example, increasing salaries by around 20% from July 2014;

76.3    ensure the Site remained operational and the progress pace was regained by, for example, maintaining the commitment of the rock supplier from UAE and the transportation fleet and hiring additional local workers; and

76.4    generally mitigate the implications of the events by, for example, requesting to discuss the situation with GCPI aiming to agree a plan which controlled and

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

23

minimised damage to all Parties. It is Archirodon's case that GCPI did not entertain the proposals and requests.

77. On 11 February 2015, Technital stated that it could not complete its assessment in respect of Delay Event No. 8 (Force Majeure) as Archirodon's submission was incomplete as regards costs impact.

78. On 3 August 2015, Archirodon wrote to Technital to reiterate its request for an Extension of the Time for Completion of 64 days, and submitted that *"the costs impact as a result of the encountered Force Majeure [...] is assessed at €8,993,193.76 and for which the Contractor is seeking compensation"* (Emphasis in original).

79. On 1 September 2015, Technital issued its determination in respect of Archirodon's Request for an extension of time and costs relating to Delay Event No. 8. The Request was rejected in the following terms:

> *"1.    It is not denied that the events in Iraq (particularly reference in the Northern and Western Provinces) took place, but there is no justification, record or proof given that the security of the Works, Project Site, Camp, Travel to/from Project was directly affected by events or actions related to the situation in the Northern and Western Provinces.*
>
> *2.    In accordance with Sub-Clause 19.2 (Notice of Force Majeure) the Engineer is not of the opinion that the Contractor was prevented from performing any of its obligations.*
>
> *3.    In accordance with Sub-Contract 8.4(d) (Extension of Time for Completion) the Engineer is not of the opinion that the shortages in the availability of Personnel or Goods was unforeseen.*
>
> *Thus, on the basis of the above points and the document submission of the Contractor to date, the Engineer does not believe there is sufficient justification for the claim for Delay Event no. 8: Force Majeure to be justified to any sufficient level, and based on this point rejects the basis for the claim".*

## Delay Damages Levied on Archirodon

80. On 19 July 2014, Technital wrote to Archirodon to inform them that they had received a Notice from GCPI in accordance with Sub-Clause 2.5 of the FIDIC General Conditions that the GCPI believed that the Delay Damages as per Sub-Clause 8.7 of the Contract should be applied. Technital explained that it would then proceed to make the necessary determinations. Under Sub-Clause 8.7 of the Special Conditions, *"Delay damages amount to 0.1% per day of the contract price. The limit of the liquidated damages for delay is 10% of the contract price."*

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

24

81. On 22 July 2014, Archirodon replied and categorically denied *"any liability whatsoever for Delay Damages"*, and commented that it had notified Technital *"of a number of events that have occurred during the course of the Works that have singularly and collectively prevented and/or hindered* [Archirodon's] *ability to meet his own programme of Works"*.

82. On 8 September 2014, GCPI submitted details of the alleged delay, explaining that Archirodon had *"failed to achieve the Works within the revised contract period which ended on 7th August 2014."*

83. On 27 August 2015, GCPI submitted a more detailed explanation of why it believed Delay Damages were due. GCPI explained that Archirodon had only presented a schedule and revised completion date one month before the contractual completion date in August 2014. The revised date moved the completion date back by 12 months, that is to 7 August 2015. GCPI commented that that *"abnormal economic request"* was *"considered by* [Technital] *inconsistent or inapplicable within a Yellow Book FIDIC contract"*, and criticised the work which Archirodon had undertaken on the Breakwater in the meantime. GCPI also noted that *"on August 2015 and therefore a few days before the completion date already shifted by 12 months,* [Archirodon] *presented an update of its claim bringing the financial request to €160 million approximately and asking to shift the completion date by a further five months, meaning that the completion date will be further shifted to 31 December 2015"*. GCPI repeated its request that Technital carry out its determination on the question of Delay Damages.

84. On 31 August 2015, Technital wrote to Archirodon to explain that it would *"comply with the instructions of* [GCPI] *and apply the Delay Damages (as per Sub Clause 8.7) from this point onwards. The Delay Damages will be applied to the required forthcoming Interim Payment Certificates until the required amount is attained. As per Sub Clause 8.7 the amount in question is 10% of the Contract Price"*. The Delay Damages therefore totalled €20,416,650.60.

85. On 28 September 2015, Archirodon responded to the submissions made by GCPI on 27 August 2015, and requested that GCPI *"reconsider the instruction given to* [Technital] *and reverse any application of Delay Damages which are clearly contractually incorrect"*. By way of overview, Archirodon commented that it had acted in compliance with the FIDIC General Conditions, and that the work which it had undertaken on the Breakwater was far more extensive and complex than GCPI's criticisms suggested.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

25

86.    On 14 October 2014, Archirodon wrote to Technital raising concerns about the *"contractually unjustifiable"* implementation of the Delay Damages decision, and the fact that Technital *"failed to provide a determination with supporting particulars taking due regard of all relevant circumstances in accordance with Sub-Clause 3.5* [of the FIDIC General Conditions]". Some emphasis was also put on the wording of Technital's letter to Archirodon dated 3 August 2014 in which it was commented that *"the unforeseen soil conditions could be undisputed"*. Archirodon asserted that:

> "[Technital] *failed to fulfil its obligations and observe its professional duties impartially and with the due diligence in accordance with the Contract. Such failure of the Engineer, whether deliberate or not, resulted in undeserved advantageous position to* [GCPI] *and has caused, and is continuing to cause, unjust severe damages to* [Archirodon. Technital] *is thus requested to exercise its authority under the Contract and reserve the application of Delay Damages with immediate effect and make a compliant determination in accordance with the Contract having regard to all relevant circumstances"*.

87.    On 14 December 2015, Technital issued Interim Payment Certificate No. 25, citing the figure for payment as being €0. This Certificate applied Delay Damages. This Certificate, as explained in the accompanying cover letter, did not permit recovery by Archirodon of the €21,000,000 claimed in relation to Delay Event No. 3:

> "It is also recorded in the Contractor Interim Payment Application No. 25 that 21,000,000 has been claimed for payment by [Archirodon] for the EOT No. 2 Delay Events No. 3 (Unforeseen Physical Conditions – Differing Soil Conditions). In accordance with Sub-Clause 3.5 [of the FIDIC General Conditions] both Parties "shall give effect" to any agreement or determination. This has not yet been received formally by [Technital] from the Parties and thus the Contract has not been amended to allow such payment to be processed by [Technital]".

## Archirodon's Claim

88.    Archirodon's Claim is substantively set out at Parts III.B – D. of its Request for Arbitration. In summary, it alleges as follows:

88.1    Archirodon performed works under the Contract, but delays occurred during the course of the Works as a result of events for which GCPI was responsible and/or for which GCPI bore the risk under the Contract. The relevant events were:

    (i)     Delay Event No. 2 – Archirodon's access to the Site was restricted by GCPI via the Basra – Al Faw Road, such that Archirodon was unable to transport materials required for the Works;

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

26

(ii)    Delay Event No. 3 – Archirodon discovered that the soil conditions and behaviour were unforeseeably different to those anticipated at the tender stage, and significant works were required to account for these differences; and

(iii)    Delay Event No. 8 – The effects of the activities of ISIS in Iraq had a direct effect on Archirodon's operations and productivity, not least due to the international response and the impact on Archirodon's personnel.

88.2    Archirodon was entitled under the Contract to an extension of time and resultant costs in light of the Delay Events No. 2 to 7 (notably Delay Events No. 2 and 3).

(i)    As a result of Delay Events No. 2 to 7, on 28 July 2015, Archirodon requested an extension to the Time for Completion of 511 days (thereby amending the Time for Completion to 31 December 2015), which carried with it a cost impact totalling €163,262,221.82.

(ii)    Archirodon had provided all the necessary information required for Technital and GCPI to reasonably assess Archirodon's claims.

(iii)    The bases of Archirodon's entitlement were pursuant to the following Sub-Clauses of the FIDIC General Conditions:

As regards Delay Event No. 2:

(a)    8.4(d), insofar as the delay was the result of '*unforeseeable shortages in the availability of personnel or Goods caused by [...] governmental actions*';

(b)    13.7, insofar as the restriction of access constituted a change to the regulations and by-laws; and

(c)    17.3 and 17.4, insofar as the restriction of access had been imposed to avoid potential public protests, which fell within Employer's Risks under the Contract;

and as regards Delay Event No. 3:

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

27

(a)     8.4(b), insofar as the delay was the result of '*a cause of delay giving an entitlement to extension of time under a Sub-Clause of these conditions*';

(b)     4.12, insofar as the soil conditions proved to be different from those which could be predicted at the tender stage and so constituted an Unforeseeable Physical Condition.

(iv)     Technital was wrong to reject Archirodon's request for an extension of time and costs.

88.3     Archirodon was entitled under the Contract to an extension of time and resultant costs in light of Delay Event No. 8:

(i)     As a result of Delay Event No. 8, on 2 December 2014 and 3 August 2015, Archirodon made an interim request for extension to the Time for Completion of 64 days, and costs totalling €8,993,193.76.

(ii)     Archirodon had provided all the necessary information required for Technital and GCPI to reasonably assess Archirodon's claims.

(iii)     The bases of Archirodon's entitlement were pursuant to the following Sub-Clauses of the FIDIC General Conditions:

(a)     8.4(d), insofar as the delay was the result of "*unforeseeable shortages in the availability of personnel or Goods caused by* [...] *governmental actions*".

(b)     17.3 and 17.4, insofar as the restriction of access had been imposed to avoid potential public protests, which fell within Employer's Risks under the Contract.

(c)     19.1(ii), insofar as the acts of ISIS amounted to circumstances of "*rebellion, terrorism, revolution, insurrection, military or usurped power, or civil war*", and the circumstances were '*exceptional*' as demonstrated by the reactions of the international community.

28

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

(d)     19.1(a) - (d), insofar as the exceptional events or circumstances were beyond Archirodon's control; could not have been provided for before entering into the Contract nor avoided; and were not substantially attributable to GCPI.

(e)     19.2, insofar as the exceptional events or circumstances prevented Archirodon from performing its general obligations under Sub-Clause 4.1 of the FIDIC General Conditions to provide the necessary resources and Goods for the execution of the Works in the Time for Completion. Archirodon was so prevented because the reaction of the international community had led to a shortage of skilled operatives, junior and senior staff in key positions. Further, Archirodon had given the appropriate notice on 25 June 2014.

(f)     19.3, insofar as Archirodon had used all reasonable endeavours to minimise the delay in the performance of the Contract.

(g)     19.4, insofar as the above were all satisfied.

(iv)    Technital was wrong to reject Archirodon's request for an extension of time and costs.

88.4    Further, notwithstanding Archirodon's entitlements to extensions of the Time for Completion, GCPI wrongfully levied delay damages on Archirodon totalling €20,416,650.60, being the maximum amount of delay damages that can be levied under the contract pursuant to Clause 8.7 of the Special Conditions.

88.5    GCPI's imposition of delay damages is unjustified, both under the Contract and as a matter of Iraqi law, in circumstances where:

(i)     Archirodon is entitled to extensions of time and GCPI therefore has no valid contractual basis to claim delay damages from Archirodon; and

(ii)    furthermore:

(a)     GCPI and Technital had admitted that Archirodon was entitled to be

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

29

compensated for the losses and damage incurred as a result of Delay Event No. 3 relating to Unforeseeable physical conditions; and

(b)    Technital had assessed Archirodon's entitlement for additional costs relating to Delay Event No. 3 as €21 million which exceeds the delay damages currently levied by GCPI totalling €20,416,650.60.

89.    Further to the Tribunal's direction at the Case Management Conference, on 2 March 2017 GCPI provided its counterclaim (see the section entitled "GCPI's Answer", sub-section 4 "The Respondent's Counterclaims"). Archirodon denies GCPI's counterclaim in its entirety and reserves the right to respond in detail once the counterclaim is fully pleaded by GCPI in its Statement of Defence and Counterclaim.

90.    Accordingly, in its Request for Arbitration Archirodon sought the following relief:

90.1    a declaration that Archirodon is entitled to extensions of the Time for Completion (both under the Contract and as a matter of Iraqi law) of at least 511 days in addition to the two-month extension granted for Delay Event No. 1;

90.2    a declaration that no delay damages are owing from Archirodon to GCPI;

90.3    a determination dismissing GCPI's counterclaim in it is entirety;

90.4    an award to Archirodon and an order that GCPI pay to it:

(i)    at least €179,667,161.96 corresponding to the additional costs incurred and claimed by Archirodon as a result of the delay events;

(ii)    any other amounts or damages to which Archirodon may be entitled under, or in connection with, the Contract (such amounts to be specified by Archirodon in the course of the arbitration);

(iii)    all costs and expenses (including, but not limited to, costs payable to the Arbitral Tribunal, ICC, legal fees and expenses, and experts' and witnesses' fees and expenses and other in-house personnel) incurred by Archirodon in connection with the preparation for and conduct of this arbitration pursuant to Article 37 of the ICC Rules;

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
(General Company for Ports of Iraq (Ira

30

(iv)    interest or financing charges on any amounts payable by GCPI to Archirodon from such date as is determined by the Arbitral Tribunal until the date of payment; and

90.5    such other or varied relief as the Arbitral Tribunal deems just and appropriate in the circumstances.

91.    The Claimant's Pre-Hearing Submissions of 6 July 2018 set out in paragraph 333 thereof the Relief sought as formulated at that date:

*"By reason of the foregoing, Archirodon respectfully requests the Tribunal to:*

a)    *declare that Archirodon is entitled to extensions of the Time for Completion (both under the Contract and as a matter of Iraqi law) of, at least, 1,048 days in addition to the 61 day extension granted for Delay Event No. 1; or alternatively*

b)    *that Archirodon is entitled to complete the Works within a reasonable time and that it has completed the Works to date within a reasonable time;*

c)    *accordingly, declare that no delay damages are owing from Archirodon to GCPI;*

d)    *declare that the Works were completed for the purposes of GC 10 on 18 July 2017;*

e)    *award Archirodon, and requires GCPI to pay to it:*

i)    *at least US$ 303,058,481 corresponding to the additional costs incurred and losses suffered by Archirodon as a result of the delay events described above (which Archirodon is entitled to both under the Contract and as a matter of Iraqi law);*

ii)    *reimbursement of the delay damages erroneously levied on it by the Engineer and GCPI totalling €20,416,650.60;*

iii)    *any other amounts or damages to which Archirodon may be entitled under, or in connection with, the Contract;*

iv)    *all costs and expenses (including, but not limited to, costs payable to the Tribunal, ICC, legal fees and expenses, and experts' and witnesses' fees and expenses and other in-house personnel) incurred by Archirodon in connection with the preparation for and conduct of this Arbitration pursuant to Article 37 of the ICC Rules; and*

v)    *interest or financing charges on any amounts payable by GCPI to Archirodon from such date as is determined by the Tribunal until the date of payment; and*

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

31

    *f)*    *grant Archirodon such other or varied relief as the Tribunal deems just and appropriate in the circumstances."*

92.  The Claimant's Post-Hearing Submissions of 2 November 2018 set out the relief sought by the Claimant at that date:

*"Archirodon respectfully requests the Tribunal to:*

*a)*  *declare that the Works were completed for the purposes of GC10 on 18 July 2017;*

*b)*  *declare that Archirodon is entitled to extensions of the Time for Completion (both under the Contract and as a matter of Iraqi law) of, 1,137 days (in addition to the 61 day extension granted for Delay Event No. 1) or such other period as the Tribunal determines to be appropriate; or alternatively*

*c)*  *that Archirodon was entitled to complete the Works within a reasonable time and that it has completed the Works within a reasonable time;*

*d)*  *accordingly, declare that no delay damages are owing from Archirodon to GCPI;*

*e)*  *declare that in the vent of non-payment of the Final Award, in whole or in part, by GCPI within 30 days of the date of the Final award, Archirodon is entitled to make a claim to the Tribunal and to seek a further award or awards for interest on any unpaid amount of the Final Award at a rate of 5%;*

*f)*  *award Archirodon, and require GCPI to pay to it:*

*i)*  *at least Euros 291,268,406 corresponding to the additional costs incurred and losses suffered by Archirodon as a result of the Delay Events described above (which Archirodon is entitled to both under the Contract and as a matter of Iraqi law);*

*ii)*  *reimbursement of the delay damages erroneously levied on it by the Engineer and GCPI totalling Euros 20,416,650.60;*

*iii)*  *any other amounts or damages to which Archirodon may be entitled under, or in connection with, the Contract;*

*iv)*  *all costs and expenses (including, but not limited to, costs payable to the Tribunal, ICC, legal fees and expenses, and experts' and witnesses' fees and expenses and other in-house personnel) incurred by Archirodon in connection with the preparation for and conduct of this arbitration pursuant to Article 37 of the ICC Rules; and*

*v)*  *interest or financing charges on any amounts payable by GCPI to Archirodon from such date as is determined by the Tribunal until the date of the Award; and*

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

32

> g) grant Archirodon such other or varied relief as the Tribunal deems just and appropriate in the circumstances. "

93. By email of 11 July 2018 (in response to a request dated 9 July 2018 from the Tribunal) the Claimant supplied a summary of the quantum of sums claimed by it, including interest up to 30 June 2018. This is stated as shown in **Appendix 2** hereto. By email of 10 July 2018 the Respondent stated that it did not pursue a counterclaim. (As noted in Appendix 2, the Respondent currently holds €20,416,651 which it has deducted from payments otherwise due to the Claimant (RSOD paragraph 442).)

**GCPI's Answer**

94. In the Terms of Reference the Respondent's case was summarised as follows.

As set out below, the Respondent requests that the Claimant's claims be dismissed.

(1) <u>Archirodon is not entitled to an extension of time or additional payment in connection with Delay Event No. 2?</u>

95. Archirodon had the choice of the access routes and bore the risk of their availability. The events on which the Claimant relies did not prevent Archirodon from using other access routes.

96. On 9 September 2014, the Engineer issued its Determination in accordance with Sub-Clause 3.5 of the General Conditions, rejecting Archirodon's claim for an extension of time and an adjustment of the contract price in connection with the alleged Delay Event No. 2. In particular, Technital found that, in accordance with Sub-Clause 4.15 of the General Conditions, the Employer did not guarantee the suitability or availability of particular access routes. In addition, as stated in the Determination, Technital did not consider Sub-Clauses 17.3, 13.7, 1.1.6.5 or 8.4 of the General Conditions applicable to the events comprising Delay Event No. 2.

97. For the reasons set out in Technital's Determination of 9 September 2014, as well as further reasons to be explained in GCPI's submissions in these arbitration proceedings – including, in particular, the availability of alternative access routes – it is GCPI's position that Archirodon is not entitled to an extension of time or additional payment in connection with Delay Event No. 2.

98. GCPI requests that Archirodon's claim with respect to Delay Event No. 2 be dismissed in its

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

33

entirety.

(2) **Archirodon is not entitled to the Extension of Time or additional payment sought in connection with Delay Event No. 3**

99.    It is for the Claimant to establish if and to what extent the soil conditions encountered meet the requirements of Sub-Clause 4.12 of the General Conditions and, if they do, that Archirodon dealt with the actual conditions in a competent manner that justifies its claim in terms of time and money.

100.    An important part of the delay suffered by Archirodon is unrelated to the soil conditions, but due to other reasons, in particular delay in commencing the works. The delay and additional costs that are related to the soil condition are attributable to the incompetent manner in which Archirodon dealt with these conditions. Had the conditions actually encountered been dealt with adequately, the works could have been performed faster and at lower costs than under the assumed conditions.

101.    On 3 August 2015, Technital rejected Archirodon's claim for an Extension of Time of 511 days of delay and additional costs in connection with Delay Event No. 3, stating *"The Contractor has included in the Claim a period of 511 days covering the overall period of delay, but a large part of such delay has nothing or very little to do with the unforeseen geotechnical conditions."*

102.    In any event, GCPI disputes Archirodon's assessment of the adjustment of the contract price and extension of time to which the Contractor is allegedly entitled as a result of Delay Event No. 3. In particular, GCPI contests that all delays and additional costs incurred by Archirodon are solely attributable to the allegedly unforeseen geotechnical conditions and therefore claimable under Sub-Clause 4.12. Archirodon's claim must be assessed taking into account the Contractor's obligations under the Contract, including the obligation under Sub-Clause and 4.12 of the General Conditions to *"continue executing the Works, using such proper and reasonable measures as are appropriate for the physical conditions"*, as well as the Contractor's general obligations under Sub-Clause 4.1 of the General Conditions.

(3) **Archirodon is not entitled to an extension of time or additional payment in connection with Delay Event No. 8**

103.    The events on which the Claimant relies did not affect the works and did not prevent performance by Archirodon; they caused neither additional costs nor delay.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

34

104.    On 1 September 2015, Technital issued its Determination in accordance with Sub-Clause 3.5 of the General Conditions, rejecting Archirodon's claims in connection with the alleged Delay Event No. 8 on the basis that Archirodon was not prevented from performing any of its obligations in accordance with Sub-Clause 19.2 of the General Conditions, and that the shortages in personnel and goods were not unforeseeable within the meaning of Sub-Clause 8.4(d) of the General Conditions.

105.    The events on which the Claimant relies took place in the northern and western provinces of Iraq in 2013 and 2014, hundreds of kilometres away from the site. The security of the Works, project site, camp, or travel to and from the project were not affected by these events. Archirodon has not provided any adequate evidence to the contrary.

106.    For the reasons set out in Technital's Determination of 1 September 2015, as well as further reasons to be explained in GCPI's submissions in these arbitration proceedings, Archirodon is not entitled to an extension of time or additional payment in connection with Delay Event No. 8.

107.    Accordingly, GCPI requests that Archirodon's claim with respect to Delay Event No. 8 be dismissed in its entirety.

(4)    <u>The Respondent's Counterclaims</u>

108.    The completion of the works was indisputably delayed, in breach of Sub-Clause 8.2 of the General and Special Conditions. The Claimant has failed to establish any right to an extension of time and, in any event, to an extension which would bring the delay for which it is responsible below the limit at which the maximum Delay Damages pursuant to Sub-Clause 8.7 of the Special Conditions are reached. GCPI is therefore entitled to Delay Damages in accordance with Sub-Clause 8.7 of the General and Special Conditions, calculated from the contractual Date of Completion onwards. The Employer's Claim has been accepted by the Engineer and applied in Interim Payment Certificate No. 25.

109.    GCPI has suffered substantial damages beyond the Delay Damages provided for in Sub-Clause 8.7, as a result of the delay that is attributable to the Claimant and of the inadequate construction methods adopted by the Claimant. Damages suffered by the Respondent include – but are not limited to – the additional costs incurred by the Respondent during the extended project duration, including additional compensation to the Engineer and to GCPI personnel; additional costs incurred as a result of the construction methods adopted by the Claimant, including increased maintenance costs; and lost revenue and profits from the operation of the

Dr. Robert Gaitskell QC
    President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
    Company S.A. (Panama)
        v.
General Company for Ports of Iraq (Iraq)

35

port, the completion of which is delayed because of the delay in the completion of the Claimant's part of the works.

110.     In the Terms of Reference the Respondent claimed compensation from the Claimant for this additional damage, which it stated would be quantified in due course upon completion of the Project. However, by email of 10 July 2018 the Respondent confirmed it is not pursuing a counterclaim in circumstances where it currently withholds Euros 20,416,651 by way of deductions for liquidated damages, as noted in RSOD paragraph 442.

(5)     Relief Sought by the Respondent

111.     In the Respondent's Post-Hearing Submissions of 2 November 2018 it set out its Request for relief at paragraph 674 thereof in the following terms:

> *"The Respondent respectfully requests that the Arbitral Tribunal:*
>
> *Dismiss the Claimant's claims in their entirety;*
>
> *Award compensation for the costs incurred by the Respondent relating to the review, investigation and defence of the Claimant's claims, both prior to and in the course of the present arbitration, including in-house and third party costs, legal fees, the administration charges of the ICC, and the fees and expenses of the Arbitral Tribunal, and*
>
> *Grant such other and further relief to which it considers the respondent entitled."*

**Issues To Be Decided**

112.     In the Terms of Reference the Tribunal stated it did not consider it necessary to define the issues at that stage but would decide the issues as they arise from the pleadings and submissions in consultation with the Parties during the course of the proceedings, subject to Article 23(4) of the Rules.

113.     Attached hereto as **Appendix 3** is the Claimant's List of Issues as supplied on 3 July 2018, in preparation for the substantive hearing. Attached as **Appendix 4** is the Respondent's List of Issues as supplied on 3 July 2018, also in preparation for the substantive hearing.

V.     ICC

114.     The Counsel in charge of the file concerning this arbitration at the Secretariat is:

Ms Asli Yilmaz
International Court of Arbitration
International Chamber of Commerce

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

36

33-43 avenue du Président Wilson

75116 Paris

France

Telephone:    +33 1 4953 28 32

Fax:    +33 1 4953 57 80

Email:    ica5@iccwbo.org

## VI.    DELAY EVENT NO. 2 (ROAD: RESTRICTED ACCESS TO THE SITE THROUGH THE BASRA – AL FAW ROAD)

### A.    The Factual Background

115.    On 6 October 2013, the Engineer wrote to Archirodon to advise that the Basra – Al Faw Road was not to be utilised by trucks and heavy vehicles travelling to the Site. The Engineer's letter (Exhibit C-32) stated that (emphasis in the original):

> "We have been informed that due to circumstances outside of the control of this Project you are **strongly** advised that from the **6am, 7ᵗʰ October 2013 not to use the Basra – Al Faw Main Road for trucks and heavy vehicles coming to site**. In the last number of days, including today, there have been a number of serious car accidents involving serious injuries and fatalities. Whilst we have not been given the impression that the trucks coming to site have been the direct cause of these accidents the increase in traffic volumes due to the truck traffic may be a contributing factor.
>
> The local population is not pleased with the number of accidents and rightly or wrongly may accuse different parties. We are now led to believe that unless some action is forthcoming from the Local Authorities in Al Faw the situation may escalate and protests on the road (leading to blockages) or protests at Contractor Camps may occur. Thus they have requested that the trucks stop using the Main Bara- Al Faw Road from **6am tomorrow**. ...
>
> Thus GCPI, in order to maintain access, is putting in place an alternative route, indicated in black on the attached drawing. This is being arranged by the Border Police who are currently informing all checkpoints along this route. This should avoid any delays to materials being brought to site. The Engineer, with the Employer, takes seriously this request from the Local Authorities. The Mayor of Al Faw understands what is being asked and thus is informing us before the situation gets out of control.
>
> Part of the confusion on behalf of various Authorities is that under Vol. 3, Technical Specifications, Section 1.3.15 (Temporary Quay) of the Contract, material from Al Zubair were to be brought to site through the use of a Temporary Jetty. This has not occurred to date.
>
> The Engineer or the GCPI offer the above information, provided by the Local Authorities, in good faith but cannot be responsible for any delays or damage to works and vehicles that may occur if protests on the Main Basra – Al Faw Road are to take place. There is already direct experience on this project of protests involving grievances of the local population. These difficulties of working in Iraq were known *to all before coming to Iraq.*

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

37

*I also request that you urgently inform the Project Security Contractors, Triple Canopy, of this possible risk of protest at site and coordinate the security practices accordingly.*"

116.  The communication of 6 October 2013 had attached a letter from the Basra Governorate to GCPI, in which the Basra Governorate requested GCPI to instruct Archirodon to stop using the Basra – Al Faw Road and to use instead an alternative route specified in the Governorate's letter. Such letter reads (in an unchallenged English translation of the Arabic original: Exhibit C-70) as follows:

*"Given the heavy traffic congestion on the Basra – Al Faw Road resulting from the frequent passage of the trucks transporting materials to the Al Faw Grand Port Project and because the above-mentioned road is a single lane road which has made it susceptible to many road accidents which have led to the loss of several lives, not to mention the financial damage that has occurred on the road due to the number of vehicles and the large weight carried by these vehicles. For these reasons please instruct the Greek company which is constructing the breakwater for the Al Faw Grand Port Project to divert its trucks from the Basra – Al Faw Road to the coastal road which connects the Al Zubair bridge in the direction of the Al Faw Port in order to reduce the congestion occurring on the Basra – Al Faw Road which is causing accidents, keeping in mind that approval has been granted for this by telephone call to the Chief of the Border Patrol for the Fourth District, Major General Hakeem who will direct their controls on the coastal road to permit the vehicles affiliated with the Al Faw Grand Port Project to use this road. In addition please instruct the Greek company to repair the damage which has been done to the Basra – Al Faw Road due to its use by the trucks affiliated with them. We also invite the Project management to expedite the design routes for the Al Faw Grand Port Project. With thanks for your cooperation in serving the public interest."*

117.  A drawing was attached to the Engineer's letter of 6 October 2013, which depicted the "*alternative road for trucks*" (the "Alternative Road") as a black line.



Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

38

118.    On 8 October 2013, the Ministry of Oil of the Republic of Iraq requested the South Oil Company ("SOC") to grant permission to the trucks wishing to use the Alternative Road (Exhibit R-120).

119.    On 8 October 2013, representatives of the Engineer drove a portion of the Alternative Road (Exhibit C-433, point 3.1, third bullet).

120.    On 10 October 2013, a Progress Meeting No. 10 between the Engineer, GCPI and Archirodon was held at the Site Offices. During the meeting, the following points were noted with regard to the "*Alternative Route*" (point 4.7 of the minutes, Exhibit C-145):

> "• *The SOC have given permission.*
> • *Now the Police Force require the names of drivers and trucks from ARCO. The sub contactor submitted. These were only received by the Engineer at 10pm, and were sent as soon as possible.*
> • *ARCO mentioned the short notice given to change and would have liked 2 to 3 days more.*
> • *The short notice was required due to the number of deaths (15 in 10 days) on the road. While it was not being implied that the trucks were directly responsible the fact that they drive in convoy was not making driving on the road any easier.*
> • *The Mayor has tried to help as much as possible but if the change wasn't made there could have been a safety issue over the possible action of the local population.*
> • *The SRE asked that ARCO themselves drive the road. He also asked them to note a mound of earth that blocked half of the road that appeared to have a mortar tube on it.*"

121.    On 22 October 2013, Archirodon responded to the Engineer's letter of 6 October 2013. Archirodon's letter (Exhibit C-71) reads as follows:

> "*...The Contractor hereby records that the use of Basra – Al Faw Road by trucks has always been lawful and such instruction of the governorate is not a consequence of any misconduct from the Contractor's side thus constitutes a change to the current regulations and statutes to avoid potential local protests which the Contractor considers as Employer's Risks (both the change to the regulations and the local protests). Having said that we put forward for your consideration the following:*
>
> *1.    According to your captioned letter we complied fully and from the 06:00 hrs of the 7th October 2013 we stopped all our trucks to use the road.*
>
> *2.    The alternative route was not open to our trucks as the check points of the Coast Guard and the South Oil Company requested passes with trucks, drivers etc.*
>
> *3.    We have produced all the requested documentation and it was duly submitted resulting in a clearance to use the alternative route on the 12th October 2013.*
> *Both our material suppliers of the day and of the night shift complained that*

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

69

this road is not in good condition and refused to haul in material from the approved sources of Zubair. We are in the process to investigate the condition of this road and we will revert. In the meantime the production levels of the sand and gravel supplies have dropped to very low levels and it is gravely affecting the progress of the works.

5.  In case that this road needs repairs we will be forced to carry them out but we reserve our rights to claim for this additional costs involved.

As far as the accidents that happened on the main Basrah-Al Faw roads please note that:

1.  The Contractor cannot be held responsible for any car accidents on the Basrah-Al Faw road and we believe that these accidents have happened due to speeding and not due to our trucks using the road.

2.  Prior to start the transportation of materials on the Basrah – Al Faw Main Road the Contractor did the official coordination with all the concerned authorities and with check points on the Main Roads as per GCPI & Engineer request.

For the sake of clarity and good order, we would like to comment on your statement that "under Vol. 3, Technical Specifications, Section 1.3.15 (Temporary Quay) of the Contract, materials from Al Zubair were to be brought to site through the use of a Temporary Jetty":

a)  Section 1.3.15 states that "The Contractor shall supply, install and maintain at his expenses throughout the duration of the Contract a temporary quay to be used for loading pontoons with construction materials coming from the national quarries such as Al Zubair". This statement does not necessitate that the material shall come from Al Zubair to Site by sea; it simply means that the Contractor shall build a temporary quay for loading its pontoons with the materials coming onshore (i.e. from Al Zubair) and to be placed offshore. It is indeed the Contractor's plan to build such a temporary quay at Site for the specified purpose that is "loading pontoons with construction materials coming from national quarries"; the temporary quay has been fabricated and delivered to Site.

b)  It is worth noting that the sand and gravel material that has had being delivered to Site using the subject road was used through direct dumping by land equipment in the part of the Breakwater within the intertidal zone or in the shallow water which is not accessible by marine equipment, therefore the use of temporary quay is not required at all.

To this date we could not establish proper deliveries of sand and gravel material via this new route and we are still struggling with our suppliers to find a solution. As you realize the progress of the works has been affected and delayed due to this change of transportation route and for any time or financial impact we reserve our rights to claim reimbursement and extension of construction time accordingly. This letter serves the purpose of, and satisfies, any notice requirements under the Contract or otherwise."

Dr. Robert Gaitskell QC
President

ICC Case No. 21785/ZF
Archirodon Construction (Overse
Company S.A. (Panama)
v.
General Company for Ports of Iraq

40

122.  On 26 October 2013, at the Weekly On-Site Progress Meeting No. 16 (as noted at point 24 of Section 4 of the minutes, Exhibit C-437):

> "ARCO complained of the poor conditions of the alternative road to Zubair, especially in the last 40km towards Zubair, which discouraged the night-shift supplier to continue the delivery of the material."

123.  On 27 October 2013, representatives of the Engineer inspected again the Alternative Road. The inspection report (Exhibit R-121), which included a number of photos, contained the following conclusion:

> "1.  The journey takes 1hour 30 minutes each way, with an average speed of 70 km/h.
> 2.  Damages are only of few, they are not severed and consistence, they are negligible.
> 3.  The assessment is that the major repairs is not required, the road is in much better condition than it thought."

124.  In the Monthly Progress Report for October 2013 of the Supervision Team, the Engineer indicated, among the "Issues of Current Concern", the following (Exhibit C-433, point 3.1):

> "-  ... Permission from the Border Police to use the road was received quite quickly. It took a number of days more for the necessary permissions from the SOC to be obtained. At the northern most section of the road the SOC has control of the access due to the crossing of an Oil Pipeline.
>
> -  On the 8th October the SRE travelled the route in question as far as the SOC Checkpoint. In general, in the opinion of the SRE, the route condition was reasonable. The amount of traffic on the route was minimal and the road itself was quite direct in direction.
>
> -  It appeared to the SRE that ARCO did not undertake an inspection or trip on the route. In fact it is thought that they have relied on the word of their sub contractor. This is not acceptable. Another inspection of a section of the route took place by Engineer's staff on the 27th October 2013. The Engineer's reports again indicated that the road is in reasonable condition and that they shouldn't be any reason why the roads could not have been used from the start, once permissions had been given.
>
> -  From the Supervision of works on site the only days where deliveries to site did not take place were the 10th, 11th, 17th and 18th of October. The 14th to the 16th were the EID Period. Deliveries took place on other days, albeit at a slower quantity at times.
>
> -  A further Joint inspection will be carried out with ARCO, and the Engineer will continue to monitor, with the use of PSD. ARCO issued correspondence on the 22nd October (181-13/FGP/ARCO) relating to the issue. One of the main items was they believe they can claim for the costs of any repairs. The Engineer does not agree with this, as it believes the Contract is clear on the

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

41

> issue of Road Maintenance. They also raised an issue of the short notice provided. This is a valid point, but contrary to what is stated in the letter the Engineer DID NOT INSTRUCT Archirodon to stop using the Main Road. We will await what further action the Contractor might take.

> - For the Project record it should now be noted that the Eastern Breakwater Project has minimal heavy traffic using the Main Al Faw Basra Road. Any traffic is mainly normal type of deliveries to Camp. Other Contractors in the Al Faw Region are using the roads and indeed the SOC is also using trucks and excavators on their site. Some of this may be using the Man Road. In the Al Faw Port Area near the SOC Site there has been damage to the tarmac roads.

> - In general it would be the Engineer's Opinion (not formally confirmed) that the slow action in increasing the production rates for the Core was due to the EID Holiday period falling at this time and also maybe the Supply Sub Contractor using the Road issue to improve his Contract Conditions.

> - The overall Roads issue – onsite and offsite, will become more important as future phases start. This will have to be borne in mind. Once 2 or more Contractors use the same roads it is possible they may try to play all contractors off each other to reduce responsibility."

125.    In a letter to Archirodon dated 1 November 2013 (Exhibit R-36), the Engineer wrote *inter alia* that:

> "Since the rerouting of your land transport of Core material from Iraqi sources and since the EID period we are not satisfied with the slow progress in increasing the rate of placing of Core Material on the breakwater, back to the rates you were having before the disruption. As you appear to be currently bringing 1,900 cubm approx to site it can presumed there are no issues with the transport logistics. If there are other reasons you are advised to inform the Engineer. We would request a reply explaining why the placement rate is not returning to pre EID Period values."

126.    The conditions of the Alternative Road were discussed on 2 November 2013, at the Weekly On-Site Progress Meeting No. 17 (as noted at point 26 of Section 4 of the minutes, Exhibit C-1222), when Archirodon again complained for its *"poor conditions"*, and again at a Progress Meeting No. 11 between the Engineer, GCPI and Archirodon of 11 November 2103 (points 5 and 6 of Section 7 of the minutes, Exhibit R-5). On that occasion the following was noted:

> "Alternative Road – It is hoped to use this road at night time. A letter has been sent to the Ministry of Oil to allow the traffic to continue at night time. The Minister has also sent a letter to encourage the use of the Al Faw – Basra road at night time. The Engineer has not seen this letter. The alternative road is in use in day time hours. During the bad weather of the 18th some sections of the road were damaged by the heavy rain. ...

> The GCPI and the Engineer travelled the road before its use and are of the opinion it is of sufficient quality and a shorter route."

127.    In an email message to Archirodon of 13 November 2013 (Exhibit R-72), the Engineer noted

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

that:

> "*The change in route of trucks was advised by the Engineer but not instructed by the GCPI (or the Engineer)... . Indeed your trucks continued to use the main route after advice.*"

128.  At the Progress Meeting No. 15 between the Engineer, GCPI and Archirodon held on 13 March 2014 at the Site Offices (Exhibit R-45, point 1 of Section 8), then:

> "*the Engineer and the Employer outlined that the relevant authorities will not allow the use of the Al Faw – Basra road at day or night by trucks for the Project. The Contractor is asked to inform his sub contractors.*"

129.  On 10 April 2104, at the Progress Meeting No. 16 between the Engineer, GCPI and Archirodon (Exhibit R-46, point 6 of Section 1), the issue of the use of the Al Faw- Basra Road was again discussed, and:

> "*The Contractor confirmed that he had informed his sub contractors about not using this road. Sub Contractors are still been observed using it. They are doing so at their risk.*"

130.  By letter dated 14 July 2014 (Exhibit C-3), Archirodon submitted its "*Request for Extension of Time for Completion – Delay Events No. 2 to 7*". With respect to Delay Event No. 2, relating to the restricted access to the Site through the Basra – Al Faw Road, the claim was submitted pursuant to GC 8.4 [Extension of Time for Completion], GC 13.7 [Adjustments for Changes in Legislation] and GC 17.3 [Employer's Risk].

131.  On 29 July 2014, the Engineer requested some information (Exhibit C-16). More specifically, with respect to Delay Event No. 2, the Engineer requested the Claimant the following:

> "*a.   Please provide evidence of the logic and quantitative connection between the time for the construction of the land part of the breakwater and the completion date of your Contract*
>
> *b.   Please provide documents demonstrating that the use of Um Qasr Pon was officially denied for use.*
>
> *c.   Please explain the meaning of "placed material" in the tables of pages 2 and 3 of your letter and provide explanation of volume control / measurement / record, for materials transported at site.*"

132.  On 31 July 2014, Archirodon provided the Engineer with details regarding the costs incurred, *inter alia*, because of the "*Change of Access Road associated with Delay Event No. 2*" (Exhibit C-4). Archirodon assessed its cost impact to be €17,204,613.64.

133.  On 3 September 2014, Archirodon responded to the Engineer's request for clarification

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.

43

(Exhibit C-17).

134.    On 9 September 2014, the Engineer provided its answer (Exhibit C-18) to the claims submitted by Archirodon, also with respect to Delay Event No. 2 (Change of Access Road), denying them.

135.    On 18 September 2014, Archirodon insisted in its requests, noting that the Engineer's answer was "*contractually unsustainable*" (Exhibit C-19).

**B.    The Position of the Claimant**

*The Claim*

136.    The Claimant submits that it is entitled to an Extension to the Time for Completion and additional costs for the restricted access to the Site through the Basra – Al Faw Road (Delay Event No. 2). More specifically Archirodon submits that, as a result of the restriction of the access to the Site through the Basra – Al Faw Road, it experienced the following consequences:

136.1    delays and disruption to the supply of local materials required for Archirodon's Works;

136.2    loss of productivity caused by the significant reduction in material supply;

136.3    delays to the completion of the near-shore part of the Breakwater constructed from land at approximately 4km;

136.4    delays to the installation of the temporary jetty for loading local material for placing in the transition layer;

136.5    a shortage of supply of local material for the transition layer which necessitated importing materials from the UAE at significant additional costs and delay to the installation of the same;

136.6    delays to the completion of the Quarry Run core section;

136.7    delays to and the postponement of the filling of the staging pier until winter time when the availability of the material was greatly reduced;

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

44

136.8    significant delays to the completion of Archirodon's Works;

136.9    increased costs associated with the use of local materials;

136.10   additional costs associated with the repair of the alternative delivery route; and

136.11   significant prolongation costs.

***There was no acceptable alternative to the Basra – Al Faw Road for the access to the Site***

137.    In that regard, the Claimant preliminarily contends that there was no acceptable alternative to the Basra – Al Faw Road for the access to the Site and the supply of the materials, sourced locally, necessary for the construction of the Breakwater.

138.    The Contract, and in particular the Employer's Requirements, envisaged that Archirodon would supply materials required for the construction of the Breakwater and staging area from Al Zubair, a quarry located approximately 120 km from the Site. In fact, under the Contract:

138.1    in relation to the onshore part of the Breakwater, and more specifically "*[f]or the first 2000m of the causeway*", "*dredged soil, after desiccation and stabilization with cement or lime will be used*" (Tender Documents – Vol. 3 – Section 1 "*Technical Requirements*", point 3.5.1.2, Exhibit C-2);

138.2    in relation to the transition layer of the offshore part and the core material for both the onshore and the offshore parts of the Breakwater, "*rock ... are available in Al Zubair area but require quality control before employing approval*" (Tender Documents – Vol. 3 – Section 2 "*Technical Specifications*", point 12.2.2, Exhibit C-2); and

138.3    in relation to the larger rock for the armour rock layer of the offshore part of the Breakwater, "*big size rocks can demand to be imported, being not available in the port region*" (Tender Documents – Vol. 3 – Section 2 "*Technical Specifications*", point 1.3.15, Exhibit C-2).

139.    Further, the Contract required Archirodon to "*supply, install and maintain at his expenses throughout the duration of the Contract a temporary quay to be used for loading pontoons with construction materials coming from the national quarries such as Al Zubair.*"

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

140.    Accordingly, Archirodon planned to supply two types of material from Al Zubair:

140.1    sand and small gravel for the construction of the core of the onshore part of the breakwater and the staging platform infill (the "D2 Fill Material"); and

140.2    sand and gravel for the construction of the 1.5 metre deep and 100 metre wide transition layer of the offshore part of the breakwater (the "D1 Transition Layer Material").

141.    The tender drawings provided by GCPI included a map, indicating two "*possible routes to project area*" (Tender Documents – Vol. 5 – "*Drawings*", drawing ME019P-T-F-G-S-D-0111, Exhibit C-8), *i.e.* a land route using the Basra – Al Faw Road and a marine route via Umm Qasr port, as follows:



Geology map showing Al Faw – Al Basrah area, with indications of quarry locations nearby Al Zubair area. Such sources can be conveniently used within the project.

142.    In light of the contractual requirements and the Employer's procurement strategy, therefore, Archirodon entered into a number of supply agreements with license holders for quarries in Al Zubair. D2 Fill Material and D1 Transition Layer Material were to be supplied from Al Zubair by land using trucks. The D2 Fill Material was to be placed onshore through direct dumping using land equipment. The D1 Transition Layer Material was to be loaded onto marine vessels for offshore placement. The additional source from the UAE for the D1 Transition Layer Material introduced in June 2013 (Method Statement dated 26 June 2013, Exhibit C-139) was a mitigation measure, which did not alter Archirodon's plan to follow the Employer's Requirements to source locally the D2 Fill and D1 Transition Layer Materials.

143.    In accordance with the Employer's Requirements, the trucks delivering the material from Al Zubair were exclusively to use the Basra – Al Faw Road prior to its unavailability. This was

46

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

because the Basra – Al Faw Road was a wide tarmac road of good quality and it provided the most direct, safest and shortest route from Al Zubair to the Site.

144.    The Alternative Road was not an equivalent alternative to the Basra – Al Faw Road. The conditions of that road, a narrow and unpaved road, were poor, as shown by the photographs contained in the report of the Engineer following the inspection at the end of October 2013 (Exhibit R-121), and confirmed by the statements of Mr Shebl (Witness Statement of 9 May 2017, p.87) and Mr Stavrou (Witness Statement of 9 May 2017, p. 12-13). As a result, Archirodon's suppliers initially refused to use it, which resulted in a significant decline in the rate of supply of materials. Indeed, one of Archirodon's suppliers of D2 Fill Material, Sama Al Watan Co. General Contract and Trading Ltd., ceased its operation altogether on 14 October 2013 due to the unavailability of the Basra – Al Faw Road. The supply of D2 Fill Material, required for the progression of the onshore Works, was reduced by approximately 50% between October 2013 and March 2014. The fact that some suppliers started to use the Basra – Al Faw Road again, albeit unofficially, did not decrease the impact of the Basra Governorate's order on the rate of supply of Goods and the additional costs incurred by Archirodon: Archirodon suffered a significant shortage of supplies caused directly by the instruction to stop using the road.

145.    The land route was the only route to get the onshore materials from Al Zubair to Site, as Archirodon did not have an alternative water route. In fact:

145.1   although Archirodon was required to build a temporary quay to facilitate the loading of materials, delivered from local sources onto small barges for offshore placement, the location of this temporary quay was confirmed by GCPI to be optional. Therefore, Archirodon reasonably understood that, while it was a requirement to construct a temporary jetty, it could choose the location of the temporary jetty. Archirodon determined that it was not feasible for practical and physical reasons to build a temporary quay at Umm Qasr Port for loading locally sourced D1 Transition Layer Material onto barges for offshore placement. Therefore, due to the unavailability and unsuitability of Umm Qasr Port for either a permanent quay or the construction of a temporary jetty, Archirodon planned to build the temporary jetty required under the Contract at Ch. 3,900. This temporary jetty was located where the offshore part of the Breakwater commenced, and was therefore where materials for the offshore part of the Breakwater, including D1 Transition Layer Material, could be most efficiently and effectively loaded onto pontoons for offshore placement;

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

47

145.2   the restriction to the use of the Basra – Al Faw Road delayed the onshore Works, which needed to be completed before the temporary jetty could be constructed. The availability or otherwise of a jetty at Umm Qasr Port would not have made a difference: the temporary jetty was for facilitating delivery of materials to be placed offshore (such as D1 Transition Layer Material) and there would have been no means to get D2 Fill Material, once loaded onto barges, back onto land at the Site for onshore placement;

145.3   therefore, Archirodon had a workable and feasible plan, which could have been implemented were it not for the restriction to the use of the Basra – Al Faw Road.

### The Bases of the Claim

146.    According to the Claimant, the unavailability of the Basra – Al Faw Road, in fact:

146.1   amounted to a governmental action which caused an Unforeseeable shortage in the availability of Goods; and/or

146.2   amounted to an impediment or prevention by the Engineer (part of the Employer's Personnel) which impeded and/or prevented Archirodon from progressing its Works; and/or

146.3   is a change in Laws made after the Base Date which affected Archirodon in the performance of its obligations under the Contract; and/or

146.4   was instructed by the Basra Governorate (a legally constituted public authority) and caused delay and disruption to Archirodon's Works; and/or

146.5   is an exceptional and unpredictable event which has made the performance of Archirodon's contractual obligations excessively onerous.

147.    All such circumstances entitle the Claimant to an Extension to the Time for Completion and additional costs.

148.    Contrary to such conclusion, it is not possible to invoke GC 4.15 and GC 4.16, which are irrelevant to this claim and subject to the remaining provisions of the Contract, in particular GC 8.4(d), 8.4(e), 8.5 and 13.7, pursuant to which Archirodon is entitled to an extension to the Time for Completion:

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

48

148.1     GC 4.15 sets out the risk allocation in the event of any changes to the suitability and accessibility of access routes to the Site, expressly providing that such risk allocation is subject to the remaining conditions of the Contract. Therefore, GCPI's assertion that Archirodon alone bears the risks and costs of the availability and suitability of access routes to the Site is incorrect. In addition, GC 4.15 addresses the risk allocation in relation to the roads or other means of access and egress immediately connected to the Site, which is not the same as the public roads. Access routes refer to roads leading from any public road, highway *etc.* to the Site itself. The Basra – Al Faw Road and the Alternative Roads are not "access routes", but public roads. Access to the Site is achieved by turning off these roads and using side roads which lead to the Site (and are therefore "access routes");

148.2     GC 4.16(c) only refers to damages, losses and expenses resulting from claims made by a third party against GCPI in relation to the transport of Goods and is not relevant in this situation where Archirodon is claiming the increased cost of materials as a result of the Basra Governorate's request and the Engineer's instruction to stop using the Basra – Al Faw Road.

148.3     GCPI refers to the Employer's Requirements relating to the maintenance of public roads. Section 1.7.10 of the Technical Requirements provides: *"The Contractor shall regularly maintain the pavement of all the public roads he may use during the transport of material and/or equipment to the constructions site, not later than seven days after any deficiency is observed."* The provision is clearly aimed at ensuring the maintenance of roads used to transport material or equipment. But it is not aimed at the need to repair a road, of largely unsuitable condition, that was never intended for use in the first place. GCPI refers to correspondence and meeting minutes in respect of Archirodon's intention to carry out road maintenance works in an attempt to support its allegation that Archirodon was aware that roadworks were necessary and that it was responsible for them. However, all of the meeting minutes and correspondence referred to by GCPI are dated before the Engineer's instruction to Archirodon to stop using the Basra – Al Faw Road, and also refer to access roads to the Site and the work camp, and not public roads, and are therefore are not covered by the Employer's Requirements. Further, each of the items listed by GCPI relate to maintenance of roads that Archirodon intended to use and was using at the time, thus proving that the Parties understood that Archirodon was responsible for the maintenance of roads that it was using and not the maintenance of any road it did not

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

49

intend to use and/or had not used yet.

149. The key issues, therefore, for the Tribunal to determine in respect of Archirodon's claim for an extension to the Time for Completion and additional costs caused by the restriction of use of the main Basra – Al Faw Road arise in respect of GC 8.4(d), 8.4(e), 8.5 and 13.7 and Iraqi Civil Code Articles 146 and 878.

(a) **The unavailability of the Basra – Al Faw Road amounted to a governmental action which caused an Unforeseeable shortage in the availability of Goods for the purposes of GC 8.4(d)**

150. Under GC 8.4(d), Archirodon is entitled to an extension to the Time for Completion to the extent that completion was delayed due to "*Unforeseeable shortages in the availability of personnel or Goods caused by epidemic or governmental actions*".

151. The Basra Governorate's order of 6 October 2013, requiring GCPI to instruct Archirodon to stop using the Basra – Al Faw Road for the transport of materials from Al Zubair amounted to a government action which caused Unforeseeable shortages in the availability of Goods for the purposes of GC 8.4(d).

152. The Basra Governorate is a public authority and a government body. Its actions are therefore governmental in nature.

153. As a consequence of this restriction, Archirodon and its suppliers had to use the Alternative Road, which resulted in a significant shortage in the availability of Goods between October 2013 and March 2014. As Archirodon required an increased quantity of material on account of the adverse Unforeseeable soil conditions, the effect of the significant reduction in the supply of materials was therefore compounded. The drop in the rate in supply of D2 Fill Material to progress the onshore Works was such that Archirodon suffered significant delay to the onshore Works. Even if the Alternative Road was in good condition from the point of view of some, this does not decrease the impact to the rate of supply and additional cost that Archirodon incurred.

154. Archirodon, further, did not have access to an alternative water route via Umm Qasr Port. As mentioned, Archirodon could not use Umm Qasr Port or set up a temporary jetty at Umm Qasr Port, which in any event would have been used for the delivery of offshore materials (and indeed, the temporary jetty was used thus when constructed at Ch. 3,900). The Basra –

50

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Al Faw Road restriction affected the delivery of D2 Fill Material for the onshore Works, so the contention that Archirodon had equivalent materials or access available via a temporary jetty intended, and used, for the delivery of offshore materials and so suffered no shortage is illogical.

155.    Archirodon, or any other experienced contractor, could not have reasonably foreseen this shortage in the availability of Goods caused by a government closing access to the main and only known route between the local quarries and the Site.

**(b)**    **The Engineer's letter of 6 October 2013 instructing Archirodon to stop using the Basra – Al Faw road amounted to an impediment or prevention caused by the Engineer for the purposes of GC 8.4(e)**

156.    Under GC 8.4(e), Archirodon is entitled to an extension to the Time for the Completion where the date of completion is delayed due to *"any delay, impediment or prevention caused by or attributable to the Employer, the Employer's Personnel, or the Employer's other contractors on the Site."* In addition, the Employer must comply with the principles of good faith in carrying out its obligations under the Contract, including not to prevent or hinder another party to the Contract from performing its obligations. A Party that fails to perform its contractual obligations in good faith is liable to compensate the innocent party for the loss suffered as a result of this failure.

157.    The Engineer, acting on behalf of the Employer, prevented and impeded Archirodon from performing its obligations under the Contract. Such an act of prevention in itself amounts to a breach of good faith. In fact, the Engineer's letter of 6 October 2013 prevented Archirodon from progressing its Works, which included the supply and delivery of the materials required for the construction of the Breakwater and the staging platform: Archirodon was clearly expected to comply with the Engineer's letter, which *"**strongly** advised"* Archirodon not to use the Basra – Al Faw Road and which specifically stated that, not only was GCPI *"in order to maintain access ... putting in place an alternative route"*, but also that GCPI and the Engineer took the Basra Governorate's order *"seriously"*. Indeed, when a few of Archirodon's suppliers unofficially resumed using the Basra – Al Faw Road in early 2014, the Engineer and GCPI felt compelled to re-iterate that *"the **relevant authorities will not allow the use** of the Al Faw-Basra road at day or night by trucks for the Project"* and asked Archirodon *"to inform his sub contractors"*.

158.    As such, it is clear that the Engineer's letter was an instruction with which Archirodon had no choice but to comply, and this action impeded and/or prevented Archirodon from performing

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

51

its obligations, the consequence of which it suffered delay.

**(c)** **The Basra Governorate's order on 6 October 2013 requiring Archirodon to stop using the Basra – Al Faw road for the transport of materials from Al Zubair caused Unforeseeable delay or disruption to Archirodon's work under GC 8.5**

159. Under GC 8.5, if:

> *"(a)* *the Contractor has diligently followed the procedures laid down by the relevant legally constituted public authorities in the Country; (b) these authorities delay or disrupt the Contractor's work; and (c) the delay or disruption was Unforeseeable"*, then *"this delay or disruption will be considered as a cause of delay under sub-paragraph (b) of Sub-Clause 8.4"*.

160. The order from the Basra Governorate directly delayed Archirodon's Works by restricting its ability to procure the materials required for the construction of the Breakwater and the staging platform. That the unavailability of the Basra – Al Faw Road due to Basra Governorate's order caused delay to Archirodon's Work is a matter of agreement between the Parties' delay experts (Mr Cookson and Mr Palles-Clark). Such delay could not have been reasonably foreseen by Archirodon or indeed any experienced contractor by the date for the submission of the Tender and was therefore Unforeseeable.

161. In addition, Archirodon legally made use of the Basra Al – Faw Road with no violation of any public authority by-laws or procedures. There was no suggestion that the Basra Governorate's order that Archirodon cease using the Basra Al – Faw Road, which Archirodon also diligently followed, was due to Archirodon breaking any laws. Each of the requirements under GC 8.5 has therefore been met by Archirodon, and as such the Basra Governorate's order on 6 October 2013 did cause Unforeseeable delay or disruption to Archirodon's Work for the purposes of GC 8.5.

**(d)** **The Basra Governorate's order on 6 October 2013 requiring Archirodon to stop using the Basra – Al Faw Road for the transport of materials from Al Zubair was a change of Laws under GC 13.7**

162. Archirodon is entitled to an extension to the Time for Completion and additional costs under GC 13.7, under which *"a Contract Price shall be adjusted to take account of any increase or decrease in Cost resulting from a Change in the Laws of the Country … made after the Base Date which affect the contractor in the performance of obligations under the Contract."*

163. The Contract defines Laws as *"all national (or state) legislation, statutes, ordinances and other laws, and regulations and by-laws of any legally constituted public authority"*. The

By: **Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

52

Basra Governorate is a legally constituted public authority and by way of its letter of 6 October 2013, it introduced a new regulation or by-law which obligated Archirodon to stop the use of the Basra – Al Faw Road.

164.    The Respondent argues that the request was not of a general nature, but was a specific request for Archirodon to stop using the Basra – Al Faw Road, and as such it was not a regulation or by-law. However, contrary to GCPI's contention that the Basra Governorate's order was not a change of law because it was not a regulation or by-law of general application, the definition of "*Laws*" does not specify that the rule must be of a general and/or specific application.

165.    In addition, contrary to GCPI's contention, the Basra Governorate's order affected the performance of its obligations under the Contract. In addition, as a direct result of this change in Laws, Archirodon incurred higher prices for materials locally supplied; was forced to procure additional materials from the UAE at a higher cost; and incurred additional expenses in repairing and maintaining the alternative route it was obligated to use by the Basra Governorate.

166.    The Basra Governorate's introduction of the new regulation obligated Archirodon to stop the use of the Basra – Al Faw Road and to use instead the Alternative Road, which was identified in the letter. As a result, the materials were delivered at a significantly slower rate and the rate of production of the onshore Works fell. Therefore, as a direct result of this change in Laws, Archirodon suffered significant delay due to the drop in the rate of delivery of the materials required for the construction of the Breakwater. In accordance with GC 13.7, Archirodon is therefore entitled to an extension of Time for Completion in respect of these significant delays.

167.    Further, as a result of this change in Laws, Archirodon incurred significant additional costs. In accordance with GC 13.7, Archirodon is entitled to these additional costs.

168.    GCPI maintains that the additional costs incurred by Archirodon to source material from the UAE instead of the local supplier in Iraq was caused by Archirodon's decision to source materials from the UAE rather than using the Alternative Road and/or constructing the temporary quay. GCPI however, does not take into account certain key facts:

168.1    Archirodon planned to build a temporary jetty at the end of the onshore part of the Breakwater. Archirodon suffered a drop in the rate of supply of D2 Fill Material for the onshore Works, impacting the completion of the onshore Works due to the Basra

Dr. Robert Gaitskell QC
President  the onshore Works, impacting the completion of the onshore Works due to the Basra
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

58

Governorate's order restricting the use of the Basra Al – Faw Road. The delay in completion of the onshore Works affected the construction of the temporary jetties, ultimately delaying the commencement of the offshore Works. In order to commence the offshore Works, Archirodon required D1 Transition Layer Material. Archirodon had intended to import a limited amount of D1 Transition Layer Material in order to commence the offshore Works pending construction of the temporary jetty. So, to mitigate the delay and to progress the offshore Works, Archirodon had to find an alternative source for the procurement of the D1 Transition Layer Material whereby material would be delivered on barges for placement offshore. If the Basra – Al Faw Road had been available to Archirodon, it would not have had to continue to source materials from the UAE, and the increased cost of the materials from the UAE is therefore a direct cost arising from the restricted access to the Basra – Al Faw Road;

168.2    many of Archirodon's suppliers initially refused to deliver material to Site, and others demanded a higher price per load for the transportation of materials from Al Zubair on account of the poor condition of the Alternative Road. These additional costs for both D2 Fill Material and D1 Transition Layer Material were incurred by Archirodon as a direct consequence of the unavailability of the Basra – Al Faw Road;

168.3    Archirodon, in June 2013, presented the option in its method statement to Technital and GCPI to import a small amount of transition layer from the UAE until the onshore part of the Breakwater was complete, which would enable the delivery of local material for onshore placement via the temporary jetty. Archirodon in order to explore this option, requested a quotation for 500,000 tonnes of transition layer material from Stevin Rock LLC in Ras-Al Khaimah. At this time, Archirodon did not have the intention to purchase that amount of transition layer, planning as it was to source the majority of the transition layer material from Al Zubair in accordance with the Employer's Requirements. The quotation for 500,000 tonnes, as explained by Mr Shebl at the Merits Hearing (Day 2, p. 154-155 of the transcript), *"doesn't mean any commitment"* and it *"is just to obtain prices"*. The purpose was to *"have the price and then to have the price agreed internally"*, so that it could, if required, *"procure this* [transition layer] *material at this rate"*. Thus, by requesting a quotation for a large amount of rocks, Archirodon could get the best rate. Further illustrative of the intention behind the request for quotation is that Archirodon did not *"include th[ese] quantities of transition layer"* within its *"supply agreement with Stevin Rock"*. Prior to the restriction of the use of the Basra – Al Faw Road, Archirodon did in fact only order approximately 70,000 tonnes of transition layer from Stevin Rock.

54

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

**(e)**   **The unavailability of the Basra – Al Faw Road due to the 6 October 2013 instruction to stop using it was an exceptional and unpredictable event of a general nature in accordance with Article 146(2) of the Iraqi Civil Code**

169.   Pursuant to Article 146 of the Iraqi Civil Code:

> "*(1)   Where a contract has been performed it is legally binding and neither party may revoke or amend it except pursuant to a provision in the law or by mutual consent.*
>
> *(2)   Where however as a result of exceptional and unpredictable events of a general nature the performance of the contractual obligation has not become impossible but onerous on the debtor such as will threaten him with exorbitant loss the court after balancing the interests of the parties may if it would be equitable reduce the onerous obligation to a reasonable limit; every agreement otherwise shall be null and void.*"

170.   Such an approach is also in line with Article 878 of the Civil Code (on which Archirodon also relies), under which:

> "*when ... as a result of events which could not have been foreseen at the time of concluding the contract the equilibrium between the respective obligations of the employer and of the contractor has collapsed and the basis on which the financial estimates of the contract have been computed has consequently disappeared the court may grant an increase of the price.*"

171.   As a result, Article 146(2) of the Iraqi Civil Code entitles a contracting party to be compensated where: (i) exceptional events of a general nature which were unexpected at the time of the signature of the contract have arisen during the performance of the contract and cannot be avoided by the contracting party; (ii) the contract is continuing to be performed; and (iii) the economic balance of the contract has been disrupted by these exceptional events and one party has sustained a serious loss.

172.   The order by the Basra Governorate was an event of a general nature as stipulated in Article 146(2), affecting as it did Archirodon and its suppliers. It was also made in the context of reducing traffic in order to avoid potential problems with the local community, who were unhappy with the congested road.

173.   The Basra Governorate's order to restrict the use of the Basra – Al Faw Road was also an exceptional and unpredictable event. It was exceptional because the order was an event that did not match with the normal course of action. It was unpredictable because the event was not provided for by the Parties in GC 4.15: it was not simply that the Basra – Al Faw Road

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

55

was subject to restrictions, but that the Basra Governorate ordered the Engineer to instruct Archirodon to completely stop using the only known accessible public road connecting Basra and Al Faw. This could not have reasonably been predicted by Archirodon: no experienced contractor could have reasonably predicted that the local authority would suddenly and with no notice prevent use of the only known accessible and usable public road between Basra and Al Faw.

174.    The Basra Governorate's order preventing Archirodon from using the Basra – Al Faw Road and the change in availability of the roads did not match with the normal course of action and was therefore an exceptional event. GCPI alleges that a change with respect to the availability of a public road does not meet the threshold of *"exceptional"* as applied by Iraqi courts. It does, however accept that in certain cases *"new "legislation" might be "exceptional"*, as it is supported by the legal commentary. The Basra Governorate's order constituted a new by-law and/or regulation, which clearly does not fall within the normal course of action.

175.    The Basra Governorate's order restricting the use of the Basra – Al Faw Road meant Archirodon's obligation to complete the Works on time became onerous and threatened it with exorbitant losses, which Archirodon did in fact go on to suffer.

176.    In addition, since Archirodon encountered unforeseeable events which caused the economic equilibrium between Archirodon and GCPI to collapse, the remedy provided by Article 878 applies.

### *The Consequences claimed: the Extension to the Time for Completion and the additional costs*

**(a)    Extension to the Time for Completion**

177.    Mr Palles-Clark's assessment of the number of days of delay caused by the restriction in the availability of the road is 76. The measured mile approach used by Mr Palles-Clark is more appropriate to determine the effect of the restrictions of the unavailability of the road up to 19 March 2014 than the method used by Mr Cookson. Accordingly, Archirodon submits that an extension to the Time for Completion of, at least, 76 calendar days should be awarded to Archirodon to reduce this onerous obligation. In the alternative, Archirodon submits that the Tribunal should declare that Archirodon was entitled to complete the Works within a reasonable time, in order to reduce the burden of this onerous obligation to a reasonable limit. Archirodon submits that 76 days represent the reasonable time required for Archirodon to complete due to restrictions in the availability of the Basra – Al Faw Road and should be added to the Time for Completion.

56

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

**(b)**     **Additional Costs**

178.    Mr Wishart, the quantum expert for Archirodon, assesses that Archirodon is entitled to additional costs of US$16,153,022 for the Delay Event No. 2. This amount is the result of four monetary claims:

     178.1    Increased Rate for Additional Transition layer imported from Ras Al Khaimah in the UAE ("RAK"): Mr Wishart calculates that Archirodon is entitled to US$14,896,057. Mr Wishart calculates the extra over rate for marine transport of D1 material as US$19.66 per tonne. This rate is arrived at by dividing the total of all costs associated with marine transportation by the total volume of material imported and deducing the saving made in respect of the material itself. The Parties' quantum experts (Mr Wishart and Mr Kitt) agree that the total quantity of D1 transition layer imported from RAK is 845,922 tonnes. However, the experts disagree as to the additional quantity of imported D1 transition layer that Archirodon should be compensated for as a result of the change in Laws. Mr Wishart considers the applicable additional tonnage of D1 transition layer is 757,683.49 tonnes, *i.e.* 845,922 tonnes less the tonnage recorded as being "*boarded on barge*" as of 30 September 2013;

     178.2    Increase Local D1 Material Rate: the Quantum Experts have agreed the additional cost to Archirodon for the increase in local D1 material is US$949,866;

     178.3    Increased Local D2 Material Rate: the Quantum Experts have agreed that the additional cost to Archirodon for the increase in local D2 material is US$ 277,568;

     178.4    Repairs and Maintenance to the Alternative Road to bring it up to a useable condition: the Quantum Experts have agreed the additional cost to Archirodon for road repairs is US$29,531.

**C.**     **The Position of the Respondent**

*The Defence*

179.    The Respondent submits that the Claimant's claim for an Extension of Time for Completion and payment of additional costs based on alleged access restrictions to the Basra – Al Faw Road must be rejected as unfounded. In summary, it is the Respondent's position that:

     179.1    under the Contract, Archirodon had the choice of material sources and access routes, and explicitly accepted to bear the risk of availability and suitability of access routes,

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

57

as well as of transportation of materials, to the Site;

179.2    no contractual exceptions to this agreed risk allocation apply: the Claimant has not demonstrated that there was an unforeseeable shortage of goods caused by governmental actions, that the Engineer prevented Archirodon from delivering materials, that the government caused unforeseeable delay, or that there was a change of laws affecting Archirodon's performance, within the meaning of the Contract. Nor has the Claimant shown that it is entitled to the remedy sought under the Iraqi legal provisions concerning exceptional circumstances;

179.3    the Claimant is in any event not entitled to an Extension of Time for Completion; and the compensation sought in connection with Claim No. 2 includes costs unrelated to the alleged road restriction, is largely unsubstantiated and generally greatly inflated.

### *Archirodon had its Choice of Sources and Routes*

180.    The Claimant insistence that it was "required" to use materials from the Al Zubair quarry is incorrect.

181.    The Tender Documents (Vol. 5 – "*Drawings*", Exhibit C-8, p. 20) mentioned Al Zubair only as a "potential", not as a "required" source. The Tender Clarifications (Exhibit C-81, items 64 and 66) also explicitly provided that sourcing and supply of materials was the choice and responsibility of the Contractor. Mr Rashid (Witness Statement of 23 July 2017, para 15) and Mr Horgan (Witness Statement of 27 July 2017, para 45) confirmed that Archirodon was not required to use Al Zubair, and it is plain from the documentary record that this was also Archirodon's own contemporaneous understanding. Moreover, as a practical matter, Archirodon had a real choice of alternative sources, as demonstrated by the fact that it imported materials from the UAE and elsewhere.

182.    Additionally, the Basra – Al Faw Road was neither the required nor the only route from the Al Zubair quarry to the Site. The Tender Documents (Vol. 5 – "*Drawings*", Exhibit C-8, p. 20; but also the "*Technical Report*" of 20 April 2012, Exhibit C-200, p. 80) mentioned, for information purposes, two potential routes for transporting materials from the Al Zubair quarry to the Site: by land via the Basra – Al Faw Road, or by a shorter route from the quarry to Umm Qasr Port, then by barge via the Khor Abd Allah Channel to the Site.

183.    As to the water route, Archirodon would have needed either to obtain access to an existing berth at the port or to build a temporary quay or jetty in the port area where the materials

58

Dr. Robert Gaitskell QC
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

could be loaded onto barges. GCPI warned Archirodon of the difficulty of securing an existing berth and therefore advised it to build a temporary quay at Umm Qasr (Witness Statement of Mr Rashid 23 July 2017, paragraph 16, and Witness Statement of Mr Horgan of 28 November 2017, paragraph 14), which has more than ten kilometres of coastline with suitable depths, and dozens of square kilometres of land on the coast which could be used as stockpiling areas.

184. Archirodon chose not to do so. While the Claimant asserted that Umm Qasr Port was unavailable, it also acknowledged that not building a temporary quay at Umm Qasr to transport materials was a decision, based on a judgment call that it was not feasible. Yet, the Claimant provided no evidence of the alleged infeasibility. The explanation of the alleged difficulties and costs of building a temporary quay is not compelling, given that *"set up of a temporary quay at the port of Umm Qasr for loading construction material"* was a specific item in the Scope of Works for which Archirodon was paid close to €600,000 (*"Schedule of Payments"*, items 1.5 and 1.6, Exhibit C-1, p. 386).

185. The Claimant also asserted that the use of the Umm Qasr Port is irrelevant, as it could only be used for the transport of materials for the offshore portion of the Breakwater, while Archirodon was only working on the onshore portion at the time the issue with the access road arose. However, this would not have been the case if the Claimant had established offshore work fronts earlier. Indeed, the Claimant's failure to establish sufficient offshore work fronts from the outset of the project led to delay.

186. The Claimant's assertion that the Basra – Al Faw Road was the only feasible land route from Al Zubair to the Site is also incorrect: the Alternative Road was a viable alternative to the Basra – Al Faw Road. In fact, just a couple of days after the Basra Governorate requested Archirodon not to use the Basra – Al Faw Road, Archirodon received permission from the South Oil Company to pass its checkpoint on the Alternative Road (Exhibit R-120). The Alternative Road was in serviceable condition. Archirodon did not visit the road itself and simply relied on the word of its sub-contractor as to the condition of the road. The Claimant refers to two photographs from the Technital survey of October 2013 (Exhibit R-121) showing two damaged areas of the Alternative Road. The Claimant ignores however that Technital identified these as the only two areas of damage worth noting on a nearly 85-km route – permitting Technital to conclude that the route was in relatively good condition. In addition, the two photographs of the damaged areas, showing cracked pavement, corroborate Mr Rashid's evidence that the Alternative Road was mainly paved. Actually, it was

**Dr. Robert Gaitskell QC**'s contemporaneous impression that slowed production was due to the Eid holiday
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

59

and that Archirodon's suppliers were simply trying to take advantage of the situation to renegotiate their contracts; the suppliers' alleged reluctance to use the Alternative Road is, therefore, not a reflection of its condition. The Claimant also has exaggerated the decrease in productivity during this period by comparing it to a hypothetical rate achieved over just a few days, and in any event it has not proved that the decrease in placing rates is due to the condition of the road.

### Archirodon Assumed the Contractual Risk Associated with Access Routes and Transport of Materials

187. The Claimant improperly attempts to shift to the Employer the risk and costs associated with access routes and transportation of goods. However, pursuant to GC 4.15(a) and GC 4.16(c), the Contractor accepted the contractual risk associated both with access routes, including the Basra – Al Faw Road, and with the transport of materials.

188. GC 4.15(a) provides that the Contractor bears the risk and costs of the availability and suitability of access routes, including "*any maintenance which may be required for his use of access routes*". The timeframe and technical steps for maintenance of public roads are set out in the Technical Specifications (Tender Documents – Vol. 3 – Section 2 "*Technical Specifications*", point 1.7.10, Exhibit C-2). As a result, Archirodon was responsible for the risk and costs associated with roads used for transportation of materials and access to Site, including the Basra – Al Faw Road and the Alternative Road.

189. The Claimant argued that GC 4.15 applied only as of the Base Date when the Contract was concluded. This interpretation would render meaningless the obligations and waivers contained in the Sub-Clauses, which all imply circumstances subsequent to the Base Date.

190. The Claimant, then, argued that the Basra – Al Faw Road and the Alternative Road were not "access routes" within the meaning of the Contract. However, there is no basis for the Claimant's interpretation of GC 4.15 as excluding public roads. The language of the clause does not support this restrictive reading, and the Claimant has provided no authority or evidence beyond Mr Shebl's statement as to his own personal understanding. Moreover, the Claimant's position is belied by the Technical Specifications, which provide specifically that the Contractor must "*regularly maintain the pavement of all the public roads he may use during the transport of material and/or equipment to the constructions site*" (Tender Documents – Vol. 3 – Section 2 "*Technical Specifications*", point 1.7.10, Exhibit C-2).

191. Similarly, under GC 4.16(c), "*unless otherwise stated*", the Contractor agreed to be responsible

60

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

associated with the transportation of materials. The Claimant argued that GC 4.16(c) serves only to indemnify and hold the Employer harmless against third parties' claims, not against the Contractor's claims. However, the Claimant has provided no authority for this interpretation, and there is nothing in the provision itself – which refers to *"all damages"* – that restricts it to third parties' claims. Therefore, GC 4.16(c) separately excludes the Respondent's liability for any claims due to the alleged increase in the costs of transportation of materials.

### *No Exceptions Apply to the Contractor's Responsibility for the Access Route and Delivery of Materials to the Site*

**(a)     There Was No Unforeseeable Shortage of Goods Caused by Governmental Actions Pursuant to GC 8.4(d)**

192.    The Claimant is not entitled to an Extension of Time for Completion for the alleged shortage of materials from October 2013 to March 2014 pursuant to GC 8.4(d).

193.    The Claimant has not proven that it suffered a shortage of goods, and cannot simply claim that there must have been a shortage of goods because there was a drop in productivity. While Archirodon points to a 50% decline in the rate of supply of D2 Fill Material between October 2013 and March 2014, it has not established that this decrease constitutes a "shortage". First, Archirodon has not shown that it had the same need for D2 Fill Material in each of those months: indeed, the Claimant exaggerated the extent of the claimed drop in the productivity. Secondly, Archirodon has not shown that it could not have made up the alleged shortfall through other means, for instance by importing more from the UAE, or by transport via the Umm Qasr Port. Whether or not alternative sources were more expensive is not relevant under GC 8.4(d). If equivalent materials were available, the situation cannot be considered a shortage.

194.    The Claimant has not shown that the alleged shortage was *"Unforeseeable"* within the meaning of the Contract. *"Unforeseeable"* is defined in GC 1.1.6.8 as *"not reasonably foreseeable by an experienced contractor by the date for submission of the Tender"*. Since the Contract expressly states that the Employer does not guarantee the availability of any particular access routes – *i.e.*, it foresees the possibility that any access route may become unavailable – a shortage arising out of limitations on one particular access route cannot be considered *"Unforeseeable"* under the Contract.

195.    The Claimant has not shown that the alleged shortage was caused by governmental actions.

**Dr. Robert Gaitskell QC** submits that *"[t]he request from the Basra Government directly caused the*

President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
                    v.
General  Company for Ports of Iraq (Iraq)

61

*shortage in materials*", but intervening or concurrent causes cannot be ignored. In particular, the Basra Governorate's request would have had no adverse effect if Archirodon had built a temporary quay at Umm Qasr as anticipated in the Contract and used more work fronts from the outset.

196.  In any event, a claim pursuant to GC 8.4(d) can be made only for an Extension of Time for Completion and cannot entitle the Contractor to additional payment.

**(b)    The Engineer Did Not Prevent Archirodon from Delivering Materials Pursuant to GC 8.4(e)**

197.  The Claimant's claim for an Extension of Time for Completion pursuant to GC 8.4(e) must also fail.

198.  First, Archirodon was not impeded or prevented from delivering materials, given the availability of the alternative routes (*i.e.*, the Alternative Road and an alternative water route) and alternative sources of materials.

199.  Second, the Engineer did not impede or prevent Archirodon from using the Basra – Al Faw Road or from delivering materials. The Claimant argued that the Engineer's cover letter enclosing the Basra Governorate's request amounts to impediment or prevention. Yet, the wording referred to by the Claimant is anything but peremptory, and the Engineer emphasised that it was not issuing an instruction, but simply transmitting a request. Mr Rashid's testimony at the Merits Hearing (Day 4, p. 13 of the transcript) made also clear that the advice was for the good of the project, to head off the possibility of delays caused by local protests. It was thus in Archirodon's interest to heed such advice. That does not, however, make the advice an instruction.

200.  Third, the Engineer did not commit "*a breach of good faith*" in transmitting the Mayor of Al Faw's request. Technital passed on the request; no more. Even if it were an instruction from the Engineer, it is unclear how this would be in bad faith.

201.  Lastly, a claim pursuant to GC 8.4(e) can be made only for an Extension of Time for Completion and cannot entitle it to additional payment.

**(c)    The Basra Governorate Did Not Cause an Unforeseeable Delay Pursuant to GC 8.5**

202.  The Claimant also claims an Extension of Time for Completion under GC 8.5, alleging that Archirodon diligently followed procedures laid down by the relevant public authorities, that

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

the Basra Governorate caused delay or disruption to the Contractor's work by its request not to use the Basra – Al Faw Road, and that such delay or disruption was "*Unforeseeable*". This claim, too, must be rejected: the criteria for an Extension of Time for Completion under Clause GC 8.5 are not met:

202.1   while the Claimant claims to have complied with the Basra Governorate's request "*from 6am on 7 October 2013*", the evidence (Exhibit R-72) indicates that Archirodon's suppliers continued or quickly resumed using the Basra-Al Faw Road in October 2013;

202.2   the Claimant has not established that the Basra Governorate's request caused the alleged delay, either as a factual matter or in terms of proximate cause, given that the Claimant had alternative sources and alternative routes for delivering materials;

202.3   finally, the alleged delay due to the restriction of the Basra – Al Faw Road is not "*Unforeseeable*" within the meaning of the Contract. Where the Contract contemplates the possibility of an access route becoming unavailable and allocates this risk to the Contractor, delay resulting from such a contingency cannot be said to be "*Unforeseeable*".

203.   Lastly, a claim pursuant to GC 8.4(e) can be made only for an Extension of Time for Completion and cannot entitle it to additional payment.

**(d)**   **There Was No Change of Laws Affecting the Contractor's Performance Pursuant to GC 13.7**

204.   The Claimant argues that the Basra Governorate's request of 6 October 2013 constituted a change of laws which affected its performance of obligations under the Contract, entitling it to an Extension of Time for Completion and reimbursement of additional cost under GC 13.7. Also this claim is meritless.

205.   The Basra Governorate's request was an informal, *ad hoc* request made by letter and directed at Archirodon, a single party. Therefore, it does not qualify as "*legislation, statutes, ordinances and other laws,* [or] *regulations and by-laws of any legally constituted public authority*" (as per the definition of "*Laws*" under the Contract) in any normal sense of those terms. The Claimant is seeking to expand the meaning beyond the text of the Contract and common usage.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
~ v.
General Company for Ports of Iraq

63

206. In addition, the Claimant has failed to prove that the request to divert its supply trucks to the Alternative Road affected the performance of its obligations. It appears that Archirodon's suppliers continued using the Basra – Al Faw Road.

**(e)    The Claimant's Claim under Iraqi Law Must Be Rejected**

207. The Claimant's claim for additional time and money pursuant to Article 146(2) of the Iraqi Civil Code must also fail, as the Basra Governorate's request that Archirodon's delivery trucks not use the Basra – Al Faw Road was not an *"exceptional and unpredictable event of a general nature"* rendering performance of the Contract *"onerous"* within the meaning of Article 146(2) of the Iraqi Civil Code.

208. For Article 146(2) of the Iraqi Civil Code to apply, the event in question must meet five criteria: it must be *"exceptional"* and *"unpredictable"*, affect a *"wide spectrum of people"*, be brought to the judge for relief during performance of the contract, and directly cause the contract to become so *"onerous"* as to threaten the debtor with *"exorbitant loss"*. If all five of these conditions are met, the judge may *"reduce the onerous obligation to a reasonable limit"*, to the extent that this is *"equitable"*.

209. Here, the conditions are not met. In fact:

209.1 the restriction of a heavily travelled single-lane road in Iraq is not *"exceptional"*;

209.2 the Contract contemplated the non-availability of access routes, and the Claimant expressly assumed that contractual risk under GC 4.15. The event was not *"unpredictable"*;

209.3 the event not *"of a general nature"*. In fact, while the Claimant has argued that the Basra Governorate's request was *"of a general nature"* because it applied to both Archirodon and its suppliers, Archirodon's two suppliers are plainly not *"a wide spectrum of people"*. The fact that the request arose as an effort to reduce traffic for the local community also does not mean that the request is of *"a general nature"*, as it did not apply to the whole community;

209.4 the claim was not brought to the judge for relief *"during performance of the contract"*: Article 146(2) is not a *post hoc* remedy;

209.5 no threat of *"exorbitant loss"*: the Claimant has simply asserted that *"the President of*

64

*Archirodon's losses resulting from this event demonstrates the exorbitant loss*", without any attempt to show that this alleged loss is "exorbitant", meaning "*grossly excessive*".

210. Moreover, even if the Claimant could establish that all five conditions were met, its claims would not be justified as a matter of equity. On the contrary, it would be inequitable to the Respondent to grant the Claimant's requests for additional payment and an Extension of Time for Completion, when the Claimant knowingly assumed the risk of availability of access routes under GC 4.15 of the Contract.

211. Additionally, the Claimant forfeited its right to claim under Article 146(2) in light of its failure to timely establish offshore work fronts and build temporary jetties, which were a key factor in causing concurrent delay.

212. Finally, Article 878 of the Iraqi Civil Code concerning changed circumstances in lump sum contracts requires a "*collapse*" of the entire economic "*equilibrium*". Even if the request not to use the Basra – Al Faw Road made performance of the Contract "*difficult*", by no stretch of the imagination did it "*cause the economic equilibrium between Archirodon and GCPI to collapse*".

### The Claimant is Not Entitled to an Extension of Time for Completion for Claim No. 2

213. Even if the Tribunal accepted the Claimant's arguments regarding liability for Claim No. 2, the Claimant is nevertheless not entitled to an Extension of Time for Completion for this claim.

214. In its Request for an Extension of Time for Completion on 14 July 2014 (Exhibit C-3), Archirodon claimed a 262-day extension to the Time for Completion for Claim No. 2. The Claimant failed to prove its entitlement to such an Extension of Time for Completion for Claim No. 2. Indeed, even the Claimant's delay expert, Mr Palles-Clark does not support this claim, and opines instead that 76 days of delay could be allocated to Claim No. 2.

215. Mr Cookson determines that if the change in access route had any effect, it would have been felt as slower than planned progress in the onshore section of the Breakwater, which could only begin to affect activities on the critical path in early December 2013, because Archirodon was not ready to commence all of the offshore works until that time. In Mr Cookson's opinion, a maximum of 35 days of delay could be found attributable to this ... analysis based on Archirodon's programming for the project, not Mr Palles-Clark's

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

65

fictional recreated baseline.

### The Amount Claimed is Unsubstantiated and Inflated

(a)    Additional Costs to Source Transition Layer (D1) Material from the UAE

216.    The Claimant claims compensation for the cost of having to import transition layer material by sea from the UAE, which it alleges is due to the temporary restrictions on the Basra – Al Faw Road. The assumptions made by the Claimant are contradicted by evidence.

217.    First, before the road restriction issue arose (in October 2013), Archirodon already planned to import at least 500,000 tonnes of transition layer material from the UAE. This is evidenced by the fact that (i) on 17 June 2013, Archirodon requested from Stevin Rock LLP, a supplier of transition layer from the UAE, a quotation for at least 500,000 tonnes of transition layer (which could be increased to 1,000,000 tonnes), that (ii) a quotation was issued by Stevin Rock on 23 June 2013 for these 500,000 tonnes, (iii) that Archirodon and Stevin Rock met on 16 June 2013 to discuss these orders, and (iv) that Archirodon accordingly placed its first purchase order on 26 June 2013. All of this happened long before the change of road issue arose. Hence, the decision to import a substantial amount of transition layer from the UAE (from 500,000 tonnes to 1,000,000 tonnes, which is close to the quantity actually imported of 845,922 tonnes) was not the consequence of any alleged restrictions on the Basra – Al Faw Road.

218.    Furthermore, even following the Claimant's reasoning, the fact that Archirodon continued to import transition layer material from the UAE after the jetty at Ch. 3,900 was completed (the delayed completion of which was, according to the Claimant, the reason why it had to import more than initially planned) was not related to the road issue. Indeed, it is agreed that on 19 March 2014 the onshore section of the Breakwater (and the jetty at Ch. 3,900) was completed, at which point it would have been possible for Archirodon to import transition layer by land and therefore to procure locally. However, Archirodon nonetheless continued to import transition layer from the UAE until July 2014; its reason for doing so was therefore unrelated to the road issue.

219.    The evidence therefore shows that Archirodon's decision to import transition layer material from the UAE was unrelated to the road issue.

220.    Even accepting the Claimant's claim under GC 13.7, if the Tribunal determined that there was indeed "a change in the Laws of the Country", the Claimant could only be entitled to the "additional Cost as a result of these changes in the Laws". Since the sudden

Dr. Robert Gaitskell QC
President

66

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

importing transition layer material from the UAE, as opposed to procuring locally, has not been incurred "*as a result of these [alleged] changes in the Laws*", the Claimant is not entitled to recover any of the amounts claimed.

221.  In any event, even assuming that the Claimant is entitled to the surcharge cost of importing transition layer by sea from the UAE as opposed to procuring locally, then the Claimant could not be entitled to more than US$42,506. This figure is calculated based on:

   221.1  a baseline quantity of 500,000 tonnes, which is what Archirodon intended to import before the road issue arose;

   221.2  total invoiced quantities of imported transition layer of 503,478 tonnes, which are the invoiced quantities of imported transition layer until March 2014, after which the onshore section of the Breakwater and the temporary jetty at Ch. 3,900 were completed, thus allowing Archirodon to import transition layer material by land and therefore procure locally; and

   221.3  the correct rate of importing material of US$12.22 per tonne, as determined excluding from the transportation cost demurrage and overstay, bad weather, maintenance and other costs for which it is undisputed that the Respondent has no liability, and which do not result from the alleged road restriction.

**(b)**   **Increase of Price for Delivery of D2 Fill Material from Local Suppliers**

222.  The Claimant claims compensation for the increase of price for delivery of D2 Fill Material from local suppliers, which it alleges is due to the temporary restrictions on the Basra – Al Faw Road.

223.  The quantum experts appointed by both Parties agree on the quantities of D2 Fill Material which have been the subject of a price increase (namely 794,772 m$^3$) and on the price increase (US$1.21 per m$^3$). The Parties' experts also agree, contrary to the Claimant's position, that there is an element of double counting between this claim and the claim for additional D2 Fill Material allegedly due to "*Unforeseeable*" penetration/settlement (Claim No. 3). Indeed, the Claimant claims the full invoiced quantities of D2 Fill Material both under this claim and under its claim for additional material allegedly due to unforeseeable penetration/settlement. As a result, both experts agree that a deduction must be made to avoid duplication.

224.  Therefore, even assuming the Claimant's case on liability were accepted, and that the increase

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

67

in the price of supply of D2 Fill Material from local suppliers were the consequence of a change of law (GC 13.7) or constituted an *"onerous obligation"* which were the direct consequence of an *"exceptional and unpredictable events of a general nature"* (Article 146(2) of the Iraqi Civil Code), the Claimant could not be entitled to more than US$851,283, which is the cost of the agreed increased quantity of 794,772 m$^3$ subject to a deduction of 91,232 m$^3$ already claimed under Claim No 3 and applying the agreed rate of US$1.21 per m$^3$.

**(c)   Increase of Price for Delivery of Transition Layer (D1) Material from Local Suppliers**

225.   The Claimant claims compensation for the increase in the delivery price of transition layer (D1) material from local suppliers, which it alleges is due to the temporary restrictions on the Basra – Al Faw Road. This claim is unsubstantiated.

226.   The Claimant's only evidence is Mr Shebl's speculation that the price increase of local D2 Fill Material would also have impacted the price of local transition layer (Witness Statement of 19 September 2017, para 88). Mr Wishart recognises that there is no evidence for the alleged cost increase of local D2 material and confirms that *"[t]he increased cost of supplying locally procured transition layer (D1) is based on the increased cost of supplying locally procured D2 fill"* (Mr Wishart Expert Report on Quantum of 15 May 2018, paragraph 4.7.2).

227.   Therefore, even if the Tribunal accepts the Claimant's arguments as to liability and causation, this claim must be rejected as unsubstantiated.

**(d)   Road Repairs**

228.   This claim in the amount of US$500,000 is unsubstantiated.

229.   The Claimant's only evidence is an internal delivery return titled *"Road repairs coastal road"* covering 1,875 m$^3$ and totalling US$29,531.

230.   Therefore, even if the Tribunal accepts the Claimant's arguments as to liability and causality, the Claimant cannot be entitled to more than US$29,531 (which is agreed by both experts).

**D.   The Evaluation of the Tribunal**

231.   The claim brought by the Claimant arising out of Delay Event No. 2 involves a number of issues. In essence, however, the claim revolves around the nature and effects of the letter sent on 6 October 2016 by the Governorate of Basra to GCPI (Exhibit C-70) and conveyed by the Engineer to the Claimant on the same day (Exhibit C-32).

68

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

232.    According to the Claimant, the Basra – Al Faw Road, as a result of that letter, became unavailable for access to the Site, and more exactly for the transport to the Site of the construction material (the Transition Layer Material and the D2 Fill Material) originating from the Al Zubair quarry, located some 120 km to the north. The use of the Alternative Road, to which the Claimant's subcontractors had to resort, affected the execution of the Works, as it caused delays and generated costs for which the Respondent is responsible. According to the Claimant, the unavailability of the Basra – Al Faw Road, in fact, (a) is a change in Laws made after the Base Date which affected Archirodon in the performance of its obligations under the Contract – GC 13.7; (b) amounted to a governmental action which caused an Unforeseeable shortage in the availability of Goods – GC 8.4(d), and/or (c) to an impediment or prevention by the Engineer, which impeded and/or prevented Archirodon from progressing its Works – GC 8.4(e); (d) was instructed by the Basra Governorate and caused delay and disruption to Archirodon's Works – GC 8.5; and/or (e) is an exceptional and unpredictable event which has made the performance of Archirodon's contractual obligations excessively onerous – Article 146(2) Iraqi Civil Code.

233.    The Respondent denies such claim and its legal bases. According to the Respondent, the Claimant had its choice of sources and routes, and assumed, under GC 4.15, the contractual risk associated with access routes and transport of materials. No exceptions, then apply to the Claimant's responsibility: there was no change of Laws affecting the Claimant's performance; there was no Unforeseeable shortage of goods caused by governmental action; the Engineer did not prevent Claimant from delivering materials; the local authorities did not cause an Unforeseeable Delay; the Claimant has no claim under Iraqi law. As a result, the Claimant is not entitled to an extension of Time for Completion and to compensation for any additional cost the restriction to the use of the Basra – Al Faw Road may have caused.

234.    As a result of the Parties' submissions, the Tribunal has to address a number of issues mentioned in Appendix 3 (§§ 1-5) and Appendix 4 (§§ 6-13), as follows:

234.1    was the Basra Governorate's letter of 6 October 2013 regarding the use of the Basra – Al Faw Road for the transport of materials from Al Zubair to the Site a change of Laws under GC 13.7 of the Contract?

234.2    did the Basra Governorate's letter of 6 October 2013 amount to a government action which caused Unforeseeable shortages in the availability of Goods for the purposes of GC 8.4(d)?

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

69

234.3    in the alternative, did the Engineer's letter of 6 October 2013 regarding the use of the Basra –Al Faw Road for the transport of materials from Al Zubair to the Site amount to an impediment or prevention caused by the Engineer for the purposes of GC 8.4(e)?

234.4    in the alternative, did the Basra Governorate's letter on 6 October 2013 cause Unforeseeable delay or disruption to Archirodon's work under GC 8.5?

234.5    was the unavailability of the Basra – Al Faw Road due to the 6 October 2013 instruction to stop using it an exceptional and unpredictable event of a general nature in accordance with Article 146(2) of the Iraqi Civil Code? Should the Tribunal declare that Archirodon was entitled to complete the Works within a reasonable time in order to reduce this onerous obligation?

235.    The Tribunal shall examine them separately and in sequence.

236.    Before turning to those issues, however, the Tribunal has to consider a preliminary point, raised by the Respondent also on the basis of GC 4.15 and GC 4.16: did the Claimant assume under those provisions the contractual risk associated with access routes and transport of materials, so that no claim could be raised in the circumstances of this case with respect to the effects produced by the Basra Governorate's letter of 6 October 2013 (Appendix 4, §§ 1-4)?

237.    The Tribunal notes, indeed, that GC 4.15 provides that the Contractor is deemed to have been satisfied as to the suitability and availability of access routes to the Site, and, *inter alia*, that the Contractor would be responsible for any maintenance which may be required for its use of access routes (GC 4.15(a)), while the Employer does not guarantee the suitability or availability of particular access routes, and costs due to non-suitability or non-availability of access routes shall be borne by the Contractor.  GC 4.15 in fact so provides:

> *"The Contractor shall be deemed to have been satisfied as to the suitability and availability of access routes to the Site at Base Date. The Contractor shall use reasonable efforts to prevent any road or bridge from being damaged by the Contractor's traffic or by the Contractor's Personnel. These efforts shall include the proper use of appropriate vehicles and routes.*
>
> *Except as otherwise stated in these Conditions:*
>
> *(a)    the Contractor shall (as between the Parties) be responsible for any maintenance which may be required for his use of access routes;*
>
> *(b)    the Contractor shall provide all necessary signs or directions along access routes, and shall obtain any permission which may be required from the*

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

*relevant authorities for his use of routes, signs and directions;*

(c)     *the Employer shall not be responsible for any claims which may arise from the use or otherwise of any access route;*

(d)     *the Employer does not guarantee the suitability or availability of particular access routes; and*

(e)     *Costs due to non-suitability or non-availability, for the use required by the Contractor, of access routes shall be borne by the Contractor."*

238.    Under GC 4.16, then, the Contractor assumed the responsibility for transporting all Goods required for the Works, and undertook to indemnify and hold the Employer harmless against and from all damages, losses and expenses resulting from the transport of Goods, and negotiate and pay all claims arising from their transport. GC 4.16 in fact so reads:

*"Unless otherwise stated in the Particular Conditions:*

(a)     *the Contractor shall give the Engineer not less than 21 days' notice of the date on which any Plant or a major item of other Goods will be delivered to the Site;*

(b)     *the Contractor shall be responsible for packing, loading, transporting, receiving unloading, storing and protecting all Goods and other things required for the Works; and*

(c)     *the Contractor shall indemnify and hold the Employer harmless against and from all damages, losses and expenses (including legal fees and expenses) resulting from the transport of Goods, and shall negotiate and pay all claims arising from their transport."*

239.    The Tribunal notes two points with regard to those provisions: (i) they express a general principle, but (ii) they are subject to the other provisions of the Contract.

240.    As to the first point, it appears to the Tribunal that the assumption of responsibility by the Contractor of the risks and costs associated with the roads used for access, and for the transportation of materials, to Site is consistent with the general structure of the Contract, a "lump sum contract" (a FIDIC Yellow Book Contract for Plant and Design-Build, 1999 edition) under which the Contract Price is a lump sum (GC 14.1) accepted by the Employer for the execution and completion of the Works in the "Letter of Acceptance" at the close of the tender, and is not determined according to a "quantity" evaluation process: payment is calculated based on previously agreed rates and prices. As noted in Addendum 1 to the Tender Documents of 28 April 2012 (rev. C02 – Exhibit C-1), amending Clause 12.4 of their Volume 1, "*the Break-down of Lump-sum price*" contained in the relevant schedule "*do not derogate in any way the clause according to which, in a lump-sum contract, the total price remains fixed irrespective of quantities of work actually carried out*". As a result, under the Contract, the Contractor had to make its evaluations in order to quantify its offer and agree on the

**Dr. Robert Gaitskell** QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

71

Contract Price, with limited possibility for subsequent revision. Included in those evaluations was also the availability and suitability of access road, and the costs of material procurement and transportation.

241. Having this point in mind, it is difficult to read in GC 4.15 and GC 4.16 the limitations that the Claimant suggests (s.34 above):

241.1 GC 4.15 does not limit the suitability and availability of access routes, for which the Contractor is deemed to have satisfied itself, only by reference to the Base Date or to the (mainly secondary) roads of proximate access to the Site, *i.e.* of those roads that depart from a main road of general use, and which are specifically (if not exclusively) intended for access to the Site. Actually, this interpretation would render meaningless the obligations and waivers contained in GC 4.15, which all imply circumstances subsequent to the Base Date. In addition, as noted by the Respondent, there is no basis for the Claimant's interpretation of GC 4.15 as excluding public roads. The language of the clause does not support this restrictive reading, and the Claimant has provided no authority or evidence in support of its interpretation, which would devoid the provision of any meaning. Moreover, the Tribunal notes that, throughout the execution of the Contract, the Claimant never denied its obligation to maintain also the "public roads" used for transport of materials to the Site (as mandated by GC 4.15), in accordance with the Technical Specifications (Tender Documents – Vol. 3 – Section 2, point 1.7.10, Exhibit C-2), which provide specifically that the Contractor must "*regularly maintain the pavement of all the public roads he may use during the transport of material and/or equipment to the constructions site*" (underlining added). The matter was indeed also discussed without objections at several progress meetings between the Parties (see for instance the minutes of the Weekly On-Site Progress Meeting No 17 of 2 November 2013, point 23 of Section 4, Exhibit C-1222; and of the Progress Meeting No 15 of 13 March 2014, point 2 of Section 8, Exhibit R-45);

241.2 GC 4.16(c) has to be read in conjunction with GC 4.16(b), imposing on the Contractor the responsibility, *inter alia*, for the transport of all Goods required for the Works. Therefore, it does not limit the Contractor's liability only to the indemnification of the Employer against third parties' claims, but serves as a complement to the underlying obligation of the Contractor to bear all the liabilities generated by the transport of Goods: the Contractor has to sustain the costs, by paying directly for the transport and indemnifying the Employer for any expense caused to the Employer by transport, even if arising from third parties' claims.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

the Claimant provided no authority for its interpretation of GC 4.16, and there is nothing in the provision itself that restricts its entire application to third parties' claims.

242.    As a second point, the Tribunal notes that those two provisions, notwithstanding their generality, are expressly subject to the other provisions of the Contract. In other words, the principle they express (that the Contractor bears the risk and costs of the availability and suitability of access routes, and is responsible for the risks and costs associated with transportation of materials to the Site) is subject to derogation introduced by other contractual conditions, which may deviate from it. The application of those other provisions, as invoked by the Claimant, has therefore to be investigated by the Tribunal. By way of a general remark, though, it has to be underlined that those other provisions, being exceptions, have to be strictly interpreted, and have to be considered in conjunction with the general principles stated by GC 4.15 and GC 4.16.

*i.*    *Was there a Change of Laws affecting the Contractor's performance pursuant to GC 13.7?*

243.    The Claimant submits that the Basra Governorate's letter of 6 October 2013 constituted a change of laws which affected its performance of obligations under the Contract, entitling it to an Extension of Time for Completion and reimbursement of additional cost under GC 13.7.

244.    Pursuant to GC 13.7:

> *"The Contract Price shall be adjusted to take account of any increase or decrease in Cost resulting from a change in the Laws of the Country (including the introduction of new Laws and the repeal or modification of existing Laws) or in the judicial or official governmental interpretation of such Laws, made after the Base Date, which affect the Contractor in the performance of obligations under the Contract.*
>
> *If the Contractor suffers (or will suffer) delay and/or incurs (or will incur) additional Cost as a result of these changes in the Laws or in such interpretations, made after the Base Date, the Contractor shall give notice to the Engineer and shall be entitled subject to Sub-Clause 20.1 [Contractor's Claims] to:*
>
> *(a)    an extension of time for any such delay, if completion is or will be delayed, under Sub-Clause 8.4 [Extension of Time for Completion], and*
>
> *(b)    payment of any such Cost, which shall be included in the Contract Price.*
>
> *After receiving this notice, the Engineer shall proceed in accordance with Sub-Clause 3.5 [Determinations] to agree or determine these matters."*

245.    GC 1.1.6.5 then defines *"Laws"* as:

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

73

*"All national (or state) legislation, statutes, ordinances and other laws, and regulations and by-laws of any legally constituted public authority."*

246. The mentioned provision requires a multi-step analysis to verify whether the Contract Price has to be adjusted to take into account an increase or decrease in Cost, as the Claimant claims. As per its express wording, in fact, there should be (i) a *"change in the Laws"*, (ii) made *"after the Base Date"*, (iii) which *"affect[s] the Contractor in the performance of obligations under the Contract"* and (iv) results in a Cost increase or decrease. Only in the event all such conditions are satisfied, can the Contract Price be adjusted.

247. The first point, therefore, is whether the Basra Governorate's letter of 6 October 2013 constituted a "Change in Laws" for the purposes of GC 13.7.

248. In the Respondent's opinion, that letter does not qualify as *"legislation, statutes, ordinances and other laws, [or] regulations and by-laws of any legally constituted public authority"* in any normal sense of those terms, and submits that the Claimant is seeking to expand the meaning beyond the text of the Contract and common usage.

249. The Tribunal does not agree with such contention and notes that the definition of *"Laws"* set by GC 1.1.6.5 is broad. By its very language, it is not limited to regulations of general nature, as contained for instance in acts of Parliament, but extends also to regulatory measures of individual nature: what connotes a *"Law"* for the purpose of the Contract is not the generality or amplitude of the possible group of concerned entities; it is the "regulatory" effect of the measure, dictated to "drive" by rules the expect behaviour of the addressee. In other words, there is a law every time a command is given, which the public authority, that has the power to enforce it, expects the addressee to follow.

250. As a result, the fact that the letter of 6 October 2013, issued by the Governorate of Basra (which is undoubtedly a *"legally constituted authority"*), did not formally dictate an order, but simply contained an *ad hoc* request to the Employer for instructions to be given to the Employee and was directed at a single party, appears irrelevant. The Tribunal in fact notes that, as made clear by the Engineer's letter to the Claimant of 6 October 2013, the Engineer, with the Employer, took *"seriously this request from the Local Authorities"*, and therefore "**strongly** advised" (with emphasis in the original) the Contractor not to use the Basra – Al Faw Road from the next day. Therefore, the Employer and the Engineer understood, at the time the letter of 6 October 2013 was sent, that the Governorate of Basra was not merely suggesting a change in the route to the Site, and was expecting the Contractor to comply with

74

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

the instructions received. In other words, the Governorate letter affected the expected behaviour of its final addressee: as a consequence, it can be held to amount to a "*Change in the Laws*" for the purposes of GC 13.7.

251. There is no doubt, then, that such "*Change in the Laws*" occurred on 6 October 2013, *i.e.* well after the "*Base Date*" (which in accordance with GC 1.1.3.1 was "*the date 28 days prior to the latest date for submission of the Tender*").

252. The next question if whether the letter of the Governorate of Basra of 6 October 2013 "*affect[ed] the Contractor in the performance of obligations under the Contract*".

253. The Tribunal is not persuaded that such condition is met. The Tribunal finds in fact that the Contractor had, under the Contract, its choice of sources and routes. Therefore, the "change in laws" affecting <u>one</u> of the possible access roads for transportation of the construction materials to the Site did not affect the Contractor's performance of obligations under the Contract: the Contractor was not required to source materials from the Al Zubair quarry and/or to use the Basra – Al Faw Road, and had viable route alternatives to the use of that road. Therefore, any consequences on the access to the Site which followed the letter of 6 October 2013 were due to its (commercial) choice to source materials from Al Zubair and to use the Basra – Al Faw Road to take them to the Site, and did not alter in any way the possibility for the Contractor to discharge its obligations under the Contract, which therefore remained unaffected.

254. First, the Tribunal notes that the Claimant was not required to use materials from Al Zubair for the construction of the Breakwater. As noted by the Respondent, in fact, the Tender Documents (Vol. 5 – "*Drawings*", Exhibit C-8, p. 20) mentioned the Al Zubair quarry as a "*[p]otential source*" for the construction materials; the "*Technical Specifications*" (Tender Documents – Vol. 3 – Section 2, point 12.2.2, Exhibit C-2), then, indicated that the transition layer material of the offshore part and the fill material for both the onshore and the offshore parts of the Breakwater were "*available*" in Al Zubair; the Tender Clarifications (Exhibit C-81, items 64 and 66) finally explicitly confirmed that sourcing and supply of materials was the choice and responsibility of the Contractor.

255. Moreover, the circumstance that the Contractor had a choice of alternative sources, and was not required to use transition layer and fill materials from Al Zubair is demonstrated by the fact that it explored the option to procure materials from elsewhere. As noted, for instance, in the Execution Plan attached (as its Annex 4.6.1.5) to the Contractor's Proposal of 1 August

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

75

2012 (s. 4.1.1, Exhibit C-99, page 122 of the pdf; also C-39), and *verbatim* confirmed in the Method Statement for the construction of the marine part of the Breakwater of 27 June 2013 (s. 6.1.1, C-139), "*a number of material sources throughout the gulf area are investigated and will be used for sourcing of materials*". In addition, at the Progress Meeting No 2 of 22 January 2013, the Contractor declared that investigation was on-going and that the possible sources identified had to be confirmed (point 10 of the minutes, Exhibit R-16). In that framework, the Contractor also requested on 17 June 2013 a quotation for delivery (between July 2013 and May 2014) of 500,000 tonnes of Transition Layer Material from Stevin Rock LLC in Ras-Al Khaimah, UAE (Exhibit 4-3-11, E152 from the hearing bundle). Even if this quotation, as stated by Mr Shebl at the Merits Hearing (Day 2, p. 154-155 of the transcript), did not "*mean any commitment*" and was "*just to obtain prices*" so that the Contractor could, if required, "*procure this* [transition layer] *material at this rate*", it shows at least that the Contractor evaluated alternative sources: therefore, the Contractor did not consider the quarry at Al Zubair to be the only mandated source, even though it eventually opted to take advantage of the availability at Al Zubair of the Transition Layer Material for the offshore part and of the core material for both the onshore and the offshore parts of the Breakwater.

256. Second, the Basra – Al Faw Road was not the required route from Al Zubair to the Site, and was not the only one available for transportation of materials to the Site. The Tender Documents (Vol. 5 – "*Drawings*", Exhibit C-8, p. 20), including the "*Technical Report*" of 20 April 2012 (Exhibit C-200, p. 80), mentioned two possible routes to the project area, *i e* potential routes for transporting materials from Al Zubair to the Site: by land via the Basra – Al Faw Road, or by a shorter route from the quarry to Umm Qasr Port, and then by barge to the Site. In addition, the "*geology*" map contained in the Tender Documents (Vol. 5 – "*Drawings*", drawing ME019P-T-F-G-S-D-0111, Exhibit C-8), in which the "possible routes" were marked by red (land) and blue (sea) arrows, showed also (even though unmarked by arrows) the coastal road, which later became the Alternative Road.

257. A possible route to the project area was therefore by sea. In order to use it, the Contractor needed either to obtain access to an existing berth at the Umm Qasr Port or to build a temporary quay or jetty in the port area, where the materials could be loaded onto barges. The Contractor chose not to use a sea route. While the Claimant asserted that Umm Qasr Port was unavailable, it also acknowledged that the decision not to build a temporary quay at Umm Qasr to transport materials on the way from Al Zubair to the Site was based on the judgment that it was not feasible. Yet, the Claimant provided no evidence of the alleged infeasibility. The Claimant also asserted that the use of the Umm Qasr Port is irrelevant, as it could only be used for the transport of materials for the offshore portion of the Breakwater.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Contractor was only working on the onshore portion at the time the issue with the access road arose, and placement of offshore materials coming from Al Zubair could start only when a temporary jetty was established at Ch. 3,9000. However, the Tribunal finds this would not have been the case if the Claimant had established offshore work fronts earlier: in other words, it was the Claimant's decision not to establish offshore work fronts earlier that made the use of the Umm Qasr Port irrelevant; and no indication is given that the offshore work fronts could not be established earlier because the sea route from Al Zubair was not available.

258.    As far as land route is concerned, the Claimant's assertion that the Basra – Al Faw Road was the only feasible land route from Al Zubair to the Site is also incorrect. Contrary to the Claimant's assertions, it appears to the Tribunal that the Alternative Road a viable alternative to the Basra – Al Faw Road.

259.    Indeed, the Tribunal notes that just a couple of days after the Basra Governorate letter of 6 October 2013 was issued, the Contractor received permission from the South Oil Company to pass its checkpoint on the Alternative Road (Exhibit R-120). The Alternative Road was in workable conditions. Archirodon did not visit the road itself and simply relied on the word of its sub-contractors to state the contrary. On the other hand, the Engineer visited the Alternative Road and identified, in contemporary documents, only two areas of damage worth noting on a nearly 85-km route, allowing the conclusion that the route was in relatively good conditions. In addition, the photographs reproduced in the Technital survey of October 2013 (Exhibit R-121), showing cracked pavement in the two damaged areas of the Alternative Road, corroborate the Respondent's contention that the Alternative Road was mainly paved. At the same time, the Tribunal remarks that no evidence has been brought to disprove the Engineer's impression, reflected in contemporaneous documents, that the slowed material delivery rate around the date of the Basra Governorate letter was not a reflection of the Alternative Road's conditions, but was due to the Eid holiday and to the Contractor's suppliers attempt to take advantage of the situation to renegotiate their contracts.

260.    Finally, it appears that that the Contractor's suppliers continued using the Basra – Al Faw Road. The absolute unavailability of that road is therefore not entirely established.

261.    As a result, the Tribunal holds that the Claimant has failed to prove that the request to divert its supply trucks to the Alternative Road affected the performance of its obligations.

262.    In light of the foregoing, one of the conditions for the application of GC 13.7 is not satisfied. The Tribunal concludes that there was no change of laws affecting the Contractor's

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

77

performance pursuant to GC 13.7.

*ii.* *Was there an Unforeseeable shortage of Goods caused by governmental actions pursuant to GC 8.4(d)?*

263. According to the Claimant, the Basra Governorate's letter of 6 October 2013, requesting GCPI to instruct Archirodon to stop using the Basra – Al Faw Road for the transport of materials from Al Zubair, amounted to a governmental action which caused Unforeseeable shortages in the availability of Goods under GC 8.4(d).

264. GC 8.4 provides that:

> *"The Contractor shall be entitled ... to an extension of the Time for Completion if and to the extent that completion for the purposes of Sub Clause 10.1 [Taking Over of the Works and Sections] is or will be delayed by any of the following causes: [...]*
>
> *(d)    Unforeseeable shortages in the availability of ... Goods caused by ... governmental actions [...]."*

265. For the purposes of such provision, it is therefore necessary that a (i) governmental action occurs, which (ii) causes Unforeseeable shortages in the availability of Goods (iii) delaying completion of Works.

266. As to the first point, the Tribunal notes that the Basra Governorate is a public authority and a government body. Its actions are therefore governmental in nature. The first condition for the application of GC 8.4 is therefore satisfied.

267. The Tribunal finds however that the second condition is not met. In fact, in the Tribunal's opinion:

267.1    the Claimant has not shown that the shortage (if any) it suffered was caused by the Basra Governorate's letter of 6 October 2013. In particular, the instruction not to use the Basra – Al Faw Road for the transport of materials from Al Zubair to the Site would have had no adverse effect if the Contractor had chosen to use the alternative sources, or the different routes for transport (by sea or land), which it had the discretion (and responsibility) to identify;

267.2    the Claimant has not shown that the alleged shortage was *"not reasonably foreseeable by an experienced contractor by the date for submission of the Tender"* (GC 1.1.6.8), *i.e.* was *"Unforeseeable"* within the meaning of the Contract. As the Respondent

78

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

correctly submitted, the availability of any particular access routes was expressly not guaranteed by the Employer under the Contract: therefore, a shortage arising out of limitations imposed on the use of one particular access route cannot be considered "*Unforeseeable*" under the Contract.

268.    As a result, the Tribunal concludes that there was no Unforeseeable shortage of Goods caused by governmental actions pursuant to GC 8.4(d): Claimant is not entitled to an Extension of Time for Completion under that provision.

iii    *Did the Engineer prevent Archirodon from delivering materials pursuant to GC 8.4(e)?*

269.    Under GC 8.4:

> "*The Contractor shall be entitled subject to Sub Clause 20.1 [Contractor's Claims] to an extension of the Time for Completion if and to the extent that completion for the purposes of Sub Clause 10.1 [Taking Over of the Works and Sections] is or will be delayed by any of the following causes:* [...]
>
> (e)    *any delay, impediment or prevention caused by or attributable to the Employer, the Employer's Personnel, or the Employer's other contractors on the Site.* [...]. "

270.    According to the Claimant, the Engineer, acting on behalf of the Employer, through the letter of 6 October 2013 prevented the Contractor from performing its obligations under the Contract, because it had no choice but to comply with the instructions received. In addition, such an act of prevention amounts to a breach of the principle of good faith, which includes the obligation not to prevent or hinder another party to the Contract from performing its obligations.

271.    The Tribunal is not persuaded by the Claimant's submissions that the Engineer's letter of 6 October 2013, forwarding the letter of the Governorate of Basra of even date, prevented the Contractor from performing its obligations under the Contract.

272.    The Tribunal, in fact, notes that the Contractor was not prevented from delivering materials, given the availability of the alternative routes (*i.e.*, the Alternative Road and an alternative water route) and alternative sources of materials, the use of which was not prevented.

273.    In addition, the Engineer did not commit "*a breach of good faith*" in transmitting the instructions of the Governorate of Basra request. Indeed, it is unclear to the Tribunal how this transmission (or even the instructions not to use the Basra – Al Faw Road) would be in bad

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

79

274. As a result, the Tribunal concludes that the Engineer did not prevent Archirodon from delivering materials pursuant to GC 8.4(e). The Claimant's claim for an Extension of Time for Completion under that provision must therefore fail.

iv. *Did the Basra Governorate cause an Unforeseeable Delay Pursuant to GC 8.5?*

275. Under GC 8.5:

> "*If the following conditions apply, namely:*
>
> (a) *the Contractor has diligently followed the procedures laid down by the relevant legally constituted public authorities in the Country,*
> (b) *these authorities delay or disrupt the Contractor's work, and*
> (c) *the delay or disruption was Unforeseeable,*
>
> *then this delay or disruption will be considered as a cause of delay under sub-paragraph (b) of Sub-Clause 8.4 [Extension of Time for Completion]."*

276. The Claimant refers to such provision to claim for an Extension of Time for Completion, by submitting that the letter of 6 October 2013 from the Basra Governorate directly delayed the Works (as agreed between the Parties' delay experts), by restricting the Contractor's ability to procure the materials required for the construction of the Breakwater and the staging platform. In addition, the Basra Al – Faw Road with used with no violation of any public authority by-laws or procedures, and the delay caused could not have been reasonably foreseen by any experienced contractor by the date for the submission of the Tender.

277. The Tribunal finds that this claim, too, must be rejected. The criteria for an Extension of Time for Completion under Clause GC 8.5 are in fact not met:

277.1 there was no "procedure" laid down by the legally constituted public authority that the Contractor had to follow diligently. Under the Contract, in fact, the Contractor had the responsibility to choose the sources and the routes for transport of materials to Site. The Contractor was not required under the Contract to use the Basra Al – Faw Road (or indeed any other specific route): it made a choice to use it for commercial reasons;

277.2 the Claimant, therefore, has also not established that the Basra Governorate's letter caused the alleged delay, either as a factual matter or in terms of causal link, given that the Claimant had alternative sources and alternative routes for delivering materials;

80

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

277.3    the fact that the Contractor had legally made use of the Basra Al – Faw Road with no violation of any public authority by-laws or procedures is therefore irrelevant;

277.4    the evidence (Exhibit R-72) shows that the Archirodon's sub-contractors continued, or quickly resumed, using the Basra-Al Faw Road;

277.5    finally, the alleged delay due to the restriction of the Basra – Al Faw Road is not "*Unforeseeable*" within the meaning of the Contract. Actually, the Contract allocated the risk of an access route becoming unavailable to the Contractor: therefore, the delay resulting from such an event cannot be said to be "*Unforeseeable*".

278.    As a result, the Tribunal concludes that the Basra Governorate did not cause through its letter of 6 October 2013 an Unforeseeable delay pursuant to GC 8.5. Consequently, the claim under that provision must be dismissed.

*iv.*    *Is the Claimant's Claim under Iraqi Law to be granted?*

279.    The Claimant invokes also some provisions of Iraqi law, and more specifically Articles 146 and 878 of the Iraqi Civil Code, in order to justify its claim for an Extension of the Time for Completion and for compensation for the additional costs generated by the unavailability of the Basra – Al Faw Road: the unavailability of the Basra – Al Faw Road, due to the 6 October 2013 instruction to stop using it, was an exceptional and unpredictable event of a general nature in accordance with Article 146(2) of the Iraqi Civil Code; in addition, the collapse of the economic equilibrium between the Contractor and the Employer it caused is relevant under Article 878 of the Iraqi Civil Code.

280.    Article 146 of the Iraqi Civil Code provides that:

"(1)    *Where a contract has been performed it is legally binding and neither party may revoke or amend it except pursuant to a provision in the law or by mutual consent.*

(2)    *Where however as a result of exceptional and unpredictable events of a general nature the performance of the contractual obligation has not become impossible but onerous on the debtor such as will threaten him with exorbitant loss the court after balancing the interests of the parties may if it would be equitable reduce the onerous obligation to a reasonable limit; every agreement otherwise shall be null and void.*"

281.    Article 878 of the Iraqi Civil Code states the following:

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overse...)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

81

*"The contractor has no claim to an increase of the price on the grounds of an increase in the prices of raw materials or the wages of workers where such increase so great as to render the performance of the contract difficult when however as a result of events which could not have been foreseen at the time of concluding the contract the equilibrium between the respective obligations of the employer and of the contractor has collapsed and the basis on which the financial estimates of the contract have been computed has consequently disappeared the court may grant an increase of the price."*

282. Article 146(2) of the Iraqi Civil Code entitles a contracting party to be compensated when:

282.1 exceptional events of a general nature which were unexpected at the time of the signature of the contract have arisen during the performance of the contract and cannot be avoided by the contracting party;

282.2 the on-going performance under the contract has not become impossible; but

282.3 the economic balance of the contract has been disrupted by these exceptional events and one party is threatened by exorbitant loss.

If these conditions are met, the judge may *"reduce the onerous obligation to a reasonable limit"*, to the extent that this is *"equitable"*.

283. The Parties dispute as to the satisfaction of those cumulative conditions. The Tribunal finds that they are not met.

284. The Tribunal notes in fact that:

284.1 the instructions for the Contractor to use a road alternative to the Basra – Al Faw Road was not an exceptional and unpredictable event making the performance of contractual obligations excessively onerous, because:

(i) the Contract did not guarantee the availability of specific access routes, and the Claimant expressly assumed the corresponding contractual risk under GC 4.15. More specifically, as already underlined, the Contractor had the responsibility to choose the sources and the routes for the transport of the materials to the Site. The Contractor was not required under the Contract to procure material from Al Zubair and/or to use the Basra Al – Faw Road (or

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

indeed any other specific route), but made a choice to use it for commercial reasons;

(ii) the evidence shows that the Contractor's suppliers continued to use the Basra – Al Faw Road even after the letter of 6 October 2013 was issued;

(iii) the imposition of traffic regulations on a public road is not an exceptional event;

284.2 the instructions issued by the Basra Governorate on 6 October 2013 cannot be considered an event of general nature: they did not apply to the whole community, but specifically affected only the Contractor and its suppliers, and were issued in the context of reducing the heavy traffic generated by them;

284.3 the performance of the Contractor's contractual obligations was not made excessively onerous by the letter of 6 October 2013; any loss the Contractor may have sustained was not directly generated by the instructions issued by the Basra Governorate, but by the Contractor's decision to source materials from Al Zubair and to use the Basra – Al Faw Road, not mandated by the Contract, instead of a different land road or of a sea route.

285. As a result, the remedy sought by the Claimant on the basis of Article 146(2) of the Iraqi Civil Code cannot be granted.

286. The same conclusion must be reached also with respect to Article 878 of the Iraqi Civil Code. That provision concerns changed circumstances in lump sum contracts and requires a "*collapse*" of the entire economic "*equilibrium*" in order to justify the granting of the remedy thereby foreseen. However, the Tribunal notes that even if the instruction not to use the Basra – Al Faw Road may have changed the way in which the Contractor had decided to perform its obligations under the Contract, it did not, for the same reasons mentioned above (§ 283), "*cause the economic equilibrium between Archirodon and GCPI to collapse*".

287. As a result, the Tribunal concludes that the Claimant's claim under Iraqi Law is to be dismissed.

### Conclusion

288. In light of the foregoing, the Tribunal concludes that the Claimant's claims relating to Delay

Dr. Robert Gaitskell
President

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

83

Event No 2 are to be dismissed.

## VII.    DELAY EVENT NO. 3 (UNFORSEEABLE SOIL CONDITIONS)

### Delay Event No. 3

#### Introduction

289.    This section of the Award contains a consideration of the Claimant's claim for additional cost and profit in connection with the soil conditions that were encountered during the execution of the project. The Claimant's related claim for an extension of time and for other losses that are said to have arisen from the soil conditions that were encountered are dealt with separately in below.

### Relevant Background

290.    Much of the factual background is agreed between the Parties. The extent of that agreement is recorded in the Agreed Factual Narrative dated 17 October 2018 supplied to the Tribunal following the merits hearing and now set out in Appendix 2 hereto. The Tribunal accepts that the Parties were unable to reach agreement on all facts but the extent of their disagreement is relatively limited and chiefly concerns the degree to which facts are said to be relevant. What follows is derived from the Agreed Factual Narrative and is a summary of the facts that are relevant to Delay Event No. 3.

### May to December 2012

291.    On 2 May 2012, the Respondent issued an invitation to tender and tender documents for the design and construction of a breakwater and staging area for the Al Faw Grand Port in Iraq ("The Project"). The tender documents had been prepared for the Respondent by a consortium known as Consorzio Italian Engineering & Contractors for Al Faw ("IECAF"). The consortium comprised Technital, PEG Engineering & Contracting and the Renato Sarno Group.

292.    The Instructions to Bidders comprised various technical, geotechnical, hydraulic and other reports and analyses. The reports, that became available to the Claimant on 8 June 2012, included information on the geotechnical conditions, based on IECAF's investigations and design parameters.

293.    Onshore, IECAF had drilled four boreholes, carried out twelve dynamic penetration tests ("DPT's) and dug fifteen trial pits. Offshore, IECAF had drilled nine boreholes and carried out fourteen cone penetration tests with piezocones ("CPTUs"). Three of the boreholes (SBH-03, SBH-07 and SBH-08) and one of the CPTU locations (CPTU-05) were within the

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

line of the Eastern Breakwater. The Tender Documents also contained IECAF's interpretation of the available site data, including tables describing the "average stratigraphy" and a "geotechnical characterization" for the port area and a table listing "expected settlement" and "volume loss".

294.    The Tender Documents stated that the assessments made by IECAF and included in the Tender Documents had to be verified and validated by the Contractor.  The following statements were included in those documents:

> "the dimensions and characteristics of the structured (sic) presented in the drawings are indicative only and the Contractor has to develop his own design and assume full responsibility of the design either following his design or accepting the design presented in volume. In case the Contractor accepts the design presented in the drawings attached to the contract, he shall explicitly declare he accepts full responsibility for that design."[3]

> "this stratigraphy is based on results obtained during the dedicated soil investigation carried out within October 2011 and January 2012. The Contractor may carry out additional soil investigations at its own expense in order to validate and take full responsibility for the final reference stratigraphic profile."[4]

> "since the staging platform and breakwater construction constitute the first phase of a major project development, it is important to study the geotechnical behaviour of the soil and the construction methodologies, in order to verify the design assumptions so far considered. In this perspective, monitoring is crucial so that staging platform and breakwater construction can be considered as a large scale test.

> The monitoring activities will be performed by means of:

> -    Piezometers;
> -    Topographical benchmarks."[5]

295.    During the period of May and June 2012, the Claimant and other tenderers made several requests for clarifications and further information.  As a result, tender clarifications were issued on 31 May and 5, 6, 11, 22 and 26 June 2012.

296.    The topic of monitoring was raised as part of the tender queries and clarifications.  The following Tender Clarifications, relevant to that topic, were provided by the Respondent:

The Contractor is to implement, *"real time monitoring which allows for real time stability evaluations and subsequent follow-up in the construction process"*[6]

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/
Archirodon Construction (Ov
Company S.A. (Panama
v.
General Company for Ports of

---

[3] H1[Folder H1/Tab1]; Exhibit C-1 Contract p115 (Technical Requirements, section 1).
[4] H1[Folder H1/Tab 1]; Exhibit C-1 Contract p130 (Technical Requirements, section 3.3).
[5] H1[Folder H1/Tab1]; Exhibit C-1 Contract p139 (Technical Requirements, section 4.4).
[6] H7[Folder H3/Tab 7]; Exhibit C-81, Tender Clarifications Nos. 1-244 p.2178 (item 127).

*"monitoring is essential to check stability during construction through pore pressure measurements in any position which is relevant for the scope."[7]*

*"during construction, continuous monitoring activities will enable to back calculate the actual permeability parameters obtaining the real consolidation curves, with production of settlement profiles at the end of construction and at the end of consolidation."[8]*

297.    The Claimant and the other tenderers were unable to conduct their own geotechnical investigations of the site before submitting bids because of the length of time that was available for the submission of tenders and by reason of the existence of unexploded ordinance ("UXO") in the area where the Breakwater was to be constructed.

298.    The Claimant submitted its bid for the Project on 1 August 2012.  The tender included a design report and drawings that generally followed the preliminary design that had been prepared by the Engineer.  The tender also included an Execution Plan, which described the methods the Claimant intended to adopt, including the major stages, in the execution of the Works.

299.    Mr Rashid gave evidence[9] that sixteen companies submitted offers for the Project.  Ten of them passed the administrative evaluation and only four of the remaining tenderers, including the Claimant, passed the technical evaluation. Those four companies submitted both technical and financial proposals.  According to Mr Rashid, the Claimant received a high ranking for its technical proposal and also proposed a competitive price.

300.    The Claimant contends that all of the tenderers, including the Claimant, concluded that on the basis of the available information the soil where the breakwater was to be constructed was over-consolidated. The Respondent disputes this and contends that there is no basis for determining how each of the sixteen bidders conducted their internal evaluation of the data from the pre-tender investigation included in the Tender Documents or the conclusions reached by these bidders. It also notes that seven of the technical bids were not evaluated, as those bidders did not pass the administrative evaluation, and so there is no way of knowing the content of such tender proposals or the conclusions of such bidders concerning the soil

---

[7] H7[Folder H3/Tab 7]; Exhibit C-81, Tender Clarifications Nos. 1-244 p.2182 (item 141).
[8] H7[Folder H3/Tab 7]; Exhibit C-81, Tender Clarifications Nos. 1-244 p.2189 (item 203).
[9] Witness statement of Mr Rashid, C8 [Folder C1/Tab 8] p.399 paragraph 8.

86

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

conditions.[10]

301.    The Tribunal has not been provided with the tenders that were submitted by the other tenders and so it is not in a position to make a finding that each of them concluded that the soil was over-consolidated.  However, there is evidence to suggest that IECAF considered that none of the tenderers considered that the geotechnical behaviour of the soil differed from that which had been assumed by it. An internal report prepared by IECAF, dated 14 April 2015 and entitled "Impacts of the unexpected soil conditions on the construction time and cost of the East and West Breakwaters" contains the following observation:

> "It is worth to add that none of the Tenderers during the preparation of the Bids has detected a geotechnical behaviour different from that presented by the Engineer.  It has also to be highlighted that 16 consortia have been participating to the tender for the East Breakwater presenting complete technical and financial offers and that all consortia used independent consultant for preparing the tenders."[11]

302.    No witness involved in the preparation of this report was called by the Respondent to give evidence.  However, IECAF is likely to have understood the technical basis of the tenders that were submitted and would have been in a strong position to know whether any of those tenderers had made assumptions about the soil conditions that differed from its own.

303.    On 9 November 2012, the Claimant was invited to negotiate a contract for the Project and was sent a draft Contract Agreement and Special (Particular) Conditions for consideration. Contract negotiations took place between the representatives of the Claimant and the Respondent on 19 and 20 November 2012.

304.    On 22 November 2012, the Claimant and the Respondent entered into Contract FGP/C-01 ("the Contract") for the Project, for the lump sum price of €204,166,506.38. The Engineer appointed by the Respondent to administer the Contract was Technital S.p.A, representing the IECAF consortium. The original Time for Completion under Clause 8.2 of the Contract was 18 months from the Commencement of Work.

305.    On 28 November 2012 the Engineer issued the Order of Commencement and the Commencement Date was confirmed as 8 December 2012.  Accordingly, the original Time for Completion was 7 June 2014, being 18 months after the Commencement Date.

January to December 2013

---

[10] See the Agreed Factual Narrative dated 17 October 2018, paragraph 16.
[11] E20/Tab 889, p.13684.

Dr. Robert Galtskell QC
President
ICC Case No. 21785/?
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

306. In January 2013, the Claimant engaged COWI, a company specializing in geotechnical and civil engineering, to verify and validated the tender information and to undertake the detailed design of the Breakwater. For that purpose COWI was given with the tender information that had been provided to the Claimant together with the Claimant's tender design. COWI was also supplied with a suite of documents described as the Master Plan Geotechnical Interpretative Reports and Annexes ("the Master Plan") that had been supplied to the Claimant by the Respondent after the award of the Contract. The Master Plan concerned the investigations undertaken by IECAF in the overall port area, including both the Eastern and Western Breakwaters.

307. COWI's engagement was subsequently formalized in a written Design Consultancy Agreement which was signed on 25 February 2013.

308. The Engineer wrote to the Claimant on 9 January 2013, noting that it had not yet provided a "Detailed Construction Time Schedule" or a "Description of Construction Methods", as required by section 1.1.7 of the Technical Specification.

309. In response, on 13 January 2013, the Claimant submitted its initial project programme, referred to as the FPBS baseline programme, detailing and refining the planned construction of the Breakwater and Staging Platform as set out in the Claimant's tender execution plan. At this point it is relevant to note that, in its tender, the Claimant had designated the boundary between the offshore and onshore sections of the Breakwater at Ch. 5,855. The onshore section extended to the north from that point and the offshore section extended south to Ch. 250. As Mr Shebl explains in his first witness statement[12] the Claimant's Tender Execution Plan indicated that the offshore part of the breakwater was to be progressed on two fronts. One, starting on the primary Breakwater at Ch 600 and proceeding northwards to Ch. 5,655 close to the boundary with the near shore part but with the exception of the part from Ch 3,040 to Ch 3,630. The other starting from Ch 600 southwards to the roundhead at Ch 250 then moving to the part from Ch. 3,040 to Ch. 3,630. However, the FPBS baseline programme indicated that the Claimant planned to start the construction of the offshore part of the Breakwater with a stretch between Ch.1,750 to Ch.1,920 and then proceed in two directions with the placement of core material for each offshore stretch split into two planned activities of (a) core material placement using marine equipment and (b) core material placement using land equipment.

[12] C/1 Tab 1, p.32 (paragraph 75).

88

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

310.    A monthly progress meeting took place on 22 January 2013. The meeting was attended by representatives of the Claimant, the Respondent and the Engineer. COWI was represented by Mr Jorgan Steenfelt, who made a presentation of the geotechnical review and design work that COWI were undertaking. The minutes of the meeting record that:

> "due to the tight programme, the Design and Construction would have to run in parallel and the 'Observation' method would be used."[13]

The minutes also record that there was an advantage in constructing a trial embankment to study and observe settlement.

311.    On 5 February 2013, COWI produced a report entitled "Specification of Additional Geotechnical Investigations" in which COWI recommended that further borehole data be obtained in the intertidal zone and that a trial embankment be constructed in the dry area of the intertidal zone, adjacent to where the permanent breakwater was to be constructed. Also in February 2013, the Claimant established temporary accommodation and an office in Al Faw, pending completion of the permanent camp.

312.    On 8 February 2013 COWI issued a memorandum evaluating the effect on the design of uncertainties that had been discovered in the bathymetry information that existed.

313.    In March 2013, and in accordance with COWI's advice given on 5 February 2013, the Claimant instructed a specialized geotechnical subcontractor, Andrea Lab, to undertake a drilling campaign in the intertidal zone. Andrea Lab carried out 3 boreholes at locations on the coastal road that had not previously been investigated.

314.    On 4 March 2013, the Claimant received the Advance Payment. The payment was received 61 days later than required by the Contract. The late receipt of the Advance Payment formed the basis of a claim for an Extension of Time, that was submitted by the Claimant to the Engineer on 26 May 2013.

315.    On 16 March 2013, COWI issued a memorandum entitled "Specifications for Piezometric Monitoring and Settlement Measurements" which proposed the use of piezometric monitoring during the construction of the Breakwater.

316.    In early April 2013, the Claimant decided to move the boundary between the near-shore and

---

[13] E/2 Tab 44, p.976.

**Dr. Robert Galtskell Q.**
President
ICC Case No. 21785/?
Archirodon Construction (Overs
Company S.A. (Panama)
v.
General Company for Ports of I

89

offshore sections, further south, from Ch. 5,855 to Ch. 3,900. This change was confirmed in an email from the Claimant to COWI dated 8 April 2013. The email stated that; *"for sections after the intertidal area (Ch.5,855 to 3,900) it has been decided that construction form land is necessary to accelerate construction and meet the project deadline….the core's quarry run has to be replaced by a gravel material that can be provided by land."*

317.  MUSC, the sub-contractor retained by the Claimant to carry out a survey of, and remove, UXO completed mobilization to site on 18 April 2013. The UXO survey and clearance was divided into a number of zones of priority, in both the onshore and offshore sections of the Breakwater.

318.  On 19 April 2013, COWI issued a memorandum to the Claimant, entitled "Clarification on design soil profiles and parameters." The memorandum explained that for the Detailed Design that it had prepared, the load soil parameters were stated in the Design Basis (COWI Doc. No. A035823-RP-14) and that those parameters had been updated based on a very thorough review of the available data provided in the Tender Documents and used in the Tender Design by the Claimant as well as during the Detailed Design. COWI confirmed that it was well aware of the need to provide a safe and robust design. In the context of optimizing the design the memorandum recorded that, *"optimization requires a solid background in terms of investigations before or during construction and a resulting reliable data basis. It is not meaningful to optimize a design based on five investigation points over a length of 8 km as this may compromise safety."*[14]

319.  Following the Claimant's instruction to COWI to extend the onshore part of the Breakwater, on 24 April 2013, COWI made a presentation to the Claimant and Technital of the proposed cross-sections for the stretch between Ch. 5,855 to Ch.3,900, now being part of the onshore section.

320.  On 2 May 2013, the Engineer wrote to the Claimant, listing activities that had not been included in the Project Programme that had been submitted on 13 January 2013.

321.  On 25 May 2013, MUSC completed clearing UXO in, and handed over, priority area 1 north (onshore) and the priority area 1 north intertidal area.

322.  Also on 25 May 2013, the Claimant submitted its first post-tender method statement. The

[14] E/2 Tab 78A p.1407.1.

90

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas
Company S.A. (Panama)
v.
General Company for Ports of Iraq (I

document covered the construction of the shallow part of the Breakwater from Ch. 8,250 to Ch. 5,655 and described the techniques and methods of construction from level +0.25 down to level -1.00 MSL.

323.    Construction of the onshore section of the Breakwater commenced on 27 May 2013. Work began with the placement of fill between Ch. 7,455 and Ch. 7,505. Sandy material was transported from land sources, dumped from trucks and pushed by bulldozers in the sea, initially on a single lift and subsequently on two lifts at greater water depth.

324.    As the onshore work proceeded, by placing granular and rock materials, bulging became visible[15] in the intertidal zone and the Claimant encountered settlement of, and penetration into, the seabed beyond that anticipated at the time of tender. The Claimant contends that it was unable to quantify the extent of the settlement and penetration until the onshore part of the Breakwater was completed in March 2014 and the results of a soil investigation campaign that was carried out between 19 and 22 April 2014 became available. The Respondent does not accept that it was not possible to quantify the extent of settlement and penetration until construction was completed and contends that this could have been measured during the course of construction through monitoring. Moreover, the Respondent does not agree that the soil investigation campaign in April 2014, measured "actual settlement."

325.    After construction commenced in May 2013, the Engineer continued to press the Claimant for details of its plans for the execution of the Project, including the plans for the construction of the marine section of the Breakwater. For its part the Claimant contends that the requests were premature whereas the Respondent disagrees and contends that the Claimant should have been able to provide the information that was requested.

326.    On 1 June 2013 the Claimant submitted a revised baseline programme, identified as RS01. This programme accounted for the 61 days of delay that had occurred in making the Advance Payment and showed a new Project Completion Date of 4 August 2014; that date being 58 days later than the contractual Completion Date of 7 June 2014. Programme RSO1 continued to show the offshore/onshore boundary at Ch. 5,855 which was the case in the FPBS programme.

327.    On 6 June 2013, the Engineer reminded the Claimant that the Marine Method Statement was

---

[15] Mr Konstantinos Loukakis gave evidence that bulging of the original seabed was evident both in the advancing front and in the completed embankment. He said this was the result of penetration of the fill materials into the seabed. C/1 Third Witness paragraph 92.

Dr. Robert Gaitskell QC
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

91

urgently required and on 12 June 2013 the Engineer wrote to the Claimant noting that it had not identified its proposed materials or submitted method statements. On 13 June 2013, the Engineer again wrote to the Claimant expressing concern about the late provision of the marine construction method statement and the submission for materials and noted that these documents were required one month before the start of work.

328. At Progress Meeting No. 6, on 18 June 2014, and in the presence of representatives of the Respondent and Technital, the Claimant confirmed its intention to proceed with the near-shore part of the Breakwater to reach a seabed level of -4.00m where a temporary jetty could be constructed. The Claimant could not however fix the boundary between the onshore and offshore sections at Ch. 3,900 until it had completed a pre-construction survey and the relevant design drawings and notes were issued to show the precise levels and boundary between the two sections. At the same Progress Meeting it was confirm that UXO removal and de-mining had been completed in the permanent camp area. The Claimant also advised that it could be 3 months before the permanent camp would be completed. In the meantime, the Claimant would continue to use the temporary camp that had been established in February 2013.

329. On 18 and 19 June 2013, COWI issued its Geotechnical Interpretative and Geotechnical Design Reports, that were based on the original tender documents and the new geotechnical information that had been gathered from the Andrea Lab investigations. The Geotechnical Interpretative Report indicated that the soil conditions at the locations of the new boreholes were consistent with the data provided by the Engineer during the tender phase. In this report, COWI found the soil to be over-consolidated, and estimated (in the Geotechnical Design Report) total average settlement of 48 cm along the 8km length of the Breakwater which was half that estimated by IECAF in the tender documents. The Geotechnical Interpretative Report and Geotechnical Design Report were provided to the Engineer for approval. On 30 June 2013, the Geotechnical Report was approved by the Engineer.

330. On 27 June 2013, the Claimant submitted to the Engineer, its first post-tender method statement for the Construction of the Marine part of the Breakwater. The document described the techniques and methods for construction of the marine part of the Breakwater from seabed level -2.75 down to seabed level -6.50 MSL, for the length thought to be corresponding to Ch. 5,200 to Ch. 1,000. Marine operations were planned to be commenced at Ch. 2,975.

331. Following COWI's recommendation, in order to obtain more information regarding the soil behaviour in relation to settlement values and rates and to confirm the soil characteristics used

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ir

92

14 July 2013 the Claimant began the construction of a trial embankment in the intertidal zone. The Claimant used settlement plates and settlement markers to monitor the trial embankment. These plates and markers provided information that enabled the rate of settlement to be calculated and captured the consolidation phenomenon.

332.  The trial embankment was constructed in the intertidal zone at Ch. 7,750, which is approximately 500m from the beginning of the Breakwater on land. The dimensions of the trial embankment were 25 meters by 30 meters at the base and it was to be constructed in two stages, the first up to 3.5 meters and then up to 5 meters after allowing for a waiting period that would permit the native soils to gain strength through the consolidation process. Mr Loukakis explained that construction of the first stage of the trial embankment was halted in July 2013, as planned, upon reaching 3.5 meters as planned. However, at that height signs of bulging were observed along three of the four sides at, and away from, its toes. Mr Loukakis explains that the bulging indicated some kind of incipient failure of the soil under the load of the embankment but which was not accompanied by any other phenomena of well know failure mechanisms of embankments.[16] In order to allow the consolidation process to take place, further construction of the trial embankment did not take place until December 2013.

333.  The UXO and demining clearance of the offshore area (priority 1 south) was completed by 11 July 2013.

334.  On 6 July 2013, the Claimant submitted to the Engineer, COWI's Breakwater Design Report. On 12 July 2013, the Engineer responded stating that although still incomplete in some respects, the report was approved with comments.

335.  A meeting took place on 16 July 2013, attended by representatives of the Claimant, the Respondent and the Engineer. The purpose of the meeting was to discuss the Claimant's claim to be entitled to an extension of time in relation to the delay on the part of the Respondent in making the Advance Payment. At the meeting it was agreed that the Claimant would be granted an extension of time of 61 days to the Completion Date but that it would not be entitled to any additional payment for that delay. The events of the meeting were confirmed by the Engineer in a letter to the Claimant dated 22 July 2013.[17] As a result of the agreement and the Engineer's award of an extension of time, the Completion Date was revised to 7 August 2014.

---

[16] C/1 Tab 4, p.259. (Loukakis (1) paragraphs 72 and 73).
[17] E/5 Tab 195 p.3322.

Dr. Robert Galtskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

336. On 24 July 2013 the Engineer wrote to the Claimant reminding it of its obligation to make a submission describing the methodology for piezometric and offshore monitoring.

337. During the Monthly Progress Meeting of August 2013, the Engineer noted that it was awaiting updates to the Method Statements for marine construction, together with the Claimant's submission with respect to piezometers. The Claimant responded confirming that the Method Statements were being updated.

338. In August 2013, the results of the pre-construction bathymetric survey were available and they confirmed that the intertidal and subtidal zone of shallow waters was more than 2 kilometers longer than the Claimant had expected.

339. On 23 August 2013, the Claimant submitted a revised method statement for the "Construction of the Dry and Shallow Part of the Breakwater," which described the techniques and methods to be implemented from level +1.24 down to level -1.00 MSL which was thought to correspond to the length from Ch. 8,250 to Ch. 5,700 based on the initial topographic survey of the land.

340. On 25 August 2013, COWI issued a set of preliminary revised (cross section) design drawings, based on the pre-construction survey and in-situ measurements of the tidal data and reflected the Claimant's decision to move the offshore/onshore boundary to Ch. 3,900. The covering email from COWI to the Claimant advised that in order for the design of each section to be optimized, detailed geotechnical analysis of each section would be necessary. The Claimant was asked to indicate whether it wanted COWI to optimize the design and re-design the sections.[18]

341. On 26 August 2013, the Claimant sent the Engineer Revision 0.1 of the method statement for the Construction of the Marine Part of the Breakwater. The only major change introduced in this method statement for the marine part of the Breakwater was the plan to commence operations at Ch. 1,300 which later, was to become the approximate location of the Rotra-V jetty. The method statement did not however refer to the Rotra-V, or any jetty, at Ch. 1,300. As in the first method statement for the offshore works, Revision 0.1 stated that the transition layer material from Iraq would be brought to Site using marine transport equipment and placed by direct dumping. Quarry run rock, under layer and armour stone from Iraq, Iran and the UAE would also be brought to Site by marine equipment.

---

[18] E/6 p.3615.

94

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

342.    Construction of the offshore section of the Breakwater commenced on 27 August 2013. Construction started with the placing of the transition layer directly on the seabed using marine equipment. The transition layer comprised a mixture of sand and gravel. When a sufficient amount of transition layer had been placed, the delivery and placing of the quarry run by marine and land equipment could commence.

343.    Between September and December 2013, the Claimant submitted final design documents following the completion of, and results from, the pre-construction bathymetric survey.

344.    At Design Meeting No. 4 held on 4 September 2013 and attended by representatives of the Respondent and Technital, the Claimant reported that the settlements measured at the trial embankment were higher than expected. The Claimant's on-site coordinator, Mr Papageorgiou underlined at the meeting that results of the trial embankment in terms of the rates of settlement and consolidation may not be fully representative of the intertidal area. For this reason Mr Papageorgiou agree to organize the site team to install a dedicated instrumented section within the shallow water stretch to continuously monitor settlements. Results obtained in this section would then be interpreted together with the trial embankment and used for the definition of reference settlement curves for the definition of the final construction levels that were necessary to comply with design levels and tolerances.[19]

345.    On 6 September 2013 the Engineer wrote to the Claimant requesting further details of the intended piezometric monitoring system.

346.    On 8 September 2013 the Engineer wrote to the Claimant requesting it to submit an updated method statement for Ch. 5,700 to Ch. 4,350. The letter noted that, although the Claimant had already started work between those chainages, it had yet to provide information regarding (1) an additional stability calculation and comments in the event that the sequence adopted was different to that proposed in the design documents; (2) approximate planned durations for each phase and for the overall construction of each section; and (3) calculations and predictions of expected excess pore pressure given the planned phasing, including a definition of actual stability criteria for piezometers to be used during construction.

347.    On 16 September 2013, the Claimant submitted to the Engineer Revision 0.2 of the method statement for the construction of the Breakwater between Ch. 3,900 and Ch. 8,205.

---

[19] E/6 Tab 237, p.3877 item 4.

95

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

revision of the method statement identified Ch. 3,900 as the transition point between the near-shore and offshore sections of the Breakwater, instead of Ch. 5,855 that had been identified in the Claimant's tender submission.

348. COWI issued a Revised Design Basis Report on 19 September 2013 and an Addendum to the Geotechnical Design Report on 23 September 2013. These documents which took into account the results of the pre-construction bathymetric survey were submitted by the Claimant to the Engineer.

349. At some stage in about mid-September 2013, the Minister of Transport for Iraq requested the Claimant to construct a section of the Breakwater to the final design height in the offshore section. The reason for this demand appears to have been to provide a public demonstration of the progress that was being made in the offshore section. Pursuant to this request, on 19 September 2013, the Claimant commenced the construction of a section of the Breakwater at Ch. 3,900. This section became known as "the Trial Island."

350. By letter dated 22 September 2013, the Respondent informed the Claimant that it considered the progress of the work to be inadequate. It stated that the pace of work was in decline and that progress over the last week had fallen behind the late plan. The letter also noted that, in the offshore area, only 56 meters of transition layer had been placed. The Claimant did not agree with the criticisms concerning progress and in a letter dated 24 September 2013, stated that there had been obstacles to progress that were being overcome by implementing various acceleration measures which it set out, including importing transition material from the Stevin Rock quarry in Ras Al Khaimah. The letter confirmed the Claimant's strong commitment to complete the project on time and its promise to construct the Trial Island.

351. The Engineer approved the Claimant's revised Method Statement for Ch. 8,205 to Ch. 5,000 on 25 September 2013. However, it did not approve the revised Method Statement for Ch. 5,000 to Ch. 3,900, on the basis that no additional Technical Notes had been presented for that section. The Engineer observed that, based on the presented calculations, it expected that in order to ensure stability *"some construction measures should be applied (e.g. placement of front and lateral berms in advance or a prescribed duration for different construction phases)."* The Engineer requested the Claimant to submit additional Technical Notes for such sections, *"in case stability is not guaranteed with proposed construction sequence as foreseen from COWI analysis and predictable from recent analysis on the shallower sections, construction sequence shall again be modified and adapted."* In response, on 3 October 2013, the Claimant issued an Addendum to the Method Statement entitled "Technical

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Stability Calculations for Stretch Ch. 4,750 to 3,900", which provided the additional geotechnical stability calculations, stating that "*all examined sections are found to be safe against an overall stability failure.*"

352. The Claimant accelerated the filling of the onshore part of the Breakwater and by the end of September 2013, it had already placed the estimated volume of material for the revised length of the onshore part of the onshore section.

353. The Minutes of Progress Meeting No. 10 dated 10 October 2013 recorded that approximately 134 meters of transition layer had been placed in the offshore section, between Ch. 3,750 and 3,900. It was also noted that the transition and quarry run layers for the Trial Island were being placed.

354. The Engineer approved the final Breakwater Design Report on 22 October 2013, having received the Claimant's Comments Resolution Sheet under cover of a Document Transmittal dated 16 October 2013.

355. During the construction of the Trial Island in October and November 2013, it became clear to the Claimant that soil was not stable enough to allow the safe construction of an initial platform with a vertical face.

356. Under cover of an email dated 15 November 2013, the Claimant sent the Engineer, for comment, draft sketches for the construction of temporary jetties on an offshore section of the Breakwater[20]. The email noted that "*Due to a) the high live loads, b) the significant vertical face and c) adverse geotechnical conditions the required dimensions of the soil placement are quite extended (around 3.5 m dredged depth and over 30 m in plan view).*" The Claimant planned to equip that section with steel structures, which had been mobilized to site, to form temporary jetties for the purpose of receiving and offloading the material from barges. This would then enable the offshore section to be constructed simultaneously on two fronts, starting from that section and proceeding in both directions.

357. On 9 November 2013 the Engineer wrote to the Claimant urging it to increase the offshore placement rates and on 14 November 2013 the Engineer wrote expressing disappointment with the progress of mobilization.

---

[20] E/8 Tab 351, p.5241.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

97

358. Under cover of an email dated 17 November 2013[21], the Claimant proposed the use of the Rotra-V barge as a temporary jetty. This was an alternative to the jetties that had been proposed to the Engineer under cover of its email dated 15 November 2013. This new proposal involved sinking the Rotra-V barge by ballasting, so that it was seated on a sand layer 2 meters above the existing sea bottom. The Rotra-V was to be positioned with its long side perpendicular to the Breakwater in the offshore section and fitted with two articulated ramps, on its short sides, to allow for the berthing and offloading of barges that were to deliver materials.

359. On 23 November 2013 the Engineer provided the Claimant with a Technical Note, which advised that, in order to achieve completion within the Time for Completion, it would be necessary to work on six work fronts. The covering letter suggested that a meeting take place to discuss the proposal.

360. On 27 November 2013 a meeting took place between the Claimant and the Engineer to discuss the Claimant's proposed construction methodology (including the use of the Rotra-V barge), the Technical Note and the Engineer's growing concern about the Claimant's ability to complete the work on time. In the context of the Trial Island it was noted that the transition layer and a 2.5 meter layer of quarry run, had been placed. The data indicated that there was some bulging at the Trial Island and the Engineer emphasized that only piezometers would provide a clearer picture for the planning the correct sequence of placing. The Claimant was asked to review the available data and to submit a final report on the Trial Island. In relation to piezometers, more generally, the Claimant had requested the supplier's technician to attend site for their placement and calibration. The Engineer expressed the view that, because piezometers were not yet in use, there was no-on site experience of the expected readings. Consequently, the Claimant was taking a high risk if piezometer readings demonstrated a need for delay in the placement of layers. Attached to the meeting minutes was a presentation by the Engineer, which suggested staged construction, including waiting times that were to be defined, based on piezometer readings.

361. The Claimant submitted Revision 0.2 of the Method Statement for the Construction of the marine section of the Breakwater on 8 December 2013. This Method Statement incorporated the proposal to install the Rotra-V barge at Ch. 1,300.

362. Although the proposal to use the Rotra-V barge had not been formally approved by the

---

[21] E/8 Tab 351A, p.5243.1.

98

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Engineer, it is clear that from, the third week of November 2013, the Claimant proceeded on the basis that the Engineer's approval would be forthcoming.

363.    On 9 December 2013, the Engineer wrote to the Claimant pressing the Claimant to provide a Method Statement for the installation and interpretation of piezometers. The letter referred to numerous previous requests for such a document.

364.    At Progress Meeting No. 12 on 15 December 2013,[22] the Engineer advised the Claimant that it had reviewed the Claimant's proposed methodology and, while agreeing that it would allow for an increase in the speed of production, it was concerned that such an increase may not be enough to complete the Project by the Completion Date.

365.    COWI issue the Staging Pier Report on 23 December 2013.

366.    The Claimant completed the setting up of its permanent camp at the end of December 2013.

367.    The consolidation of the first phase of the trial embankment was, for all practical purposes, completed by the end of December 2013. The Claimant then proceeded with the second phase of the trial embankment construction.

368.    By the end of December 2013, all UXO removal and de-mining was completed.

369.    Between December 2013 and February 2014, the Claimant installed 18 piezometers at four near-shore and offshore locations. All the installed piezometers were destroyed after a few days. The Claimant also experienced issues with data transmission. The Claimant contends that the piezometers were destroyed as a result of wave action, associated with bad weather and by excessive settlement that had over stretched and severed the cabling. The Respondent contends that the problems with the piezometers were the consequence of incorrect installation, which could have been overcome. The Tribunal considers that it is unnecessary to decide why the piezometers were destroyed or why there were problems with data transmission. The essential point is that they ceased to function properly and consequently data transmission was compromised, particularly in the period December 2013 to early 2014. The influence of this event was limited since by April 2014 the position was understood and recognised and alternative procedures adopted, as noted in the narrative below.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)

General Company for Ports of Iraq

---

[22] E/9, Tab 381.

90

**January to December 2014**

370.  The Claimant mobilized the Rotra-V barge to site in January 2014. Difficulties were encountered during its installation due, in part, to soil and the winter weather conditions. The Rotra-V barge did not in fact become operational until May 2014.

371.  On 9 January 2014, the Claimant submitted Programme RS02. It had a data date of 28 December 2013 and incorporated the 61 day extension of time that had been awarded in relation to the delay in making the advance payment. Programme RS02 reflected the changes to the Claimant's methodology, including the Rotra-V barge. Changes from the previous FPBS Programme also included mitigating measures such as compression of the planned durations for the Staging Platform, switching from a 6 to a 7 day working week, the placement of quarry rock by land equipment using the Rotra-V barge and more concurrent working.

372.  On 20 January 2014, the Claimant submitted to the Engineer a "Trial Embankment Interpretative Report" which contained an analysis of the soil behaviour in that area. An addendum report was produced by the Claimant on 28 February 2014 and was submitted to the Engineer on 1 March 2014. The report indicated that the consolidation related properties of the soil were different from those assumed at Tender. However, the extent to which this would have an impact upon the construction of the Breakwater, and whether these conditions were applicable to the full length of the Breakwater had to be explored further. The Report also concluded that there were no global stability issues.

373.  The Engineer carried out its own interpretation of the observed soil conditions at the trial embankment and, on 17 March 2014, issued its assessment in a document entitled. "Geotechnical Characterization of Foundation Soil based on Observed Behaviour during Construction." That report stated that the geotechnical character of the soil differed from that assumed at Tender and predicted that the settlement at the end of construction would be higher than expected.

374.  By the end of the first quarter of 2014, both the Claimant and the Engineer had agreed that the findings of the trial embankment experiment were applicable to the whole area.

375.  The Claimant achieved substantial completion of the core section of the onshore part of the Breakwater by 19 March 2014. From that date, use of the temporary jetty at Ch. 3,900 commenced. This allowed for significantly enhanced rates of placement of the transition layer.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

376.    During the first week of April 2014, the problems that had been encountered in obtaining reliable piezometer readings were the subject of discussions at site between the Engineer's team and the Claimant's Design and Construction Team.  In a letter to the Claimant dated 7 April 2014[23], the Engineer referred to those discussions and to the status of the installed piezometers.  The letter noted that although, at times, the site conditions may not be favourable for piezometers, such monitoring had been employed on other projects with similar problematic conditions, with satisfactory results, meaning that technical solutions were possible.  The letter concluded by recording that if alternative methods of monitoring were to be proposed then a formal submission should be made as soon as possible.  Such a proposal should be supported by a full report and any alternative that was proposed should be equivalent to piezometric monitoring.

377.    The Claimant engaged Andrea Lab to perform Cone Penetrometer Tests ("CPTs") to explore the subsoil conditions and evaluate the subsoil properties.  A field investigation was carried out between 19 and 22 April 2014.  The investigation included the carrying out of 8 CPTs together with dissipation tests at the same locations.  The findings of the investigation are set out in a Factual Report issued on 17 May 2014[24] and an Additional Report issued on 31 May 2014.[25]

378.    The Rotra-V was commissioned at the end of May 2014 and was operational in June 2014.  As noted above, the barge was located at Ch. 1,350 and enabled larger barges to moor alongside and offload quarry run and rock armour that had been imported from the UAE for offshore works.  The Rotra-V enabled the Claimant to use land-based equipment to place quarry run in either direction from that facility.  This meant that the Claimant was able to advance the offshore work in three directions; south from the temporary jetty, north of the Rotra-V towards the land and south of the Rotra-V towards the Staging Platform.

379.    On 7 June 2014, the Claimant proposed to the Engineer an alternative monitoring system, which used settlement platforms and markers to collect information on settlement and its magnitude.  This proposal was an alternative to piezometers, which monitored pore pressure.  Under cover of a letter dated 16 June 2014[26], the Engineer responded to the proposal attaching a report prepared by the Engineer's Design Team.  The report stated that since February 2014 the Claimant had been requesting complementary or alternative methods of monitoring and

---

[23] E/11 Tab 529.
[24] E/12 Tab 603.
[25] E/12 Tab 613.
[26] E/13 Tab 635.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

that construction activities had been allowed to proceed in order to avoid delay. The report noted the problems that had been encountered with piezometers and recognized that alternative methods may have to be put into place and stated that the Claimant's proposal was deemed to be adequate and should be implemented, subject to certain conditions; which were set out. The report concluded by stating that effective substitution of piezometers with the monitoring, proposed by the Claimant, would be validated and deemed adequate *"only based on results actually obtained and agreed."*

380.    In early May 2014, the Claimant had started to increase its transportation fleet from a 200,000 ton total capacity to 242,300 tons.  By 24 June 2014, 20 out of 28 transport barges carrying material for the Project were either on Site or sailing to Site and were all due to be unloaded at the Rotra-V barge.

381.    On 25 June 2014, the Claimant suspended deliveries and notified the Engineer of a Force Majeure event pursuant to GC 19.2.  The reasons for the suspension are disputed and are the subject of the Claimant's Force Majeure claim.

382.    The Claimant resumed delivery of materials on 8 July 2014.

383.    On 14 July 2014, the Claimant sent the Engineer, particulars of its claims in respect of Delay Events 2 to 7 and requested an extension of time.  Delay Event 3 related to the Claimant's claim of Unforeseeable Physical Conditions in connection with the soil conditions and its behaviour that had initially been noted during the construction of the Trial Embankment and been the subject of later reports.

384.    On 19 July 2014, the Engineer notified the Claimant that it had received notice from the Respondent that it considered that delay damages should be applied pursuant to GC Sub-Clause 8.7.  On 8 September 2014 the Respondent submitted its claim for delay damages to the Engineer and requested the Engineer to proceed with a determination under GC  Sub-Clause 3.5.  Under the cover of a letter dated 10 September 2014, the Engineer provided the Claimant with a copy of the Respondent's letter dated 8 September 2014 and stated that it intended to proceed in accordance with GC Sub-Clause 3.5.

385.    In the meantime, on 29 July 2014, the Engineer wrote to the Claimant seeking further information about the certain statements contained in the claim that had been submitted on 14 July 2014.  The Claimant responded by letter on 3 September 2014.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

386.    By letter dated 9 September 2014, Mr Horgan, on behalf of the Engineer, advised the Claimant that he had considered the claims made in relation to Delay Events 2 to 7 inclusive and decided to reject each of them. The letter made reference to Sub-Clause 20.1 which, he asserted, imposed strict obligations on the Claimant to give notice of its claims. He considered that the Claimant had failed to comply with those requirements.   In relation to Delay Event 3, and while acknowledging that the Claimant's assumption about the ground conditions proved different from those "individuated by the Contractor at the Tender stage", Mr Horgan stated that he did not consider the soil conditions that had been encountered to be "unforeseeable." He also stated that even if he was wrong about that, the conditions had been encountered were more favourable to the Claimant than those indicated in the Tender information.

387.    On 18 September 2014, the Claimant responded to the Engineer's rejection of the claim stating that the contents of the decision and the conclusions were unsustainable.  The Claimant also pointed out that GC Sub-Clause 20.1 had in fact been deleted and been replaced by Clause 20 of the Particular Conditions.  The Engineer responded by letter dated September 2014 recognizing that GC Clause 20.1 had been deleted by the Particular Conditions but suggested that this was a typographical error.  The Claimant disagreed[27] and advised that it would not agree that the clause should be re-instated.  Nevertheless, the Parties agreed to meet on 6 November 2014 to seek to achieve a solution to their disagreement.

388.    On 26 October 2014, the Claimant submitted its proposed method statement for the infilling of the Staging Platform.  The method statement explained that the Claimant planned to construct the Staging Platform by raising the revetments up to +1.30 m above mean sea level. After partial completion of that step a geotextile layer and sufficient fill material to protect that layer would be placed using land and/or marine equipment.  The Claimant then planned to commence backfilling up to +1.30 m above mean sea level.  The proposal also explained that in order to control the bulging and its effects on the transition layer and revetments, the Claimant planned to create four working fronts to maintain and guide bulging to the centre of the area and away from the revetments.   The last stage was, upon completion of the Breakwater sections, to fill up to the final level.  The Claimant contends that it was intended that the bulk of the filling of the Staging Platform was to be done using land equipment, delivered by trucks that travelled along the Breakwater.  The Respondent contends that it was intended that the fill material was to be transported by land to the temporary jetty at Ch. 3,900 and then to the Staging Platform, using marine transport barges, which would then be moored

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Ports of Iraq (Iraq)

_____
[27] Claimant's letter dated 6 October 2014, E/16 Tab 746.

103

directly against the body of the Breakwater and be offloaded to trucks for placement in the Staging Platform.

389.   In the event, the method statement that had been submitted in October was, in one respect, not followed. On 14 December 2014, the Claimant advised the Engineer that it would not begin construction of the Staging Platform with the revetments, but would instead start with the first layer of infilling. On 22 December 2014, the Claimant started the first layer of infilling.[28]

390.   From November 2014, and as the Works proceeded, stability failures started to manifest themselves in various areas of the Project. Between November 2014 and December 2015, 40 collapses occurred in the offshore section of the Breakwater. Most of the collapses occurred between Ch. 2,700 and Ch. 3,700, which is a section of the Breakwater that became known as "the Green Mile."

391.   The Engineer's monthly progress report for November 2014 advised the Respondent that sections of the Breakwater had settled unexpectedly in local isolated areas. The report advised that although progress was satisfactory for the equipment on site it was not possible to speed up construction without compromising the integrity and stability of the Breakwater. The Engineer's monthly progress report for December 2014 advised the Respondent that the number of sections experiencing settlement over the past month appeared to have reduced and that over the holiday period only one section had experience settlement. The Engineer considered that the reason for the reduction was that there had been greater monitoring and care in construction coupled with a slightly slower pace of construction. The Engineer again cautioned that it was not possible simply to speed up construction without compromising the integrity and stability of the Breakwater.

392.   On 5 and 9 December 2014 meetings took place in Dubai between the Parties' representatives, and the Engineer, to discuss the Claimant's claims for an extension of time and for additional payment.

393.   On 8 and 9 December 2014, the Claimant made a supplemental submission in relation to Delay Event 3.

**January to December 2015**

394.   Collapses continued to occur throughout 2015. Two major collapses occurred in February

---

[28] The final version of the Method Statement for the Staging Platform was issued in March 2015 and showed construction starting with the first layer of infilling.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ir

2015. One was between Ch. 2,530 and Ch. 2,750 and the other between Ch. 310 and Ch. 510. After these collapses had occurred, the Claimant increased the number of layers so that the load could be added more progressively. This was achieved by making layers thinner; a maximum lift was 50cm.

395.  On 14 January 2015, the Claimant issued a document entitled, "Geotechnical Investigation Plan and Procedure" which proposed additional CPTs in the onshore and offshore section of the Breakwater and boreholes in the offshore section. The objective of these investigations was to assess the interface level between the original ground and the new fill materials. By an email dated 2 February 2015, the Engineer responded stating that the Claimant's proposed plan and procedure were not approved because the proposed methodology would not provide sufficiently precise results. On 21 February 2015, the Engineer wrote again stating that the Claimant's proposal was not approved. That letter also explained that although the Engineer may witness the investigation that the Claimant intended to carry out this did not mean that the Engineer would agree with the findings. The Claimant expressed its disagreement with the position that the Engineer was taking[29].

396.  On 2 February 2015, the Claimant started placement of the fill material for the Staging Platform up to -4.00 below MSL. Marine equipment was used for the placement.

397.  Between March and April 2015, there were repeated failures in the Green Mile section of the Breakwater. After these failures the Claimant implemented waiting periods between successive construction stages.

398.  On 15 March 2015, the Claimant submitted a revised method statement for the Staging Platform, which reflected the marine placement of the file that had commenced.

399.  On 30 March 2015, the Claimant informed the Engineer that it intended to engage Fugro, to conduct the additional soil investigations that it had proposed should be carried out.

400.  Between April and June 2015, Fugro undertook the additional soil investigations in the offshore section of the Breakwater. The investigations include performing 24 boreholes and 27 CPTs together with associated soil tests.

401.  On 1 April 2015, a further collapse of the quarry run occurred between Ch. 3,600 and Ch.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
105
General Company for Ports of Iraq (Iraq)

---

[29] See E/19, Tab 853.

2,800 and at Ch. 1,620.  The collapse prevented the Claimant from progressing the infilling of the Staging Platform using land-based equipment until rectification was complete on 28 April 2015.

402.  On 2 April 2015, the Claimant informed the Engineer that it would place additional berms at the Staging Platform to enhance stability and minimize the risk of excessive bulging and/or collapse, emphasizing that the additional berms were necessary due to the geotechnical conditions, which the Claimant contended were unforeseeable.

403.  During a Weekly Progress Meeting on 4 April 2015, the Engineer warned the Claimant that its construction methods could be contributing to the problem of collapses and advised that longer waiting periods should be implemented.

404.  IECAF produced an internal report dated 14 April 2015, entitled "Impacts of the Unexpected Soil Conditions on the Construction of the East and West Breakwaters."[30]  The report was not provided to the Claimant at the time but was disclosed by the Respondent during the course of the arbitration.  The report refers to two earlier reports of IECAF, dated 27 January 2015 and 25 February 2015, which address "the technical reasons for considering the differences in the soil conditions as 'unforeseeable'."  The report dated 25 February 2015[31] is annexed to the report of 14 April 2015.  The earlier report of 27 January 2015 is not annexed and was not in evidence before the Tribunal.

405.  The IECAF report dated 25 February 2015 states that the earlier report had been prepared on the assumption that the Claimant could be willing to commence an international arbitration to obtain compensation that it believed it was entitled to due to unexpected settlement but was very detailed and highly technical.  The 25 February report noted that it had been prepared to provide an Executive summary of the report of 27 January 2015.

406.  The IECAF report dated 25 February contained the following findings:

406.1  The site conditions and soil conditions had been defined at the design stage of the Project.  The results of the site investigation that had been performed at that stage showed a rather uniform geotechnical condition and that the soil parameters were very similar over a very wide area with a rather uniform change in the stratigraphy.[32]

[30] E/20 Tab 889.
[31] E/20 Tab 889, p.13692.
[32] E/20 Tab 889, p.13694.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

106

406.2   That the laboratory and site test results clearly showed that the clay is slightly over consolidated in comparison with typical results for clay which is normally consolidated.[33]

406.3   During the tender stage the Claimant confirmed IECAF's interpretation of the soil behaviour and proposed a similar breakwater cross section to that contained in IECAF's tender information.[34]

406.4   The soil behaviour differed from expectations because bulging occurred around the construction and settlement was greater and faster than foreseen. It was only after July 2014 that it was possible to understand and explain the reasons for a soil behaviour which differed from expectations.[35]

407.   The IECAF report dated 14 April 2015 contains the following statement:

> "The soil characteristics defined by the Consultant and confirmed later by the Contractor have been proved to be fully valid (soil stratigraphy and geotechnical parameters) but it has been understood that the soil behaviour depend also on the presence of very unusual and unpredictable singularity that no site investigation or laboratory or in-situ test can detect. The new findings presented in the above mentioned report are considered ahead of the scientific state of the art in the geotechnical field."

408.   Returning to events on site. In its monthly progress report for April 2015, the Engineer advised the Respondent that the excessive settlement that was being experienced was the result of the pace at which the Claimant was placing the fill material. The Engineer observed that it would prefer to see the Claimant slow down and take account of longer waiting periods but was concerned that if the Engineer instructed this it may give the Claimant reason to think it could claim an extension of time. The Engineer described the problem as "a difficult 'catch 22' situation." Nevertheless, at a Weekly Progress Meeting on 6 June 2015, the Engineer advised the Claimant of its opinion that "construction methodology/speed has a part to play in the settlements especially if the works proceed to (sic) fast." The Claimant responded, explaining that it was necessary to balance the effects on proceeding quicker and rectifying afterwards with the effects of waiting and doing little works at times.

409.   At the Monthly Progress Meeting on 14 June 2015, the Engineer again expressed the opinion

---

[33] E/20 Tab 889, p.13697.
[34] E/20 Tab 889, p.13699.
[35] E/20 Tab 889, p.13700.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

107

that the settlement problems were due to the Claimant's construction methodology. However, the Claimant stated that there were only two options. First, maintain the methodology of pushing progress and rectifying settlements. Second, introduce waiting time and build up sections. The Engineer responded saying that "*the issue of timing and waiting periods has (sic) been indicated from quite early in the Project.*"

410. On 17 June 2015, the Claimant and the Engineer met in Milan, Italy, to discuss the stability failures. At the meeting, the Engineer sated its position that the encountered soil behaviour mechanism was "*impossible to be discovered during normal site investigation."* Following this meeting the Claimant decreased the lift thickness (thereby increasing the number of layers) and imposed waiting times between the placement of subsequent fill layers as well as increasing certain berms in order to improve the stability of sections. The Claimant contends that the waiting times were based on an evaluation of the monitoring data. The Respondent contends that, in the absence of evidence on record as to how monitoring data was used to determine waiting times between layers, the waiting times were determined as a matter of guesswork.

411. On 25 June and 5 July 2015, the Claimant submitted memoranda concerning the implementation of waiting periods between placement of layers for both the Breakwater and sections of the Staging Platform. The memoranda were approved by the Engineer on 29 June and 14 July 2015 respectively.

412. On 15 July 2015, the Claimant wrote to the Engineer advising that Claim No. 3 would be revised, based on the results provided by Fugro. The Engineer responded by letter dated 16 July 2015, noting that while the soil had an unexpected behaviour when compared with what was technically predictable at the beginning of the project it was of the opinion that the settlement that had been observed was related to the Claimant's construction methodology. The letter went on to note concern that the Claimant was now predicting a completion date in December 2015 and stated that the Respondent had good grounds for enforcing all of its contractual remedies "*for the Contractor's poor performance.*"

413. On 25 July 2015, the Claimant submitted its Programme for Remaining Works, reflecting the discussions that had taken place at the meeting on 17 June 2015 and, what it considered to be, its best-case scenario for the waiting time based on future monitoring of settlement.

414. On 28 July 2015, the Claimant submitted a revised claim for Delay Event No. 3 based on the CPT and borehole investigations carried out by Fugro. The claim sought **Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

108

of 511 days and €163,262,221.82. The claim was rejected by the Engineer on 3 August 2015.

415.    On 30 July 2015, Fugro produced a Geotechnical Investigation Report which identified the interface depth between the placed material and the underlying natural clay at each of the field test locations that had been the subject of investigation between April and July 2015.

416.    On 27 August 2015, the Respondent notified the Claimant and the Engineer of its claim for delay damages and requested the Engineer to carry out a determination in accordance with GC Sub-Clause 3.5. By letter dated 31 August 2015, the Engineer confirmed that it would comply with the Respondent's instruction to apply Delay Damages. On 28 September 2015, the Claimant requested the Respondent to reconsider its decision to deduct Delay Damages but by letter dated 13 October 2015, the Respondent rejected that request. On 14 October 2015 the Claimant again wrote to the Engineer and the Respondent contesting the application of Delay Damages.

417.    By letter dated 5 October 2015, the Claimant informed the Engineer that it intended to carry out further soil investigations with the aim of obtaining more information that would help the analysis and quantify the penetration and settlement volumes that had occurred as a result of the soil conditions that had been encountered. By a letter dated 13 October 2015, the Engineer stated that the proposed methodology, and the conclusions that were sought to be drawn, were not agreed.

418.    On 17 October 2015, the Claimant submitted a plan for the additional investigations.

419.    Even though measures had been taken to adapt the construction method, two further major collapses occurred in September and November 2015. The collapses occurred in the Green Mile.

420.    Fugro undertook further soil investigations in the offshore section of the Breakwater between October and November 2015. Those investigations were carried out without the approval of the Engineer.

421.    A meeting took place in Baghdad on 15 October 2015 attended by representatives of the Ministry of Transport for Iraq, the Respondent, the Engineer and the Claimant. The purpose of the meeting was to attempt to reach an amicable settlement in respect of the Claimant's claims. Further meetings were held between representatives of the Respondent, the Engineer and the Claimant in Baghdad over a period of 3 days, between 27 and 29 October 2015, again

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
-v.-
General Company for Ports of Iraq (Iraq)

109

with the objective of achieving an amicable settlement of the Claimant's claims. During those meetings the Engineer acknowledged the financial impact of the soil settlement and collapses and estimated the resulting costs of additional materials to be €20 million. The Claimant estimated the cost of additional material to be €93 million.

422. The events of the meetings that took place between 27 and 29 October 2015 are recorded in a Memorandum prepared on 29 October and signed by a representative of each of the Parties.[36] The Memorandum records the following matters:

> "• ARCO and TCH have explained that the Engineer, all bidders, and also ARCO, after signature of the Contract have confirmed the same soil parameters.
>
> • In a period between January 2014 and July 2014 and based on the results of the trial embankment and of the excavation of the first offshore portion of the breakwater, the Parties understood that the behaviour of the soil was different than expected.
>
> • ARCO and TCH therefor agree that the soil behaviour, as detected by the trial embankment and during construction of the first sections of the offshore portion of the breakwater was unforeseeable.
>
> • TCH consider that the soil resistance has not been influenced by the new soil behaviour since there are not scientific reasons to assume that the presence of cracks can modify the geotechnical parameters of the clay material.
>
> • This different position reflects a different stability calculation criteria. ARCO is using soil parameters related to undrained conditions, because construction time is small compared to the consolidation period, while TCH is considering the cracks meaning that when soil is loaded the water can flow easily.
>
> • TCH does not consider valid the assumptions introduced by ARCO since ARCO is assuming the undrained conditions instead of drained conditions. The stability analysis carried out using the drained conditions shows that the sections, contrary to ARCO conclusions are stable, provided that they are built following a careful schedule... ARCO believe that undrained analysis is applicable since the construction period is less than the consolidation period. This fully justifies that collapses have occurred due to locally weaker soil conditions".

423. On 10 December 2015 a further meeting took place between representatives of the Ministry of Transport of Iraq, the Respondent, the Engineer and the Claimant. The purpose of the meeting, again was to try to reach an amicable settlement in respect of the issues in dispute, including Delay Event 3. The events of the meeting are recorded in minutes prepared by the Engineer.[37] In relation to the claim for unforeseen soil conditions the minutes contain the following:

---

[36] E/24 Tab 1031.
[37] E/25 Tab 1059.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

110

> *"ARCO presented the claim as submitted previously. The Engineer has presented a Determination consisting in the acceptance of the conditions stated in Sub-Cl 4.12 but the rejections of the Extension of Time (511 days) and the Variation of the Contract Value (about 163 mil Eur) claimed. The valuation of ARCO hides serious responsibilities on the method of construction which is fully responsibility of the Contractor. From the moment the unusual conditions have been discovered it was duty of the Contractor to adjust the design and method to the new soil conditions rather than continuing with the previous ones. The measurement of volumes ex-post can't be used in the evaluation as it is the consequence of the careless behaviour of the Contractor, have been undertaken by the Contractor without the approval of the Employer/ Engineer and finally the unit rates adopted hide a double counting of factors which have not be (sic) included in a cost reimbursement.*
>
> *The determination of the Engineer is for 2 or 3 months of extension of time and for up to 20 mil euro."*

424.   Although this passage refers to "a Determination" by the Engineer, no document has been supplied to the Tribunal that contains a record of such a Determination and the Claimant contends that no such Determination was ever issued. Mr Assad Rashid, the Respondent's Project Director, attended the meeting and gave evidence to the Tribunal. In cross-examination he was asked about the Determination and said that he did not consider it to be binding on the Respondent.[38]

425.   At the conclusion of the meeting, the Claimant stated that it was ready to respond to a credible proposal from the Respondent. The Claimant was asked by the Respondent to defer the commencement of an arbitration, in order to allow more time for discussion. However, the Claimant stated its intention to proceed with the arbitration process:

425.1   On 14 December 2015, the Engineer issued Interim Payment Certificate No. 25 and certified that the monthly interim payment due to the Claimant was zero because a deduction for liquidated damages had been applied in accordance with GC Sub-Clause 8.7.

425.2   On 28 December 2015 further major collapses occurred at Ch. 2,930 to Ch. 3550 and Ch. 3,500 to Ch. 3,700. Prior to these collapses the Engineer had advised the Claimant to proceed with some additional conservatism. Following the collapse, the Claimant extended the waiting periods and proceeded with intermittent construction with several month-long intermediate waiting periods to avoid further collapse incidents.

---

[38] Transcript Day 5, p.47, line 15 to p.48, line 6.

111

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

**January 2016 to December 2016**

426.    On 13 January 2016, the Respondent issued the Take-Over Certificate for the roundhead section of the Breakwater, between Ch. 250 and Ch. 500.

427.    On 18 January 2016, the Claimant notified the Engineer that onshore part of the Breakwater from Ch. 3,900 to Ch. 8,205 was substantially complete and would be ready for taking over by the Respondent on 31 January 2016. On 19 January 2016, the Engineer acknowledged the notice and requested the Claimant to undertake certain works, including completing the road pavement, to enable Take Over of the Section.

428.    On 23 January 2016, the Claimant submitted a proposal for the reconstruction and completion of the Breakwater stretch between Ch. 2,950 and Ch. 3,690. The Engineer commented on the proposal by way of a letter dated 1 February 2016. One of the comments was that monitoring could be improved with the installation of some piezometers. The Claimant updated the proposal on 17 March 2016. This update included a work stoppage of 5 months at level +2.20m, where significant and repeated instabilities had been encountered.

429.    On 30 January 2016 the Claimant informed the Engineer that the road pavement and the onshore part of the Breakwater would be complete on 4 February 2016 and that Ch. 3,900 to Ch. 8,205 would be ready for taking over on 7 February 2016. However, on 4 February 2016, the Engineer wrote to the Claimant and rejected the application. The Engineer noted that the Respondent was under no obligation to take over a section of the Breakwater and that the Respondent intended to proceed in accordance with its right to take over the works only when the whole Breakwater was completed.

430.    The Claimant filed its Request for Arbitration on 24 March 2016.

431.    On 5 May 2016, the Claimant submitted the hand-over documentation for the Staging Platform Area. On 15 May 2016, the Staging Platform and ancillary structures were taken over by the Respondent.

432.    The work of reconstructing and completing the section of the Breakwater between Ch. 2,950 and Ch. 3,690 was undertaken between May and October 2016. The Claimant contends that in carrying out this work, it implemented a 5 month waiting period between the placement of rock armour in around May 2016 and the recommencement of placement on 22 October 2016. The Respondent contends that there is no evidence that the 5 month

Dr. Robert Gaitskell QC
President

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

112

implemented the 5 month waiting period.[39]

433.    The Tribunal has considered the evidence and finds that the Claimant did implement a 5 month waiting period in carrying out the work of reconstructing the section Breakwater at Ch. 2,950 to Ch. 3,690. The fact that the daily reports show the last placement of rock armour on 21 May 2016 and the recommencement of placement of rock armour on 22 October 2016 is compelling evidence that the stated waiting period was observed. Further support that there was such a waiting period is contained in the Minutes of Progress Meeting No. 43 which took place on 29 September 2016.[40] Section 4 of the Minutes records that there had been no activities in this critical area since mid-May 2016. The section goes on to note that monitoring of the area was ongoing, that the settlement rate was diminishing slowly and that the plan is to resume construction on 19 October 2016, but a final decision would be taken after analysis of the next week's monitoring.

434.    As a result of delays in the completion of the Works the Respondent contended that it had to pay charges to its bank to extend the letter of credit. These charges were deducted from Interim Payment Certificate Nos. 20 and 33. These deductions were in addition to the liquidated damages that had been deducted from Interim Payment Certificate No. 25.

January to August 2017

435.    On 10 July 2017, the Claimant notified the Engineer that the Works would be completed on 18 July 2017 and requested a Taking-Over Certificate for Ch. 750 to Ch. 8205, Stretch SB3a, Stretch SB3b and Roundhead SB1a.

436.    No further construction work was carried out after 16 July 2017. On 17 July 2017 the Claimant submitted the As-Built Drawings. However, on 5 August 2017, the Engineer requested the Claimant to re-submit the As-Built Drawings.

437.    The Engineer inspected the Breakwater on 24 July 2017 and on 6 August 2017, issued a Taking Over Certificate for the stretch between Ch. 750 and Ch. 8,250, Stretch SB3a, Stretch SB3b and Roundhead SB1a.

438.    By letter dated 28 August 2017, the Claimant advised the Engineer that it did not accept the date of Taking Over referred to in the letter of 6 August 2017 and contended that Taking Over should have been certified with effect from 18 July 2017. The Engineer responded by letter

---

[39] See Agreed Factual Narrative, paragraph 230.
[40] CX-189.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

143

dated 29 August 2017 explaining that the reason why Taking Over had not been certified on 18 July 2017 was that the Claimant had failed to submit As-Built Drawings that complied with the requirements of the Contract.  The Claimant does not accept that the As-Built Drawings that it had submitted on 17 July 2017, did not comply with the requirements of the Contract.

## The Parties' Cases

### The Claimant's Position

439.  The Claimant contends that the soil conditions that it encountered in the construction of the Breakwater caused it to incur additional cost and caused delay.  It claims to be entitled to recover those costs from the Respondent and it also claims an extension to the Time for Completion. Refer to Appendix 3 hereto.

440.  The Claimant advances its claim on the following three bases:

440.1  That it encountered "unforeseeable physical conditions" within the meaning of GC Sub-Clause 4.12 of the Contract.[41]

440.2  That the Employer's Requirements contained errors regarding the soil profile and geotechnical parameters of the Site, within the meaning of GC Sub-Clause 1.9 of the Contract, which an experienced contractor would not have discovered when scrutinizing the Employer's Requirements.[42]

440.3  That the conditions encountered by the Claimant were an exceptional and unpredictable event of a general nature which entitles it to relief in accordance with Article 146(2) of the Iraqi Civil Code.[43]

(a)  The claim under GC Sub-Clause 4.12 of the Contract

441.  The Claimant contends that the Tender Documents indicated that the soil on the site was in an over consolidated state as opposed to a normally consolidated state.  Based on that analysis it prepared its Tender design which, consistent with the information provided at Tender, was based on the soil being in an over consolidated state.  The Claimant contends that after it had been awarded the contract it engaged COWI as its design consultant to undertake the detailed design of the Breakwater.  It says that COWI carried out an independent geotechnical

[41] Claimant's Pre-Hearing Submissions, Section 6.
[42] Claimant's Pre-Hearing Submissions, Section 7.
[43] Claimant's Pre-Hearing Submissions, Section 8.

114

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

assessment based on the Tender documents and new geotechnical information that had been obtained, including the results of Andrea Lab's investigations. COWI's Geotechnical Design Report, that was issued in June 2013, indicated that the results of the new site investigations were consistent with the borehole data contained in the Tender documents. COWI also concluded that the soil at the Site was over consolidated.

442.    Based on the design that had been prepared by COWI, the Claimant proceeded with the works.    However, in July 2013, after the construction of the first stage of the Trial Embankment had been completed, the Claimant observed bulging along three of its four sides some 20m away from the toes of the embankment. Subsequent monitoring and investigation of the settlement of the Trial Embankment revealed that consolidation settlement was around 50 cm greater than had been anticipated using the Engineer's and COWI's design parameters and that consolidation was practically complete in about 6 months as opposed to the 2 year period expected by the Engineer.  The Claimant contends that the observations at the Trial Embankment were the first indication that the actual soil conditions at Site were inconsistent with the information provided at Tender.  However, it says that those observations, did not suggest that stability problems would be encountered in constructing the Breakwater.

443.    The Claimant contends that, as it proceeded with the Works, it encountered:

443.1    Excessive consolidation settlement arising from consolidation displacement due to the dissipation of pore pressure;

443.2    Undrained deformations, including bulging;

443.3    Collapses in the offshore section of the Breakwater.

444.    The Claimant alleges that the excessive settlement, undrained deformations and collapses were the consequence of natural physical or sub-surface conditions that were not reasonably foreseeable at the date of the submission of its tender. It alleges that whereas the information that was available to the Claimant at tender indicated that the soil conditions beneath the site of the Breakwater were over consolidated, the soil encountered was normally consolidated. Accordingly, the Claimant says, it is entitled to recover its Costs pursuant to GC Sub-Clause 4.12.

445.    The Claimant states that the Respondent did not dispute in either its Answer to the Request for Arbitration or in the Statement of Defence that the physical conditions encountered by the

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

115

Claimant were not Unforeseeable. It notes that, by its Answer, the Respondent stated that it accepted that compensation was due for the Unforeseen physical conditions encountered. The Claimant also states that the Engineer has, on various occasions, accepted that the Claimant encountered Unforeseeable physical conditions. The Claimant contends that the Respondent changed its position when it served its Rejoinder and that change was the product of advice given by Professor Burcharth.

446. The Claimant denies the suggestion that its construction methods caused or contributed to the failures and states that it was not practical to have used piezometers and, based upon readings, introduce waiting times between the placing of layers of material. The Claimant states that it was not feasible to use piezometers and the introduction of waiting times, sufficient to reduce settlement to acceptable levels and had it done so this would have increased the construction time by a factor of between 10 and 100.

447. In its Pre-Hearing Submissions the Claimant stated that Mr Wishart had assessed the costs that it was entitled to recover as a result of the Unforeseeable physical conditions as US$90,457,681. This figure is set out in the Pre-hearing Submissions at paragraph 236. comprises two elements. First, the additional cost of materials resulting from settlement/penetration, which he quantified at US$75,345,863. This figure is set out in paragraph 237 of the Pre-Hearing Submissions. Second, the additional cost of materials resulting from the collapses, which he quantified at US$16,299,444.[44] This figure is set out in paragraph 240 of the Pre-Hearing Submissions. (Although the two constituent figures add to a slightly higher figure than the total of US$90,457,681 this makes no material difference for present purposes.)

<u>The Claim under GC Sub-Clause 1.9</u>

448. The Claimant contends that the Employer's Requirements contained an error, which an experienced contractor, exercising due care, would not have discovered when scrutinizing those Requirements under GC Sub-Clause 5.1. The Claimant claims the additional costs, that it alleges that it has incurred, plus a reasonable profit, pursuant to GC Sub-Clause 1.9. It also claims an extension of time under that Sub-Clause.

449. The error that is alleged to have existed arises from Table 3.5 of the Employer's Requirements[45] which summarized the geotechnical characterization of the available data. The column headed "OCR" in that Table contained various values ranging between 1.0 and

---

[44] Claimant's Pre-Hearing Submissions paragraphs 236 to 243.
[45] H/1 p.132.

116

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

4.0.  The Claimant contends that these values indicate that the soil on the Site was over consolidated.  It says this was an error because both Parties' technical experts have agreed that the soil was, in fact, normally consolidated.

450.  The Claimant contends that it scrutinized the Employer's Requirements in preparation for its Tender and relied on the information contained in those Requirements, including the geotechnical parameters and soil profile but no errors were apparent.  The Claimant says that it exercised due care in scrutinizing the requirements and could not have discovered the error.

451.  Under this, independent basis of claim, the Claimant claims the additional cost of material quantified in the same sum as that claimed under GC Sub-Clause 4.12, plus a margin of 15% in respect of profit.[46]

The claim under Article 146(2) of the Iraqi Civil Code

452.  The Claimant contends that the Site conditions encountered were an exceptional and unpredictable event of a general nature which made the obligation to complete the Works by the Time for Completion and for the Contract Price excessively onerous in accordance with Iraqi law.

453.  The exceptional event is alleged to be the magnitude of consolidation and deformations that were encountered and the various collapses.  The soil conditions are said to be an unpredictable event because were not foreseen by the Claimant and were not reasonably foreseeable.  It is alleged that the Site conditions have exposed it to exorbitant loss.

454.  The Claimant contends that on the basis of Article 146(2) of the Iraqi Civil Code the Tribunal should reduce these onerous obligations by awarding it an extension to the Time for Completion and additional cost.  Alternatively, the Tribunal should reduce these onerous obligations by; (1) declaring that the Claimant is required to complete the Works within a reasonable time; (2) declaring that the Claimant has completed the Works within a reasonable time in all the circumstances; and (3) awarding the Claimant its additional cost which is quantified on the same basis as the claim under GC Sub-Clause 1.9.

The Respondent's Position

455.  The Respondent contends that the soil conditions that were encountered could and should have been anticipated by the Claimant both at the Tender stage and, at the latest, during the

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

[46] Claimant's Pre-Hearing Brief, section 7.2.

117

detailed design phase following the award of the contract.

456. In relation to the Tender stage, the Respondent says that the Claimant failed diligently to analyse the available tender information.[47] The Respondent contends that if the information contained in the Tender Documents had been diligently analysed and interpreted, the presence of normally consolidated weak soil would have been evident in, at least, certain locations along the alignment of the Breakwater. A diligent contractor would have paid particular attention to the data most relevant to the design and construction of the Breakwater. That information included the results of CPTU-5 and SBH-03, as these were the only pre-tender geotechnical investigations in the alignment of the Breakwater, which provided information on the soil parameters most relevant for design and construction. A proper understanding of CPTU-5, would have indicated to an experienced contractor that significant settlement and stability failures, including collapses and bulging, were likely. The Respondent says that the Claimant's tender indicates that it was aware of the possibility of the alleged unforeseeable conditions because it contained statements that; (a) further geotechnical investigation was required and (b) that the soil parameters used by the Claimant would need to be verified and/or re-considered at the detailed design stage. The Respondent also relies on the fact that the Claimant's Tender shows an estimated settlement of 72 cm at the end of construction, which was greater than the 45 cm indicated in the tender documents.

457. The Respondent says that it must be presumed that the Claimant either; (1) failed diligently to analyse and interpret the available data and, instead, simply relied on the Engineer's interpretation; or (2) intentionally chose to take a commercial risk when making its tender proposal.

458. In relation to the period after the award of the Contract the Respondent contends that the Claimant failed diligently to analyse the soil conditions when it was preparing its detailed design.[48]

459. The Respondent says that the Claimant ignored the advice of COWI, that additional geotechnical investigations were necessary to optimize the design and instead only undertook three additional boreholes in the intertidal zone. Not only were these insufficient for the detailed design but the results were irrelevant to the design of the offshore sections of the Breakwater.

---

[47] Respondent's Pre-Hearing Submission, section 2.1.1.
[48] Respondent's Pre-Hearing Submissions, Section 2.1.2.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

460.    The Respondent also says that, in preparing the detailed design, the Claimant; (1) failed to take into account the results of the Trial Embankment and (2) failed diligently to analyse the Tender information and the results of the three additional boreholes that were drilled.

461.    Once it became apparent that the soil was not behaving in the way that had been assumed, the Claimant had an obligation to identify the soil conditions and to adapt the design and construction to the actual soil behaviour.[49]  The Respondent relies upon evidence that shows that the Claimant was aware in the summer of 2013 that the soil was weaker and more deformable than previously assumed and that this would result in the use of additional material.  It contends that instead of adapting to the soil conditions encountered it followed what the Professor Burcharth described as "trial and error" or "heuristic approach".  The Respondent says that, contrary to the Claimant's assertions, modifications to the design and/or construction method were possible, provided that the Claimant had undertaken the necessary geotechnical investigations and monitoring by means of piezometers. However, the Claimant failed to monitor soil conditions, which would have allowed it to tailor its construction method to avoid stability failures.

462.    The Respondent relies on an illustrative alternative construction method for cross-section B3 that was prepared by Professor Burcharth and which could have been followed for that cross-section in order to avoid stability failures, avoid delay and reduce the amount of construction material used.  The Respondent does not accept the Claimant's submission that such a method would have significantly lengthened the construction period.

463.    The Respondent also contends that the Claimant contributed to the delay and additional cost because stability failures and settlement were caused by the its failure to implement adequate waiting periods.[50]

464.    The Respondent contends that the claim under GC Sub-Clause 4.12 should be rejected because:

464.1    The soil conditions that were experienced were not "Unforeseeable". The Claimant could and should have expected the soil conditions, or at least recognized their possibility, had it diligently analysed and interpreted the site data available at tender;[51]

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[49] Respondent's Pre-Hearing Submissions, Section 2.2.
[50] Respondent's Pre-Hearing Submissions, Section 2.2.3.
[51] Respondent's Pre-Hearing Submissions, Section 2.3.1.1.

119

464.2   The Claimant failed to give notice of its claim "as soon as practicable" after encountering the alleged "Unforeseeable" physical conditions.[52]

464.3   In any event the Claimant has failed to establish that the costs and delay claimed are attributable to "Unforeseeable" conditions. The Claimant was not entitled to follow a "trial and error" approach and should have applied monitoring and a staged approach to construction. The Claimant can only recover compensation for costs and delay that would have been incurred had it applied appropriate working methods. Accordingly, stability failure and a portion of consolidation settlement must be excluded.[53]

465.    The Respondent contends that the claim under GC Sub-Clause 1.9 should also be rejected because[54]:

465.1   The Claimant has not established any "error" in the Employer's Requirements;

465.2   The Claimant could and should have discovered any issue with the Engineer's interpretation of the pre-tender geotechnical investigations;

465.3   The Claimant did not provide the requisite notice under GC Sub-Clause 1.9.

466.    The Respondent further contends that the costs and delay claimed were not attributable to any error in the Employer's Requirements.[55]

467.    The Respondent says that the claim under the Iraqi Civil Code, Article 146(2) should also be rejected because:[56]

467.1   There was no "exceptional and unpredictable event of a general nature";

467.2   The Claimant's performance was not rendered more "onerous;"

467.3   Article 146(2) cannot be applied as a *post hoc* remedy;

---

[52] Respondent's Pre-Hearing Submissions, Section 2.3.1.2.
[53] Respondent's Pre-Hearing Submissions, Section 2.3.1.3.
[54] Respondent's Pre-Hearing Submissions, Section 2.3.2.
[55] Respondent's Pre-Hearing Submissions, Section 2.3.2.4.
[56] Respondent's Pre-Hearing Submissions, Section 2.3.3.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

120

467.4    It would be inequitable to award the relief sought by the Claimant.

468.    The Respondent also contends that the quantification of the claim is unfounded and inflated for various reasons.[57]

## The Geotechnical Expert Evidence

469.    Each party relied upon the evidence of independent experts to support their respective cases.

470.    The Claimant relied upon Professor Antonio Gens who is a Professor in the Department of Civil and Environmental Engineering at the Universitat Politecnica de Catalunya in Barcelona. He obtained a PhD degree from Imperial College, London and has been involved in geotechnical research, consulting and teaching for approximately 40 years. He has published 300 papers, published 9 book chapters and co-edited 9 books. Professor Gens has been consulted both in Spain and around the world, in relation to a variety of projects where geotechnical issues have arisen, including breakwaters, harbour quays, deep excavations, tunnelling, embankment and concrete dams, tailing dams, power stations, airports, radioactive waste repositories, large-scale scientific facilities, deep and shallow foundations, ground improvement, slope stability, underpinning of structures and site investigations. He was a member of the international committee of geotechnical engineers appointed to investigate the failure of the deep excavation in the Nicholl Highway, Singapore. Professor Gens contributions to the advancement of soil mechanics and geotechnical engineering have been recognized by the award of several international prizes.

471.    In his first report Professor Gens states that the issues in this case involve a number of geotechnical phenomena that fall squarely within his area of expertise of geotechnical engineering. He says that, in that respect, he has been closely involved in the design and construction of a breakwater in Bilbao (Spain), breakwaters and quays in the Port of Nador (Morocco) and breakwaters and quays in the port of Barcelona (Spain). In relation to the Barcelona project he has been the main geotechnical consultant to the Port Authority since 2000.[58]

472.    Professor Gens provided two expert reports and gave evidence to the Tribunal on Day 5. He began his evidence by making a short presentation. Professor Gens had also signed a Joint Statement with Professor Burcharth.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas
Company S.A. (Panama)
v.
General Company for Ports of Iraq

---

[57] Respondent's Pre-Hearing Submissions, Section 2.5.
[58] D/1 page 4, paragraph 1.4.

121

473. In cross-examination, Professor Gens was asked about the port of Barcelona[59], which is one of the projects that he had been involved with. He explained that an aspect of that project was the construction of new breakwaters, one of which was between 6 and 8 kilometers in length. Professor Gens told the Tribunal that the geotechnical conditions in the port at Barcelona were similar to those at Al Faw. He explained that as a geotechnical consultant to the Port, he was involved throughout the process of design and construction, including reviewing the geotechnical investigation and the detailed design. He also said that for that port and for Bilbao port he had been involved in the geotechnical design of the breakwaters.

474. The Tribunal found Professor Gens to be an impressive witness who had considerable international experience of the geotechnical issues that have arisen in this arbitration. He gave his evidence with care and the Tribunal derived very considerable assistance from both his written and oral evidence.

475. The Respondent relied upon the expert evidence of Professor Hans Falk Burcharth and Professor Lars Vabbersgaard Andersen.

476. Professor Burcharth is Professor Emeritus at Aalborg University in Denmark and, since 2009, has been an international consultant on the design and construction of ports and coastal structures. Between 1979 and 2009 he was Professor of Marine Civil Engineering, Hydraulics and Coastal Engineering. From 1974 until 2002 Professor Burcharth was Head of the Department of Civil Engineering. He is a Doctor Technicis.

477. Professor Burcharth has had a distinguished career, published numerous articles and been awarded several international honours. He is not, however, a geotechnical engineer.

478. Professor Burcharth has provided two expert reports and gave evidence to the Tribunal on Day 6. At the beginning of his evidence, together with Professor Andersen, he made a brief presentation. Professor Burcharth had signed the Joint Statement with Professor Gens. Professor Andersen was not a signatory to that document.

479. In cross-examination it became clear that Professor Burcharth's main expertise is in assessing the impact of waves on marine structures. He agreed that geotechnical engineering is a specialist area of civil engineering and that it is principally concerned with the behaviour of ground materials from an engineering perspective.[60] He accepted that he was not a specialist

---

[59] Transcript Day 5, p.53, line 11 to p.56, line 12.
[60] Transcript Day 6, p.61, lines 12 to 20.

122

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

in geotechnical engineering but said that he had a wide background of working with, and judging, geotechnics.[61]

480.   The Claimant contends that the evidence of Professor Burcharth should be disregarded because it does not fulfil any of the criteria for being independent expert evidence because he lacks the requisite specialist knowledge, it is unclear whether his reports represent his true independent opinion and because his conclusions have been reached in an evidential vacuum.[62]   The Respondent rejects those criticisms and contends that the issues that have arisen in relation to this Delay Event concern matters of coastal engineering and that Professor Burcharth has acted as a consultant on over 70 port and coastal projects.[63]

481.   The Tribunal has carefully considered Professor Burcharth's evidence and, while it has not doubt that he has had an extremely distinguished career, the Tribunal finds that it can derive very little assistance from his evidence.   There can be no doubt that Professor Burcharth was doing his best to give his evidence, independently and fairly.   The Tribunal is also in no doubt that the opinions that he expressed were his own and were the product of a careful consideration of the underlying facts.   The submission made by the Claimant that Professor Burcharth's reports may not be the product of his own work is not accepted.

482.   However, the Tribunal considers that there are a number of problems with Professor Burcharth's evidence.

483.   First, the technical issues that arise for decision involve a consideration of the geotechnical conditions that existed at the Site, how those conditions were, or should have been, understood by the Claimant and its designer, COWI.   As Professor Burcharth accepted, he is not a geotechnical engineer.   In cross-examination he candidly accepted that Professor Gens is one of the world's leading experts in geotechnical matters.[64]   Professor Burcharth also agreed that Professor Andersen was more expert than he was in geotechnical matters.[65]

484.   Second, one of the central issues in relation to this claim is whether the conditions encountered by the Claimant were reasonably foreseeable by an experienced contractor at the date of the submission of its tender.   As the Tribunal will explain in a little more detail below, that is a question that must be considered from the perspective of an experienced contractor,

---

[61] Transcript Day 6, p,62, line 23 to p.63, line 10.
[62] Claimant's Post-Hearing Submissions paragraphs 18 to 31.
[63] Respondent's Reply Submissions, paragraph 39.
[64] Transcript Day 6, p.66 lines 6 to 9.
[65] Transcript Day 6, p,66 line 5.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

123

in the position of the Claimant, at the date when its tender was submitted. Yet, that is not a question that Professor Burcharth specifically considered in either of his reports. In cross-examination Professor Burcharth said that one of the main points in his reports was that the soil conditions were foreseeable and that he had considered that question in the correct contractual context.[66] However, and notwithstanding the submission to the contrary contained in paragraph 62 of the Respondent's Post-Hearing Submissions and in its Reply Submissions, the Tribunal is not at all satisfied that Professor has considered the question of foreseeability from the perspective of an experienced contractor.

485.    Third, the Tribunal is not persuaded that Professor Burcharth has any experience of designing, or of checking the design, of a structure such as the Breakwater from a geotechnical perspective. His experience in relation to design appeared to relate to hydraulics and the impact that waves have on structures. The Tribunal's attention has not been drawn to any project where Professor Burcharth provided advice to either a contractor or an employer on the design of a structure, such as the Breakwater, from a geotechnical perspective. The Tribunal accepts that in re-examination, Professor Burcharth was asked about his experience in the design of breakwaters and that he gave evidence that he has been involved in the design and construction of many breakwaters of all kinds and in all conditions.[67] However, with the exception of one project in 1962 where he said that he was the designer and supervised construction, he did not explain the precise nature of his involvement in those projects. The Tribunal was left with the impression that his role in those projects was concerned with design and construction from a hydrology perspective.

486.    These difficulties with Professor Burcharth's evidence have led the Tribunal to conclude that it can attach very little weight to it.

487.    The Respondent also relied upon the evidence of Professor Andersen. He is a professor of Computational Methods in the Civil Engineering Department at Aarhus University, Denmark. He had contributed to Professor Burcharth's reports, although he did not sign those reports, and to the Presentation that was given by Professor Burcharth on Day 6. Professor Burcharth's first report states that Professor Andersen worked under his supervision and assisted with the Finite Element stability and settlement calculations in that report.[68] Details of these calculations are contained in an Appendix to Professor Burcharth's first report. In relation to the Presentation, Professor Andersen explained that he had performed various

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

[66] Transcript Day 6, p.69 line 3 to p.72 line 1.
[67] Transcript Day 6, p.198 line 20 to p.200 line 24.
[68] D/1 Tab 12, p.178 paragraph 12.

124

computer simulations to model the behaviour of the ground conditions at certain locations. Professor Andersen did not give evidence about the foreseeability of the ground conditions at the Site or any of the other issues that were covered by Professor Burcharth's reports. Quite understandably, the Claimant took the position that it did not wish to cross-examine him.

### The Claimant's Claim under GC Sub-Clause 4.12

(1)    The proper interpretation of Sub-Clause 4.12

488.    The Claimant's claim for Unforeseeable physical conditions is made pursuant to GC Sub-Clause 4.12. That Sub-Clause provides as follows:

> "In this Sub-Clause 'physical conditions' means natural physical conditions and man-made and other physical obstructions and pollutants, which the Contractor encounters at the Site when executing the Works, including sub-surface and hydrological conditions but excluding climatic conditions.
>
> If the Contractor encounters adverse physical conditions which he considers to have been Unforeseeable, the Contractor shall give notice to the Engineer as soon as practicable.
>
> The notice shall describe the physical conditions, so that they can be inspected by the Engineer, and shall set out the reasons why the Contractor considers them to be Unforeseeable. The Contractor shall continue executing the Works, using such proper and reasonable measures as are appropriate for the physical conditions, and shall comply with any instructions which the Engineer may give. If an instruction constitutes a variation, Clause 13 (Variations and Adjustments) shall apply.
>
> If and to the extent that the Contractor encounters physical conditions which are Unforeseeable, gives such notice, and suffers delay and/or incurs Cost due to these conditions, the contractor shall be entitle, subject to Sub-Clause 20.1 (Contractor's Claims) to:
>
> (a)    an extension of time for any such delay, if completion is delayed, under Sub-Clause 8.4 (Extension of Time for Completion), and
> (b)    payment of such additional Cost, which shall be included in the Contract Price.
>
> After receiving such notice and inspecting and/or investigating these physical conditions, the Engineer shall proceed in accordance with Sub-Clause 3.5 (Determinations) to agree or determine (i) whether and (if so) to what extent these physical conditions were Unforeseeable, and (ii) the matters described in sub-paragraphs (a) and (b) above related to extent......
>
> ... The Engineer may take account of any evidence of the physical conditions foreseen by the Contractor when submitting the Tender, which may be made available by the Contractor, but shall not be bound by any such evidence."[69]

489.    The term "Unforeseeable" is defined in Sub-Clause 1.1.6.8 as:

_Dr. Robert Gaitskell QC_
_President_
_ICC Case No. 21785/ZF_
_Archirodon Construction (Overseas)_
_Company S.A. (Panama)_
_v._
_General Company for Ports of Iraq (Iraq)_

---

125

> *"not reasonably foreseeable by an experienced contractor by the date for the submission of the Tender.[70]"*

490. The term "Cost" is defined in Sub-Clause 1.1.4.3 as meaning:

> *"all expenditure reasonably incurred (or to be incurred) by the Contractor, whether on or off the Site, including overhead and similar charges but does not include profit."[71]*

491. It is also relevant to note that although Sub-Clause 4.12 refers to Sub-Clause 20.1, that sub-clause was in fact deleted by the Special (Particular) Conditions and replaced with a clause that makes no reference to the provision of notices in relation to Contractor's claims.[72]

492. Subject to a disagreement between the Parties as to whether it is a condition precedent to the right to recover under Sub-Clause 4.12 that the Claimant has given a notice that complies with the requirements of that Sub-Clause, there is no dispute about its proper interpretation. The nature of the requirement to give notice under this Sub-Clause is considered later in this Award at paragraph 576 in the context of the Respondent's wider argument that the Claimant failed to give notice of its claim.

493. The Tribunal considers that in order to make a claim under Sub-Clause 4.12, the Claimant must demonstrate that:

493.1   it has encountered "physical conditions;" and

493.2   those conditions were "Unforeseeable", in the sense that they would not have been reasonably apparent to an experienced contractor at the date of tender; and

493.3   those conditions caused it to suffer delay and/or incur cost.

494. The fact that the Claimant may not in fact foresee the physical conditions that it encountered is not determinative of whether those conditions were "Unforeseeable" for the purpose of a claim under Sub-Clause 4.12. That is because the Claimant must demonstrate that the physical conditions that were encountered would not have been reasonably foreseeable to an experienced contractor at the date of tender. This requires the Tribunal to consider what an

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

experienced contractor would have foreseen at the date of the tender. The fact that the Claimant did not foresee the relevant conditions is a relevant consideration, because the Claimant is an experienced contractor, but it is not determinative. The Tribunal agrees with the submission made by the Respondent that the difference between what may have been unforeseen by the Claimant and what was Unforeseeable is a key distinction. The Tribunal also accepts the Respondent's submission that the fact that the Claimant did not anticipate the soil conditions that were encountered does not make them "Unforeseeable" for the purpose of the contractual test.[73]

495.    In order to decide whether physical conditions were Unforeseeable, the Tribunal must consider the position of an experienced contractor having all of the information and the data that was available to the Claimant before the Contract was signed. The enquiry into what was foreseeable must include the information that was provided by the Respondent to the Claimant for the purpose of preparing its tender but it may, in principle, include other information that was available from other sources. Such information might theoretically include the results of tests and investigations that could be carried out by the Claimant at the Site during the tender period. Although a possibility, in this case the Respondent has made it clear in opening its case that it does not suggest that the Claimant should have undertaken more site investigations, such as another borehole campaign or more CPTUs[74] before the Contract became effective. In this case what is important, and as the Respondent explained in this passage of the transcript, is the information that was available to the Claimant during the tender period.

(2)    Did the Claimant encounter physical conditions that were unforeseeable?

496.    The first question for the Tribunal is the correct characterization of the "physical conditions" that are said, by the Claimant, to have been "Unforeseeable."

497.    The Claimant's pleaded case[75] is that the "physical conditions," which are said to have been Unforeseeable, are the excessive consolidation settlement, and stability failures that led to bulging and collapses. In its Post-Hearing Brief the Claimant contends that the physical condition was the fact that the soil was found to be normally consolidated and this condition caused the excessive consolidation settlement and stability failures that occurred.[76]

498.    The Respondent contends that there is uncertainty about the Claimant's case and that it is not

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

---

[73] Respondent's Reply Submissions paragraph 106.
[74] Transcript Day 1, p.89 line 14 to p.90 line 9.
[75] SofC paragraph 393 (A/1 p.149) and Reply paragraph 246 (A/1 p.434).
[76] Claimant's Post-Hearing Submissions paragraph 120.

· 127.

clear what are alleged to be the "physical conditions" that were Unforeseeable.[77]   The Respondent says that the consequence of the Claimant's case is that soil conditions along the entire length of the 8km Breakwater and all soil behaviour encountered over the 4 to 5 years of construction was Unforeseeable and that cannot be correct.  The Respondent goes on to say that if there were "physical conditions" that were Unforeseeable, then those conditions were limited to the stability failures that occurred in the Green Mile.[78]

499.   The Tribunal accepts that the Claimant's pleading does not spell out that the excessive consolidation and stability failures that occurred were the consequence of the soil being normally consolidated.  However, the Claimant's pleaded case makes it clear that it had assumed from the information, that was made available to it by the Respondent at tender stage, that the soil conditions were over consolidated and that it prepared its design on that basis.  It alleges that this assumption turned out to be erroneous because the soil was in fact normally consolidated and that mistaken assumption caused the excessive settlement and stability failures.   The Tribunal is satisfied that the Respondent understood the Claimant to put its case in that way, not least because the Respondent's central defence to this part of the Claimant's case, and which was supported by Professor Burcharth, was that the Claimant should have understood from the information that was available to it at tender stage, that the soil conditions were not over consolidated but, were instead, normally consolidated.

500.   The Tribunal will now consider the Claimant's case that the soil conditions that were encountered were Unforeseeable.

501.   The information that was provided to the Claimant by the Respondent for the purpose of its tender included the Geotechnical Interpretative Report, the Geotechnical Analysis Report, the Technical Report, Volume 3 of the Tender Documents (Technical Requirements and Technical Specifications) and Volume 5 of the Tender Document (Drawings).  The Claimant contends that this tender information indicated that the soil in the area of the Breakwater was over-consolidated.  Mr Loukakis explained, in cross-examination, that the information that was provided at tender stage about the ground conditions was unusually detailed as it included design parameters and 20 sections along the length of the Breakwater, which were designed for the specific geotechnical conditions and parameters that had been derived by the Engineer. He also explained that in preparing its tender the Claimant's engineering team reviewed all of this information and reached the conclusion that the information that was included in the Geotechnical Characterisation Table contained in the Employer's

[77] Respondent's Pre-Hearing Submissions paragraph 84 and Post-Hearing Submissions paragraph 184.
[78] Respondent's Post-Hearing Submissions paragraph 185.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Requirements was valid.[79]  It is common ground between the Parties that the Claimant's tender design assumed that the soil conditions along the length of the Breakwater were over-consolidated.  The Claimant supported its case by the evidence of Professor Gens.  It also relied; (1) the Engineer's internal report dated 14 April 2015 that noted that its own investigations at tender stage had clearly indicated that the clay was slightly over consolidated and that the soil behaviour differed from expectations because bulging had occurred and settlement was greater and faster than foreseen;[80] (2) the fact that it appears that the other contractors who had submitted tenders for the Works had also assumed that the soil was over-consolidated; and (3) on the Engineer's Determination at the meeting on 10 December 2015 that recognized that the conditions that had been encountered were, in principle, Unforeseeable; and (4) by its Answer to the Request for Arbitration, which accepted the Engineer's Determination that compensation was due to "unforeseen physical conditions;" and (5) the Respondent's Defence which did not contend that the Claimant should have foreseen the physical conditions that were encountered.

502.  The Respondent contends that the Claimant failed adequately to analyse the soil conditions at the Breakwater at tender stage.  It says that had the Claimant acted diligently at that stage it would have anticipated soil conditions similar to those actually encountered during construction.  Namely, normally consolidated soil, close to stability failure.[81] Further, it contends that, given the risk that there was uncertainty associated with the limited pre-tender site investigations and the variability of soil conditions in a delta setting, the soil conditions that were actually encountered could not have been excluded and therefore could not be considered Unforeseeable.[82] The Respondent also contends, as noted above, that if the soil conditions are to be considered Unforeseeable this should be limited to the soil conditions that were encountered in the Green Mile.[83] The Respondent supported its case on each of these points by the evidence of Professor Burcharth.

503.  Professor Burcharth makes the following main points:

503.1  Using geotechnical parameters from CPTU-05 for a simple finite element analysis, a bidding contractor could and should have expected, at least in some locations along the Breakwater, normally consolidated, weak soil, consolidation settlement of roughly two meters at the crest of the Breakwater and soil that is close to stability

---

[79] Transcript Day 2, p.204 line 6 to p.205 line 7.
[80] E/20 Tab 889.
[81] Respondent's Post-Hearing Submissions paragraphs 181 and 183.
[82] Respondent's Post-Hearing Submissions paragraph 184.
[83] Respondent's Post-Hearing Submissions paragraph 185.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

129

failure;[84]

503.2 The Claimant should have carefully looked at all available information, and taken CPTU-05 into account not only because it was the only pre-tender CPTU in the Breakwater alignment but because it is essential to consider the "weakest link;"[85]

503.3 The Claimant should have allowed for consolidation of up to 98 cm at some locations, as indicated by the results of CPTU-05 and factored in the possibility of stability failures. It should also have expected that the soil in some locations could be even weaker than CPTU-05;[86]

503.4 A diligent contractor would not have assumed that the soil was over consolidated along the entire Breakwater and would have considered a wider range of possible soil conditions because; (a) the information provided as part of the tender documents was clearly limited and the tender documents contained warnings that the geotechnical parameters could not be relied on and had no contractual value and (b) the Claimant knew that the information could not be relied upon for the detailed design without undertaking further investigations; and (c) the data from the pre-tender geotechnical investigations was not only limited but was inconsistent between locations;[87]

503.5 An experienced contractor would not have relied on the "average stratigraphy" and "geotechnical characterization" table and assumed average conditions.[88]

504.  The Tribunal has given very careful consideration to the evidence given in support of each of these points by Professor Burcharth, but has reached the conclusion that it is unable to accept it. The Tribunal's reasons are as follows:

504.1 First, and as noted earlier in this Award (paragraphs 479   486), the Tribunal is not persuaded that Professor Burcharth has the appropriate expertise to provide evidence on what are essentially geotechnical issues.

504.2 Second, the Tribunal is not satisfied that Professor Burcharth has approached the question of foreseeability by posing and answering the correct question. Namely,

[84] Respondent's Post-Hearing Submissions paragraph 64.
[85] Respondent's Post-Hearing Submissions paragraph 65 to 66.
[86] Respondent's Post-Hearing Submissions paragraph 67.
[87] Respondent's Post-Hearing Submissions paragraphs 68 to 77.
[88] Respondent's Post-Hearing Submissions paragraphs 78 to 86.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

130

would an experienced contractor, in the position of the Claimant at the date of tender, have considered it foreseeable that the ground conditions in the alignment of the Breakwater were, or might include areas of, normally consolidated ground? As the Respondent correctly recognizes in its submissions, the question of whether an experienced contractor would have regarded the conditions that were encountered to be Unforeseeable is central to a claim under GC Sub-Clause 4.12. However, this is an issue that was not directly addressed in either of Professor Burcharth's reports.

504.3    Third, the Tribunal is not persuaded that an experienced contractor would have attached particular weight to the result from CPTU-05. The Tribunal preferred the evidence of Professor Gens that, from a geotechnical point of view, it is sounder to consider the ensemble of all the available information, given the homogeneity of the site[89].

504.4    Fourth, even if an experienced contractor had focused on the results of CPTU-05, the Tribunal is not persuaded that it would, as Professor Burcharth suggests, have predicted soil conditions that were normally consolidated, weak soil. Professor Burcharth was cross-examined about his assessment of the data relating to CPTU-05 and he confirmed that; (1) he had not taken account of the 1.5 meter layer of sand;[90] (2) in order to derive the OCR the only exercise of analysing the data relating to CPTU-05 he had performed was to use the data shown in the tender information (H3 p2054) and read off the blue spots and mark them down in his report.[91] However, and in contrast, Professor Gens explained that an experienced contractor would have considered and analysed the raw data and derived the OCR. He had done that exercise and used the SANSHEP approach to analyse the raw data and reached the conclusion that the soil was over consolidated in that location.[92]

504.5    Professor Burcharth also said that because the CPTU results did not provide information regarding the top layer of soil, the Claimant should have assumed an OCR value of less than 1 for the top layer of soil at CPTU-05. However, that suggestion is no more than an assertion and was not supported by any credible reasoning. Moreover, Professor Gens said that such an assumption made no sense from a geotechnical engineering perspective and in any event the conclusion drawn by Professor Burcharth was incorrect because the evidence suggested to him that the

---

[89] Professor Gens Reply Report, paragraph, D/1 p.147.
[90] Transcript Day 6, p.119 lines 15 to 16.
[91] Transcript Day 6, p.138 line 1 to p.139 line 24.
[92] Transcript Day 5, p.17 line 22 to p.19 line 20.

131

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

soil properties of the top layer were consistent with the soil properties at deeper layers.[93]

504.6   Fifth, the conclusion that was drawn by the Claimant, that the soil at the Site was over-consolidated, is supported by the detailed and closely reasoned evidence of Professor Gens. He gave evidence that an experienced contractor, at the time of tender, would have concluded that the soil at the site was over consolidated.[94] The Tribunal accepts that evidence.

505.   In its Reply Submissions the Respondent contends that, in addition to anticipating normally consolidated soil, an experienced contractor could also have anticipated that the Breakwater would be close to failure during construction.[95] That contention is only supported by the evidence of Professor Burcharth and is not accepted by Professor Gens. The Tribunal prefers the evidence of Professor Gens.

506.   The Tribunal finds that an experienced contractor, at the date of tender, would have foreseen that the soil in the alignment of the Breakwater was over consolidated. Such a contractor would not have foreseen that the soil was normally consolidated.

507.   The conclusion that the Tribunal has reached on this issue is consistent with the following:

507.1   IECAF had assumed that the soil along the alignment of the Breakwater was over consolidated;

507.2   It would appear that the other tenderers for the Project had also assumed that the ground conditions were over-consolidated. Although the Tribunal has not been provided with the tenders submitted by the other tenderers it appears clear from the conclusions drawn by IECAF, in its report dated 14 April 2015, that the other tenderers had made the same assumption as the Claimant.[96] It is likely that IECAF would have known of the assumptions that those tenderers had made. The Tribunal notes that the Respondent states that the Tribunal cannot draw any conclusions about those tenders. But if it is the case that those tenders did not make the assumption attributed to them then it was open to the Respondent to disclose the relevant parts of those tenders to dispel any doubts;

_____

[93] Transcript Day 5, p.71 line 1 to 2 and p.67 lines 1 to 18.
[94] D/1 p.60 paragraph 15.3.
[95] Respondent's Reply Submissions Section 3.2.2.2.
[96] H20 Tab 889.

132

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

507.3    IECAF's report dated 14 April 2015 recorded that it considered that the soil conditions encountered by the Claimant differed from those that had been anticipated by it at tender stage;

507.4    At the meeting between the Claimant, the Respondent and the Engineer on 27 and 29 October 2015, the Engineer agreed that the soil behaviour, as detected by the Trial Embankment and during construction of the first sections of the offshore sections of the Breakwater, was unforeseeable;[97]

507.5    At a meeting between the Claimant, the Respondent and the Engineer is recorded as presenting a Determination, which accepted that in principle, the Claimant had encountered Unforeseeable physical conditions within the meaning of Sub-Clause 4.12.[98]

508.    Having regard to the Tribunal's finding that the Claimant encountered physical conditions that were Unforeseeable it is not necessary to decide whether the Respondent is bound by the admissions contained in the Answer to the Request and the Defence.

(3)    <u>The Respondent's case that, at the detailed design stage, the Claimant failed to carry out the necessary geotechnical investigations and failed to prepare a sufficiently cautious design</u>

509.    The Respondent contends that, following the award of the Contract, at the detailed design stage, the Claimant failed to carry out geotechnical investigations to determine the soil conditions along the Breakwater and to prepare a detailed design and method statements tailored to the actual soil conditions in each location.  The Respondent says that it did not perform a detailed design at all but simply converted its tender proposal into a detailed design and method statements.[99]  The Respondent's case has the following three elements:

509.1    It was inappropriate for the Claimant to rely on only limited pre-tender investigations for the purpose of its detailed design;[100]

509.2    The Claimant's design was not sufficiently cautious;[101]

---

[97] E/24 Tab 1031.
[98] E/25 Tab 1059.
[99] Respondent's Post-Hearing Submissions paragraphs 87 to 88.
[100] Respondent's Post-Hearing Submissions Section 2.3.1.
[101] Respondent's Post-Hearing Submissions Section 2.3.2.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

509.3   As a result the Claimant's detailed design and construction methods were not appropriate for the soil conditions at the Eastern Breakwater.[102]

510.   The Respondent, in reliance upon the evidence of Professor Burcharth, contends that the results of the pre-tender investigation were clearly insufficient for the detailed design and construction of the Breakwater because the investigations were too far away from the Breakwater alignment to be relied upon.  It goes on to say that, in accordance with the Eurocodes, the Claimant should have conducted geotechnical investigations at intervals of around 200m for the purpose of the detailed design.  The Respondent says that the only further investigations that were carried out for the purpose of the detailed design were the three boreholes in the inter-tidal zone, that these were insufficient for the detailed design and, in any event, indicate that at least for the onshore part of the Breakwater the settlements would be larger than the figures given in the tender documents.  The Respondent also alleges that the results of the Trial Embankment were not taken into account in the detailed design.  It also contends that the evidence suggests that COWI considered that further geotechnical tests were advisable and rely on COWI' memorandum dated 19 April 2013 and an email from COWI to the Respondent dated 25 August 2013.

511.   In relation to its submission that the detailed design was not sufficiently cautious, the Respondent contends that, because the detailed design proceeded on the basis of a very limited number of geotechnical investigations, COWI's design was based on an over-estimate of the soil strengths.  The Respondent says that the pre-tender investigations indicated that the soil would be close to failure during construction at some parts of the Breakwater and that COWI would have reached a more accurate conclusion if it had based its stability and settlement calculations on the soil parameters from CPTU-5.  It also says that COWI assumed, for the detailed design, soil strengths higher than those indicated by COWI's own analysis of the pre-tender CPTUs.  This is said to be so because at the locations of 14 of the pre-tender CPTUs included in the Master Plan the soil strength is lower than the strengths assumed by COWI for the detailed design.

512.   In relation to its submission that the design and construction methods were not appropriate for the soil conditions, the Respondent says that if the Claimant had carried out sufficient geotechnical investigations, either before the commencement of work or after construction had commenced, the design and construction method could have been tailored for the soil conditions that existed.

---

[102] Respondent's Post-Hearing Submissions Section 2.3.3.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

134

513.    For its part the Claimant denies that its approach to the detailed design was in any way deficient. It contends that in order to be satisfied that COWI's design did not follow established and sound geotechnical practice, there must be clear evidence of a failure to meet the standards of care that a professional designer would meet. The Claimant says that there is no such evidence. It is said that the only evidence that is relied upon by the Respondent in support of this aspect of its case is the expert evidence of Professor Burcharth who lacks the necessary qualifications and experience and whose evidence amounts to little more than bare assertions. It also makes the point that Professor's Burcharth's evidence is given with the benefit of hindsight. The Claimant says that it is significant that Mr Horgan, the Senior Resident Engineer, gave evidence to the Tribunal that the Engineer was involved in the preparation of the detailed design and neither Technital nor the Respondent contemporaneously raised any issues about the detailed design or the soil parameters selected by COWI.[103]

514.    The Claimant says that the criticisms of the design that were made by Professor Burcharth are rejected by Professor Gens and that the Tribunal should accept Professor Gens evidence.[104]

515.    The Claimant contends that the suggestion that the Eurocode required the Claimant to undertake further investigations is mistaken because, as Professor Gens, explained that code only requires further investigations if the preliminary investigations have not provided sufficient information. In his view the site investigations were sufficient and therefore further investigations were not required.[105]

516.    The Claimant does not accept Professor Burcharth's criticism that COWI's design did not adopt conservative values. The Respondent's case that the Claimant should have based its detailed design on the results of CPTU-05 is not supported by Professor Gens. In any event, even if COWI had used the undrained shear strength values identified in CPTU-05 for the purpose of the detailed design a comparison between those values and the undrained parameters selected by COWI were consistent with the CPTU-5 values, were conservative and accounted for any modest variations and other uncertainties.[106]

517.    The Claimant contends that the Respondent is mistaken in its suggestion that COWI requested the Claimant to carry out further geotechnical investigations in order **Dr Robert Gaitskell QC**

Dr Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[103] Claimant's Post-Hearing Submissions paragraphs 141 to 145
[104] Claimant's Post-Hearing Submissions paragraphs 146 to 156.
[105] Claimant's Post-Hearing Submissions paragraph 151.
[106] Claimant's Post-Hearing Submissions paragraphs 155 to 156.

the detailed design.[107]

518. In order to address this aspect of the Respondent's case it is necessary to begin by dealing with a threshold question. The Respondent's essential point is that errors were made by COWI, and the Respondent, in undertaking the detailed design of the Embankment. The threshold question concerns the standards by which the criticisms of the design, and the approach that was adopted, are to be judged. For its part, the Claimant contends that in order to succeed the Respondent must establish that COWI were negligent in the preparation of the detailed design. The Respondent's position is not entirely clear. In its Reply Submissions[108] the Respondent contends that the Tribunal need not find that COWI made an error in the detailed design which no reasonable member of the profession would have made. It says that it is sufficient for the Tribunal to find that the Claimant has failed to prove that the delay and costs claimed are attributable to the Unforeseeable conditions. However, that proposition is directed to the consequence of a finding that the Claimant made errors in the course of the detailed design and does not address the question of the legal standard by reference to which the Claimant's conduct is to be judged. Put another way, if the matter is analysed as a question of causation, the Respondent's criticisms only have validity if they can be said to have caused some, or all, of the delay and loss that is attributed to the Unforeseeable conditions. The Tribunal considers that if the Claimant's design was competently prepared and was based on an approach and on assumptions that would be made by an experienced contractor, the detailed design cannot be said to have been the cause of the Claimant's loss or delay.

519. From the way in which the Respondent advances this part of its case it appears to accept that it is not sufficient simply to assert that the detailed design might have been prepared in another way, for example by adopting more conservative assumptions. It is implicit in the Respondent's case that the Claimant and COWI failed to exercise the degree of care and skill in the preparation of the detailed design that would and should have been exercised by a competent designer.

520. The nature and content of the duty that was to be exercised by the Claimant and COWI must be decided by reference to the terms of the Contract.

521. GC Sub-Clause 5.1 of the Contract, contains a description of the Claimant's general obligations in relation to the design of the works, and provides (insofar as material) as

---

[107] Claimant's Post-Hearing Submissions paragraph 153.
[108] Respondent's Reply Submissions paragraphs 111 to 112.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

follows;

> "The Contractor shall carry out, and be responsible for, the design of the Works. Design shall be prepared by qualified designers who are engineers or other professionals who comply with the criteria (if any) stated in the Employer's Requirements…….
>
> The Contractor warrants that he, his designers and design Subcontractors have the experience and capability necessary for the design….."

522.    The requirements of GC Sub-Clause 5.1 are that:

522.1   the design shall be carried out by qualified designer who have the experience and capabilities necessary to perform the work; and

522.2   in carrying out the design the Engineers will comply with any requirements stipulated in the Employer's Requirements.

523.    GC Sub-Clause 7.1 is also relevant and, insofar as material, provides as follows:

> "The Contractor shall carry out the manufacture of Plant, the production and manufacture of materials, and all other execution of the Works:
>
> (a)    in the manner (if any) specified in the Contract,
> (b)    in a proper workmanlike and careful manner, in accordance with recognized good practice…"

524.    The Tribunal considers that GC Sub-Clause 5.1 and 7.1 of the Contract make it clear that in order to succeed in its criticisms of the detailed design, the Respondent must establish either:

524.1   that the detailed design was not carried out in accordance with any requirements stipulated in the Employer's Requirements; or

524.2   in preparing the detailed design, the Claimant (or COWI for whom it was contractually responsible) failed to perform its obligations in a proper and careful manner, in accordance with recognised good practice.

525.    The Tribunal does not understand the Respondent to contend that the design was carried out in a manner that failed to comply with any particular requirement of the Employer's Requirements.  Therefore, if the Respondent's case is to succeed, in relation to failures in the detailed design, the Tribunal must be satisfied that in preparing the detailed design the Claimant or COWI, failed to perform its obligations in a careful manner, in

Dr. Robert Gaitskell QC
President
ICC Case No. 19785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

137

accordance with recognized practice.

526.   The Tribunal also considers that in order to succeed in its arguments that errors were made in the preparation of the detailed design the Respondent must be able to show, by reference to independent expert evidence, that its criticisms are soundly based.

527.   The difficulty that the Respondent faces, and one which the Tribunal considers to be fatal to the case that errors were made in the development of the detailed design, is that the main evidence that is relied upon in support of that case, is that of Professor Burcharth.   As the Tribunal has already explained in paragraphs 479-486 above, he is not a geotechnical engineer and, with the possible exception of his work on a Breakwater in 1962, he has no experience of preparing the detailed design of a Breakwater, at least from a geotechnical perspective.   The opinions that he expressed about how the design should have been approached were informed by his knowledge and considerable experience of the influence of waves and water on structures.

528.   There can be no possible doubt that Professor Burcharth's knowledge and experience, in his own field of expertise, is pre-eminent.   However, the Tribunal found his evidence to be of no assistance in addressing the questions of whether:

528.1   the Claimant and COWI made errors in the development of the detailed design;

528.2   the design was not carried out in a careful manner and in accordance with recognized good practice.

529.   In contrast, Professor Gens is a geotechnical engineer who has considerable international experience in the design and construction of structures such as the Breakwater.   Professor Gens gave detailed written and oral evidence by which he explained why he disagreed with Professor Burcharth's criticisms of the design and why he did not accept that the Claimant or COWI should have called for further site investigations before preparing the detailed design. The Tribunal accepts that evidence.

530.   Professor Gens explained that he had considered COWI's detailed design and concluded that:

*"Both the tender and detailed design calculations follow well-established methods of geotechnical analysis.   An overconsolidated state of the clay has been assumed implying a higher strength and a lower compressibility than those of the same clay in a normally consolidated state.   The calculations by the Engineer and COWI indicate*

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

*that, if the parameters derived from site investigations had been representative of the clay behaviour, the embankment would have been stable and the settlements quite limited."[109]*

531.    Professor Gens disagreed with Professor Burcharth's suggestion that COWI should have carried out a sensitivity analysis by undertaking a statistical analysis.[110]

532.    Professor Gens also disagreed with Professor Burcharth's evidence that the detailed design did not take account of the possibility of variations in soil parameters. He explained that the design took this into account by making, what he considered to be, the conservative assumption that the sand layer was not in fact present at any part of the Site.

533.    In relation to Professor Burcharth's belated evidence that the Eurocode imposed an obligation on COWI to undertake an additional site investigation Professor Gens disagreed. In the course of his presentation to the Tribunal he said that:

> *"In the last iteration of the joint statement when we decided we would not comment any more on each other, otherwise we would never finish, Professor Burcharth introduced the second of the Eurocodes, the section 2.4.1.1, which ... saying that it prescribes an additional investigation. In fact it doesn't. What it says in cases where the preliminary investigations don't provide the necessary information to assess the aspects mentioned in 2.3, which I added there, complementary investigations shall be performed during the design phase of the investigation.*
>
> *So this is under the condition that the preliminary investigations have not provided the necessary information. And it is obvious that COWI did consider that it provided the necessary information. And I think they were correct on that."[111]*

534.    The evidence demonstrated that the only area where COWI considered that an additional site investigation was necessary was in the inter-tidal zone. COWI's advice was that additional boreholes should be excavated in that area. That advice was accepted by the Claimant who, instructed Andrea Lab to carry out 3 boreholes at locations on the coastal road.    The boreholes were drilled in March 2013.

535.    The Respondent's case that COWI considered that further geotechnical tests were advisable is based upon COWI's memorandum dated 19 April 2013[112] and its email dated 25 August 2013.[113] The Respondent recognizes that both documents are to be understood in the context of the optimization of the design but say that they demonstrate **Dr. Robert Gaitskell QC**

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[109] D/1 Tab 1, paragraph 8.6.
[110] D/1 Tab 18, Joint Statement p.27.
[111] Transcript Day 5, p.22 lines 4 to 18.
[112] E/2 Tab 78A p.1407.1.
[113] E/6 p.3615.

design tailored to the actual soil conditions, would require additional information.[114] The Tribunal does not accept that these documents show that COWI considered that additional geotechnical tests were necessary. It is clear from the memorandum and email that COWI were saying that if the Claimant wanted the design to be optimized then further information about the site would be required. The Tribunal is satisfied that in using the term "optimized," COWI were referring to the production of a more economical design, such as one that would have a smaller section or involve the use of a smaller quantity of materials. They were not referring to the need for more information to finalize the design that they were developing which was not an "optimised" design.

536. Professor Gens did not accept the Respondent's case that COWI's design was not sufficiently cautious. The Respondent submitted in its Post-Hearing Submissions that COWI assumed for the detailed design shear values which were higher than its own analysis of the pre-tender CPTUs.[115] However, as Professor Gens explained in his Technical Presentation[116] the shear strength values adopted by COWI for the detailed design were well below the lower bound values for each of the CPTUs-04, -07, -13 and -14. The graphs also show that the design parameters became increasingly conservative with increased water depth.

537. The Tribunal therefore rejects the Respondent's contention that, at the detailed design stage, the Claimant should have carried out further geotechnical investigations. The Tribunal also rejects the Respondent's case the detailed design was not sufficiently cautious. The Tribunal is satisfied that the preparation of the detailed design was carried out in a competent manner, in compliance with recognized standards of good practice and in compliance with the Claimant's obligations under the Contract.

(3)    The Respondent's case that the Claimant adopted an inappropriate working method

538. The Respondent contends that when, during construction of the Breakwater, it became apparent that the assumed geotechnical parameters were not correct, the Claimant did not react or adapt its working methods or the design.

539. The Respondent says that there were indications from early in he construction process that the assumptions concerning the soil conditions were incorrect.[117] In support of this part of its case the Respondent relies upon the behaviour of the Trial Embankment, the observations during construction of the onshore section of the embankment, observations at the Trial Island

---

[114] Respondent's Post-Hearing Submissions paragraph 105.
[115] Paragraph 108.
[116] Technical Presentation K/1, Tab 1 p.31.
[117] Respondent's Post-Hearing Submissions, Section 2.4.1.

140

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

and the collapses that occurred in the construction of the Green Mile.

540.    The Respondent contends that the Claimant could have avoided stability failures and limited consolidation settlement by the appropriate use of piezometric monitoring and by adopting a staged construction method.[118]

541.    The Claimant denies that it failed to take appropriate steps to deal with the problems of excessive consolidation and stability failures once thy emerged.  It does not accept that monitoring with piezometers was practical or that the information that might have been provided would have avoided or limited the problems that were encountered.[119]  The Claimant contends that the construction methodology that it adopted was appropriate in the circumstances and that the introduction of waiting times, sufficient to limit or avoid the problems that were encountered would have prolonged the completion of the Project by between 10 and 100 times.[120]

542.    The Respondent relied upon the expert evidence of Professor Burcharth to support its case on this issue. For its part, the Claimant relied upon the expert evidence of Professor Gens.

543.    As with the previous issue, it is necessary to start by identifying the relevant contractual standard by reference to which the Claimant's conduct during the performance of the Contract is to be measured or assessed.   This topic has not been directly addressed by the Parties but it is the starting point for any enquiry into whether there was any failure on the part of the Claimant that might be regarded as relevant to the losses and delay that are attributed to this Delay Event.

544.    The Tribunal considers that the Respondent's criticisms of the Claimant's conduct must be considered in the context of the following provisions of the Contract:

544.1    GC Sub-Clause 4.12, and in particular the following obligation:

> "The Contractor shall continue executing the Works, using such proper and reasonable measures as are appropriate for the physical conditions, and shall comply with any instructions the Engineer may give."

544.2    GC Sub-Clause 7.1, which imposed and obligation on the Claimant to execute the works in the manner specified in the Contract (if any) and in a good and workmanlike

---

[118] Respondent's Post-Hearing Submissions, Section 2.4.2.
[119] Claimant's Post-Hearing Submissions, Section 7.
[120] Claimant's Post-Hearing Submissions, Section 8.

141

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/2F
Archirodon Construction (Overs
Company S.A. (Panama)
General Company for Ports of I

and careful manner in accordance with recognized good practice.

545.   The Tribunal considers that it must have regard to the obligations contained in these two Sub-Clauses of the Contract when it is deciding whether the Claimant's construction methodology, or its monitoring, were deficient. If the Tribunal is to be persuaded to accept the Respondent's case it must be satisfied either:

545.1   that, in breach of GC Sub-Clause 4.12, the Claimant failed to use such proper and reasonable measures as were appropriate for the physical conditions or that it did not comply with any instructions that the Engineer may have given; or

545.2   that, in breach of GC Sub-Clause 7.1, the Claimant failed in some material respect, to execute the works in the manner specified in the Contract and/or in a good and workmanlike and careful manner in accordance with recognized good practice.

546.   It follows from this, that it is not sufficient for the Respondent to establish that there were other ways of approaching the consolidation and stability problems that were encountered or that other approaches to construction might have been adopted.

547.   The first criticism that the Respondent makes is that the Claimant failed to respond sufficiently promptly or effectively to the emerging evidence that the ground conditions were different to those that had been assumed.   The Respondent relies on the evidence of the ground conditions revealed by the Trial Embankment that was constructed in 2013 and the Trial Embankment Interpretative Report dated 20 January 2014.   The Respondent also attaches importance to the evidence of Professor Gens that the results of the Trial Embankment showed that the soil was normally consolidated.

548.   However, as the Claimant points out in its Reply Submissions[121] the behaviour of the Trial Embankment took time to evaluate. As the Engineer's Executive Report dated 25 February 2015 records:[122]

> "Only in January 2014 based on the preliminary results of the trial embankment has it been possible to present a plausible interpretation of a different soil behaviour......This interpretation has been confirmed after further analysis and final data obtained from site on June 2014.   Furthermore, on July 2014 a further unexpected and striking soil behaviour has been noticed; a bulging ( a rise of the soil around the breakwater under construction) with no failure of the section.

[121] Paragraphs 68 to 73.
[122] E/20 p.13700.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

142

> *Therefore, only after July 2014 it has been possible to understand and to explain the*
> *reasons for a soil behaviour different from the expectations."*

549.  The fact that the significance of the ground conditions at the Trial Embankment was not fully understood until later in 2014, is also supported by the Engineer's Report dated 14 March 2014[123] which expressed the opinion that the Trial Embankment showed that stability during construction was better than evaluated in the Tender Design and that this meant a higher factor of safety during construction.  The Engineer went on to propose that the results meant that the Claimant could reduce the size of the stability berms.  This proposal was never implemented but it serves to demonstrate that the criticism that is now made of the Claimant that it failed to appreciate the significance of the Trial Embankment and change its construction method in 2013 or before the interpretation was completed is unfair.

550.  The Tribunal also attaches weight to the evidence of Professor Gens that the Claimant would not have been justified in extrapolating the results of the Trial Embankment immediately after the results were available.[124]

551.  When, in the course of cross-examination, Professor Gens said that the results of the Trial Embankment showed that the soil conditions at that location were normally consolidated, the Tribunal did not understand him to qualify his clear written evidence that the Claimant would not have been justified in immediately applying those results to the whole of the works. Indeed, as he notes in his report and adopting the opinion of the Engineer given March 2014[125], there would need to be a period of observation to decide whether the observed soil behaviour could be considered valid for the whole Project.

552.  The Respondent's case, that the Trial Island should have indicated to the Claimant that the ground conditions were materially different to those that had been assumed, is also rejected by the Tribunal.  The Trial Island was built in September and October 2013, at the request of the Respondent. It was constructed because the Minister of Transport at the time was to visit the Site and the Respondent wanted to see the full height of the Breakwater offshore. For that reason it was built very quickly.  Mr Loukakis gave evidence that bulging occurred shortly after construction was completed and said that this was an indication that the soil conditions may have been more adverse in that location.[126]  However, he went on to say that the Trial Island was built very quickly and so it was not possible to be sure whether the failure was the

---

[123] E/11 Tab 492.
[124] Expert Report dated 15 May 2018 paragraph 15.19 (D/1 p.64).
[125] E/11 Tab 492 , section 4, p.7296.
[126] Transcript Day 3, p.60 lines 17 to 18.

Dr. Robert Galtskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

143

result of the local ground conditions or the speed of construction.[127]

553.    The Respondent also relies on the fact that in the onshore section, bulging occurred and the Claimant placed more construction material than expected.  The Respondent says that this proved that the soil parameters that had been assumed were incorrect and provided a warning that further investigations were required before proceeding with the offshore work.  The Respondent relies on the evidence of Professor Burcharth in support of this submission.

554.    The Claimant accepts that bulging and unexpected consolidation occurred  in the course of the construction of the onshore section of the Breakwater but says that it was unclear what the cause of this was. On the basis of the evidence of Mr Loukakis, it also says that, until about March 2014, there was no evidence that the results of the Trial Embankment and the experience during onshore construction was applicable to the offshore works.[128] The Tribunal accepts that evidence.

555.    As the Tribunal has already noted, the results of the Trial Embankment enabled the Claimant and the Respondent to conclude that the soil conditions were different than had been assumed. However, the process of evaluating the evidence that had been obtained took time and, as the Engineer confirmed in his report dated 25 February 2015,[129] a proper understanding of the failure mechanism only began to emerge from about July 2014. The Tribunal finds it difficult to accept that the Claimant should have appreciated the significance of the settlement and bulging of the onshore sections of the Embankment when; (a) the Engineer did not consider that the ground conditions differed from those that had been assumed in the design until after the results of the Trial Embankment had been evaluated and (b) Professor Gens gave evidence, which has been accepted by the Tribunal, that it was the behaviour of the Trial Embankment that demonstrated that the soil conditions were different from those that had been assumed and (c) the Tribunal has found  that those results took time to evaluate.

556.    Therefore, the Tribunal does not accept the Respondent's case that the Claimant should have attached significance to the excessive settlement and bulging of the onshore sections of the Embankment.

557.    Another complaint made by the Respondent is that it was not until the Claimant reached the Green Mile that it acknowledged that the problems that were being encountered with

[127] Transcript Day 3, p.61 lines 6 to 23.
[128] Claimant's Reply Submissions paragraphs 74 to 76.
[129] E/20 Tab 889 at p.13700.

144

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

settlement and bulging could not be solved by simply placing more materials and began implementing longer waiting periods. The Respondent contends, the Claimant could not determine optimal waiting periods because it did not carry out necessary monitoring.[130] The complaint about a failure to monitor in the Green Mile is part of a wider criticism made by the Respondent that the Claimant failed to limit consolidation through monitoring, establish control criteria and failed to obtain consistent monitoring data.[131] This more general criticism forms the foundation of the Respondent's key point that if the significance of the excessive settlement, bulging and stability failures had been appreciated, either from 2013 or some later stage, the Claimant could, and should, have implemented appropriate waiting periods which would have avoided the stability failures and limited consolidations settlement.[132]

558.    The Claimant denies that its monitoring was deficient[133] and contends that its method of working was appropriate in the circumstances. It contends that it adapted its working methods as work proceeded and introduced waiting periods to mitigate stability failures but says that it is unrealistic to have adopted the waiting periods proposed by Professor Burcharth because to have done so would have prolonged the works by between 10 and 100 times.[134]

559.    The Respondent's complaint about the Claimant's failure to monitor the works is not a complaint that stands in isolation but is put forward on the basis that if there had been appropriate monitoring, using piezometers, the behaviour of the ground would have been better understood with the result that the construction method could have been adapted to avoid the stability failures and reduce consolidation settlement.[135] The complaint about monitoring is therefore only relevant if effective monitoring would have had the outcome contended for by the Respondent.

560.    The Respondent's case that the stability failures would have been eliminated and consolidation settlement significantly reduced, was supported by the evidence of Professor Burcharth. As part of his evidence he produced an illustrative example for cross section B3, and concluded that if that method had been adopted 20cm of settlement could have been avoided.

561.    The Tribunal considers that the Respondent's case that the Claimant's working methods were inappropriate is not persuasive. The Tribunal considers that the Respondent's case presents

---

[130] Respondent's Post-Hearing Submissions, paragraph 140.
[131] Respondent's Post-Hearing Submissions, Section 2.4.2
[132] Respondent's Post-Hearing Submissions, paragraph 141 and 142 and 172 to 176.
[133] Claimant's Post-Hearing Submissions, Section 7.
[134] Claimant's Post-Hearing Submissions, Section 8.
[135] Respondent's Post-Hearing Submissions, paragraph 172.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

145

several difficulties.

562. In order to succeed in its case that the Claimant might have avoided the stability problems and significantly reduced consolidation settlement, it is not sufficient for the Respondent to adduce evidence that demonstrates that the work might have been performed in another way. The Tribunal considers that in order to succeed in its argument the Respondent must:

562.1 establish that, in proceeding in the way that it did, the Claimant failed to exercise the standards of care that a competent contractor would have used in responding to the Unforeseen conditions; and

562.2 show, by credible evidence, that if the Claimant had performed the works differently the problems that were encountered could have been materially reduced.

563. The Tribunal is not persuaded that the Respondent has come close discharging either of these essential requirements.

564. First, the Respondent's case that the Claimant should have adopted different working methods, is supported by Professor Burcharth. As the Tribunal has already indicated in paragraphs 479–486 above, it considers that he lacks the necessary expertise to opine on how an experienced contractor should have responded to the problems as they unfolded.

565. Second, Professor Gens gave evidence that the construction methodology used by the Claimant was appropriate based on the conclusions that had been reached about the soil conditions. He considered that when the stability problems became apparent in the Green Mile the Claimant responded to those problems by modifying the construction method by the use of thinner construction layers and increased waiting periods.[136] The Tribunal accepts that evidence.

566. Third, Professor Gens also gave evidence that although other methods of construction could have been used which, if adopted, would have reduced the phenomena of excessive undrained settlements and collapse all of the potential alternatives would have significantly increased construction time, materials and cost.[137] Mr. Shebl's third witness statement contains a consideration of alternative methodologies that might have been adopted. The evidence contained in that statement, which was not challenged, suggests that if the Claimant had

---

[136] D/1 p.65, paragraph 15.24.
[137] D/1 p.66, paragraph 15.25.

146

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

changed its construction method to incorporate prolonged waiting periods, the project would not have been completed until May 2019 and would have resulted in additional costs of US$227,496,518.  Professor Gens had reviewed these options and concluded that although they can only be a first approximation, and further refinement would have to be undertaken as work proceeded, it is evident that the adoption of such methods would have involved significant additional material, cost and delay.[138]

567.    Fourth, the evidence that Professor Burcharth gave that the construction methodology might have been a modified was supported by an illustrative example for cross section B3.  For this purpose he had conducted a Finite Element analysis using the actual soil conditions. However, it emerged that this example was not supportive of the Respondent's case that stability failures would have been avoided if that methodology had been adopted.  This became clear from Professor Gens evidence.  He had conducted a finite element analysis of the cross section, using the construction times that were proposed, assuming the soil to be normally consolidated and using the parameters adopted by Professor Burcharth.  In all cases Professor Gens found that the model predicted failure, even when the 20 day waiting period was incorporated into the calculations.[139]  He therefore concludes that the method proposed by Professor Burcharth was not appropriate and would have led to collapses in a number of locations.

568.    In its Reply Submissions the Respondent says that it does not suggest that the Claimant should have followed the placement sequences identified in the model for cross section B3 but says that it is an illustrative example of how staged construction could have been used to avoid stability failures and limit consolidation.[140]  However, the difficulty with this submission is that if the model is not reliable or credible it is not possible for the Tribunal to regard it as illustrative in any meaningful way.  Professor Gens accepts that one method of addressing the stability problems that were encountered would be to introduce very long waiting times between the placement of layers.[141]  The issue is whether the steps that would need to have been taken would have been a reasonable and appropriate reaction to the problem.  Professor Gens is of the view that the cost and delay of adopting that approach would have been very significant.  In the absence of any credible analysis from Professor Burcharth as to how the Claimant should have proceeded with the works it is not possible to regard the example cross-section B3 as illustrative in any meaningful way.  In the Tribunal's opinion, Professor Burcharth's evidence does not provide a basis for a finding that that the

---

[138] D/1 p.162 paragraph 60.
[139] D/1 p.166 paragraph 75.
[140] See paragraph 155.
[141] D/1 p.66 paragraph 15.25.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.    147
General  Company for Ports of Iraq (Iraq)

*Claimant* should reasonably have adopted an alternative approach to the construction of the off shore section of the Embankment.

In its Reply Submissions, the Respondent also says that Professor Gens is wrong to say that it would have taken between 10 and 100 times longer to execute the works if staged construction methods were adopted. It says that much shorter waiting periods would be required and that the delay would not be nearly as great.[142] However, the basis for this submission is said to be the evidence Professor Burcarth. As noted earlier by the Tribunal in paragraphs 479-486 hereof, the Tribunal did not find his evidence of assistance on this point. In any event the Respondent and Professor Burcarth have provide no proper basis for the Tribunal to reach any conclusions as to the time within which the works would have been completed had such methods been adopted.

570. Fifth, the Respondent's case is the product of hindsight. The Tribunal considers that it is necessary to evaluate the Claimant's conduct and its approach to the excessive settlement and stability failures that occurred as the problems were unfolding in the period after the first quarter of 2014. When the history of that period is examined, it is clear that the Engineer did not consider that it was either appropriate or necessary for the Claimant to change its methodology.

571. The Tribunal notes that in its Reply Submissions the Respondent contends that the Engineer repeatedly raised concerns about the need for staged construction using waiting periods.[143] The Tribunal has carefully examined each of the documents that is relied upon in support of that submission, in footnote 214 and reached the firm conclusion that it is not soundly based. In relation to the year 2014, there is reference to only one document and that is dated 15 January 2014. That document contains a comment on the Claimant's draft method statement and was written before the point when, the evidence suggests, there was an appreciation that the soil conditions differed from those assumed by the design. Moreover, it is likely that the advice was taken into account by the Claimant when it produced the next iteration of its method statement because the Tribunal's attention has not been drawn to any evidence that shows that the Respondent raised the comment again in the context of the next revision of the method statement.

572. The next document that is relied upon, in the footnote, is dated 4 April 2015. Approximately 15 months after the previous document. The Respondent then identifies a total of 4 documents

---

[142] Respondent's Reply Submissions paragraph 160.
[143] Respondent's Reply Submissions paragraph 148.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

148

in the months of April and June 2015 when the Engineer made specific recommendations about the introduction of waiting times at particular locations. The Tribunal is unable to conclude from these documents that the Engineer expressed any general concern about the Claimant's working methods or that waiting periods that were being applied were generally insufficient. Not only is it clear that these documents contained comments about the need for waiting times at particular locations there is no evidence to suggest that the Claimant ignored the particular recommendations that were made. On the contrary the Tribunal is satisfied that the Claimant did adapt its methodology at various locations, including the Green Mile and introduced longer waiting periods between the placement of layers of material.

573.  The Tribunal has also considered the evidence of Mr Horgan on this point.  In paragraph 42 of his first witness statement[144] he states that the Engineer repeatedly advised the Claimant to implement waiting periods to avoid sudden settlements. He says that following numerous discussions between the Engineer and the Claimant, the Claimant agreed in July 2015 to follow that advice and implement waiting periods. In support of that proposition he relies upon the minutes of meetings that took place in March, April, June and July 2015. Mr Horgan was cross-examined about this paragraph.[145]  He agreed that this part of his evidence related to the sudden and unexpected settlements that were occurring in the Green Mile. These meetings took place after the unexpected stability failures had occurred and contained the Engineer's opinion as to how future collapses might be avoided.  The Tribunal considers that this evidence does not provide support for the general submission that the Engineer repeatedly advised the Claimant to implement waiting periods.  In any event,  the Green Mile was a particularly problematic area and the Tribunal has no basis for concluding that even if greater waiting periods had been adopted most of the stability failures would have been avoided. Indeed, Professor Burcharth's example at cross section B3, using the assumptions that he had adopted,  predicted failure even when a 20 day waiting period was applied.

574.  Having regard to the Tribunal's finding that the Claimant's working methods were, in all the circumstances reasonable, and that the excessive consolidation and stability failures that occurred could not reasonably have been avoided without causing considerable further delay to the project and at great expense, the Respondent's case that Claimant failed effectively to monitor the settlements can be dealt with relatively briefly.

575.  The Tribunal has reached the following conclusions in relation to the Respondent's case that the Claimant failed properly to monitor the settlement of the Embankment: **Dr. Robert Gaitskell QC**
                                                                                              President
                                                                                              ICC Case No. 21785/ZF
                                                                                              Archirodon Construction (Overseas)
                                                                                              Company S.A. (Panama)
                                                                                              v.
                                                                                              General Company for Ports of Iraq

---

[144] C/1 p.424.
[145] Transcript Day 3, p.171 line 2 to p.173 line 17.

149

575.1   The Employer' Requirements imposed an obligation on the Claimant to monitor dedicated cross sections of the works in order to measure the degree of consolidation of the foundation soil and stability during construction. Those Requirements proposed three types of monitoring; namely (a) piezometric monitoring, (b) construction control monitoring and (c) topographic monitoring.[146] The Contract thus, imposed a contractual obligation on the Claimant to monitor dedicated cross sections of the works but it did prescribe how the means by which monitoring was to be performed. It identified piezometers as one means of monitoring.

575.2   Between December 2013 and February 2014, the Claimant installed 18 piezometers at four near-shore and offshore locations. However, all piezometers were destroyed after a few days. The Claimant also encountered issues with the transmission of data. Piezometers were re-installed but problems with obtaining reliable data continued into April 2014. During the first week of April 2014, the problems were the subject of discussions between the Claimant and the Engineer. In a letter dated 7 April 2014, the Engineer referred to those discussions and noted the status of the installed piezometers and the problems that had been encountered with obtaining reliable readings. The Engineer advise that if alternative methods of monitoring were to be proposed by the Claimant it could do so and any report proposing an alternative should be equivalent to piezometric monitoring.

575.3   The Tribunal is satisfied that the difficulties that were being encountered by the Claimant in obtaining reliable readings form the piezometers in the period before April 2014 were the result of a combination of storm damage and the settlement that was occurring.

575.4   On 7 June 2014, the Claimant proposed an alternative monitoring system involving settlement platforms and markers to collect information on settlement and it magnitude. Under cover of a letter dated 16 June 2014, the Engineer responded confirming that the substitution of piezometer with the monitoring proposed by the Claimant would be validated and deemed adequate based on results obtained from the substituted system. On the basis of this approval letter the Claimant abandoned the use of piezometers and monitored settlement by the use of settlement platforms and markers. The Tribunal considers that the Engineer's letter contained an approval that

[146] H/3 Tab 2.

150

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

subject to validation, the settlement platforms proposed by the Claimant were to be used in substitution for piezometers.

575.5    After 16 June 2014, the Claimant, with the approval of the Engineer, monitored the Works using settlement plates and markers.

575.6    The Tribunal is satisfied that the results of monitoring, derived from the use of settlement plates, was provided to the Engineer.[147]

575.7    The Respondent's complaint that the Claimant failed to establish control criteria to determine waiting periods, is not accepted by the Tribunal. Such criteria were initially specified in the proposal dated 7 June 2014. The Tribunal is satisfied that such criteria were established in accordance with that proposal. If it had not done so it is overwhelmingly probable that the Engineer would have raised the point at the time. However, there is no evidence that such a complaint was raised in 2014. The Tribunal received evidence from Mr Loukakis about the establishment of control criteria. In cross examination he explained that when the Claimant started using settlement plates it was building the underwater section of the Breakwater and that for that part the Claimant established a criterion of 12 mm per day. He said that later on, when the upper sections were being built, the criterion of 2 to 3 mm per day was established. He explained that this criterion was observed through daily or two daily monitoring.[148]   Mr Loukakis was taken in cross-examination to a letter dated 30 March 2016[149] from the Engineer, which claimed that since July 2015 the Claimant had failed to provide clear construction control criteria. Mr Loukakis said that he did not know why the Engineer was making that complaint because the Claimant was using the 2 to 3 mm per day and making daily observations.[150] That evidence is accepted by the Tribunal. Mr Horgan, the author of the letter, did not give evidence about it and his witness statement does not contain any evidence about the establishment of control criteria. His written evidence on monitoring is confined to saying that the settlements that occurred in 2015 could have been avoided by proper monitoring.[151]

575.8    Although settlement plates and piezometric monitoring do not provide equivalent

---

[147] Examples are contained in E/22 Tab 965 and E/23 Tab 986.
[148] Transcript Day 3, p.100 line 24 to p.101 line 10.
[149] E/27 Tab 1114.
[150] Transcript Day 3, p.101 lines 11 to 19.
[151] C/1 p.424 (paragraphs 39 to 41).

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

151

information, both types of monitoring provide information that enables the progress of consolidation to be measured. However, the Tribunal does not accept Professor Burcharth's evidence that a benefit of piezometers, which measure pore pressure, is that they provide information about why settlement is occurring. As Professor Gens explained, this proposition is incorrect. He said that, since 1980, geotechnical experts have considered it overly simplistic to consider that piezometer observations are sufficient to check and ensure stability.[152] The Tribunal accepts that evidence.

575.9   The Tribunal, in any event, rejects the Respondent's case that collapses and bulging, and a limited portion of the consolidation settlement could have been avoided through monitoring. At best, monitoring was only capable of providing information about the rate of settlement. The Tribunal considers the Claimant to be correct in saying that consolidation settlement would not have been limited by any form of monitoring. Further, the Tribunal is not persuaded that the stability failures that occurred would have been prevented by monitoring, whether by piezometers or settlement plates. Such failures would only have been prevented, or significantly reduced, if the method of construction that was adopted had been changed after the problem with the ground conditions had been identified early in 2014. However, as explained in paragraph 541 in the previous section of this Award, such a change would have caused very great delay to the completion of the Project and considerably greater cost would have been incurred.

### The Respondent's case that the Claimant failed to give notice of its claim under GC 4.12

576.   The Respondent contends that notice is a pre-requisite to claiming and extension of time and costs under Clause GC Sub-Clause 4.12. It does not suggest that the clause requires that the notice should specifically refer to the clause or provide notice of a claim but says that the notice should alert the Engineer and the Employer to the conditions the Contractor considers to be Unforeseeable.[153]

577.   The Respondent alleges that because the Claimant was aware, in the summer of 2013, that settlement was greater than anticipated and that it would use more construction materials than planned it should have given notice at that stage whereas, it in fact gave notice of a claim under GC Sub-Clause 4.12 about a year later.[154] The Respondent says that the Claimant's failure to give notice deprived it of the opportunity of addressing how it might have dealt with

[152] D/1 Tab 11 paragraphs 42 to 44.
[153] Respondent's Post-Hearing Submissions paragraph 193.
[154] Respondent's Post-Hearing Submissions paragraph 191.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

152

the geotechnical conditions moving forward.[155]

578.  The Respondent also alleges that the Claimant failed to comply with GC Sub-Clause 8.3.[156] However, it does not go so far as to contend that this alleged failure bars the claim.

579.  The Claimant contends that, on a proper interpretation of the Contract, notice is not a pre-requisite to a claim under GG Sub-Clause 4.12.[157]  If it is wrong *about that, it contends that the Claimant complied with its obligation to give* notice under that Sub–Clause and that the reports on the Trial Embankment constitute compliance with that requirement.[158]

580.  GC Sub-Clause 4.12 clearly provides that if the Claimant encounters physical conditions that it considers to be "Unforeseeable" it *"shall give notice to the Engineer as soon as practicable."*  The Sub-Clause goes on to provide that the notice *"shall describe the physical conditions, so they can be inspected by the Engineer and shall set out the reasons why the Contractor considers them to be Unforeseeable.*  The Sub-Clause then provides that:

> *"If and to the extent that the Contractor encounters physical conditions which are Unforeseeable, gives such notice and suffers delay and/or incurs Cost due to these conditions, the Contractor shall be entitled, subject to Sub-Clause 20.1 (Contractor's Claims), to....."*

581.  As the Tribunal has previously noted in paragraph 31 of this Award, Sub-Clause 20.1 of the General Conditions was deleted by the Special (Particular) Conditions.  That Sub-Clause provided that if the Contractor failed to give notice of any claim for an extension of time or for additional payment within 28 days of becoming aware of the relevant circumstance, it is not entitled to pursue that claim and the Employer is discharged from all liability in connection with the claim.

582.  The Tribunal is satisfied that, on a proper interpretation of Sub-Clause 4.12, it was a term of the Contract that the Claimant should, as soon as reasonably practicable, give notice to the Engineer of the physical conditions which it considered to be Unforeseeable and that such notice should describe the physical conditions and the reasons why the Claimant considers them to be Unforeseeable.  However, the Tribunal is not satisfied that any failure to give such a notice would prevent the Claimant from pursuing a claim under that Sub-Clause.  There are two reasons why the Tribunal has reached this conclusion.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

[155] Respondent's Reply Submissions paragraph 179.
[156] Respondent's Post-Hearing Submissions paragraph 194.
[157] Claimant's Post-Hearing Submissions paragraph 209.
[158] Claimant's Post-Hearing Submissions paragraph 210.

First, if it was intended that a failure to give a notice in accordance with that Sub-Clause had the effect of barring, or preventing, the Claimant from pursuing any claim then it is likely that the Contract would have stipulated that consequence. The loss of a right to pursue a claim is a serious matter and, in the absence of clear words, should not be implied. There are no such clear words in the Sub-Clause.

584.    Second, the clause of the General Conditions that dealt with the consequences of a failure to give notice of claims under the Contract was set out in Sub-Clause 20.1. That Sub-Clause made it clear that a failure to give notice of any claim, in accordance with its requirements, operated as a bar to the right to pursue such a claim. However, that Sub-Clause was deleted. The fact of its deletion is significant for two reasons. First, it is a strong indication that the Parties did not intend that a failure to give notice of a claim under any clause of the Contract should operate as a bar to making a claim. Second, Sub-Clause 4.12 specifically referred to Sub-Clause 20.1, which indicates to the Tribunal that, as originally drafted without the amendment, then the Parties had intended that in order to succeed in a claim under Sub-Clause 4.12 the Contractor would have to comply with Sub-Clause 20.1. If it did not, the Claimant would lose its right to claim. In the context of Sub-Clause 4.12 the effect of the deletion of Sub-Clause 20.1 indicates that the Parties did not intend the failure to give notice under Sub-Clause 4.12 to operate as a bar to the pursuit of any claim.

585.    Even if the Tribunal had reached the conclusion that the requirement to give a notice in accordance with the Sub-Clause 4.12 was a pre-condition to bringing a claim, the Tribunal is satisfied that the Claimant complied with the requirements of that clause when it supplied the Engineer with the Trial Embankment Reports on 20 January 2014 and 1 March 2014 respectively. Those reports indicated that the consolidation and related properties of the soil were different from those that had been assumed at Tender. The Tribunal does not consider that the Claimant was obliged to give notice before this date and specifically rejects the Respondent's submission that notice of a claim should have been given in 2013, during the course of the construction of the onshore Breakwater, as it was not apparent to the Claimant at that stage, that the soil conditions were materially different than had been assumed by the design. Refer above to paragraphs 306-369 for the narrative of events in 2013, and particularly refer to paragraphs 324 and 507.4 as regards the Engineer agreeing in October 2015 that the soil behaviour was unforeseeable.

586.    The Tribunal also rejects the Respondent's submissions that the Engineer and the Employer would have acted differently if; (a) the Claimant had given notice earlier than it did;

154

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

that the information contained in the Trial Embankment reports was inadequate for the purpose of Sub-Clause 4.12. Not only is there an absence of persuasive evidence that would permit the Tribunal to reach that conclusion but also, as the Claimant points out, Mr Horgan gave clear evidence that the Claimant was in regular communication with the Engineer regarding the issues on the Project; including the soil conditions.[159]

587.    In the light of the Tribunal's conclusion that the Claimant is not barred from pursuing its claim by reason of the alleged failure to comply with the notice requirement of Sub-Clause 4.12, it is strictly unnecessary to deal with the Respondent's separate point that the Claimant failed to comply with Sub-Clause 8.3. However, had it been necessary to decide the point, the Tribunal would have concluded that a failure to comply with that provision does not prevent the Claimant from pursuing its claim under Sub-Clause 4.12. In the Tribunal's opinion there is nothing in Sub-Clause 8.3 that would suggest that a failure to give notice of an event, which may increase the price or delay the Works will result in the Claimant being prevented from pursuing a claim under Sub-Clause 4.12; or for that matter, any other relevant provision of the Contract.

**The Claimant's Claim under GC Sub-Clause 1.9**

588.    The Claimant also advances its claim, for the financial and temporal consequences of the excessive settlement and stability failures that occurred, pursuant to GC Sub-Clause 1.9. The Claimant emphasizes that its claim is not made in the alternative to the claim under GC Sub-Clause 4.12 but is advanced as an independent and distinct claim. It contends that GC Sub-Clauses 1.9 and 4.12 are not mutually exclusive and that, in principle, it could succeed under both Sub-Clauses.[160]

589.    A finding that the Claimant is also entitled to recover under GC Sub-Clause 1.9 is of some commercial significance because that Sub-Clause entitles the Claimant to recover both its Cost and its reasonable profit. In contrast Sub-Clause 4.12 does not entitle the Claimant to recover a reasonable profit.

590.    The following part of GC Sub-Clause 1.9 is of particular relevance:

> *"If the Contractor suffers delay and/or incurs Cost as a result of an error in the Employer's Requirement, and an experienced contractor exercising due care would not have discovered the error when scrutinizing the Employer's Requirements under Sub-Clause 5.1 (General Design Obligations), the Contractor shall give notice to the Engineer and shall be entitled subject to Sub-Clause 20.1*

---

[159] Claimant's Reply Submissions paragraph 117.
[160] Claimant's Reply Submissions paragraphs 79 to 80.

Dr. **Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

155

*(Contractor's Claims) to:*

> (a)   *an extension of time for any such delay, if completion is or will be delayed, under Sub-Clause 8.4 (Extension of Time for Completion) and*
>
> (b)   *payment of any such Cost plus reasonable profit which shall be included in the Contract Price... "[161]*

591.   GC Sub-Clause 1.1.1.5 defines the term "Employers Requirements" as meaning;

> *"the document entitled employer's requirements, as included in the Contract, and any additions and modifications to such document in accordance with the Contract. Such document specifies the purpose, scope, and/or design and/or other technical criteria, for the Works."[162]*

592.   The Claimant contends that its claim under GC Sub-Clause 1.9 gives rise to the following three questions:

592.1   was there an error in the Employer's Requirements and, if so, what was that error?

592.2   in accordance with GC Sub-Clause 5.1, would an experienced contractor, exercising due care, have discovered the error when examining the Site and the Employer's Requirements before submitting the Tender?

(3)   What delay and additional Cost and reasonable profit arose as a result of the error?[163]

593.   The Claimant contends that the error in the Employer's Requirements was the information contained in Table 3.5, entitled "Al Faw Grand Port- Staging Pier -Geotechnical Parameters."[164]   The Claimant contends that the information contained in the Table constituted design parameters to be observed by the Claimant in its design and that the information was erroneous, in that it indicated that that the soil on the Site was over consolidated when in fact that same soil turned out to be normally consolidated.[165]

594.   In relation to the second question, the Claimant contends that this error was only discoverable after the commencement of construction and/or the completion of additional site investigations. Hence, an experienced contractor would not have discovered the error in the Employer's Requirements by the date for the submission of the Tender.[166]

595.   The Respondent invites the Tribunal to dismiss the claim for three main reasons.

[161] H/1 p.40.
[162] H/1 p.34.
[163] Claimant's Post-Hearing Submissions paragraph 122.
[164] H/1 p.132 and H/3 pp.1807 to 1808.
[165] Claimant's Post-Hearing Submissions paragraph 124.
[166] Claimant's Post-Hearing Submissions paragraphs 132 to 138.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

156

596.   First, it contends that the Claimant has failed to establish any error in the Employer's Requirements. The Respondent does not accept that the information contained in the Table was "a requirement" or a design parameter but was, instead a reflection of the Engineer's interpretation of the sited conditions based on the limited data available at the time of tender. Such information was not intended to be used for the purpose of determining the detailed design. Moreover, the Employer's Requirements expressly stated that the information on geotechnical parameters was provided for information only and did not have contractual validity.[167]

597.   Second, the Claimant has failed to establish that the Table contained any error. The Table was a reflection of the underlying data from the pre-tender CPTUs and boreholes.[168]

598.   Third, the Respondent contends that the Claimant should have discovered the alleged error if it had exercised due care. In particular, the Claimant should have carried out a more thorough analysis of the soil conditions during the detailed design of the works. Had it done so then the error would have been discovered.

599.   Fourth, and in any event, the Claimant failed to give any notice of its claim. The Respondent relies upon the fact that the first time that the Claimant intimated a claim under GC Sub-Clause 1.9 was when it was pleaded in the Statement of Claim.[169] That document does not constitute "a notice" for the purpose of the Sub-Clause 1.9.

600.   Fifth, the Respondent contends that the cost and delay that are claimed were not attributable to any error in the Employer's Requirements.[170]

601.   The Tribunal accepts the Claimant's submission that there is no reason, in principle, why a contractor might not be able to establish a claim under both Sub-Clause 4.12 and 1.9. It also accepts that the Sub-Clauses are not mutually exclusive. However, the two Sub-Clauses are directed to two different types of problem that might arise after the date when the Contract became effective. Sub-Clause 1.9 is directed to errors that are contained within the Employer's Requirements. Sub-Clause 4.12 is directed to Unforeseeable physical conditions. It is possible that the Claimant might have a claim under both Sub-Clauses where, for example, the Employer's Requirements contained erroneous design parameters for the

---

[167] Respondent's Post-Hearing Submissions paragraphs 201 to 205
[168] Respondent's Post-Hearing Submissions paragraphs 207 to 209
[169] Respondent's Post-Hearing Submissions paragraphs 220 to 222.
[170] Respondent's Post-Hearing Submissions paragraphs 223 to 227.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF                         157
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Breakwater, which the Claimant was required to adopt in the detailed design and, during the course of the works, ground conditions were encountered which were Unforeseeable which rendered the detailed design inappropriate. Such a claim would necessarily involve proving that the relevant design parameter was a requirement, which was erroneous and one which could not have been discovered with the exercise of reasonable care. It would also involve establishing the requirements of GC Sub-Clause 4.12. However, from a practical perspective it is improbable that, in this example, a claim would be pursued under both limbs. In the first place, it would be clear that the cause of the Claimant's loss was the requirement to design to an erroneous design parameter. Second, there would be no obvious benefit to the Claimant in pursuing its claim under Sub-Clause 4.12 because it would be confined to recovering its cost and would not be permitted to recover its loss of profit.

602. However, in this case the Tribunal is not persuaded that the Claimant has a viable claim under Sub-Clause 1.9.

603. First, and as the Respondent has correctly pointed out, in order to succeed in its claim it must be able to show that the information contained in Table 3.5 was information to which the Sub-Clause 1.9 was intended to apply. In the Tribunal's opinion it is not sufficient for the Claimant to show that the Table was contained within the Employer's Requirements. It must go further and show that Table 3.5 contained information concerning the design or technical criteria for the works with which it was required to comply. That this is so is apparent from the definition of the term "Employer's Requirements" contained in GC Sub-Clause 1.1.1.5 which states that those requirements:

> "...specifies the purpose, scope, and /or design and/or other technical criteria for the Works".

604. Second, it is clear to the Tribunal that the information contained in Table 3.5 was not information that "specifies the purpose, scope ... design ... or other technical criteria for the Works." As the passage that precedes the Table makes clear, information contained within it is a summary interpretation of the information derived from the available investigations. That summary cannot in any sense be characterised as a design requirement or technical criteria with which the Claimant was required to comply. Not only is it clearly a description, or interpretation, of the existing site investigation data but the Employer's Requirements made it clear that the underlying information, upon which that interpretation had been based was provided to the Claimant for information. Addendum 1 to the Tender Documents identified the site investigation reports that had been provided to the Claimant and contained the following passage:

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

158

*"The Tenderers should be aware that said documents are provide for information only, and that they do not have any contractual validity."[171]*

605.   The intention of these words is clear.  The site investigation reports and other technical information was provided to the Claimant for information.  However, as the Tender Addendum also makes clear, they were not to have contractual validity.  That is to say they were not to give rise to contractually enforceable rights and obligations.  If that is correct, it is very difficult to see how the information contained in Table 3.5, represented an interpretation of the underlying data, can be said to have contractual effect.

606.   Third, even if Table 3.5 can be said to constitute an "Employer's Requirement", the Tribunal is not satisfied that the Table contained an error.

607.   In order to explain this conclusion it is necessary to focus on the  "error" which is relied upon by the Claimant in support of this aspect of its case.  The Claimant's case is that Table 3.5 contained a summary of the geotechnical characterisation of the foundation soils that had been derived from the available data.  The values within the column headed "OCR" indicated that the soil is over consolidated.  Those values, it is said, are erroneous because after the Works commenced, and more data concerning the ground conditions became available, it became clear that the ground was normally consolidated.

608.   The question of whether the values in the column headed "OCR" indicated that the ground was over consolidated is disputed by the Respondent who, on the basis of Professor Burcharth's evidence, contends that the Claimant should have appreciated that the soil was normally consolidated.  For reasons explained in paragraphs 475–486 earlier in this Award the Tribunal has rejected that evidence.  However, the fact that the Tribunal has reached that conclusion does not lead to the conclusion that the OCR values contained in the Table were in error.   The Tribunal considers that such a conclusion would only be justified if the interpretation of the underlying data that was summarized in the table was erroneous.  If the OCR values contained in the Table were an accurate representation of the underlying site investigation data then it cannot properly be said that the information in the Table was erroneous.  The problem, or error, is that the underlying data was not an accurate or reliable representation of the ground conditions at the Site.  However, the fact that there may have been an error in the site investigation data is irrelevant, not only because that is not the error that is relied upon by the Claimant but also because such a case would not have been open to

[171] H/2 p.1119.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas) [159]
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

the Claimant.   That is because it could not properly be said that the site investigation data constituted a part of the Employer's Requirements in the sense that they contained a design requirement or other technical criteria.   To the contrary, the Contract expressly advised the Claimant that the site investigation reports were provided for information and did not have contractual validity.

609.   A further problem with this aspect of the Claimant's case is that it is a central part of its claim under Sub-Clause 4.12 that the ground conditions that were encountered were Unforeseeable. It supported that case with evidence from Professor Gens that included evidence that he could derive similar OCR values to those indicated in the Table using SANSHEP methodology. That evidence, which the Tribunal has accepted, leads to the conclusion that the Table did not contain an error because it was an accurate, or at least a reasonable, interpretation of the underlying data.   The problem was with the underlying data that was used to produce the information contained in the Table.   That data was either itself, inaccurate or possibly materially incomplete but that is not a relevant error.

610.   The question of whether the site investigation data had been incorrectly evaluated, or whether there was a problem with the original data, was dealt with by Professor Gens, in the course of his oral evidence.   In re-examination the following exchange took place:

> "*Q.*    *You were asked questions by the respondent's counsel in relation to the paragraph in the middle of the page.  I just want to read back to you the last bit of that.  It says:*
>
> > '*It is very important to realize that, as demonstrated by the claimant's geotechnical expert report, the stability problems did not arise from the natural variability of ground conditions but they were due to the fact that the site investigation erroneously characterized the clay foundation soil as over-consolidated instead of normally consolidated or at most lightly consolidated.*'
>
> *I want to ask you about the expression used here:*
>
> > '*The site investigation erroneously characterized the clay foundation soil as over-consolidated instead of normally consolidated.*'
>
> *Are you saying that an error was made in the site investigation themselves? Or was it in fact that those-----the results did not conform with the conditions later discovered on site?  Or is there some other explanation?*
>
> *A.*    <u>No.  I'm saying  the data was well analysed and in that respect correctly concluded that the soil was over-consolidated.  So obviously there was a problem with the original data.  What's the source of that problem?   I cannot comment.</u>"

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

611.    This answer, which the Tribunal accepts, shows that Professor Gens was of the opinion that the data concerning the ground conditions at the site had been well analysed. It was his opinion that the fact that the ground conditions turned out to be of a different character was the result of a problem with the underlying data.

612.    Accordingly, the Tribunal rejects the Claimant's claim under GC Sub-Clause 1.9.

**The Claimant's Claim under Articles 146(2) and 878 of the Iraqi Civil Code**

613.    The Claimant's claim under Articles 146(2) and 878 is advanced in the alternative to the claims made pursuant to Sub-Clause 4.12 and Sub-Clause 1.9. The Claimant sets out its case on this matter at, for example, paragraphs 254 et seq. in its Pre-hearing Submissions of 6 July 2018.

614.    As the Tribunal has found that the Claimant is entitled to succeed in its claim under Sub-Clause 4.12, the Claimant's claim under Articles 146(2) and 878 does not arise for consideration.

615.    In any event, even if the claim had been advanced as an independent claim, and not as an alternative, the Tribunal would have rejected it on the basis that, by reason of its findings in relation to Sub-Clause 4.12, the performance of the Contract has not become more onerous on the Claimant because it is entitled both to recover its Costs and obtain an extension of time for the delay caused by the alleged exceptional or unpredictable event.

616.    Therefore, the Tribunal rejects the claim under Articles 146(2) and 878 of the Iraqi Civil Code.

**The Claimant's Claim for Additional Costs Arising out of Delay Event No. 3**

617.    The Tribunal has found that the Claimant has succeeded in establishing its claim under GC Sub-Clause 4.12. That clause entitles the Claimant to recover the additional costs that it incurred as a result of the Unforeseeable physical conditions that were encountered. As the Claimant accepts, that Sub-Clause does not entitle the Claimant to recover loss of profit.

618.    The Claimant's claim for additional costs comprises the following three elements:

618.1   US$75,345,863 in respect of additional quantities placed because of the Unforeseeable settlement and penetration that occurred ("Claim B.01");

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

161

618.2    US$14,229,444 as additional costs incurred as a result of collapses ("Claim B.02");

618.3    other costs, comprising wastage and loss of net quantities (US$ 546,573) ("Claim B.03") and the costs of additional site investigations by Andrea Lab and Fugro (US$335,801) ("Claim B.04").[172]

619.    The Respondent contends that the quantification of the Claimant's claim is unfounded and inflated.

620.    In relation to Claims B.01 and B.02 the Respondent's contend that:

620.1    the quantification of the claim is improper and should not be accepted because:(a) the quantification of foreseeable settlement is flawed and lower than the settlement actually expected by the Claimant and (b) the quantification of actual settlement is based on insufficient data and unreliable extrapolations and include material which is not related to the alleged Unforeseeable conditions and (c) the rates applied are inflated and in particular include both unexplained amounts for demurrage and an artificially high level of depreciation which does not reflect the Claimant's actual depreciation costs;[173]

620.2    in any event the Claimant's compensation should be limited and in support of this part of its case the Respondent provides a valuation of cost based on (a) an estimation of the settlement volumes that were "foreseeable" at the time of tender and (b) and estimation of the consolidation settlement that actually occurred on site and (c) corrected rates that reflect the Claimant's actual costs.[174] The Respondent identifies a primary and alternative position which quantifies claims B.01 and B.02 as US$9,019,668 alternatively US$12,179,666.[175]

621.    The Respondent contends that Claim B.03 should be rejected for lack of particularization and substantiation.[176]

622.    The Respondent contends that Claim B.04 should be rejected on the basis of lack of

[172] Claimant's Post-Hearing Submissions paragraph 291, 311, 338 and 341.
[173] Respondent's Post-Hearing Submissions Section 2.7.1.1.
[174] Respondent's Post-Hearing Submissions Section 2.7.1.2.
[175] Respondent's Post-Hearing Submissions paragraph 347.
[176] Respondent's Post-Hearing Submissions Section 2.7.2.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

162

particularization and because it is excluded by the Contract.[177]

623.    The Parties' positions in relation to each component of the claims will be considered in detail in due course.  However, at this stage it is necessary to refer to the expert evidence, given by the quantum experts, that was relied upon by the Parties in support of their respective cases.

624.    The Claimant relied upon the expert evidence of Mr Iain Wishart who is a Chartered Quantity Surveyor with over 40 years' experience of construction projects in various places around the world, including almost 11 years living and working in the Middle East.

625.    Mr Wishart provided two expert reports[178] and gave evidence to the Tribunal on Days 7 and 8. At the outset of his evidence on Day 7 Mr Wishart gave a presentation.[179]

626.    The Respondent relied upon the expert evidence of Mr Gary Kitt who is a Chartered Surveyor and has worked in the construction industry for nearly 35 years.

627.    Mr Kitt provided two expert reports[180] and gave evidence on Days 8 and 9.  He gave a presentation at the outset of his evidence.[181]

628.    Both experts had contributed to a Joint Statement ("the First Joint Statement") dated 29 June 2018, which very helpfully identifies the main issues that had arisen from their reports and, against each issue, their respective positions.[182]

629.    During the course of the hearing the Tribunal became concerned that the Respondent may not have articulated the financial consequences of the various arguments that it had deployed during cross-examination.  Accordingly, on Day 8, the Tribunal directed the Respondent to serve a short note, clarifying its case as to the financial consequences of (a) the volume of material that the Claimant must be taken to have foreseen and (b) the quantification of the actual quantities of the material that were claimed in relation to the alleged Unforeseeable settlement and collapses.  The Tribunal also directed that when the Respondent had clarified its case the quantum experts should then seek to agree their financial consequences.  If agreement was not possible the experts were directed to produce a further joint statement.

---

[177] Respondent's Post-Hearing Submissions Section 2.7.3.
[178] D/3 Tab 37 and D/5 Tab 90.
[179] K/1 Tab 7.
[180] D/5 Tabs 94 and 96.
[181] K/1 Tab 8.
[182] D/5 Tab 97.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

630.   On 10 August 2018, the Respondent served a document entitled "Respondent's Response to the Tribunal's Questions of 25 July 2018." That document made it clear that its primary defence to the claim was maintained. However, on the hypothesis that its primary defence was rejected, the Respondent made the following points:

630.1   The Claimant's case that the "expected" quantities should be calculated by reference to drawing No. ME019P-T-F-G-S-D-0128 should be rejected.

630.2   The "expected" quantities should be derived from (a) the consolidation settlement resulting from a calculation based on CPTU-O5, as explained by Professor Burcharth; or alternatively (b) the Claimant's own estimate of expected consolidation settlement as set out in the Tender Proposal.

630.3   In relation to collapses, it was not reasonable for the Claimant to assume zero materials for stability failures at the time of tender.

630.4   The Claimant's quantification of actual settlement was disputed on various grounds.

630.5   In any event the Claimant's quantification based on the Fugro surveys must be reduced to (a) exclude projections for additional settlement until the end of consolidation, (b) exclude quantities placed to compensate for bulging which was the result of the Claimant's inappropriate method of construction, (c) exclude any volume of material placed due to collapses because such collapses were attributable to the Claimant's inappropriate construction methods and (d) reduce by 10% the amount of material placed to compensate for consolidation settlement given the evidence of Professor Burcharth that applying appropriate construction methods consolidation settlement could have been reduced by this amount.

631.   In the event the quantum experts were unable to agree the financial consequences of the matters set out in the Respondent's document dated 10 August 2018 and on 30 October 2018, Mr Wishart and Mr Kitt provided a Second Joint Statement.[183]

632.   The Claimant contends that, whereas Mr Wishart approached the assessment of its claims in an independent, comprehensive and thorough manner, Mr Kitt did not approach his duties in that way.[184] The Tribunal has carefully considered the criticisms that are made of Mr Kitt but

[183] D/5 Tab 103.
[184] Claimant's Post-Hearing Submissions paragraphs 57 to 63.

164

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

it has come to the clear conclusion that, as Mr Wishart had done, he approached his responsibilities objectively and in a thorough and proper manner and did his best to assist the Tribunal. It is correct, that at the time of preparing his first report Mr Kitt had not inspected documents that were held in the Claimant's offices in Dubai and he only did so for the purpose of his second report. However, the Tribunal is unable to conclude from this that Mr Kitt was, in any sense, failing in his duties to the Tribunal. He explained during the course of cross-examination that the reason why he had not visited the Claimant's offices in Dubai any earlier was that he had not finalized all of the terms of his engagement until a late stage and that by the time that he had done so he had other commitments that prevented him from visiting before 20 May 2018.[185] The Tribunal accepts that explanation.

633.   Before dealing with the detailed issues that have arisen in relation to the quantification of the claim under GC Sub-Clause 4.12 it is necessary to refer to the Respondent's general point that the claim should be dismissed because it arises as a result of the Claimant's inappropriate working methods. As noted earlier in this Award, the Respondent contends that if the ground conditions were Unforeseeable then it should have been apparent to the Claimant after it had commenced work that the assumptions that it had made about the nature of the ground were incorrect; either at the detailed design stage or subsequently. The Tribunal has already explained in paragraphs 324, 507 and 585 above why it does not accept those arguments, when dealing with the Respondent's defences to the claim under GC Sub-Clause 4.12. Accordingly, the Tribunal rejects the Respondent's related argument that the Claimant's claim for the cost of dealing with the Unforeseeable ground conditions should be dismissed or reduced by reason of those defences.

634.   The Tribunal will now consider the issues that have arisen in relation to the quantification of the claim.

Claim B.01:  The additional settlement quantities due to settlement/penetration

635.   The Claimant's claim for US $ 75,345,863 comprises the following six elements:

635.1   B.01.1 Quarry Run (Ch 3900 –RH EB-01a, 02a)

635.2   B.01.2 Core Material (Ch 3900-Ch 8205)

635.3   B.01.3 Fill Material Staging Platform

635.4   B.01.4 Placing of Quarry Run Offshore

635.5   B.01.5 Placing of Fill Material Onshore

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[185] Transcript Day 9 p.8.

635.6   B.01.6 Placing of Fill Material Staging Platform

Expected Settlement

The Parties and their experts agree that the first issue concerns the amount of settlement that the Claimant must be taken to have foreseen, or allowed for, its price for the Works.

The Claimant's valuation of its claim is based on Drawing ME019P-T-F-S-D-0128 ("Drawing MEO19"), which was a drawing prepared by the Engineer, and incorporated into Volume 5 of the Tender Documents.[186]   That drawing shows that the Engineer had calculated an expected settlement of 70cm.   On the basis of that drawing the Claimant has derived a measured expected settlement volume of 128,832 cubic meters calculated as follows:

- Quarry run offshore (including staging pier) 68,628 cubic meters
- Fill onshore 40,204 cubic meters
- Fill staging pier 20,000 cubic meters.

The Claimant contends that this drawing should be used because it was a contract document and, in any event, it represented the Engineer's analysis of the volumes of settlement to be expected, based on the soil conditions which were foreseen at tender.   Therefore, it says, the use of Drawing ME019 is both reasonable and appropriate.

The Respondent disagrees and contends that the "expected" volumes should be calculated on the basis of two alternatives.   The first alternative is that expected settlement should be derived by extrapolating geotechnical information from CPTU-05.   Based on that approach the volume of settlement that should have been expected was 302,569 calculated as follows:

- Quarry run offshore (including staging pier) 163,604 cubic meters.
- Fill onshore 95,844 cubic meters.
- Fill staging pier 43,120 cubic meters.

The Respondent's alternative is that the "expected" volumes should be calculated by reference to the settlement that was calculated by the Claimant and incorporated into its tender proposal.[187]   Based on the Claimant's calculation the volume of settlement that should have been expected is alleged to be 205,811 cubic meters, calculated as follows:

186 H/3 p.2060.
187 H/1 p.566.

166

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

- Quarry run offshore (including staging pier) 109,804 cubic meters.
- Fill onshore  64,326 cubic meters.
- Fill staging pier 31,680 cubic meters.

641.  The Claimant does not accept either of these alternatives and invites the Tribunal to reject them.

642.  The Tribunal is not persuaded that it should approach the quantification of the "expected" settlement by reference to Drawing ME019 for three reasons. First, it does not represent the extent of the settlement that the Claimant in fact foresaw at the date of the Contract. The amount of settlement that was actually foreseen was greater than that indicated in Drawing ME019 and is shown in the table incorporated into the Claimant's tender.[188]  Second, and as the Respondent correctly points out, Drawing ME019 incorporated the following notes:

> "The profiles indicated are estimates and need to be validated by the monitoring campaign foreseen during construction............
>
> The indicated values are not contractually binding: contractors shall make their own interpretation and settlement elevation....."

Not only do these notes make it clear that the drawing is not contractually binding but also it is made very clear that the estimates are precisely that and are not fixed or final values.

643.  Equally, the Tribunal is not persuaded by the Respondent's primary alternative argument that the expected settlement volumes should be derived by extrapolating quantities from CPTU-05. That case is based on the evidence of Professor Burcharth who considered that an experienced contractor would have attached particular weight to the results of that CPTU. Professor Gens disagreed with Professor Burcharth. The Tribunal has already found that it prefers the evidence of Professor Gens and has concluded that an experienced contractor would not have attached particular weight to CPTU-05 nor would it have predicted consolidation settlement of 98 cm at a typical offshore cross section. In these circumstances the Tribunal also rejects the Respondent's case that the "expected" volumes of settlement should be quantified by extrapolation from CPTU-05.

644.  However, the Tribunal is persuaded by the Respondent's alternative argument that the "expected" settlement should be calculated by reference to the table contained in the Claimant's tender. In the Tribunal's opinion that table represents the best evidence of the

**Dr. Robert Gaitskell QC**
President

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama) 167
v.
General  Company for Ports of Iraq (Iraq)

likely settlement that an experienced contractor would have foreseen and allowed for at tender stage. Apart from its case that the Tribunal should accept its case that the expected settlement should be calculated by reference to Drawing ME019, the Claimant has not provided any good reason why the Tribunal should conclude that the settlement values shown in the tender table should not be provided as a starting point.

645. The Tribunal has therefore concluded that the expected settlement should be calculated by reference to the estimated settlement values shown in the tender table.

646. Mr Kitt has calculated the estimated "expected" settlement, on that basis, to be 205, 811.14 cubic meters. The calculation of that volume is explained by Mr Kitt in paragraph 4.1.4 of the Second Joint Statement of the quantum experts. Mr Wishart comments on that calculation are contained in section 5.3.2.3 of Second Joint Statement. Mr Wishart considers that Mr Kitt's calculation is mathematically correct although he expresses a concern that the calculated volume may not be correct.[189] The Tribunal has considered Mr Wishart's concerns and is not persuaded that they are valid and it does not accept them.

647. The Respondent maintained a separate point that the Claimant's calculation of the expected volume was erroneous because it assumes no allowance for bulging and collapses.[190] That point is rejected by the Tribunal, for two reasons. First, the proposition that the Claimant should have anticipated a certain level of bulging and collapses was based on the evidence of Professor Burcharth. However, the Tribunal is not persuaded by that evidence and declines to accept it. Second, even if the Tribunal had been persuaded that some allowance should have been made for bulging and collapses the Respondent provided no evidence of what that allowance should have been.

648. The Tribunal finds that the volume of settlement that the Claimant should have expected was 205,811.14, is derived as follows:

- Quarry run offshore (including the staging pier) 109,804 cubic meters.
- Fill onshore 64,326 cubic meters.
- Fill staging pier 31,680.

(2)   Estimation of the volume of Consolidation Settlement.

649. The Claimant's calculation of the actual volume of settlement is based on the site

[189] Paragraph 5.3.2.3.13
[190] Respondent's Post-Hearing Submissions paragraph 284 to 285.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

investigations performed by Fugro. Based on that information the Claimant has calculated a measured settlement volume of 1,773,465 cubic meters.

650.    In order to derive the actual settlement volumes from the Fugro investigations the Claimant produced a trapezoidal profile.

651.    The Respondent contends that the Claimant's calculations, based on the Fugro surveys, do not constitute and adequate basis to quantify the actual settlement volumes and makes the following main points:

651.1    The methodology adopted by Fugro is not appropriate and was disputed by the Engineer at the time;

651.2    Fugro is not an independent organization but was retained by the Claimant for the purpose of preparing the claim;

651.3    The Claimant only used 24 of the test results derived by Fugro along the Breakwater, with intervals ranging from 200 to 800 meters. These are insufficient to derive any meaningful conclusions on the soil penetration depth throughout the Breakwater. Because the variation of penetration depths between two test locations is significant it is not possible to interpolate the penetration depths between two locations to determine actual settlement volumes;

651.4    There were 66 test results available from the Fugro testing campaign and it is not clear why only 24 test results were used;

651.5    Even assuming the Fugro surveys contained sufficient information to determine actual settlement volumes, the Claimant's assumption that the settlement profile corresponds to a trapezoidal shape is not reliable.[191]

652.    The Claimant disputes each of these criticisms and contends that the Fugro results provide a sound basis for computing the actual volume of material that was placed.[192]

653.    The Tribunal has examined each of the criticisms that have been made by the Respondent and has decided that they do not provide a proper basis for rejecting the computed volumes. The

---

[191] Respondent's Post-Hearing Submissions paragraphs 291 to 300.
[192] Claimant's Reply Submissions paragraphs 137 to 140.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of I

reasons why the Tribunal has declined to accept the criticisms made by the Respondent are, in brief, as follows:

653.1 Although the fact that the Engineer had reservations about the methodology that was use is a factor to be taken into account in deciding upon the weight to attach to the Respondent's complaints those reservations are not decisive and would only have weight if they are supported by appropriate independent expert evidence.

653.2 As the Claimant points out, Fugro is a well-known, international, specialist offshore geotechnical survey company. There is no reason to believe that Fugro did not conduct the investigations with care and professionalism. Mr Wishart was entitled to rely on the results that Fugro obtained.

653.3 Mr Wishart had undertaken an exercise to independently check the volumes that had been derived from the Fugro investigations. Not only did that exercise show a close correlation between the volumes that had been derived but the results of that reconciliation was not disputed by Mr Kitt.[193]

653.4 The Tribunal is not persuaded that the Claimant was incorrect to select 24 out of 66 boreholes for the purpose of the calculation. The Fugro boreholes were performed at different points in time. The first was in April 2014, the second was between April and July 2015 and the third in November 2015. As settlement occurred over time it was necessary to be selective. The Tribunal did not understand the Respondent to suggest that a different combination of results should have been used to quantify settlement volumes or that a more meaningful representation of actual settlement might have been obtained.

653.5 While Professor Gens considers that the borehole and CPTU results derived from the Fugro investigations provide the most reliable and reasonable way to determine the location of the interface between the embankment and the natural ground.[194] He also explained that the use of settlement measurements may under-estimate the additional material that had been placed because the measurements did not take account of lateral spreading of the foundations caused by the spreading of foundation soil.[195] The Tribunal accepts the evidence of Professor Gens.

[193] Transcript Day 9, p.60 line 15 to p.61 line 7.
[194] D/1 p.30, paragraph 10.2 and D/1 p.160 paragraph 49 and D/1 pp.411 to 412 ( Professor Gens Comments on item 7(b) in the Joint Statement).
[195] D/1 p.160 paragraph 51.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
'Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

170

653.6 The Tribunal was not persuaded that the trapezoidal settlement profile used by the Claimant was invalid and it does not accept that such a profile should be rejected in favour of a finite element analysis model. The Tribunal accepts the evidence of Professor Gens that the use of finite element analysis does not, in this case, satisfactorily simulate failure and that it is not a reliable basis for calculating settlement profiles to derive volumes of construction materials.[196]

654. The Respondent also contends that if the Tribunal is satisfied that the estimation of settlement volumes should be based on the Fugro test results and the trapezoidal profile then an adjustment should be made because:

654.1 The Claimant's calculation includes an additional allowance for additional settlement that may have occurred on the offshore section of the Breakwater.[197]

654.2 It is necessary to distinguish between volumes attributable to consolidation settlement and those due to bulging and for that purpose a ratio of 38/93 has been derived.[198]

654.3 A deduction of 10% should be made from the calculated volume of consolidation settlement because Professor Andersen testified that at least 10% of the consolidation settlement could have been avoided by applying appropriate construction methods. Accordingly, the volume obtained through the application of the 38/93 ratio should be further reduced by 10%.[199]

655. The Claimant denies that any of these adjustments should be made.[200]

656. The Tribunal does not consider that the estimated volumes should be reduced for any of the reasons provided by the Respondent.

657. The Respondent's first criticism is that it is wrong to include an allowance for future settlement because it is a volume that is entirely theoretical and may not have been placed. The allowance comprises two components, namely; (a) an allowance of 70,523 cubic meters for future settlement where construction had not reached the final level and (b) an allowance

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[196] Expert Joint Statement paragraph 7(a), D/1 p.410.
[197] Respondent's Post-Hearing Submissions paragraph 330.
[198] Respondent's Post-Hearing Submissions paragraphs 331 to 334.
[199] Respondent's Post-Hearing Submissions paragraph 335.
[200] Claimant's Post-Hearing Submissions paragraphs 305 to 310.

171

of 178,550 cubic meters for future settlement of 0.50m to 0.75m under the core and 0.10m at the end of the berms.[201] Mr Shebl gave evidence about these estimates[202]but the Tribunal found it to be of limited assistance because it did not address the question of whether the estimated volumes were in fact placed.

658.   The Respondent is correct to say that computation of placed volume is theoretical; in the sense that it represents an additional volume of material that may not, in the event, have been deposited in the Breakwater. However, the quantification of the additional volume of material derived from the Fugro investigation results is necessarily an assessment based on the data that was obtained at the point in time when those tests were performed. Those investigations can only have predicted the interface between the fill and the original ground at the date when the investigations were performed. The investigations were carried out during the course of the construction of the Breakwater. As it is common ground that the process of consolidation and settlement was ongoing it is inevitable that the interface between the Embankment and the underlying soil will be different and lower than the level that was derived from the Fugro investigations. If that deduction is correct, and the Tribunal considers that it is, then it would have been necessary for the Claimant to place material to compensate for that additional consolidation settlement. Although the Tribunal has not received evidence that would enable it to quantify the material that may have been placed at various locations where the Fugro investigations were conducted, in the period after those tests, it has received a considerable body of evidence that shows that the process of filling was ongoing.

659.   The Tribunal is therefore satisfied that, on the balance of probabilities, an additional volume of material would have been placed to accommodate the further settlement that is likely to have occurred after the Fugro investigations had taken place. The Tribunal, therefore, accepts Mr Shebl's assessment that 70,523 cubic meters were placed in respect of that estimated settlement. However, the Tribunal is not persuaded that the second allowance of 178,550 cubic meters should be made for future settlement that might occur after completion of construction. As the Tribunal understood it this involves two assumptions. The first is that after completion of construction of the Breakwater, further settlement of between 0.5m and 0.75m would occur at the core and 0.10 m. at the berms. The second assumption is that the Claimant made provision for this settlement, during construction by applying additional material to compensate for that future settlement. The Tribunal considers that neither of these assumptions has been supported by the evidence. Accordingly, the Tribunal finds that the measured volume of settlement should not include the allowance of 178,550 cubic meters for

---

[201] E/30 p.21
[202] C/1 p.76.   209 paragraphs 2.5.14 and 2.5.15.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

172

future settlement that might occur after completion of construction.

660. The Respondent's second criticism, that it is necessary to distinguish between material placed as a consequence of consolidation settlement and bulging, stems from its points that; (a) the Claimant should have expected some bulging and (b) that bulging was caused by the Claimant's method of working. For reasons given earlier in this Award the Tribunal (e.g. see 306 – 369, 324, 507.4 and 585) is not persuaded that the Claimant should have assumed that bulging would have been inevitable, or indeed likely. The Tribunal has also rejected the Respondent's case that bulging was caused by any failure on the part of the Claimant to adopt appropriate working methods.

661. The Respondent's third point, is that settlement could have been reduced by 10% by adopting different working methods. The Tribunal has already considered whether the consolidation settlement was caused by the failure of the Claimant to adopt appropriate working methods and has concluded that it was not. The Respondent's case that the Claimant could have reduced such settlement by 10% is therefore rejected. It follows that the volume of material claimed in relation to consolidation settlement does not fall to be reduced by that percentage.

(3)    Conclusions in relation to the volume of material claimed to be attributable to consolidation and settlement bulging

662. By email dated 24 December 2018, the Tribunal invited the parties' quantum experts to agree a table setting out the consequences of each party's case in relation to the adjustments that were to be made to the volume of material claimed to be referable to settlement and penetration.  In response to this request, Mr Wishart and Mr Kitt conferred and reached agreement on the contents of a table that show the various adjustments that are to be made in relation to the alternative cases that have been advanced.  A copy of the agreed table ("The Table"), dated 16 January 2019, was provided to the Tribunal under cover of an email from the parties dated 17 January 2019.  A copy of the Table is contained in **Appendix 7** to this Award. (The Parties' email of 17 January 2019 providing the Table stated, inter alia:

> *"Please see attached the table prepared jointly by the Parties' quantum experts in response to the Tribunal's request of 24 December 2018, in PDF and Excel format.*
>
> *As requested in the Tribunal's email of 11 January 2019, should the Tribunal not accept the Respondent's deductions, such deductions can be removed from the calculation by entering zero, or the appropriate quantity determined by the Tribunal, in the fields in Columns F, H J or L of the Excel version of the table."*

663. The Measured Settlement Volume that is claimed in relation to B.01 is 1,773,465 cubic

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

meters. The Tribunal has concluded that this claimed volume should be reduced to reflect the Tribunal's findings that; (1) the "expected settlement" is to be calculated by reference to the table contained in the Claimant's tender and (2) material that the Claimant alleges was placed to compensate for future settlement after completion of construction. The Table records agreement upon the following volumes for each of these matters:

663.1   205,811 cubic meters, in respect of "expected settlement"; and

663.2   178, 550 cubic meters, in respect of projected settlement.

The sum of these two volumes is 384,361 cubic meters. This sum must be deducted from the claimed volume of 1,773,465. The resulting volume of settlement for which the Claimant is entitled to be compensated is therefore 1,389,104 cubic meters.

664.   The Tribunal is satisfied that no other adjustment to the Measured Settlement Volume is appropriate.

(4)    <u>Additional costs Claimed to have been incurred by the Claimant as a consequence of the placing of the Measured Settlement Volume</u>

665.   The Parties are agreed on the following rates for the supply of the additional material:

665.1   Quarry run US$ 5.25 per tonne.

665.2   Fill material US$ 12.78 per tonne.

666.   The Parties have been unable to agree the rates for marine transportation and for placing. The differences that have arisen are dealt with below.

(a)    <u>The marine transportation rate</u>

667.   The Claimant claims a rate of US$24.20 per tonne for marine transportation. The Respondent contends that the correct valuation of that rate is US$16.76.[203] The difference between the two valuations that has arisen exists because Mr Wishart and Mr Kitt differ as to the elements that are to be included in the rate. There is also a related dispute as to which items the marine rate is applicable.

668.   Mr Wishart considers that the rate should comprise the following elements:

[203] See First Joint Statement of the Quantum Experts, issue 2.

174

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

668.1  Charter

668.2  Freight

668.3  Consumables

668.4  Clearance

668.5  Surveys

668.6  Owned Barges

669.  The Claimant contends that the marine transport rate is applicable to the cost of imported Di transition layer, quarry run and rock armour.[204]

670.  Mr Kitt considers that the rate for transportation should be derived from the agreement with MCC and accordingly only allows item (2) in the previous paragraph.  While he agrees that the costs, that he has excluded from the rate, were incurred by the Claimant, he considers that they should be disallowed for the purpose of the valuation.  His reason for excluding those costs is that he has not seen evidence that shows that the costs were incurred as a result of the Unforeseeable ground conditions.    The Respondent also contends that the marine transportation rate only applies to quarry run because, it contends, the other materials were imported by land.[205]

671.  The Tribunal is not persuaded by Mr Kitt's evidence that the valuation of the marine transport rate should be confined to the item for freight.  Mr Kitt accepted that Clause 6 of the Freight Agreement excluded a range of matters, which are typical costs that would generally be charged as an addition to the price for freight. He also accepted that the freight rate would be higher it these items were included.  In relation to demurrage, Mr Kitt accepted that the shipping invoices included claims for such charges and that invoices showing demurrage were paid.   His point was that it was possible that the transport vessels may have been delayed for reasons other than the Unforeseeable ground conditions.   That point would have been a good one if there was evidence that showed that demurrage may have been incurred for reasons that were not connected with Unforeseeable conditions.    However, the Respondent has not directed the Tribunal to any such evidence and it did not suggest, in cross-examination of any of the Claimant's witnesses that demurrage costs were incurred by reason of matters that were the Claimant's contractual responsibility.

672.  Therefore, the Tribunal accepts Mr Wishart's evidence that the marine transportation rate of US$24.20 is appropriate.

---

Dr Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

[204] Claimant Post-Hearing Submissions paragraph 143.
[205] Respondent Post-Hearing Submissions paragraph 340.

175

673. The Respondent's case that the marine transportation rate should only be applied to quarry run materials is rejected.

(b) The Placing Rates

674. There is a dispute between the Parties in relation to the rate for placing of; (1) core material (D2) in the onshore Breakwater between Ch. 3,900 and Ch. 8,205 and (2) quarry run in the offshore part of the Breakwater and D2 fill in the Staging Pier.

675. In relation to the placing rate for core material for the onshore section of the Breakwater the Claimant contends for a rate of US$3.66 per cubic meter and the Respondent contends for a rate of US$2.65 per cubic meter. In relation to the placing of the quarry run and the placing of D2 fill in the staging pier the Claimant contends for a placing rate of US$11.62 per cubic meter and the Respondent contends for US$8.79 per cubic meter.

676. The main difference between the quantum experts arises from the differing approaches they adopt in relation to the valuation of plant and equipment.

677. In summary, Mr Wishart adopts, as part of his valuation of the placing costs, an allowance for depreciation/owning costs in respect of plant and equipment. The sum that he supports is based on a review of documentation provided by the Claimant that identifies that these costs have been allocated by the Claimant. Mr Kitt considers that such an approach is flawed and should be rejected because there is no evidence of the date and cost purchase of the plant and equipment for which an allowance for depreciation is claimed. He says that, having discussed the matter with Mr Shebl, the depreciation figures proceed on the basis of amounts "charged" to the project by either the Claimant's Fixed Asset Department or the Claimant's Central Facility Yard ("ARCO C.F.Y.") in Ras al Khaimah UAE.[206] He also makes the point that he has not seen any evidence of the Claimant's depreciation policy and has not been provided with details of the basis of the calculation of the monthly amounts for depreciation. Mr Kitt has a separate concern, which is that it is inappropriate to combine the total monthly costs of land and marine based equipment and divide the resulting amount by the total volume of material placed because issues that affected the placing of material onshore may distort the rate derived.[207]

678. As a result of his concerns Mr Kitt has determined, what he considers to be, the following

D/5 p.2735 paragraph 6.2.20.
D/5 p.2719 paragraph 4.2.35.

176

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

reasonable rates:

678.1    The tender rate of US$8.79 per cubic meter, for the placing of quarry run and D2 fill in the offshore section of the Breakwater and the placing of fill material in the staging platform;

678.2    a rate of US$2.65 per cubic meter, for placing fill material on the onshore part of the Breakwater.[208]

679.    The Tribunal accepts that the use of plant and equipment involves a cost, either in terms of a hire cost, maintenance cost or replacement. When plant is owned, contractors would normally expect to recoup the cost of purchasing the plant by writing off the cost of purchase over a number of years; that number, normally being dictated by the estimated useful life of the relevant plant. Practice varies as to the method by which depreciation allowances are recovered. Sometimes depreciation is built into the rates for particular work and, on others, it is treated as a part of the overheads of a company. In some instances the recovery is achieved by a blend of the two.

680.    The Tribunal has great sympathy for the concerns expressed by Mr Kitt because there is no basis for knowing whether the costs that have been allocated by the Claimant to depreciation (or to the costs of ownership) have in fact been incurred. The Tribunal has received no direct evidence from the Claimant as to how the costs have been derived. Mr Wishart has not been instructed to investigate the basis of the allocations, or to consider whether the allowances are reasonable. His evidence goes no further than to confirm that the records support the claimed figures. Mr Kitt's conversation with Mr Shebl suggests that the sums claimed are not true costs, in the sense of hire costs, but are instead costs that have been allocated on, what would appear to the Tribunal to be, a notional basis. Whether the allocation is reasonable is not something that the Tribunal can assess because it has not been provided with any evidence that would enable it to make that assessment.

681.    The Tribunal therefore rejects Mr Wishart's rates for the placing of material and adopts Mr Kitt's approach, and his rates of US$ 8.79 per cubic meter for the placing of D2 and quarry run material offshore and US$ 2.65 per cubic meter for the placing of D2 fill material onshore.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[208] Respondent's Post-Hearing Submissions paragraph 343.

Conclusions in relation to the valuation of the additional volume of material placed as a consequence of settlement and penetration

Drawing the threads together, the Tribunal decides that the additional volume of material for which the Claimant is entitled to be compensated is 1,389,104 cubic meters. The Table that has been agreed between the quantum experts enables the Tribunal to calculate how that volume is to be allocated to the various components of claim B.01. That allocation is as follows:

| | | |
|---|---|---|
| B.01.1 | Quarry Run (Ch.3,900 –RH EB-01a, 2a) | 859,530 cubic meters |
| B.01.2 | Core Material (Ch. 3,900-Ch 8205) | 406,729 cubic meters |
| B.01.3 | Fill Material Staging Platform. | 122,845 cubic meters |
| B.01.4 | Placing of Quarry Run (as B.01.1) | 859,530 cubic meters |
| B.01.5 | Placing of Core Material (as B.01.2) | 406,729 cubic meters |
| B.01.6 | Placing of Fill Material for Staging Platform | 122,845 cubic meters |

683. The Claimant is entitled to be compensated for the placing of the additional material at the following rates:

683.1 Supply of Quarry Run. US$5.25 per tonne (agreed rate).

683.2 Supply of Fill Material. US$12.78 per tonne (agree rate).

683.3 Transportation. US$24.20 per cubic meter.

683.4 Placing of D2 and Quarry Run material offshore, US$8.79 per cubic meter.

683.5 Placing of D2 Material onshore, US$2.65 per cubic meter.

684. Applying these rates to the additional volume of material for which the Claimant is entitled to be compensated, the Tribunal decides that the Claimant is entitled to be paid US$ 57,491,157. That sum is calculated as follows:

| | | |
|---|---|---|
| B.01.1 | Quarry Run: | US$41,764,562 |
| | (859,530 cubic meters at US$48.59 per cubic meter.[209]) | |
| B.01.2 | Core Material: | US$ 5,197,996 |
| | (406,729 cubic meters at US$12.78) | |
| B.01.3 | Fill Material Staging Platform: | US$ 1,569,959 |
| | (122,845 cubic meters at US$12.78) | |
| B.01.4 | Placing of Quarry Run Material: | US$ 7555,269 |

[209] A unit rate of US$5.25 for supply plus US$24.20 for transport and applying a conversion factor of the agreed rate per tonne to cubic meters.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq

|  | | (859,530 cubic meters at US$8.79) | |
| B.01.5 | | Placing of Material: | US$ 1,077,832 |
|  | | (406,729 cubic meters at US$2.65) | |
| B.01.6 | | Placing Fill Material Staging Platform: | US$ 325,539 |
|  | | (122,845 cubic meters at US$2.65) | |

### Claim B.02 Collapses

685.    The Claimant's claim in relation to collapses is for US$ 14,229,444 and comprises the
following six elements:

685.1    B.02.1 Additional Quarry Run

685.2    B.02.2 Additional Armour Rock

685.3    B.02.3 Re-construction of missing Quarry Run

685.4    B.02.4 Trimming of Quarry Run

685.5    B.02.5 Removal and Reinstating of Disturbed Armour Rock

685.6    B.02.6 Re-constructing missing Armour Rock.[210]

686.    Claim B.02 concerns the quantification of the claim for the collapses that occurred between
Ch 310 and Ch. 510 and Ch 2530 and Ch. 3700 in the period between 19 February 2015 and
28 December 2015.  The volume of material that is claimed by the Claimant to have been
placed as a result of collapses is summarized in Table 5.1 of Mr Wishart's first report.[211]

687.    The Respondent's primary case is that the Claimant could have avoided the collapses that
occurred by adopting a method of working that incorporated greater waiting periods between
the placing of layers.  The Tribunal has rejected that case for reasons that are given earlier at
paragraph 541 in this Award.

688.    The Respondent's quantum expert, Mr Kitt has investigated the quantities of additional
material that are claimed to have been placed by the Claimant as a result of the collapses and
is satisfied that the claimed quantities reasonably reflect the extent of the work that was
performed.[212]

689.    The Tribunal considers that the quantities of materials, claimed to have been placed as a
consequence of the collapses, have been established by the Claimant.  Those quantities, which

---

[210] Claimant's Post-Hearing Submissions paragraphs 338 to 339.
[211] D/3 p.1293.
[212] Mr Kitt's Second Report paragraphs 5.3.7 to 5.3.9.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

179

are summarized in Table 5.1 of Mr Wishart's first report,[213] are to be adopted for the purpose of the quantification of the claim.

690. The issues that divide the quantum experts concern the applicable rates for transportation and placing of those materials. The issues are precisely the same as those which the Tribunal has determined in the previous section of this Award (e.g. see paragraphs 635–685). Accordingly, the findings that the Tribunal has made as to the applicable rates for transportation and placing of materials apply to the quantification of the claim for collapses. In relation to the rate for placing Rock Armour the Tribunal adopts Mr Kitt's adjusted rate of US$4.02.[214]

691. Accordingly the Claimant is entitled to be paid the sum of US$ 12,884,996 in relation to collapses. That sum is calculated in the following way:

691.1    B.02.1  Additional Quarry Run.  US$ 8,485,758
174,640 cubic meters at US$ 48.59 per cubic meter.[215]

691.2    B.02.2 Additional Armour Rock.  US$ 2,127,318
43,781 cubic meters at US$48.59 per cubic meter.

691.3    B.02.3 Re-Constructing of Missing Quarry Run.  US$ 1,535,086.
174,640 cubic meters at US$8.79 per cubic meter.

691.4    B.02.4 Trimming of Quarry Run.  (Included above, as noted in Mr Wishart's report)

691.5    B.02.5 Removal and Reinstating of Disturbed Rock Armour.  US$ 351,999.
87,562 cubic meters at US$4.02 per cubic meter.

691.6    B.02.6 Re-Constructing Missing Rock Armour.  US$ 384,835.
43,781 cubic meters at US$8.79 per cubic meter.

(3)    Adjustment in placing costs for net quantities

692. The Claimant claims US$546,573 by of an adjustment. The Claimant contends that the average rates for placing additional materials were calculated on the basis of gross (loose)

[213] D/3 p.1293.
[214] D/5 p.2724 paragraph 4.3.15.
[215] A unit rate of US$5.25 for supply plus US$ 24.20 and applying a conversion factor of 1.65 for cubic meters.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

180

volumes whereas the claim calculations were valued as net quantities derived from measurement. The Claimant contends that this difference in approach results in an under-recovery of cost.

693. The claim is said to be a function of the quantities of material that are the subject of the claim and the methodology for deriving those quantities is explained in Table 5.11 of Mr Wishart's first report.[216]

694. The Respondent invites the Tribunal to dismiss the claim. It contends that the claim is not clear. It also contends that there is no evidence to support the factors of 3%, 5% and 7% that have been adopted by Mr Wishart in Table 5.11.[217]

695. The Tribunal is not persuaded that the Claimant is entitled to the sum claimed. The Tribunal agrees with the Respondent that the claim has not been explained and that no evidence has been given that seeks to explain, or justify, the percentages that have been used by Mr Wishart to arrive at the alleged conversion factors. The Tribunal does not accept the point made in the Claimant's Reply Submissions, that the Statement of Claim and Mr Wishart's report constitutes sufficient evidence to establish the claim.

696. Accordingly, the claim for US$546,573 is denied.

(4) Claim for the costs of additional site investigations by Andrea Lab and Fugro

697. The Claimant claims US$335,801 in respect of costs that it incurred in employing Andrea Lab and Fugro to undertake the additional site investigations to determine the interface levels between the Breakwater and the underlying soil.

698. The Respondent agrees that the sum has been incurred by the Claimant but contends that it should be rejected by the Tribunal for the following three reasons:

698.1 The Claimant has not alleged any basis for recovery;

698.2 The costs of site investigations constitute an indirect or consequential loss and, as such are excluded by GC Sub-Clause 17.6;

698.3 The costs are not a Cost, due to the Unforeseeable conditions, under GC Sub-Clause

---

[216] D/3 p.1316.
[217] Respondent's Post-Hearing Submissions paragraphs 350 to 355.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

181

4.12. The investigation costs were not incurred to better understand the soil conditions for design and construction purposes but in order to enable the Claimant to quantify the claim.[218]

The Respondent's criticisms of this claim have not been directly addressed by the Claimant in its Post-Hearing Submissions or its Reply Submissions. The Tribunal does not accept the general point made by the Claimant in its Reply Submissions[219] that because the Tribunal gave the Claimant permission to advance the claim it is taken to have decided that the loss was, in principle, a Cost that was incurred as a result of the Unforeseeable conditions. The Tribunal confirms that it did not decide that the sum was, in principle, recoverable under GC Sub-Clause 4.12.

700. The Tribunal considers that the Claimant has failed to establish that it is entitled to recover the costs that are claimed under this head. The Tribunal is satisfied that the costs were incurred in order to obtain evidence that would assist the Claimant in establishing its claim against the Respondent. In order to be recoverable under GC Sub-Clause 4.12 the costs must have been incurred as a consequence of the Unforeseeable physical conditions. That is because the Sub-Clause describes the Costs that are recoverable as Costs "due to these conditions." As the costs were incurred for the purpose of establishing the claim they were not, in the Tribunal's opinion, costs that were due to the Unforeseeable conditions.

701. If the Engineer had directed the Claimant to retain Fugro and Andrea Lab to undertake the further investigations in order to gain a better understanding of the ground conditions the Claimant would have had a strong case for saying that the costs were recoverable under GC Sub-Clause 4.12. However, not only was no such instruction given but at he time the Engineer adopted the position that the investigations were not necessary or appropriate.

702. The Tribunal therefore denies the claim for US$335,801.

## Summary of Decisions in relation to Delay Event No. 3

703. The Tribunal's decisions are as follows:

703.1 The Claimant did encounter physical conditions that were Unforeseeable within the meaning of GC Sub-Clause 4.12.

---

[218] Respondent's Pre-Hearing Submissions paragraphs 224 to 230 and Post-Hearing Submissions paragraphs 356 to 361.
[219] Paragraph 150.

182

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

703.2    An experienced contractor, at the date of tender, would have foreseen that the soil in the alignment of the Breakwater was over-consolidated.

703.3    An experienced contractor, at the date of tender, would not have foreseen that the soil in the alignment of the Breakwater was normally consolidated.

703.4    The Respondent's case that the Claimant should have conducted further geotechnical investigations at the detailed design stage is denied.

703.5    The Respondent's case that the Claimant's detailed design was not sufficiently cautious is denied.

703.6    The Respondent's case that the Claimant adopted inappropriate working methods is denied.

703.7    The Claimant is entitled to recover the Cost that was caused by the Unforeseeable physical conditions, pursuant to GC Sub-Clause 4.12.

703.8    The Claimant is also entitled to an extension of time for the delay caused by the Unforeseeable physical conditions pursuant to GC Sub-Clause 4.12.

703.9    The Claimant is not barred from pursuing its claim under GC Sub-Clause 4.12 by reason of an alleged failure to comply with the notice requirements of that Sub-Clause.

703.10   The Claimant's claim under GC Sub-Clause 1.9 is denied.

703.11   The Claimant's claim under Articles 146(2) and 878 of the Iraqi Civil Code is denied.

703.12   The Claimant is entitled to be paid US$57,491,157 in respect of additional quantities of material placed because of the Unforeseeable settlement and penetration that occurred (Claim B.01).

703.13   The Claimant is entitled to be paid US$12,884,996 in respect of collapses (Claim B.02).

703.14   The Claimant's claim for wastage and loss of net quantities is denied (Claim B.03).

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.

183

703.15  The Claimant's claim for the costs of additional site investigations is denied (Claim B.04).

## The Claimant's Claim for an Extension of Time

### Introduction

704.  The Claimant claims an extension of time in relation to each of the Delay Events.  On its primary case, an extension of time of 1072 days (alternatively 1,049 days) is claimed.  (The Claimant does not seek a full extension of time.  The total delay is 1,092 days.  That period of 1,072 days is allocated to the Delay Events in the following way:

704.1  Delay Event No. 2:      76 days.

704.2  Delay Event No. 3:      992 days (primary case) alternatively at least 968 days.

704.3  Delay Event No. 8:      4 days.

705.  Having regard to the Tribunal's decision that Delay Events 2 and 8 (as to which see above in respect of those Delay Events)  should be denied, the only claim for an extension of time that remains relevant relates to Delay Event 3.

706.  The Respondent's primary case is that the Claimant is not entitled to any extension of time in relation to Delay Event 3 because the soil conditions were not Unforeseeable.[220]  Its first alternative case is that much of the delay could have been avoided by the adoption of alternative working methods.[221]  Its second alternative case is that the claim for an extension of time is founded upon an analysis of delay that is fundamentally flawed and has the effect of greatly over-stating the consequences of the Unforeseeable soil conditions.  The Respondent's invite the Tribunal to reject the Claimant's analysis and adopt the analysis of delay that is put forward by its own expert.[222]  If that analysis is accepted, the Claimant should be awarded a very significantly smaller extension of time.

707.  The Tribunal has not accepted the Respondent's case that the ground conditions were foreseeable (see paragraph 496 et seq. above).  The Tribunal has also declined to accept the Respondent's alternative case that if the ground conditions were Unforeseeable, the Claimant could have avoided, or greatly reduced the impact of the  those conditions by adopting a more conservative design or alternative working methods (see paragraphs 541 and 575.9 above).

---

[220] Respondent's Post-Hearing Submissions paragraphs 244 and 245.
[221] Respondent's Post-Hearing Submissions paragraphs 246 and 251 to 252.
[222] Respondent's Post-Hearing Submissions paragraphs 250 and 480 to 511.

84

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

708.    Accordingly, the main question that arises for decision by the Tribunal is to quantify the delay that was caused by Delay Event 3.  In order to perform that task the Tribunal must evaluate the evidence given by the Programming experts in respect of each party's case.

## The Evidence of the Programming Experts

709.    The Claimant relied upon the evidence of Mr Robert Palles-Clark.  He is currently a Director of Blackrock Expert Services Limited and has approximately 32 years of experience in the construction industry.   For much of that period his work has involved forensic delay analysis.

710.    Mr Palles-Clark provided two expert reports[223] and gave evidence to the Tribunal on Days 6 and 7.  At the beginning of his evidence on Day 6, Mr Palles-Clark made a presentation to the Tribunal.

711.    The Respondent relied upon the evidence of Mr Lee Cookson.  He is a partner of Arcadis and, since 1998, has developed an expertise in the analysis of delay on construction projects.

712.    Mr Cookson provided two expert reports[224] and gave evidence to the Tribunal on Day 7.  At the beginning of his evidence he made a presentation to the Tribunal.

713.    Mr Palles-Clark and Mr Cookson also provided a Joint Statement, dated 3 July 2018, which helpfully summarized matters that were and were not agreed.[225]

714.    Mr Palles-Clark and Mr Cookson gave their evidence with great care and the Tribunal is entirely satisfied that each did their best to assist the Tribunal.

(1)    The expert's methodology

715.    The programming experts agree that an As-Planned versus As-Built Windows delay analysis is the most suitable method for analysing delay on the Project.  The experts have also agreed that such a method involves various steps, one of which requires comparing activities as they occur against an appropriate baseline programme.[226]

716.    The main reason why the programming experts had reached very different conclusions as to the causes of delay, and the points in time when delay was said, by each of them, to have

---

[223]  D/2 Tab 19 and D/2 Tab 29.
[224]  D/2 Tab 32 and D/2 Tab 35.
[225]  D/2 Tabs 36, 36A and 36B.
        Expert Joint Statement paragraphs 11 and 12.  (D/2 p.1232.5).

Dr. Robert Gaitskell QC
        President
    ICC Case No. 21785/ZF                    185
Archirodon Construction (Overseas)
    Company S.A. (Panama)
        v.
General  Company for Ports of Iraq (Iraq)

occurred arises because of the different baselines that they have used to analyse delay.[227]  The differences that arise, principally by reason of this important disagreement, are apparent from the Schedule attached to the Joint Statement.[228]

717.  Mr Palles-Clark and Mr Cookson agree that the initial baseline programme FPBS issued on 13 January 2013 (with a data date of 22 November 2012) is appropriate to be used initially in the delay analysis.  Mr Palles-Clark has used this programme for his delay calculations until March 2013 (Window 1 and Window 2 of his analysis).  Although paragraph 25 of the Joint Statement records agreement that Mr Cookson had used the FPBS programme for his delay calculations up to March 2013, he explained in cross-examination that this was not entirely accurate.  He explained that he had used the FPBS programme to quantify delay up until the point in time when programme RS02 was issued.[229]

718.  The programming experts also agree that the FPBS programme is not an appropriate baseline against which to quantify delay after March 2013 (in the case of Mr Palles-Clark) and after the issue of RS02 (in the case of Mr Cookson).[230]  The experts agree that there were several significant changes to the assumptions made in FPBS that occurred and that led to changes of sequence that need to be taken into account. The principal change was in the sequence of works.  Programme FPBS reflected the original planned sequence that involved parallel onshore and offshore working fronts.  This sequence was changed to one which involved completing the onshore works up until Ch. 3,900 after which the Claimant would advance the offshore works.  However, the experts differ as to how these changes are to be reflected in the baseline programme that is to be used to measure delay.   In relation to the period after March 2013, Mr Palles-Clark uses a version of the FPBS programme that he has re-sequenced.   A copy of that adjusted programme is contained in Appendix 4 of his first report.  However, in relation to the period after its issue in December 2013, Mr Cookson has used, an adjusted version of, the RS02 programme, which takes account of the 61 day delay that occurred as a result of the late receipt of the advanced payment, the changes to sequence that had occurred and the implementation of 7 day working.  Mr Cookson uses programme RS02 as a baseline primarily because it was the programme that was used by the Claimant to plan and monitor the works.[231]

719.  The Claimant contends that, in relation to this important difference, the Tribunal should adopt

[227] Expert Joint Statement paragraph 6 (D/2 p.1232.3)
[228] D/2 Tab 36B.
[229] Transcript Day 6, p.127 line 13 to p.128 line 19.
[230] Joint Statement paragraph 26 (D/2 p.1232.8).
[231] Joint Statement paragraphs 26 to 28. (D/2 p.1232.8 to 1232.9)

186

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

Mr Palles-Clark's adjusted baseline programme and to reject Mr Cookson's programme.[232] The Respondent contends that the Tribunal should accept Mr Cookson's baseline programme and reject Mr Palles-Clark's adjusted programme.[233]

720.    The Tribunal has carefully considered all of the evidence given by the programming experts in relation to the baseline issue and, having done so, is not persuaded that it should accept Mr Palles Clark's adjusted baseline programme for the purpose of quantifying delay. The Tribunal has reached this conclusion for the following reasons.

721.    First, programme RS02 showed how the Claimant actually intended to carry out the work from its data date of 28 December 2013. Mr Shebl gave evidence that RS02 showed the logic that the Claimant was applying in the performance of the work.[234] The Tribunal agrees with Mr Cookson that any baseline should use a programme that reflects how the Claimant planned to perform the works.

722.    Second, programme RS02 was a much more detailed programme than its predecessor and included almost twice as many activities. Mr Shebl explained that the reason why this was so was that the design of the Breakwater was nearly fully developed by January 2014.[235]

723.    Third, and as Mr Cookson explained, programme RS02 accounted for the status of work at 28 December 2013 and showed completion within the Time for Completion of 7 August 2014. That date reflected the extension of time that had been awarded by the Engineer to reflect the 61 day delay that had occurred as a result of the Respondent's failure to make the Advance Payment on time. The Tribunal considers that any baseline programme that is used to evaluated delay after December 2013 should reflect and be consistent with the Time for Completion. The Tribunal is not persuaded that it makes any sense to monitor delay by reference to a Time for Completion that is no longer applicable.

724.    Fourth, Mr Palles-Clark's baseline programme does not include the complete scope of construction activities that were to be performed; as noted in paragraph 3.24 to 3.26 of Mr Cookson's reply report.[236]

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

---

[232] Claimant's Post-Hearing Submissions paragraphs 34 to 49.
[233] Respondent's Post-Hearing Submissions paragraphs 250 and 480 to 488.
[234] Shebl (1) paragraph 357.
[235] Shebl (1) paragraph 357.
[236] D/2 p.1140.

225.  Fifth, and as Mr Cookson explains in his reply report,[237] Mr Palles-Clark's baseline programme produces delay calculations that bear little resemblance to the actual delays that were being reported by the Claimant during the Project.

226.  The Tribunal concludes that it prefers Mr Cookson's baseline programmes for evaluating progress and deriving critical delay.

### The application of the methodology and the assessment of delay

227.  The experts have analysed delay by reference to six windows or time slices.  Although the dates for the commencement and conclusion of each window that have been used by each expert are slightly different, those differences are marginal and do not affect the conclusions that are to be drawn about the causes of delay and their effect.

228.  Because the Tribunal has dismissed the Claimant's claims in relation to Delay Events 2 and 8 it is only necessary to assess the delay that was caused by Delay Event 3.

### Time period 1 (Palles-Clark; 8 December 2012 to 19 March 2014/Cookson; 8 December 2012 to 22 March 2014)

229.  The total period of delay attributed to this period by Mr Palles-Clark is 242 days.  Mr Cookson's period of delay is 75 days.  The experts are agreed that the reason for the difference is the use of different baseline programmes. In relation to Delay Event 3 Mr Palles-Clark considers that the Claimant was delayed by 112 days in the period between 28 May 2013 and 19 March 2014 as a result of the placing of additional quantities.  Mr Cookson considers that there was no delay in the period up to December 2013 but in relation to the period between 29 December 2013 and 22 March 2014, 40 days of delay were caused as a result of the placing of additional quantities.

230.  The Parties are agreed that one of the key reasons for this difference relates to the methodology for calculating the delay arising out of the Claimant having to place additional quantities.[238]   The Claimant contends that Mr Palles-Clark has identified the volume of additional materials placed and applied an average placement rate to determine the delay caused.[239] The Respondent is critical of Mr Palles-Clark's approach for several reasons and it contends that it results in an inflated and artificial period of delay.[240]

D/2 p.1141.
Respondent's Reply Submissions paragraph 207.
Claimant's Post-Hearing Submissions paragraph 250.
Respondent's Reply Submissions paragraphs 208 to 211.

188

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

731.	The Tribunal is not persuaded by Mr Palles-Clark's methodology for the quantification of delay. First, it attributes delay to the offshore works in the period before December 2013. However, the evidence clearly showed that the offshore work had barely commenced before that date. Second, the calculation used by Mr Palles-Clark to quantify delay is, as the Respondent correctly explains in its submissions, highly sensitive to the placing rate that he has used. Third, Mr Palles-Clark has used at least three different methods and two different baselines to calculate the delay caused by the placing of additional quantities but has not satisfactorily explained why he has done so. Fourth, the planned durations that he has used in his adjusted baseline are considerably shorter than those that were planned in the FPBS programme used by the Parties prior to December 2013. The Tribunal therefore accepts the Respondent's submission that the measurement of actual placement rates against theoretical placement rates produces a theoretical delay.[241]

732.	The Tribunal prefers Mr Cookson's approach which is based on the Claimant's planned rate of productivity.[242] The Tribunal accepts his assessment of 40 days delay in Window 1.

Time Period 2 (Mr Palles-Clark; 20 March 2014 to May 2014

Mr Cookson; 23 March 2014 to 17 June 2014)

733.	Mr Palles-Clark concludes that in this period 18 days delay occurred. He identifies the cause of the delay as the delayed mobilization of the Rotra V barge[243]. Mr Cookson is of the opinion that a delay of 43 days occurred in window 2 and allocates the delay between (a) a delay of 33 days for the late mobilization of the Rotra V barge and (b) a delay of 10 days caused by the need to place additional quantities of quarry run material in Stretch 2.

734.	The Claimant contends that the delay to the mobilization of the Rotra V barge was caused by Delay Event 3. First, because it is said that the installation of the barge was delayed as a result of the soil conditions. Second, because it is said that the Rotra V barge was only required because of the Unforeseeable conditions.[244] The Respondent disputes both of these propositions.[245]

735.	The Tribunal considers that the primary issue that arises in Window 2 is whether the delay in the mobilization of the Rotra V barge can properly be said to be a consequence of Delay Event 3. The Tribunal has reached the conclusion that it cannot for the following two

---

[241] Respondent's Reply Submissions paragraph 209.
[242] Cookson's first report paragraph 7.47 (D/2 p.1065).
[243] In cross-examination he confirmed that, contrary to the impression conveyed by the Joint Statement, he did not attribute any delay to additional quantities. Transcript Day 7, p.53 lines 4 to 21.
[244] Claimant's Post-Hearing Submissions paragraphs 259 to 263.
[245] Respondent's Reply Submissions paragraphs 212 to 213.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

189

reasons:

735.1    The Claimant's submission that the Rotra V barge was only required because of Delay Event 3 is not sustainable in the light of the facts that have been agreed between the Parties. The Claimant proposed the use of the Rotra V barge under cover of an email dated 17 November 2013, as an alternative to the jetties that had previously planned. This proposal was made several weeks before the Claimant had reason to suppose that the ground conditions were not as had been previously assumed. As noted earlier in this Award at paragraphs 305–368, 324, 507.4 and 585, the Claimant had no reason to know that the soil conditions were normally consolidated until the reports on the Trial Embankment had become available at the end of January 2014. The Tribunal appreciates that the Claimant relies upon the evidence of Mr Shebl to support its case that the Rotra V barge was only required as a result of the unforeseeable ground conditions.[246] However, the Tribunal considers that Mr Shebl's recollection must be mistaken because the proposal was made at time when the Claimant still believed that the ground conditions were normally consolidated.

735.2    The Claimant's submission that the installation of the Rotra V was delayed by the Unforeseeable ground conditions is not accepted. Apart from the evidence given by Mr Shebl that problems were encountered in the installation of the Rotra as a result of the soil conditions and settlement,[247] there is no other contemporary evidence that provides any support for that submission. In any event the Tribunal considers that Mr Shebl's evidence is not a sound basis for the Claimant's submission that the problems with the Rotra were caused by the Unforeseeable conditions. In the first place Mr Shebl's evidence was very general and referred to the fact that the installation works were sensitive to the soil and "there was some settlement". The Tribunal could not possible conclude from that evidence that the problems were the result of the soil being normally consolidated. Such settlement may equally have occurred if the soil had been over-consolidated as had been assumed by the Claimant. The second difficulty is that Mr Shebl gave evidence that the installation was delayed by bad weather conditions. These conditions are not the result of Delay Event 3 and the Tribunal does not accept the Claimant's submission that delays caused as a result of weather can be disregarded because the incidence of bad weather was otherwise allowed for.

Claimant's Post-Hearing Submissions paragraph 261.
Claimant's Post-Hearing Submissions paragraph 259.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

736.    The Tribunal accepts Mr Cookson's assessment of 10 days delay in respect of Delay Event 3, which he attributes to additional quantities of quarry run placed in the area known as Stretch 2 in Windows 2.

Time Period 3 (Mr Palles-Clark; 23 May 2014 to 14 September 2014
Mr Cookson; 18 June 2014 to 20 September 2014)

737.    Mr Palles-Clark allocates 28 days to Delay Event 3 and identifies the cause of that delay to the placing of additional quantities. Mr Cookson allocates 37 days to Delay Event 3 which he also attributes to the placing of additional quantities. In the Joint Statement, he explains that he has applied a percentage increase to the Claimant's total budgeted quantities and the total quantities to arrive at the period of delay. Mr Cookson says that although this results in a slightly higher figure than Mr Palles-Clark he does not consider his assessment unreasonable.

738.    The Tribunal accepts Mr Cookson's evidence and finds that the Claimant was delayed by 37 days as a result of Delay Event 3 in Time Period 3.

Time Period 4 (Mr Palles-Clark; 15 September 2014 to 28 December 2015
Mr Cookson; 21 September 2014 to 28 December 2015)

739.    The total period of delay in this Time Period is said by Mr Palles-Clark to be 305 days, of which he allocates 295 days to Delay Event 3. He split this period between additional quantities (91 days), collapse rectification (155 days) and the introduction of waiting times (49 days). Mr Cookson assesses a total period of delay of 379 days in this Time Period. He allocates only 56 days delay to Delay Event 3 and identifies the cause to be delay caused by collapse rectification.

740.    The main difference that divides the experts concerns a disagreement about the critical path of the Project between September 2014 and April 2015. Mr Palles-Clark considers that the critical path ran through the completion of the Breakwater to allow the Claimant to use trucks to deliver material to the Staging Platform and use land based equipment to place material and form the revetments. Mr Cookson takes a different position and contends that the critical path ran through the placing of fill material in the staging platform. In essence he contends that the staging platform could have been, and fact was, progressed using marine equipment and did not require access by land based equipment from the main Breakwater. The difference between the experts is described in detail in paragraphs 100 to 153 of the Joint Statement.[248]

Dr. Robert Gaitskell QC
D/2 pp. 1232.40 to 1232.59.
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

191

141. A great deal of evidence was deployed in relation to this issue and the matter was canvassed in detail in the cross-examination of the experts. Having considered that evidence the Tribunal is not persuaded that Mr Cookson is correct in his conclusion that completion of the main axis of the Breakwater was irrelevant to the progress and completion of the Staging Platform. He is of course correct to say that the Staging Platform could have been progressed independently and indeed there is evidence that demonstrates that materials were transported by marine equipment to that area. However, Mr Cookson accepted in cross-examination that the Claimant intended to place approximately 80% of the materials for the Staging Platform using land-based equipment.[249] He also accepted that the most efficient way of transporting the material to the Staging Platform was by means of land-based equipment along the Breakwater.[250] In the light of this evidence the Tribunal is unable to accept Mr Cookson's evidence that the completion of the Breakwater was not critical to the completion of the Staging Platform.

142. Equally however, the Tribunal is not persuaded by Mr Palles-Clark's evidence that effectively ignores the progress that was, and could have been, made using marine equipment. Therefore the Tribunal is not prepared to accept the full period of 91 days delay that is attributed to Delay Event 3a in this Time Period. Taking all the circumstances into account the Tribunal finds that Delay Event 3 (a) caused a delay of 41 days.

143. The second component of the claim for an extension of time in this Time Period is for 155 days delay in relation to Delay Event 3b, which relates to collapse rectification. As to this Mr Cookson assesses 56 days delay.

144. Mr Palles-Clark's written evidence, in relation to the two largest components of Delay Event 3b, was explored in cross-examination. In relation to the first period of 69 days he said that the period corresponds to the totality of the period between 19 February and 28 April 2015. He accepted that the inference from this was that no work was carried out in that period which he agreed was not true.[251] He said that the quantification of delay was difficult because there were a lot of collapses, and had that not occurred, there would have been a higher rate of production but accepted that the records showed that during this period work only stopped on 16 days.[252] There was then the following exchange:

---

Transcript Day 7, p.167 lines 6 to 20.
Transcript Day 7, p.168 line 8 and page 169 line 17
Transcript Day 7, p.69 lines 4 to 21.
Transcript Day 7, p.70 lines 2 to 10.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

"A.    Well that's one measure of delay. And obviously that's the low hanging fruit, if you like, in terms of you can clearly identify a stop period, which would be the----bottom of the range of the estimate and I accept. But then there is the -- we don't know is the extent of the work involved in repairing the quarry run and the extent to which the works were interrupted.

Q.    Well, when you don't know, wouldn't it have been a more sort of immediately apparent solution to say; well somewhere between 16 and 53 make it 30?

A.    That I accept, would have been a better way of putting it, yes."

745.    In relation to the delay of 32 days, which related to the period between 29 April and 3 July 2015, Mr Palles-Clark accepted that some progress would have been made but said that it was difficult for him to judge how much. The following exchange is relevant:

"Q.    .....I guess the difficulty I have with this is that, as we saw for the previous provision that there seems to --- there seems to have been a tendency on your part to err on the higher side and to say: well---because, basically you allocated the entire delay to those delay events, even though you say yourself that some progress could have been made, even though it is difficult to say how much.

A.    I think, in relation to this delay the same criticism is a fair one."

746.    In the light of the evidence given by Mr Palles Clark in cross-examination in relation to Delay Event 3a, the Tribunal considers that his assessments do not provide a sound basis for assessing delay in relation to that event. The Tribunal therefore adopts Mr Cookson's assessment of 56 days.

747.    Mr Palles-Clark allocates 49 days delay to event 3c, which concerns alleged delay resulting from the introduction of waiting times. Mr Cookson allocates no period to this event because he considers that the introduction of waiting times had no effect on the most substantial item of work in this period which was the Staging Platform infilling. In its Reply Submissions, the Respondent comments that the Claimant does not defend its allocation of 49 days to event 3c.[253]

748.    The Tribunal is not satisfied that the Claimant has established an entitlement to an extension of time for delay event 3c and accepts the evidence of Mr Cookson that no delay was caused by that event.

749.    In conclusion the Tribunal concludes that in relation to Time Period 4 the Claimant was delayed by a period of 97 days by reason of Delay Event 3.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Reply Submissions paragraph 214.

193

**Time Period 5 (29 December 2015 to 18 July 2017)**

750.    Mr Palles-Clark identifies a total period of delay in this period of 515 days.  Mr Cookson identifies a total period of delay of 542 days.  The reason for the difference arises because of the different baselines that each expert has used in their respective analysis.

751.    Mr Palles-Clark's analysis attributes 47 days to Delay Event 3a, 75 days to Delay Event 3b and 393 days to Delay Event 3c.  Whereas, Mr Palles-Clark attributes the whole delay, of 542 days, to Delay Event 3b.

752.    The Tribunal has already found in paragraphs 718–726 above that it prefers Mr Cookson's baseline programme.  Applying that baseline, the total period of delay that occurred in Time Period 5 is 542 days.

753.    If the Tribunal had reached the conclusion that the collapses should have been avoided by the Claimant, then it would have been relevant to consider Mr Palles-Clark's allocation of delay to the three events (3a, 3b and 3c).  However, the Tribunal has concluded that the Claimant could not reasonable have avoided the collapses and has found that they were a consequence of the Unforeseeable ground conditions.  Therefore it is not necessary for the Tribunal to decide how the period of total delay of 542 days, in Time Period 5, should be allocated.

754.    Consequently, the Tribunal decides that, in Time Period 5, the Claimant was delayed by 542 days by reason of Delay Event No. 3.

**Summary of the Tribunal's Decision in relation to the Claimant's Claim for an Extension of Time**

755.    The Claimant is entitled to an extension of time of 726 days in relation to Delay Event 3. That period is calculated as follows:

755.1    40 days in Time Period 1

755.2    10 days in Time Period 2

755.3    37 days in Time Period 3

755.4    97 days in Time Period 4

755.5    542 days in Time Period 5

756.    The Claimant's claim for an extension of time in relation to Delay Event 2 is denied.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

194

757.   As also noted in Section VIII immediately below the Claimant's claim for an extension of time in relation to Delay Event 8 is denied. This outcome is recorded here so that this present section is complete in dealing with delay and extensions of time.

**VIII.   DELAY EVENT NO. 8 (FORCE MAJEURE – ISIS)**

758.   The Claimant's and Respondent's issues as regards Delay Event No. 8 are set out in Appendices 3 and 4 respectively hereto.

759.   Appendix 3 formulates the Claimant's issues as follows:

**Delay Event No. 8**

760.   Was the ISIS insurgency a Force Majeure event pursuant to GC 19.1 of the Contract? If so:

760.1   What delay was suffered by Archirodon due to the Force Majeure event?

760.2   What additional Costs were incurred by Archirodon due to the Force Majeure event?

761.   Appendix 4 hereto sets out the Respondent's issues as regards Delay Event No. 8, as follows.

**Claim arising out of Delay Event No. 8**

762.   Was the ISIS insurgency a Force Majeure event pursuant to Sub-Clause GC 19.1 of the Contract? In particular:

762.1   Could Archirodon have reasonably provided for the event or circumstance before entering into the Contract (GC 19.1(a))?

762.2   Could Archirodon have reasonably avoided or overcome the event or circumstance once it arose (GC 19.1(c))?

762.3   If so, was Archirodon prevented from performing any of its obligations under the Contract by Force Majeure? If so, did Archirodon incur delay attributable to this Force Majeure Event? If so, what delay was incurred by Archirodon due to the Force Majeure event?

762.4   Did Archirodon incur additional Costs caused by the Force Majeure event? If so, what additional Costs were incurred? Does "Cost" include profit under Clause GC 19.1 of the Contract?

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

762.5  If so, did Archirodon use all reasonable endeavours to minimize any delay in performance of the Contract as a Result of Force Majeure (GC 19.3)?

### The Claimant's case as set out in its Pre-Hearing Submissions

#### Was the ISIS insurgency a force majeure event pursuant to GC 19.1 of the Contract?

763.  As detailed at Sections VIII of the Statement of Claim and the Reply, as a result of actions of ISIS in Iraq in June 2014 a number of countries banned citizens from travelling to Iraq; this included countries from which Archirodon employed a large number of personnel. Consequently, employees on rotation leave could not, or in some cases did not want, to return to work on the Project. In addition, other workers resigned or requested repatriation.

764.  As a result, Archirodon suffered a shortage of skilled personal. The lack in manpower resulted in delays to the Works and Archirodon incurred additional costs for (i) increasing the location allowance; and (ii) for the provision of an evacuation boat. In addition Archirodon also suffered a loss of productivity.

#### The ISIS insurgency was a Force Majeure Event pursuant to GC 19.1

765.  Pursuant to GC 19.1 [*Force Majeure*] Archirodon is entitled to an extension to the Time for Completion and additional costs as a result of an exceptional event or circumstance:

765.1  Which is beyond a Party's control;

765.2  Which such party could not reasonably have provided against before entering into the Contract;

765.3  Which having arisen, such Party could not reasonably have avoided or overcome; and

765.4  Which is not substantially attributable to the other Party.

766.  GC 19.1 further provides a non-exhaustive list of exceptional events or circumstances that may constitute a *Force Majeure* event so long as the overarching criteria listed in GC 19.1(a) to (d) are satisfied. This includes (i) "*hostilities (whether war be declared or not)*", and (ii) "*rebellion, terrorism, revolution, insurrection, military or usurped power or civil war*".

767.  As detailed at Sections V.L and VIII.B.2 of the SoC, the ISIS insurgency in Iraq in June 2014 gave rise to a claim for an extension to the Time for Completion and additional costs as a

196

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

result of *Force Majeure* event pursuant to GC 19.1.

768.  As set out at paragraph 279 of the Rejoinder, GCPI "*accepts that the ISIS events in 2014 were beyond the control of and not attributable to either party, as required by Clause 19.1 (a) and (d)*".

769.  GCPI alleges that Archirodon's claim fails as it cannot satisfy GCs 19.1 (b) and (c).[254] GCPI is incorrect.

770.  GC 19.1(b) requires that Archirodon "*could not reasonably have provided against [the Force Majeure events or circumstances] before entering into the Contract*". In paragraphs 379 to 387 of its SoD, GCPI suggest that this condition has not been satisfied because:

"(i)    "*Although Archirodon may not have been able to predict the rise of ISIS in Iraq, any responsible contractor entering into business in Iraq in 2012 would have acknowledged the possibility of increased conflict or terrorist activity in the country and planned and staffed the project to handle any such eventualities*"; and

(ii)   "*a reasonable contractor would have... anticipated the possible difficulties with using personnel from countries that had previously issued travel bans... and would have either staffed the project with different nationalities or drawn up contingency plans to replace any workers who might be affected by travel bans in future.*"

771.  GCPI repeats *similar* assertions at paragraphs 280 to 283 of the Rejoinder.

772.  As detailed at Section VIII.B.1 of the Reply, GCPI assertions are rejected for the following reasons:

772.1   the ISIS insurgency was not an expected, foreseeable or an event which a reasonable Contractor should expect to plan for;[255]

772.2   a previous instance of a country issuing a travel ban or travel advisory against workers travelling to Iraq is not sufficient, for GC 19.1 purposes, to transfer the risk of all future travel bans onto Archirodon;[256]

772.3   staffing shortages suffered by Archirodon as a result of the ISIS insurgency is not a

---

[254] **A6:** Respondent's Rejoinder to Claimant's Reply, dated 28 November 2017, paragraph 279.
[255] **A5:** Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 391.
[256] **A5:** Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 392.

Dr. Robert Gaitskell QC
President

ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

circumstance that it could *"reasonably have provided against before entering the Contract"*. It was neither reasonable not possible for Archirodon to provide against the ISIS insurgency at the time of entering the Contract;[257] and

772.4    it is speculative, unrealistic and uncommercial to suggest that Archirodon should have *"anticipated the possible difficulties with using personnel from countries that had previously issued travel bans"*[258] and sourced its personnel from other countries, particularly in circumstances whereby Archirodon employs many skilled workers from those countries that imposed a travel ban.[259]

773.    Accordingly, the ISIS insurrection and the impact thereof in June 2014 was not an event or circumstance that could have reasonably been provided against at the outset of the Contract. Therefore, GC 19.1(b) is satisfied.

774.    GC 19.1(c) provides that once the *Force Majeure* event or circumstance has arisen it is one that *"such Party could not have reasonably avoided or overcome"*.

775.    GCPI claims at paragraphs 382 and 383 of the SOD that GC 19.1(c) is not satisfied as the *Force Majeure* event claimed by Archirodon was one that could reasonably have been overcome by Archirodon, because it was overcome by increasing staff salaries 15-20% and replacing the personnel who resigned. GCPI further alleges that this is substantiated by the production figures for the period June to August 2014.

776.    GCPI repeats this assertion at paragraphs 283 to 284 of the Rejoinder, further alleging that Archirodon's productivity figures for the period June to August 2014 were impacted, not by the problems causes by ISIS, but by the alleged failure by Archirodon to maintain adequate supplies of materials on site.

777.    As detailed at Section VIII.B.2 of the Reply, GCPI assertions are rejected for the following reasons:

777.1    the issues surrounding Archirodon's workforce had largely been resolved by around September 2014; however one of the key reasons the situation had been resolved was

---

[257] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 393.
[258] A4: Respondent's Statement of Defence, dated 25 July 2017, paragraph 380, see also similar comments in A6: Respondent's Rejoinder to Claimant's Reply, dated 28 November 2017, paragraph 282.
[259] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 396.

198

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

that the ISIS insurgency had "stabilised"; [260]

777.2   the actions that Archirodon undertook were mitigation measures as envisaged in the by GC 19.3; [261]

777.3   the fact that a party is able to mitigate and eventually overcome the impact of an event does not mean the event is not *"Force Majeure"* for the period of time in which it does impact; [262]

777.4   although Archirodon was able to mitigate some of the delays caused to the Project after the ISIS insurgency in 2014, these measures required time and cost to implement, and their effects were not felt until a number of months after the Force Majeure event first arose. During this period, Archirodon's productivity was adversely affected; [263]

777.5   there was no supply problems of the material on the Project, from early May 2014 to June 2014 Archirodon increased their transport capacity by 35%; and [264]

777.6   any suspension of deliveries, and consequential impact on the supply of materials, was as a direct result of the staffing issues cause by the ISIS insurgency. [265]

778.   Accordingly, each element of GC 19.1 is satisfied, and as such Archirodon is entitled to both an Extension to the Time for Completion and additional costs.

Archirodon was prevented from performing its obligations pursuant to GC 19.4

779.   GC 19.4 provides that Archirodon is entitled to an Extension of Time to Completion and additional costs if a Force Majeure event prevents it from performing any of its obligations.

780.   GCPI alleges at Section 5.5.2 of its SoD and Section 3.52 of its Rejoinder that Archirodon was not *"prevented"* from performing its obligations pursuant to GC 19.4. GCPI is incorrect. Archirodon was prevented from performing from its obligations including not being able to provide the necessary personnel pursuant to GC 4.1. In addition, the Force Majeure event caused delays to the Works and affected Archirodon's ability to meet its obligations pursuant

[260] A6: Respondent's Rejoinder to Claimant's Reply, dated 28 November 2017, paragraph 404.
[261] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 406.
[262] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 407.
[263] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 408.
[264] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 437.
[265] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 437.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

199

to GC 8.2.[266]

781. GCPI seeks to suggest that prevention of performance under the GC 19.4 must be *"impossible"*. As set out at paragraphs 419 to 420 of the Reply, this is not the test under the Contract.

782. Furthermore, as detailed in the Reply, the cases GCPI rely upon in its SoD make clear that staffing issues or shortages are sufficient to amount to a Force Majeure event, even if the effects of the event are later mitigated. [267]

783. Archirodon provided timely notice pursuant to GC 8.3 of its Force Majeure claim. [268] Accordingly, Archirodon has satisfied each contractual requirement for a claim for Force Majeure.

9.1  If so, what delay was suffered by Archirodon due to the Force Majeure event?

784. Mr Palles-Clark's analysis shows that the Force Majeure event encountered by Archirodon caused 4 days of critical delay in the period between 7 June 2014 and 14 September 2014.[269] Mr Cookson does not consider that the Force Majeure event caused any actual delay to completion because *"Archirodon actually increased production on critical Quarry Run, which suggests that available resources were allocated to the completion of critical works"*.[270] Instead, Mr Cookson suggests that the delay incurred in the period during which the Force Majeure event was having an effect was due to the Unforeseeable physical conditions encountered by Archirodon.[271]

785. For the reasons set out in Mr Palles-Clark's reports,[272] Archirodon maintains that it entitled to, at least, a 4 day extension of time due to the Force Majeure event.[273] However, in any event, as alluded to above, Mr Cookson accepts that the delay incurred in the period 18 June 2014 to 20 September 2014 is excusable delay.

**The Respondent's case as set out in its Pre-hearing Submissions**

786. Claims in Connection with Alleged Force Majeure (Claim No. 8)[274].

---

[266] A3: Claimant's Statement of Case and Annex I and II, dated 9 May 2017, paragraphs 518 to 519.
[267] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraphs 415 to 425.
[268] A5: Claimant's Reply to the Statement of Defence, dated 19 September 2017, paragraph 434.
[269] D36: Joint Statement of the Delay Experts, dated 3 July 2018.
[270] D32: Expert Report of Lee Cookson, dated 15 May 2018, paragraph 2.19.3.
[271] D32: Expert Report of Lee Cookson, dated 15 May 2018, paragraph 2.19.3.
[272] D32: Expert Report of Lee Cookson, dated 15 May 2018, paragraph 2.19.3.
[273] D19: Expert report of Robert Palles-Clark, dated 15 May 2018, paragraph 754.
[274] SoD, p.113 et seq. (s. 5.5); Rejoinder, p.91 et seq. (s. 3.5).

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

787.    The Claimant's claim based on Force Majeure (Claim No. 8) is unfounded and does not entitle it to an EoT or to the payment of additional costs.

### The ISIS Activity in June 2014 Does Not Constitute a Force Majeure Event[275]

788.    The ISIS insurgency in June 2014 is undisputed. As the Engineer noted in its determination "[i]t is not denied that the events in Iraq (particularly reference in the Northern and Western Provinces) took place".[276] The Respondent likewise does not contest that the ISIS activity in Iraq in June 2014 was the type of circumstance that **could** constitute Force Majeure under Clause GC 19.1. However, in the actual circumstances on which the Claimant bases its claim, the legal elements required for a claim of Force Majeure under the Contract are not met.

789.    Pursuant to Clause GC 19.1, Force Majeure may include events "of the kind" listed in the clause, so long as conditions (a) to (d) are satisfied.[277] Those conditions require that the alleged Force Majeure be an event or circumstance:

789.1   which is beyond a Party's control;

789.2   which such Party could not reasonably have provided against before entering into the Contract;

789.3   which, having arisen, such Party could not reasonably have avoided or overcome; and

789.4   which is not substantially attributable to the other Party.

790.    Regarding Clause GC 19.1 (a) and (d), it is undisputed that terrorist activity in Iraq was beyond the control of and not attributable to either Party. However, as explained below, the conditions set out in Clause GC 19.1(b) and (c) are not met.

### Iraq was a High-Risk Location at the Time of the Contract Signature[278]

791.    Pursuant to Clause GC 19.1(b), Force Majeure requires that Archirodon "could not reasonably have provided against [these events] before entering into the Contract".[279] This is not the case. Archirodon could and should have anticipated security issues with an effect on staffing and planned accordingly.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/EF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

---

[275] SoD, p.114 et seq. (s. 5.5.1); Rejoinder, p.91 et seq. (s. 3.5.1).
[276] Letter from the Engineer to Archirodon (ref. AFE-0597/WH) dated 1 September 2015, at **Exhibit C-103**, p. 5 [E1002].
[277] Contract, at **Exhibit C-1**, p. 90 et seq. of pdf (Cl. GC 19.1) [**H1**].
[278] See SoD, p.59 et seq. (s. 4.7.1); Rejoinder, p. 37 et seq. (s. 2.7.1).
[279] Contract, at **Exhibit C-1**, p. 90 of pdf (Cl. GC 19.1(b)) [**H1**].

792. The Claimant argues that it "*could not reasonably have provided against*"[280] the effect of travel bans on its work force in Iraq, because the ISIS events in June 2014 were not "*foreseeable*" as a "*real likelihood*" at the time of the Contract.[281] This is incorrect.

793. It is undisputed that at the time the Parties entered into the Contract, Iraq was a high-risk country in which to work.[282] Hundreds of attacks happened throughout Iraq in 2012, while Archirodon was preparing its bid.[283] In the two months leading up the submission of Archirodon's bid, a series of bomb attacks killed more than 350 people and wounded hundreds more.[284] Under these circumstances foreign organizations were advised to take security into consideration when operating in the area.[285]

794. Although Archirodon may not have been able to predict the rise of ISIS, any responsible contractor entering into business in Iraq in 2012 would have acknowledged the possibility of increased conflict or terrorist activity in the country and planned and staffed the project to handle any such eventualities.[286]

795. Archirodon's operations in fact demonstrate its awareness of the serious threats posed by working in Iraq. Mr Shebl explains that, from the start of the project, Archirodon had its own secured camp "*with double fences and security towers with armed watchmen, and security gates, security check points a few kilometres before the work camp.*" Archirodon had also hired Triple Canopy, the security company for the US Embassy in Baghdad to provide armed guards and armoured vehicles for use by Archirodon personnel on and off site.[287] Furthermore, in order to find workers willing to come to Iraq, Archirodon had to pay on average a 20–30% premium above base salary.[288]

796. Despite the extensive, expensive security measures built into its bid, Mr Shebl asserts that "[a]*t the time of tender, there was no reason for us to expect that there would be a situation in Iraq in the foreseeable future that would lead to a travel ban (or bans) affecting our workforce.*"[289] This, however, was not the case.

---

[280] Contract, at **Exhibit C-1**, p. 90 of pdf (Cl. GC 19.1(b)) [**H1**].
[281] Reply, p.111 *et seq.* (paras. 392-393); WS2 Shebl, p. 44 *et seq.* of pdf (para. 108.1).
[282] WS2 Shebl, p.25 of pdf (para. 66); SoD, p.59 *et seq.* (s 4.7.1); Rejoinder, p. 37 *et seq.* (s. 2.7.1); WS Horgan, p. 16 (para. 56).
[283] See e.g., "Weekly Security Update" (Iraq Business News) (excerpt) dated 20 November 2012, at **Exhibit R-73** [**E30**]; see also "Iraq attacks in Baghdad and north 'kill 107'" (BBC News) dated 23 July 2012, at **Exhibit R-74** [**E25**].
[284] "Iraq attacks in Baghdad and north 'kill 107'" (BBC News) dated 23 July 2012, at **Exhibit R-74** [**E25**].
[285] "Weekly Security Update" (Iraq Business News) dated 1 March 2012, at **Exhibit R-77**, p. 2 [**E19**]; "Weekly Security Update" (Iraq Business News) dated 9 May 2012, at **Exhibit R-78**, p. 2 [**E24**].
[286] Letter from the Engineer to Archirodon (ref. AFE-0597/WH) dated 1 September 2015, at **Exhibit C-103**, p. 3 [**C109**].
[287] WS2 Shebl, p. 40 of pdf (paragraph 100.1). See also WS2 Shebl, p. 25 of pdf (paragraph 66).
[288] WS2 Shebl, p. 41 of pdf (paragraph 100.4).
[289] WS2 Shebl, p. 44 of pdf (paragraph 108.1).

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

797.  In addition to the general security risks associated with a project in Iraq, Archirodon should have been aware of the possibility of travel restrictions affecting manpower resources. For example, due to the dangerous situation in the country, the Philippine Government had a ban on processing and deployment of Filipino workers to Iraq in place when the Contract was signed.[290] Archirodon has repeatedly emphasized that Filipino nationals constituted a "core" part of its skilled workforce for the work necessary for the project,[291] and yet they were banned from deployment to Iraq at the time of tender.

798.  As set out in the SoD,[292] considering the Filipino ban together with those previously enacted by India and other countries, and the increasing violence in Iraq, a reasonable contractor would have anticipated potential issues with expatriate workers and planned accordingly.

799.  Contrary to the Claimant's assertion,[293] it is not the Respondent's burden now to explain how Archirodon should have addressed these risks in selecting staff for the project. However, as the Engineer observed in its Determination, rejecting the claim for Delay Event No. 8, at the time of contracting, skilled labour was available locally, as well as in countries without any travel restrictions to Iraq.[294]

Archirodon Could and Did Overcome the Circumstances it Relies upon as Force Majeure[295]

800.  Clause 19.1(c) requires that once having arisen, the Party *"could not reasonably have avoided or overcome"* the circumstances.[296]  This requirement is not met, either.  Archirodon did in fact overcome the events successfully.

801.  Though the Claimant attempts to downplay its success in overcoming the potential threats to its work posed by the ISIS uprising, the works in fact progressed with the staff on site. Moreover, just two months after its initial notice of Force Majeure, the Claimant reported having *"covered"* its staffing needs through prompt 15-20% pay raises and successful recruitment, locally and from Iran and placement rates were back to where they had been before the notice.[297]

---

[290] SoD, p.60 (paragraph 188).
[291] SoC, p.57 (paragraph 213); WS2 Shebl, p.45 of pdf (paragraph 108.2); WS Stavrou, p.24 (paragraph 78).
[292] SoD, p. 115 *et seq.* (paragraphs 379 to 381).
[293] Reply, p. 114 (paragraph 399); WS2 Shebl, p.7 of pdf (paragraph 20).
[294] Letter from the Engineer to Archirodon (ref. AFE-0597/WH) dated 1 September 2015, at **Exhibit C-103**, p.4 of pdf [E1002].
[295] See SoD, p. 63 *et seq.* (s. 4.7.3).
[296] Contract, at **Exhibit C-1**, p. 90 (Cl. GC 1.9(c)) [H1].
[297] Letter from Archirodon to the Engineer (ref. 340-14/FGP/ARCO) dated 26 August 2014, at **Exhibit C-113** [E712]; SoC, p. 116 (paragraph 383); Rejoinder, p.93 (paragraph 283).

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF                          203
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

The Claimant asserts that, without ISIS-related events, its productivity would have reached 300,000m$^3$ per month as of June 2014.[298] This figure is unsupported. Furthermore, Mr Horgan explains that, given the other factors limiting productivity in June and July 2014, this figure is unrealistic.[299]

In sum, the Claimant could have reasonably provided against staffing problems arising from travel bans, and in the event, successfully overcame any issues those bans posed to its work under the Contract. Accordingly, the ISIS-related events referred to by the Claimant do not constitute Force Majeure under Clause GC 19.1.

### ISIS Events Did Not Prevent Archirodon from "Performing Any of Its Obligations"[300]

Even if the ISIS events were a Force Majeure event under Clause GC 19.1, the Contract only entitles a Contractor to an EoT and costs where it has been both *"prevented from performing any of his obligations"* and *"suffers delay and/or incurs Cost by reason of Force Majeure"*.[301] The Claimant has not established that it was prevented from performing its obligations.

The standard for what constitutes prevention from performance under Clause GC 19.4 is very high. A party claiming Force Majeure must demonstrate that performance has become physically or legally impossible, not simply more onerous or unprofitable. As elaborated in a leading FIDIC commentary:

> *"The now classic example of this is the refusal of the English and American courts to grant relief as a consequence of the Suez crisis during the 1950s. Those who had entered into contracts to ship goods were not prevented from carrying out their contractual obligations as they could go via the Cape of Good Hope even though the closure of the Suez Canal made the performance of that contract far more onerous".[302]*

The Claimant asserts that Force Majeure caused delay and *"affected"* its ability to meet the contractual obligation for timely completion under Clause GC 8.2.[303] However, the Claimant has not established that the ISIS activity in June 2014 actually delayed its already much-delayed performance. Mr Horgan has pointed to problems with supply of materials and the timing of Ramadan as two factors that decreased productivity specifically during the summer of 2014.[304] In any event, that performance is delayed, hindered or adversely affected does meet the requirement under Clause GC 19.4 that a Contractor be prevented from performing

[298] Reply, p.123 (paragraph 437).
[299] WS2 Horgan, p. 8 et seq. (paragraphs 21 to 25). See also Rejoinder, p. 93 (paragraph 283).
[300] SoD, p.118 et seq. (s.5.5.2); Rejoinder, p. 94 et seq. (s. 3.5.2).
[301] Contract, at **Exhibit C-1**, p. 91 of pdf (Cl. GC 19.4) **[H1]**.
[302] J. Glover and S. Hughes QC, *Understanding the FIDIC Red Book - A Clause-by-Clause Commentary* (Sweet & Maxwell, 2011), 2nd Edition (excerpt), at **Exhibit RLA-20 [F27]**.
[303] SoC, p.146 (paragraph 519). See also Reply, p. 119 (paragraph 418).
[304] WS2 Horgan, p.8 et seq. (paragraphs 22 to 25).

204

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq

any of its obligations.

807.  The Claimant argues that it was prevented from performing its obligation "*to provide the necessary personnel required pursuant to GC 4.1.*"[305] This claim must also fail. Clause GC 4.1 states in relevant part:

> "*The Contractor shall provide the Plant and Contractor's Documents specified in the Contract, and all Contractor's Personnel, Goods, consumables and other things and services, whether of a temporary or permanent nature, required in and for this design, execution, completion and remedying of defects*".[306]

808.  Clearly, the Claimant was not prevented from fulfilling its contractual obligation under Clause GC 4.1 to provide personnel for the project, even if the ISIS events in June 2014 created temporary difficulties with some staff. To the contrary, the Claimant ensured that the project was properly staffed by promptly raising salaries by 15-20%, recruiting new personnel locally and from countries without travel restrictions, and arranging resident visas in the UAE to circumvent the travel bans affecting certain employees.[307] The measures implemented by the Claimant may have rendered compliance with Clause GC 4.1 more expensive and burdensome, but as the Claimant acknowledges in its Reply, delay and additional expense do not constitute prevention for purposes of Clause GC 19.4.[308] The Claimant fulfilled its contractual obligation to provide acceptable personnel, and as Mr Shebl states, "*works were not impossible to perform during* [the relevant] *period, and they did proceed*".[309]

809.  As both a matter of fact and law, although problems with personnel may have rendered the Claimant's performance of Clause GC 4.1 more difficult or expensive, they did not prevent it.

### Iraqi Law Precludes the Claimant from Recovering the Cost of Increased Staff Salaries[310]

810.  Article 878 of the Iraqi Civil Code does not permit the Claimant as a contractor in a lump sum contract to receive compensation for the additional salaries paid to staff during summer 2014.[311]

811.  Equitable relief under Article 878 of the Iraqi Civil Code is only available where increased costs claimed resulted from unforeseeable events. Difficulties in staffing due to security issues was not unforeseeable. Iraq was not a stable country when the Contract was signed, and the

---

[305] SoC, p.145 (paragraph 518).
[306] Contract, at **Exhibit C-1**, p.44 of pdf (Cl. GC 4.1) [**H1**].
[307] SoC, p.146 (paragraph 522).
[308] Reply, p.119 (paragraph 418).
[309] WS2 Shebl, p.28 of the pdf (paragraph 72).
[310] SoD, p.121 *et seq.* (s. 5.5.3); Rejoinder, p.98 *et seq.* (s. 3.5.3).
[311] Iraqi Civil Code (English translation), at **Exhibit CL-2**, p. 270 of the pdf (Art.878) [**F2**].

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq

Claimant was well aware that working in Iraq at that time was a high-risk endeavour.[312]

312. Moreover, Article 878 of the Iraqi Civil Code is quite clear that, with respect to lump sum contracts, a contractor *"has no claim to an increase of the (...) wages of workers where such increase was so great as to render the performance of the contract difficult"*. Rather a contractor must prove that *"the equilibrium between the respective obligations of the employer and of the contractor has collapsed and the basis on which the financial estimates of the contract have been computed has consequently disappeared."*[313] This is not the case.

813. Even if a 15-20% increase in the salaries of some staff rendered the Contract less profitable, this does not mean that the equilibrium between the Parties' relative obligations *"collapsed"* or that the basis of the financial estimates of the Contract had *"disappeared"* as a result of the ISIS uprising.

### The Claimant Is Not Entitled to an EoT for Claim No. 8

814. For the reasons set out above, the conditions set out in Clause GC 19.1(b) and (c) are not met in the present case, so that Archirodon's claim for an EoT based on Force Majeure under that clause must fail.

815. Even if the Tribunal reached a different conclusion in this respect, the Claimant would still not be entitled to an EoT in that it has failed to prove any delay to completion that would have been caused by the Force Majeure events complained of. As noted in the Archirodon letter of 26 August 2014 to the engineer, the works in fact progressed with the staff on site and, just two months after its initial notice of Force Majeure, the Claimant reported having *"covered"* its staffing needs through prompt 15-20% pay raises and successful recruitment, locally and from Iran.[314]

816. Mr Cookson similarly concludes on the basis of his review of the factual record, that he does *"not consider that Delay Event No. 8 caused any actual delay to completion of the project. At the time Delay Event No. 8 was having an effect, Archirodon actually increased production on critical Quarry Run, which suggests that available resources were allocated to the completion of critical works"*.[315] The Claimant's own expert, Mr Palles-Clark, finds only four

312. WS2 Shebl, p.39 (paragraph 100); SoD, p. 121 *et seq.* (paragraph 398); Reply, p.121 (paragraph 430).
313. Iraqi Civil Code (English translation), at **Exhibit CL-2**, p.270 of the pdf p. 270 of pdf (Art. 878) [**F2**].
314. Letter from Archirodon to the Engineer (ref. 340-14/FGP/ARCO) dated 26 August 2014, at **Exhibit C-113 [E712]** SoC, p.146 *et seq.* (paragraph 522). See also SoD, p.116 (paragraph 383).
315. Cookson Delay Report, p.15 (paragraph 2.19.3).

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq

days attributable to Claim No. 8.[316]

817.    Accordingly, the Claimant's claim for an EoT under Claim No. 8 must fail.

The Amounts Claimed Are Unfounded[317]

818.    The Claimant makes two claims for additional costs allegedly incurred as a result of ISIS activity in Iraq:

818.1    increase of staff salaries to encourage workers to stay on site, in the amount of US$429,211; and

818.2    the cost of the emergency evacuation plan in the amount of US$1,002,168.42.[318]

819.    As set out in the SoD and in the Rejoinder,[319] the Claimant is not entitled to either of these costs.  The supply of personnel and security on site were the Claimant's responsibility under the Contract.[320]  A reasonable contractor doing business at the time in Iraq would have made sufficient allowance in its offer for the cost of attracting, retaining and providing security for its employees in a high-risk location:

819.1    However, if the Tribunal accepts the Claimant's arguments as to liability under Clause GC 19.1, the quantification of this claim is agreed between the experts of both Parties and is not disputed.[321]

**The Claims Schedule**

820.    This Schedule, in Appendix 6 hereto, compiled by the Parties, was provided on 13 November 2018.  It helpfully summarises all the references to the pleadings and evidence, and legal provisions, including giving transcript references to key evidence given at the hearing.

Extent of the Time and money claims associated with Delay Event No. 8

821.    Mr Wishart's schedule, consistently with the Appendix 6 Schedule,  stated in respect of this item as follows:

---

[316] See Delay Joint Statement, p.5; Appendix 2 - Mr Palles-Clark's and Mr Cookson's critical path graphic, p.3.
[317] SoD, p.122 et seq. (s. 5.5.4); Rejoinder, p.98 et seq. (s. 3.5.4).
[318] L/C Impact on Contract Price, at **Exhibit C-252 [E1256]**; SoD, p.122 et seq. (s. 5.5.4); Rejoinder, p.98 et seq. (s.3.5.4).
[319] SoD, p.122 et seq. (s. 5.5.4); Rejoinder, p.98 et seq. (paragraphs 300 to 301).
[320] Contract, at **Exhibit C-1**, p.47 of pdf (Cl. GC 4.8) **[H1]**; p.52 of pdf (Cl. GC 4.22); p. 56 of pdf (Cl. GC 6.1); p. 347 of pdf (Technical Specifications, section 16).
[321] Quantum Joint Statement, p.17 (Items JS 172 and JS 173).

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.

207

| S04 | JS03 | Claim Group C Force Majeure – Country Unrest Situation | US$1,438,887 |
|---|---|---|---|

Parties' valuations of the Claimant's Claims:

| C. | Quantum of Claim No. 8 (Claim in connection with alleged Force Majeure) | 1,438,887 | 0 | 1,438,887 |
|---|---|---|---|---|

**Background to Discussion**

823. Clauses 19.1 provides that even if the ISIS activity amounted to a Force Majeure event under that clause, the Contract only entitles a Contractor to an EoT and costs where it has been both *"prevented from performing any of his obligations"* and *"suffers delay and/or incurs Cost by reason of Force Majeure"*.[322]  The Respondent contends the Claimant has not established that it was prevented from performing its obligations.

824. The Respondent asserts a Party claiming Force Majeure must demonstrate that performance has become physically or legally impossible, not simply more onerous or unprofitable.

825. The Tribunal assumes for the purposes of argument that the events constituting delay Event 8, namely the activities of ISIS, amounted to a force majeure event. The next question is whether, in all the circumstances, the consequences satisfied Clause 19.1 in that the Claimant was both *"prevented from performing any of his obligations"* and *"suffers delay and/or incurs Cost by reason of Force Majeure"*.[323]  As elaborated in a leading FIDIC commentary (J. Glover and S. Hughes QC, *Understanding the FIDIC Red Book - A Clause-by-Clause Commentary* (Sweet & Maxwell, 2011), 2nd Edition (excerpt), at **Exhibit RLA-20 [F27].**):

> *"The now classic example of this is the refusal of the English and American courts to grant relief as a consequence of the Suez crisis during the 1950s. Those who had entered into contracts to ship goods were not prevented from carrying out their contractual obligations as they could go via the Cape of Good Hope even though the closure of the Suez Canal made the performance of that contract far more onerous.*[324]

**Post-Hearing Materials**

826. The Parties' Post-Hearing Briefs and Reply Briefs reiterated their arguments as noted above. The Claimant emphasized that, unlike earlier existing threats, the occurrence of the ISIS threat meant it was obliged to be in a position to evacuate its expatriate staff to international waters.

[321] Contract, at Exhibit C-1, p.91 of pdf (Cl. GC 19.4) **[H1]**.
[322] Contract, at Exhibit C-1, p.91 of pdf (Cl. GC 19.4) **[H1]**.
[323] J. Glover and S. Hughes QC, *Understanding the FIDIC Red Book - A Clause-by-Clause Commentary* (Sweet & Maxwell, 2011), 2nd Edition (excerpt), at **Exhibit RLA-20 [F27]**.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

208

**Discussion and Decision by the Tribunal**

827.    As noted above, for the Claimant to succeed in respect of Claim Event 8 it must satisfy the requirements of, inter alia, Clause 19.1. As the Claimant notes in paragraph 264 of its Pre-Hearing Submissions (above):

827.1    Pursuant to GC 19.1 [Force Majeure] Archirodon is entitled to an extension to the Time for Completion and additional costs as a result of an exceptional event or circumstance:

(i)      Which is beyond a Party's control;

(ii)     Which such party could not reasonably have provided against before entering into the Contract;

(iii)    Which having arisen, such Party could not reasonably have avoided or overcome; and

(iv)     Which is not substantially attributable to the other Party.

828.    There is little dispute (see paragraph 788 above) that the ISIS attacks in Iraq were an exceptional event, and that this event was beyond the Claimant's control, and was not substantially attributable to the Respondent. This leaves two sub-issues where the Parties are in significant disagreement, namely whether Clause 19.1(b) and (c) were satisfied in all the circumstances.

829.    Firstly, as regards Clause 19.1(b), the Claimant contends it could not have provided against the ISIS events before entering the Contract. The Respondent asserts that, given the existing levels of violence (above) already being experienced in Iraq prior to the advent of ISIS a reasonably prudent contractor ought to have been aware of the possibility of escalating violence and further such threats, and ought to have taken steps from the outset, prior to the ISIS threat, to put itself in a position where such an escalation as came about with ISIS could be dealt with. Such steps, says the Respondent, would have included ensuring that employees were recruited from a variety of different countries, including from Iraq itself, so that if (as happened) the countries from which many of the employees were engaged (e.g. the Philippines) did impose restrictions on recruitment this did not give rise to serious consequences. Further, the Claimant itself notes the serious steps it had taken to secure its site

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

209

and keep it safe from the outset. It had also obtained a vessel which could serve for evacuation, although it obtained a bigger and more expensive high speed evacuation boat once the ISIS threat appeared.

Secondly, as regards Clause 19.1(c), the Claimant contends that, once the exceptional event had arisen, it could not reasonably have avoided or overcome it. In response, the Respondent asserts that, in fact, the Claimant did overcome the event. The Respondent points out all the steps the Claimant took once the ISIS threat materialised and says these successfully avoided any significant delay or other consequences. Mr Cookson, the Respondent's expert, says that at the time the Event 8 was unfolding the Claimant appears to have increased production in some respects. The Respondent notes the Claimant's success in arranging UAE residence permits for employees that were thus able to avoid recruitment restrictions from their original countries. Further, the payment of increased wages, to the extent of about 15-20%, meant that all necessary staff could be recruited, particularly once the source of such employees was widened to include countries other than the traditional sources of labour.

831. In the Tribunal's view, the Claimant is to be congratulated for its effective steps, both before the ISIS threat appeared, and after it did occur, to keep its site and its employees safe, and to ensure the retention and recruitment of all necessary employees. Even though the Claimant has asserted it suffered delays and other consequences, the Respondent challenges this, and notes that even if the claim is proved in principle, the Claimant's own expert only allocates 4 days of delay to this event.

832. However, taken overall, the Tribunal is not persuaded that the Clause 19.1(b) and (c) constituent elements of a force majeure event, as noted above, have been satisfied in all the circumstances, since the Claimant appears to have prudently taken appropriate steps in advance of the ISIS threat materialising, and certainly took appropriate steps thereafter, to avoid any material consequences. The Tribunal accepts the evidence of the Respondent, as noted in paragraph 800 et seq. above, in this regard. Accordingly, the Tribunal declines to find that the ISIS threat in fact gave rise to a force majeure event pursuant to Clause 19.1. The claim is rejected.

## IX.  OTHER CLAIMS

833. These claims are shown in the Parties' agreed Schedule in Items 4-15 of Appendix 6. Broadly, the claims are dependent upon the extent to which the Claimant succeeds in its primary claims in items 1-3 of the Schedule of Appendix 6 (*i.e.*, on Delay Events No. 2, 3 and 8).

210

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

**Schedule Item 4: Is the Claimant entitled to a declaration that it completed the Works within a reasonable time?**

834.    In the Schedule the issue is explained thus:

> "Claim for a declaration that Archirodon was entitled to complete the Works within a reasonable time and that it completed the Works within a reasonable time".

835.    In that Schedule the Claimant summarises its case thus:

> "But for the occurrence of events for which GCPI is liable, Archirodon would have completed the Project by the Time for Completion, as extended by 61 days due to Delay Event No. 1, of 7 August 2014. Therefore, the Tribunal should exercise its discretion under Article 146(2) of the Iraqi Civil Code to declare that Archirodon was entitled to complete the Works within a reasonable time. A reasonable time to complete the Works was 18 July 2017".

836.    The Claimant in Appendix 6 hereto refers in the Schedule to Article 146(2) of the Iraqi Civil Code. The Respondent in response contends that this provision merely permits the Tribunal, when unforeseen circumstances arise to restore the economic balance for future performance. The issue of whether the Claimant completed within a reasonable time has already been dealt with in Delay Event 3 above. The Tribunal's view is that, as noted above in respect of Item 2, Delay Event 3, the extension of time to which the Claimant is entitled is 726 days (see paragraph 755 above), whereas the overall delay is about 1,095 days. Since the Claimant did not complete the Works within the time stipulated by the Contract it cannot be said that it completed within a reasonable time. Hence, the requested declaration is denied.

**Schedule Item 5: Recovery of Liquidated Damages?**

837.    The Schedule describes this item thus: "*Recovery of the withheld Liquidation Damages*". It goes on to state that the Claimant's case is as follows:

> "Archirodon is entitled to an extension to the Time for completion as a result of Delay Events Nos. 2, 3 and 8. Notwithstanding this, GCPI wrongfully levied delay damages on Archirodon. Accordingly, Archirodon is entitled to reimbursement of delay damages totalling €20,416,650.60".

838.    In the Schedule the Respondent states, inter alia:

> "The Claimant is not entitled to reimbursement of Delay Damages, which were applied by the Engineer in accordance with the Contract and Iraqi law, because the Contract provides that Delay Damages are applied at the rate of 0.1% of the Contract Price per day, until the contractual maximum is reached after 100 days of delay. It is not disputed that the Works were completed 1,095 days after the revised completion date, and the Claimant has not shown any right to an EoT, let alone one

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

211

*that would bring the delay for which it is responsible below 100 days"*.

839.  The Tribunal's view is that, since the Claimant only recovered 726 days extension of time, it is still much more than 100 days in delay for overall completion (see paragraph 755 above above). This means that the maximum liquidated damages of 100 days at 0.1% Contract Price (i.e., 10%) is deductible by the Respondent. (Clause 8.7 and Special Conditions thereto,) The sum withheld is €20,416,650.60. On the basis that this figure is 10% of the Contract Price (Respondent's Post-Hearing Submissions, paragraph 514) , the withholding of that sum by the Respondent is justified, and no part is recoverable by the Claimant. Hence, this claim fails.

## Schedule Item 6: Prolongation?

840.  The Schedule lists the Claimant's case as:

> *"Archirodon is entitled to an extension to the Time for Completion as a result of Delay Event Nos. 2, 3 and 8. Accordingly, Archirodon is entitled to the corresponding prolongation Costs. Furthermore, the Costs claimed reflect the actual costs incurred by Archirodon"*.

Thus, the prolongation claim is directly related to the extension of time the Claimant is able to secure. As noted above, the Claimant has secured an extension of 726 days.

841.  In the Schedule the Respondent states this is a total costs claim, and goes on to state *"lastly, the quantification of this claim should be rejected as the Claimant has included inflated depreciation costs which do not reflect the Claimant's actual depreciation costs"*. Certainly, the depreciation of plant is one of the biggest elements in this claim, and the two quantum experts, Messrs Wishart and Kitt, have different figures. Their joint statement includes various agreements as to figures. The Tribunal notes that the delay claim (which is the premise for the prolongation claim) largely relates to the last period addressed by the experts, when the daily rate was lower, since there were fewer resources on site. In this regard, the Tribunal notes that Mr Wishart included land and marine equipment when taking an average, but most of the marine equipment had been decommissioned by the stage of the collapse delays, so his daily rate is considered unjustifiably high by the Tribunal and so Mr Kitt's figures are preferred.

842.  The Claimant's Post-Hearing Brief (PHB) contends that, on the basis it is entitled to an extension of 1,137 days, it should recover US$ 53,737,465 for prolongation, based on Mr Wishart's figures. It notes (paragraph 520ff, PHB) that:

212

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

*"The Parties' quantum experts agree on several of the elements of the prolongation claim. Mr Wishart and Mr Kitt agree that the correct approach to value the prolongation claim is to identify those time-related costs during the period of delay[325]. Both experts also agree that there are 5 elements which constitute the build-up of the prolongation costs:*

*a)    indirect manpower;*
*b)    indirect equipment;*
*c)    general and administrative expenses;*
*d)    canteen and laundry expenses; and*
*e)    fixed assets and depreciation.*

*Of the five issues listed above, the experts agree on the value of:*

*(i)    indicative manpower[326];*
*(ii)   canteen and laundry expenses[327]; and*
*(iii)  fixed assets and depreciation[328].*

*The quantum experts differ on the calculation of indirect equipment and general and administration expenses"*.

843.    The Respondent's Post-Hearing Brief contends (paragraph 558 ff) with paragraph numbers removed in the quotation below, that Mr Wishart, the quantum expert for the Claimant:

*"simply accepts whatever Archirodon's Fixed Asset Department chose to charge to this project. Indeed, Mr Wishart confirmed at the Hearing that he had neither requested a copy of Archirodon's plant depreciation policy, nor asked for the equipment's purchase price, age or resale value[329]. This information, as well as the build-up of these estimates, would have been necessary to assess whether the Fixed Asset Department's estimates charged to the project are reasonable[330]. When confronted with this flaw in his valuation, Mr Wishart attempted to evade the issue by stating that this check would have been unnecessary given that the depreciation estimates were not charged to the project continuously throughout the equipment's mobilisation periods[331],. However, this is wrong. The evidence shows that the monthly estimates have indeed been charged for each piece of equipment throughout their mobilisation periods, from the beginning to the end, with no interruption[332,333]*

---

[325] **M9 (Folder M1/Tab 9)**: Hearing Transcript, Day 9, p.13, lines 9 to 13; **D96 (Folder D5/Tab 96)**: Reply Expert Report of Gary Kitt (Redacted), dated 15 June 2018, paragraph 6.2.2.

[326] **D96 (Folder D5/Tab 96)**: Reply Expert Report of Gary Kitt (Redacted), dated 15 June 2018, paragraph 6.2.9.

[327] **D96 (Folder D5/Tab 96)**: Reply Expert Report of Gary Kitt (Redacted), dated 15 June 2018, paragraphs 6.2.49 to 6.2.50.

[328] Appendices attached to **D96 (Folder D5/Tab 96)**: Reply Expert Report of Gary Kitt (Redacted), dated 15 June 2018; **II26A (Electronic only)**: Updated GK Assessment of Prolongation 190 Days (Confidential), dated 6 July 2018, Summary of Indirect Costs, cell V4.

[329] Transcript Day 8, 191:14 – 192:3 (cross-examination of Mr Wishart **[M8: Folder M1/Tab 8]**.

[330] Transcript Day 8, 235:10 – 237:7 (presentation of Mr Kitt ) **[M8: Folder M1/Tab 8]**.

[331] Transcript Day 8, 201-24 – 202:9 and 203:4 – 204:1 (cross-examination of Mr Wishart) **[M8: Folder M1/Tab 8]**.

[332] Spreadsheet Equipment-Owned-Indirect Cost (up to July'17).xlsx detailing the monthly, yearly and overall costs of indirect owned equipment from January 2013 to July 2017, at Exhibit C-1157, worksheets "Owned Equipment" and "Owned Equip – Duration" [199 (electronic only)].

[333] Extract of Spreadsheet Equipment-Owned-Indirect Cost (up to Jul'17).xlsx detailing the monthly, yearly and overall costs of indirect owned equipment from January 2013 to July 2017, at Exhibit C-1157 [199 (electronic only)], worksheet "Owned Equipment": it appears that the Claimant has exhibited a version of the spreadsheet "Spreadsheet Equipment-Owned-Indirect Cost (up to Jul'17).xlsx" that is missing some data, but this reference is to the original version of this spreadsheet that was disclosed by the Claimant to its quantum expert (Appendix 7-2-1 to Wishart Quantum Report – Indirect Equipment, p.2 (para. 2.3.4) **[D66: Folder D4/Tab 66, p.2132]**) and then subsequently, following the Tribunal's order, to the Respondent quantum expert on 18 April 2018 (in answer to Requests 39, 40 and 42).

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF                                       213
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

> *... Mr Kitt has performed similar high-level checks for various pieces of equipment and found in each case that Archirodon's Fixed Asset Department's monthly estimates for depreciation were unreasonably high (two to four times the actual estimated cost)[334]. The above shows that the reasonableness of Archirodon's estimates is far from granted. Yet Mr Wishart has failed to perform even a high-level check that the Fixed Asset Department estimates are reasonable and therefore that the basis on which the Claimant claims compensation reflects its actual depreciation costs. On that basis, the Claimant's claim for depreciation costs must be fully rejected as inflated and unsubstantiated and contrary to the principles of recovery under the Contract. The issue in this case is that neither the information necessary to assess the actual depreciation cost of equipment nor the build-up of these estimates has been disclosed by the Claimant. With this information, one would have been able to easily assess the actual depreciation costs incurred by Archirodon for each piece of equipment ...*"

244. Although this was already noted by Mr Kitt in his first expert report[335], Mr Wishart has surprisingly not performed this check and it is still unclear why neither Archirodon's build-up of these estimates nor its plant depreciation policy nor its equipment purchase price, age or resale value, have been disclosed. In this respect, the Respondent requests the Tribunal to draw adverse inferences[336]. In the absence of evidence of the Claimant's claim, Mr Kitt could not perform a detailed analysis of actual depreciation costs of equipment deployed on the project. The "best [he] could do", given that his preliminary estimation of the actual depreciation costs of several pieces of equipment showed that they were consistently lower than the claimed costs, was to determine an appropriate discount to apply to the claimed costs, determined by reference to the average gap between claimed and actual depreciation costs of the sample items analysed[337]. As Mr Kitt explained in the first quantum Joint Statement and at the Hearing, this is not a "definitive calculation", since the Claimant has failed to produce the information necessary to perform a precise calculation, but this is the best alternative approach he could offer to the Tribunal, based on the limited information available to him:

> *"I do not suggest to the Tribunal that my assessment is definitive but it highlights to me that the Claimant's claim appears to be overstated. It will be evident to the Tribunal that I have reduced the claimed amounts for depreciation and reserves to 40% of the Claimant's claimed amounts to give the Claimant the benefit of any doubt seeing as my assessment (which suggested that the real adjustment could have been as low as 30%) was based on estimated values"[338].*

[334] Kitt Quantum Reply Report, p.67 (Table 4 and paras. 6.2.23-24 **[D96: Folder D5/Tab 96]**; Transcript Day 8, 235:11-25 (presentation of Mr Kitt) **[M8: Folder M1/Tab 8]**.

[335] Kitt Quantum Report, p.70 (paragraph 7.2.29) **[D94: Folder D5/Tab 94]**.

[336] "Underlying Documents for the figures of prolongation costs allegedly incurred by Archirodon" and in particular "depreciation-policy for plant owned by Archirodon" were requested by the Respondent as part of its Request for Document Production No. 39.

[337] Kitt Quantum Reply Report, p.66 (paragraph 6.2.22) **[D96: Folder D5/Tab 96]**. As Mr Kitt determined, on the basis of few items analysed, that the estimated actual costs represented on average 29% of the claimed costs (ranging from 22% to 38%), he reduced the value of this claim to 40% of the claimed costs (conservative rounding in favour of the Claimant to account for uncertainty).

[338] Quantum Joint Statement, p.18 (Item JS 185) **[D101: Folder D5/Tab 101, p.2795]**. See also Kitt Quantum Reply Report, p.66 (paragraph 6.2.25 **[D96: Folder D5/Tab 96]**; Transcript Day 8, 235:11 – 237:7 (presentation of Mr Kitt) **[M8: Folder M1/Tab 8]**.

214

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

845.    The same issue arises regarding reserve costs, which are part of the same "Owned Equipment" category and for which the Fixed Asset Department has also provided estimates on which the Claimant and Mr Wishart rely for their valuation. Mr Kitt has accordingly applied the same discount to reserve costs[339]. He was not cross-examined on this issue at the Hearing. As to costs of spare parts, Mr Kitt has included only the cost of items which were described as "spare parts". Mr Kitt has excluded other sub-categories for which the Claimant provides no "*detail or explanation as to why the[se] other sub-categories (Used Materials, Repairs by Third parties and Materials) have been included in the Spare Parts claim*"[340]. Mr Kitt was not cross-examined on this issue. As to legal costs, Mr Kitt has removed from the prolongation costs legal costs charged by Tamimi and Clyde & Co which, in Mr Kitt's view, are not time-related. Mr Kitt was not cross-examined on this issue. Accordingly, assuming that the Respondent was fully responsible for all three alleged delay events, the Claimant's compensation for prolongation costs should be limited to US$ 5,398,689 (on the basis of a period of prolongation period of 122 days and after having removed or adjusted the unsupported, inflated or not time-related costs)[341].

846.    By email of 28 February 2019 the Tribunal raised the following question for the Parties:

> "*Question 1: As regards the Claimant's claim for prolongation: at the moment the experts have provided some information as regards daily rates for different time slices. For example, Mr Kitt has provided such information at p.105 of the Respondent's PHB and the tables at pp.19 and 20 of the Second Joint Statement of the Quantum Experts. These rates vary considerably (ranging from 28,583 per day and 97,425 per day). However, the Tribunal does not appear to have figures for all periods (for example we do not appear to have Mr Kitt's figures for May 2016 and July 2017). Although the figure of 28,583 may be applicable to the early part of this period the likelihood is that the figure tapers down. On the basis that, if an award of prolongation is made, it should involve applying different rates for different periods, the Tribunal invites the parties/experts to provide all such rate material, or, if the experts believe they have already provided such material, identify precisely where it may be located.*"

847.    The Parties replied in the following terms on 6 March 2019:

> "*Question 1: the Parties confirm that the applicable daily rates calculated by Messrs Wishart and Kitt are as set out in Attachment 1 to the Quantum Experts' First Joint Statement (D101: Folder D5/Tab 101, p. 2805). The Respondent notes that, with respect to the daily rates calculated by Mr Kitt, the figures indicated in the column "cost per day" included in the tables provided by Mr Kitt on pp. 19-20 or pp. 129-140 (Appendix 2) of the Second Joint Quantum Statement, also reproduced on p. 105*

---

[339] Kitt Quantum Reply Report, p.68 (paragraphs 6.2.26-28) [**D96: Folder D5/Tab 96**].
[340] Kitt Quantum Reply Report, p.69 (paragraph 6.2.31) [**D96: Folder D5/Tab 96**].
[341] Kitt Quantum Statement dated 30 October 2018, p.20 (Section 4) (paragraph 4.8.4) and Appendix 2 [**D103**].

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF                                215
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

*of the Respondent's Reply Post-Hearing Submission, represent the average daily cost of prolongation in the windows identified by Mr Cookson, calculated based on the daily rates included in the column entitled "Mr Kitt's Assessment" in Attachment 1 to the Quantum Experts' First Joint Statement. The Respondent confirms that, should the Tribunal adopt Mr Kitt's assessment of the daily rates, then the daily rates included in Attachment 1 to Quantum Experts' First Joint Statement should be used for all other periods".*

848.    As noted in paragraph 751 above, the Claimant is entitled to an extension of time of 726 days in relation to Delay Event 3 (the only extension to which it is entitled).    That period is calculated as follows (see Section VII above, where Mr Cookson's Time Periods are accepted):

848.1    40 days in Time Period 1 (8 December 2012 – 22 March 2014).

848.2    10 days in Time Period 2 (23 March 2014 – 17 June 2014).

848.3    37 days in Time Period 3 (18 June 2014 – 20 September 2014).

848.4    97 days in Time Period 4 (21 September 2014 – 28 December 2015).

848.5    542 days in Time Period 5 (29 December 2015 – 18 July 2017).

849.    Hearing Bundle Page 2805:

## Quantum Experts' Joint Statement - Attachment 1
## Summary of the Monthly Time-Related Costs

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| December 2012 | 24 | 42,583.92 | 1,774.33 | 42,583.92 | 1,774.33 |
| January 2013 | 31 | 241,890.95 | 7,802.93 | 235,672.37 | 7,602.33 |
| February 2013 | 28 | 329,446.50 | 11,765.95 | 327,081.60 | 11,681.49 |
| March 2013 | 31 | 636,838.68 | 20,543.18 | 630,982.39 | 20,354.27 |
| April 2013 | 30 | 629,054.90 | 20,968.50 | 619,989.70 | 20,666.32 |
| May 2013 | 31 | 700,330.16 | 22,591.30 | 677,390.25 | 21,851.30 |
| June 2013 | 30 | 926,014.54 | 30,867.15 | 879,218.18 | 29,307.27 |
| July 2013 | 31 | 1,325,745.58 | 42,765.99 | 1,250,549.98 | 40,340.32 |
| August 2013 | 31 | 1,538,066.21 | 49,615.04 | 1,441,297.94 | 46,493.48 |
| September 2013 | 30 | 1,990,933.96 | 66,364.47 | 1,865,939.99 | 62,198.00 |
| October 2013 | 31 | 2,451,886.79 | 79,093.12 | 2,271,066.22 | 73,260.20 |
| November 2013 | 30 | 2,525,877.14 | 84,195.90 | 2,303,544.47 | 76,784.82 |
| December 2013 | 31 | 2,621,682.86 | 84,570.41 | 2,355,229.18 | 75,975.13 |
| January 2014 | 31 | 2,205,279.92 | 71,138.06 | 1,931,877.36 | 62,318.62 |
| February 2014 | 28 | 3,020,026.62 | 107,858.09 | 2,704,466.55 | 96,588.09 |

216

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| March 2014 | 31 | 2,848,577.49 | 91,889.60 | 2,501,112.06 | 80,681.01 |
| April 2014 | 30 | 2,787,914.74 | 92,930.49 | 2,413,746.28 | 80,458.21 |
| May 2014 | 31 | 2,946,425.29 | 95,045.98 | 2,558,871.44 | 82,544.24 |
| June 2014 | 30 | 3,240,220.58 | 108,007.35 | 2,821,715.82 | 94,057.19 |
| July 2014 | 31 | 2,826,923.37 | 91,191.08 | 2,379,792.51 | 76,767.50 |
| August 2014 | 31 | 3,162,967.43 | 102,031.21 | 2,686,713.23 | 86,668.17 |
| September 2014 | 30 | 3,499,215.24 | 116,640.51 | 3,024,205.84 | 100,806.86 |
| October 2014 | 31 | 3,461,663.74 | 111,666.57 | 2,970,707.58 | 95,829.28 |
| November 2014 | 30 | 3,731,575.14 | 124,385.84 | 3,202,637.86 | 106,754.60 |
| December 2014 | 31 | 3,688,261.62 | 118,976.18 | 3,143,309.55 | 101,397.08 |
| January 2015 | 31 | 3,406,772.18 | 109,895.88 | 2,874,431.06 | 92,723.58 |
| February 2015 | 28 | 3,397,764.39 | 121,348.73 | 2,915,226.76 | 104,115.24 |
| March 2015 | 31 | 2,996,546.71 | 96,662.80 | 2,547,118.50 | 82,165.11 |
| April 2015 | 30 | 2,905,958.65 | 96,865.29 | 2,505,814.41 | 83,527.15 |
| May 2015 | 31 | 2,979,327.15 | 96,107.33 | 2,590,023.60 | 83,549.15 |
| June 2015 | 30 | 2,799,722.55 | 93,324.09 | 2,416,958.57 | 80,565.29 |
| July 2015 | 31 | 2,443,848.60 | 78,833.83 | 2,109,949.67 | 68,062.89 |
| August 2015 | 31 | 1,888,815.08 | 60,929.52 | 1,662,551.54 | 53,630.69 |
| September 2015 | 30 | 1,251,049.29 | 41,701.64 | 1,082,253.30 | 36,075.11 |
| October 2015 | 31 | 1,213,429.56 | 39,142.89 | 1,040,990.41 | 33,580.34 |
| November 2015 | 30 | 1,240,972.04 | 41,365.73 | 1,066,228.28 | 35,540.94 |
| December 2015 | 31 | 1,071,065.92 | 34,550.51 | 903,825.29 | 29,155.65 |
| January 2016 | 31 | 1,068,490.97 | 34,467.45 | 901,250.34 | 29,072.59 |
| February 2016 | 29 | 1,044,885.26 | 36,030.53 | 870,102.02 | 30,003.52 |
| March 2016 | 31 | 1,031,217.74 | 33,265.09 | 873,296.22 | 28,170.85 |
| April 2016 | 30 | 1,030,551.77 | 34,351.73 | 890,227.25 | 29,674.24 |
| May 2016 | 31 | 894,350.01 | 28,850.00 | 775,825.20 | 25,026.62 |
| June 2016 | 30 | 370,812.10 | 12,360.40 | 356,106.62 | 11,870.22 |
| July 2016 | 31 | 236,287.83 | 7,622.19 | 221,582.35 | 7,147.82 |
| August 2016 | 31 | 355,732.82 | 11,475.25 | 329,642.34 | 10,633.62 |
| September 2016 | 30 | 231,907.44 | 7,730.25 | 215,201.96 | 7,173.40 |
| October 2016 | 31 | 243,105.08 | 7,842.10 | 228,399.60 | 7,367.73 |
| November 2016 | 30 | 151,737.44 | 5,057.91 | 131,829.96 | 4,394.33 |
| December 2016 | 31 | 433,037.81 | 13,968.96 | 416,442.33 | 13,433.62 |
| January 2017 | 31 | 303,027.39 | 9,775.08 | 287,321.91 | 9,268.45 |
| February 2017 | 28 | 376,048.03 | 13,430.29 | 361,342.55 | 12,905.09 |
| March 2017 | 31 | 303,443.09 | 9,788.49 | 285,070.61 | 9,195.83 |
| April 2017 | 30 | 318,346.34 | 10,611.54 | 299,745.86 | 9,991.53 |
| May 2017 | 31 | 303,648.37 | 9,795.11 | 286,637.89 | 9,246.38 |
| June 2017 | 30 | 388,599.87 | 12,953.33 | 371,765.39 | 12,392.18 |

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

217



| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| July 2017 | 31 | 427,423.51 | 13,787.86 | 412,718.03 | 13,313.48 |
| August 2017 | 6 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total | 1,703 | 90,487,328.36 | | 79,469,582.14 | |

850.  For Time Period 1 : 40 days in period 8 December 2012 – 22 March 2014. Mr Kitt's figures are:

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| December 2012 | 24 | | | 42,583.92 | 1,774.33 |
| January 2013 | 31 | | | 235,672.37 | 7,602.33 |
| February 2013 | 28 | | | 327,081.60 | 11,681.49 |
| March 2013 | 31 | | | 630,982.39 | 20,354.27 |
| April 2013 | 30 | | | 619,989.70 | 20,666.32 |
| May 2013 | 31 | | | 677,390.25 | 21,851.30 |
| June 2013 | 30 | | | 879,218.18 | 29,307.27 |
| July 2013 | 31 | | | 1,250,549.98 | 40,340.32 |
| August 2013 | 31 | | | 1,441,297.94 | 46,493.48 |
| September 2013 | 30 | | | 1,865,939.99 | 62,198.00 |
| October 2013 | 31 | | | 2,271,066.22 | 73,260.20 |
| November 2013 | 30 | | | 2,303,544.47 | 76,784.82 |
| December 2013 | 31 | | | 2,355,229.18 | 75,975.13 |
| January 2014 | 31 | | | 1,931,877.36 | 62,318.62 |
| February 2014 | 28 | | | 2,704,466.55 | 96,588.09 |
| March 2014 | 31 | | | 2,501,112.06 | 80,681.03 |

A practical method of calculating prolongation is to calculate an average daily rate for the 16 month period. The sum of the daily rates is 727,877.00. Dividing by 16 gives the per day figure: 45,492.31. Hence, the award of prolongation for that period is: 40 days x 45,492.31 = US$1,819,692.40.

851.  For time Period 2: 10 days in period 23 March 2014 – 17 June 2014.  Mr Kitts' figures are:

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |

218

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| March 2014 | 31 | | | 2,501,112.06 | 80,681.03 |
| April 2014 | 30 | | | 2,413,746.28 | 80,458.21 |
| May 2014 | 31 | | | 2,558,871.44 | 82,544.24 |
| June 2014 | 30 | | | 2,821,715.82 | 94,057.19 |

Thus, adopting the methodology as above and calculating an average daily rate for the 4 month period: the sum of the daily rates is 337,740.67. Dividing by 4 gives the per day figure: 84,435.17. Hence, the award of prolongation for that period is: 10 days x 84,435.17 = US$844,351.70

852.   <u>For Time Period 3:</u>  For the 37 days in period 18 June 2014 – 20 September 2014, the figures from Mr Kitt for those months are:

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| June 2014 | 30 | 3,240,220.58 | 108,007.35 | 2,821,715.82 | 94,057.19 |
| July 2014 | 31 | 2,826,923.37 | 91,191.08 | 2,379,792.51 | 76,767.50 |
| August 2014 | 31 | 3,162,967.43 | 102,031.21 | 2,686,713.23 | 86,668.17 |
| September 2014 | 30 | 3,499,215.24 | 116,640.51 | 3,024,205.84 | 100,806.86 |

Adopting the methodology as above and calculating an average daily rate for the 4 month period: the sum of the daily rates is 358,299.72. Dividing by 4 gives the per day figure: 89,574.93. Hence, the award of prolongation for that period is: 37 days x 89,574.93 = US$3,314,272.40

853.   <u>For Time Period 4:</u>  For the 97 days in period 21 September 2014 – 28 December 2015, the figures from Mr Kitt for those months are:

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| September 2014 | 30 | | | 3,024,205.84 | 100,806.86 |
| October 2014 | 31 | | | 2,970,707.58 | 95,829.28 |
| November 2014 | 30 | | | 3,202,637.86 | 106,754.60 |
| December 2014 | 31 | | | 3,143,309.55 | 101,397.08 |
| January 2015 | 31 | | | 2,874,431.06 | 92,723.58 |

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| February 2015 | 28 | | | 2,915,226.76 | 104,115.24 |
| March 2015 | 31 | | | 2,547,118.50 | 82,165.11 |
| April 2015 | 30 | | | 2,505,814.41 | 83,527.15 |
| May 2015 | 31 | | | 2,590,023.60 | 83,549.15 |
| June 2015 | 30 | | | 2,416,958.57 | 80,565.29 |
| July 2015 | 31 | | | 2,109,949.67 | 68,062.89 |
| August 2015 | 31 | | | 1,662,551.54 | 53,630.69 |
| September 2015 | 30 | | | 1,082,253.30 | 36,075.11 |
| October 2015 | 31 | | | 1,040,990.41 | 33,580.34 |
| November 2015 | 30 | | | 1,066,228.28 | 35,540.94 |
| December 2015 | 31 | | | 903,825.29 | 29,155.65 |

Adopting the methodology as above and calculating an average daily rate for the 16 month period: the sum of the daily rates is 1,187,478.80. Dividing by 16 gives the per day figure: 74,217.43. Hence, the award of prolongation for that period is: 97 days x 74,217.43 = <u>US$7,199,090.20</u>

For Time period 5: For the 542 days in period 29 December 2015 – 18 July 2017, the figures from Mr Kitt for those months are:

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| December 2015 | 31 | | | 903,825.29 | 29,155.65 |
| January 2016 | 31 | | | 901,250.34 | 29,072.59 |
| February 2016 | 29 | | | 870,102.02 | 30,003.52 |
| March 2016 | 31 | | | 873,296.22 | 28,170.85 |
| April 2016 | 30 | | | 890,227.25 | 29,674.24 |
| May 2016 | 31 | | | 775,825.20 | 25,026.62 |
| June 2016 | 30 | | | 356,106.62 | 11,870.22 |
| July 2016 | 31 | | | 221,582.35 | 7,147.82 |
| August 2016 | 31 | | | 329,642.34 | 10,633.62 |
| September 2016 | 30 | | | 215,201.96 | 7,173.40 |
| October 2016 | 31 | | | 228,399.60 | 7,367.73 |
| November 2016 | 30 | | | 131,829.96 | 4,394.33 |
| December 2016 | 31 | | | 416,442.33 | 13,433.62 |
| January 2017 | 31 | | | 287,321.91 | 9,268.45 |
| February 2017 | 28 | | | 361,342.55 | 12,905.09 |
| March 2017 | 31 | | | 285,070.61 | 9,195.83 |

220

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

| Month | Duration | Mr Wishart's Assessment | | Mr Kitt's Assessment | |
|---|---|---|---|---|---|
| | | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] | Monthly Indirect Costs [US$] | Daily Indirect Costs [US$] |
| April 2017 | 30 | | | 299,745.86 | 9,991.5 |
| May 2017 | 31 | | | 286,637.89 | 9,246.3 |
| June 2017 | 30 | | | 371,765.39 | 12,392.1 |
| July 2017 | 31 | | | 412,718.03 | 13,313.4 |

855.    An average daily rate for the 20 month period: the sum of the daily rates is 309,437.15. Dividing by 20 gives the per day figure: 15,471.86. Hence, the award of prolongation for that period is: 542 x 15,471.86 = US$8,385,748.10.

856.    Thus, the total prolongation award to the Claimant is **US$21,563,154,** comprising:

856.1    Period 1: US$1,819,692.40

856.2    Period 2: US$844,351.70

856.3    Period 3: US$3,314,272.40

856.4    Period 4: US$7,199,090.20

856.5    Period 5: US$8,385,748.10

**Schedule Item 7:  Letter of Credit**

**A.    Summary of the Claim and its Background**

857.    The Claimant claims in this arbitration the payment by the Respondent of some amounts related to the charges incurred for the extension of the letter of credit opened by the Respondent under the Contract Agreement (Article 4) (the "Letter of Credit"), which had eventually been borne by the Claimant. The Claimant submits that the extension of the Letter of Credit was a consequence of the delays to the Project for which the Respondent is responsible. Therefore, in the Claimant's opinion, all such charges have to be borne by the Respondent and reimbursed to the Claimant.

858.    In that context, the Claimant made reference in its allegations to the payments due by the Respondent under Interim Payment Certificates No. 30 and No. 36. It then referred to payments due by the Respondent under Interim Payment Certificates No. 20 and No. 33. At the same time, the Claimant mentioned an amount of US$45,993.62 (which the Claimant converts to €38,446.56) directly paid to the Respondent's bank.

859.    The correspondence between the Parties in such regard can be summarized as follows.

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

221

On 9 July 2016, the Claimant noted (Exhibit C-233) that the Respondent had failed to pay, within the prescribed time, the amount of the Interim Payment Certificate No. 30. It therefore gave the Respondent a 21 days' notice under GC 16.1 and informed it that:

> "the Contractor may, after 21 days from this date [the date of the notice], suspend (or reduce the rate of work) unless and until the Contractor has received Interim Payment No. 30 in full as certified by the Engineer".

On 12 July 2016, the Engineer wrote to the Claimant asking whether it had received the payment (Exhibit C-234). The Engineer provided a copy of the "Employer's Certificate" and advised that the Respondent had made "an interim amendment", deducting amounts on which the Engineer was seeking clarification.

On 19 July 2016, the Claimant confirmed to the Engineer that it had not received the funds related to Interim Payment Certificate No. 30, contested the deduction made by the Respondent and noted that the Respondent had no right whatsoever to interfere with or amend the Engineer's certificates in any ways.

On 6 October 2016, the Claimant wrote to the Engineer reiterating that the Claimant had failed to pay in full the amounts certified by the Engineer under, inter alia, Payment Certificate No. 30 (Exhibit C-236). At the same time, the Claimant indicated that it had reviewed the payments made by the Respondent, recording the following "incompliances":

| IPC | Amount Certified | Amount Paid | Difference | Outstanding Amount | Remarks |
|---|---|---|---|---|---|
| 19 | 11,225,054.57 | 10,503,009.25 | 722,045.32 | - | Paid latter under IPC 23 |
| 20 | 2,141,491.55 | 2,055,577.76 | 85,913.79 | 85,913.79 | Deduction made by the Employer for amendment charges of LC |
| 30 | 5,009,188.81 | 4,784,081.74 | 225,107.07 | 225,107.07 | Deduction made by the Employer. Not paid till this date |
| 31 | 4,434,648.07 | 4,420,578.88 | 14,069.19 | 14,069.19 | Deduction made by the Employer. Not paid till this date |
| | | Total Outstanding Amount | | 325,090.05 | |

On 24 November 2016, the Engineer wrote to the Claimant stating that it was seeking further clarification from GCPI in relation to the "amendment charges of the LC" (Exhibit C-237).

On 4 December 2016, Archirodon again contested the deductions made by GCPI

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

222

Payment No. 30 and the deduction in relation to the *"charges of the LC"* (Exhibit C-238). In that respect, the Claimant indicated that:

> *"There is no provision in the Contract to the effect that charges for the LC will be borne by the Contractor. It is in fact the Employer unilateral decision to make payments through LC.*
>
> *If the Employer considers himself entitled to recover these charges, the Employer should have raised an Employer's claim pursuant to Sub-Clause 2.5 for the Engineer's Determination in accordance with Sub-Clause 3.5. Only after being determined by the Engineer, a deduction may be certified by the Engineer.*
>
> *The Employer failed to follow the prescribed contractual mechanism for an Employer's claim; moreover, the Employer is not entitled to make any deductions whatsoever to any certified payment."*

866.  On 14 December 2016, the Engineer transmitted to the Claimant a letter (in Arabic) from the Respondent on the *"issue of Fees for the Extension of the Letter of Credit"* (Exhibit C-239), noting that:

> *"... the Contract is in delay and thus the Letter of Credit had to be extended for obvious practical reasons.*
>
> *The issue of the Project Delay (and the responsibility or extent of such) to the Project Contract is the subject of current arbitration proceedings, taken by Archirodon, and subjects such as extensions to a Letter of Credit might form part of these proceedings."*

867.  On 26 April 2017, the Claimant served further notice under GC 16.1 in relation to delays in the payment of Interim Payment Certificate No. 33 (Exhibit C-240).

868.  On 21 May 2017, the Claimant informed the Engineer that it had been advised by the bank that the Interim Payment Certificate No. 33 would be credited in *"an unjustified reduced amount of €721,377.21"*, after the deduction of €325,078.01 (Exhibit C-241, and the attached swift message).

869.  On 22 May 2017, the Engineer acknowledged receipt of the Claimant's letter and promised to *"try and seek prompt resolution of the matter"* with the Respondent (Exhibit C-242).

870.  On 6 June 2017 (Exhibit C-243) and 12 June 2017 (Exhibit C-245), the Claimant insisted for the full payment under Interim Payment Certificate No. 33. On 7 June 2017 (Exhibit C-244) and 12 June 2017 (Exhibit C-246), the Engineer confirmed its effort to obtain clarifications from the Respondent.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

223

871.    On 20 July 2017, the bank account of the Claimant was debited with US$45,993.62 with respect to "*Advising Charges for Export LC*" (Exhibit GK-13).

872.    On 10 August 2017, the Engineer transmitted to the Claimant the Respondent's letter No. 1/3/10/21557 dated 8 August 2017 (Exhibit C-247), advising that:

> "… the Employer's obligation to bear the fees of the L/C extension inside Iraq is applicable during the contract period. Since there is no any addendum to extend the contract period which ended at 7th August 2014, the contractor should bear the fees of the L/C extension after that date, as the reason to extend the L/C is the contractor failed to complete the contract works within the contract period."

873.    On 20 August 2017, the Claimant submitted its "*Statement at Completion (Interim Payment Certificate No. 36)*" (Exhibit C-248).  Such statement included schedules relating to "*L/C Extension Charges*" in the amount of US$45,993.62, and "*Overdue Payments (Amount Certified but Not Paid)*" relating to Interim Payment Certificate No. 20 (for €85,913.79) and to Interim Payment Certificate No. 33 (for €325,078.01) for a total amount of €410,991.80.

874.    On 5 September 2017, the Engineer issued the Interim Payment Certificate No. 36 (Exhibit C-249). With respect to "*L/C Extension Charges*", the Engineer referred to the Claimant's position expressed in the letter dated 8 August 2017.

875.    On 18 September 2017, the Claimant disputed the deductions made in the Interim Payment Certificate No. 36 and maintained to be entitled to the amounts included in the Statement at Completion.  More specifically, with regard to "*Non-payment of certified amounts – Undue deductions made by the Employer*", the Claimant noted the following:

> "The Contractor rejects the Employer's letter … dated 8th August 2017 enclosed to the Engineer's letter … dated 10th August 2017 for the following reasons:
>
> -    First, Sub-Clause 14.7 is clear that "The Employer shall pay to the Contractor: (b) the amount certified in each Interim Payment Certificate …". The Employer is therefore in default of not paying a certified amount.
>
> -    Second, there is no provision in the Contract to the effect that charges for the LC will be borne by the Contractor. It is in fact Employer unilateral decision to make payments through L/C.
>
> -    Third, in the event that the Employer considers itself entitled to recover these charges, the Employer should have raised an Employer's claim under Sub-Clause 2.5 for the Engineer's determination in accordance with GC Sub-Clause 3.5. This did not happen. Accordingly, the Employer is not entitled to make any of the deductions to the certified amounts.
>
> -    Fourth, the Employer argument that the Contractor is liable …

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

224

the L/C because of the allegedly inexcusable delay is contractual unsustainable. The Employer has claimed, and the Engineer has determined and certified, the deduction of the full amount of the delay damages. Clause 8.7 clearly provides that "these delay damages shall be the on damages due from the Contractor". Thus, as the delay damages have been already deducted, the Employer is not allowed any further damages.

-    In conclusion, attributing the charges of the L/C extensions to the Contractor's obligation is contractually and legally unsustainable, therefore the Employer must pay the withheld certified amounts and other charges paid directly by the Contractor to the Employer's bank in relation to the L/C extension charges."

## B.    **The Position of the Parties**

The Position of the Claimant

876.    The Claimant, as indicated, claims in this arbitration the payment by the Respondent of some amounts related to the charges incurred for the extension of the Letter of Credit, eventually borne by the Claimant. The Claimant's position can be summarised as follows.

877.    In its Reply to the Statement of Defence of 19 September 2017 (§ 453), the Claimant submitted to be entitled, in addition to an Extension of Time in respect of the Delay Events, also to compensation for the additional costs it had suffered as a result of having to retain Project resources for this extended period of time as well as other costs. In that framework, the Claimant noted that the Respondent had failed to pay amounts certified under Interim Payment Certificate No. 30 and that the Engineer had failed to certify amounts properly due under Interim Payment Certificate No. 36. The Claimant declared that those amounts related to charges allegedly incurred by the Respondent in extending the Letter of Credit beyond the Time for Completion. However, the Claimant submitted that, as it is entitled to an extension of time up to the date of taking over, it is not liable for any such charges.

878.    The Claimant's Reply to the Statement of Defence had attached the following table (Exhibit C-251) detailing the "L/C Extension Charges" as follows:

| L/C EXTENSION CHARGES DEDUCTED FROM IPC | | | | |
|---|---|---|---|---|
| S/N | IPC | Amount Certified by Engineer (€) | Amount Paid by Employer (€) | Overdue Amount (€) |
| 1 | IPC 20 | 2,141,491.55 | 2,055,577.76 | € 85,913.79 |
| 2 | IPC 33 | 1,046,455.22 | 721,377.21 | € 325,078.01 |
| SUB-TOTAL | | | | € 410,991.80 |

L/C EXTENSION CHARGES DIRECTLY PAID BY ARCHIRODON TO EMPLOYER'S BANK

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
Ports of Iraq (Iraq)

225

| | | | | |
|---|---|---|---|---|
| **L/C EXTENSION CHARGES DEDUCTED FROM IPC** | | | | |
| **S/N** | **Description** | **Claim Amount (US$)** | **Exchange Rate (15 September 2017)** | **Claim Amount (€)** |
| 1 | L/C Extension Charges | 45,993.62 | 1.1963 | € 38,446.56 |
| | **SUB-TOTAL** | | | **€ 38,446.56** |
| | **TOTAL** | | | **€ 449,438.36** |

179.   In support of such claim, the Claimant made reference to the Second Witness Statement of Mr Ahmed Shebl dated 19 September 2017 (§§ 145-165).  Indeed, of Mr Shebl in that statement concluded that:

> "The amount deducted by GCPI for the charges of extending the L/C remains unpaid and further charges were imposed by GCPI bank on Archirodon in order to extend the validity of the L/C and make the payments. I believe this is completely incorrect and Archirodon should be compensated for these unjustified deductions and charges. These deductions and charges amount to €449,438.36."

180.   In his Expert Report on Quantum dated 15 May 2018, Mr Iain Wishart indicated, with regard to the "Letter of Credit Extension Charges", that he had checked the Claimant's Reply to the Statement of Defence, Claimant's Exhibit C-251, Mr Shebl's Second Witness Statement and the supporting documents, and declared the following:

> "7.4.43   ... I found that the Engineer had indeed certified an amount of €1,046,455 under IPC33. However, the Claimant received €721,377, leaving an outstanding balance €325,078.
>
> 7.4.44   Likewise I checked the certification and payment collection records for IPC 20 and found that the amount certified by the Engineer was €2,141,492. The amount received by the Claimant was €2,055,578, leaving an outstanding balance of €85,914.
>
> 7.4.45   I am unable to determine if the amounts deducted related purely to the cost of extending the Letter of Credit (L/C) as I have not seen any details from the Respondent to support its deductions made to the Engineer's certifications.
>
> 7.4.46   On the presumption that the deductions made by the Respondent to the amounts certified by the Engineer related solely to costs for extending the L/C, I consider that the outstanding balance for IPC 20 and IPC 33 is €410,992 (€325,078 plus €85,914), which corresponds with the Claimant's calculations at its Exhibit C-0251.
>
> 7.4.47   In addition to the amounts deducted by the Respondent from the Engineer's certifications, the Claimant claims that it also had to pay charges of US$45,994 (equivalent of €38,447) for extending the L/C directly to the Respondents bank.
>
> 7.4.48   I requested and was provided by the Claimant with proof of payment of the above amount to the Respondent's bank, which I include as Exhibit 7-0-3 of this report."

226

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Ira

> 7.4.49    *I have checked the proof of payment and I am satisfied that the Claimant paid US$45,994 in connection with L/C charges.*
>
> 7.4.50    *Whether or not the Respondent was entitled to make such deductions for extending the L/C, or indeed whether or not the cost is deemed to be included as part of the Liquidated Damages levied against the Claimant, is a legal matter and I do not proffer an opinion."*

881.    In his Expert Reply Report on Quantum dated 14 June 2018, then, Mr Wishart (at § 7.5.1) "carried forward") in his calculations the amount of US$45,994 corresponding to the direct payment by the Claimant of the charges for the extension of the Letter of Credit, and mentioned it specifically in the final summary of the Claimant's entitlement. At the same time, Mr Wishart indicated that the deduction of €410,992 from the Interim Payment Certificate was already taken into account in that final summary with respect to the total amount paid to the Claimant.

882.    In its Post-Hearing Submission of 2 November 2018 (§§ 539-543), the Claimant referred again to Mr Shebl's Second Witness Statement, and indicated that the amounts, which the Respondent had failed to pay under Interim Payment Certificate No. 30 and Interim Payment Certificate No. 36, related to charges allegedly incurred by the Respondent in extending the Letter of Credit beyond the Time for Completion. However, the Claimant noted that the Respondent had not set out any contractual or legal basis under Iraqi law permitting it to deduct such amounts. If the Claimant had caused any delay to the Project (which is denied), the recourse for the Respondent under the Contract was only to levy delay damages, and not to unilaterally deduct amounts related to the extension of the Letter of Credit. Accordingly, the Claimant is not liable for any such charges under the Contract or otherwise and is entitled to reimbursement of all the charges withheld, as specified in Mr Wishart's report.

883.    In the Post-Hearing Reply Submission of 28 November 2018 (§ 298), the Claimant confirmed to be entitled to:

883.1    *"US$45,994"* for the direct payment made to the Respondent's bank; and

883.2    *"US$410,992"* for the deducted payments from Interim Payment Certificates Nos. 20 and 33.

## The Position of the Respondent

884.    The Respondent submits that the Claimant's claim for compensation for charges allegedly incurred by GCPI in extending the Letter of Credit must be dismissed.

Dr. Robert Galtskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas )
Company S.A. (Panama)
v.
for Ports of Iraq (Iraq)

227

More specifically, in its Pre-Hearing Submissions of 6 July 2018, the Respondent contended that:

885.1  The Claimant has not established any entitlement to an Extension of Time, and therefore cannot recover any costs for the alleged extension of the Letter of Credit.

885.2  Additionally, charges related to the Letter of Credit would constitute an indirect loss, which is excluded by GC 17.6.

885.3  In any event, these amounts are unsubstantiated.

886.  In that regard, the Respondent points at Mr Wishart's Expert Report on Quantum dated 15 May 2018, and refers to the declaration of its quantum expert, Mr Gary Kitt, who, in his report of 15 June 2018 (§§ 6.4.1-6.4.4), addressing the claim of US$45,993.62, declared to have the same difficulty as Mr Wishart to determine whether the amounts deducted related purely to the costs of extending the Letter of Credit, and introduced the following evaluations:

> "∘    *Primary valuation: $0.00; and*
> ∘    *Alternative valuation in the amount claimed.*"

887.  In its Post-Hearing Reply Report of 28 November 2018, then, the Respondent addressed the "*Claim for Letter of Credit Claim and for Deducted Payments from IPC 20 and 33*" (§§ 390-398), as contained in the Claimant's Post-Hearing Submission.

888.  In that regard, the Respondent contended that although the Claimant had made a vague allusion to "*charges allegedly incurred by GCPI in extending the letter of credit*" in its Reply to the Statement of Defence, it did not include in its Pre-Hearing Submission or prior submission any claim for reimbursement of the charges incurred in extending the Letter of Credit beyond the time for completion, quantified in its Post-Hearing Submission at US$45,994. In the same way, the Respondent submitted that, apart from vague references to alleged issues with Interim Payment Certificates Nos. 30 and 36 in its Reply to the Statement of Defence, the Claimant had not made any claim for reimbursement of alleged "*deducted Payments from IPC 20 and 33*" in its Pre-Hearing Submission. However, it claimed an amount of US$410,992 in its Post-Hearing Submission.

889.  According to the Respondent, these claims are not admissible under Article 22(4) of the ICC

228

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

Rules, which prevents a party to bring new claims falling outside the scope of the Terms of references in order to avoid taking the other party by surprise and to allow the proceedings to be managed smoothly and efficiently. The Claimant has not indicated any reason why this claim could not be made earlier, which is not surprising as there is none.

890.    In addition, these two claims are also global claims which should be rejected as such, and in any event because the Claimant is not entitled to an Extension of Time (let alone to an Extension of Time covering the entire project's delay). Furthermore, these claims are excluded by GC 17.6, as they are not directly and immediately caused by alleged Unforeseeable soil conditions, road restriction or a Force Majeure event and (if established) would constitute indirect or consequential damages.

891.    In any event, in the Respondent's opinion, those claims are based on *"false contentions"*:

891.1    contrary to what the Claimant asserts, the Respondent paid the amounts certified under Interim Payment Certificate No. 30. Interim Payment Certificate No. 30 was certified by the Engineer on 14 May 2016 in the amount of €5,009,188.81. On 21 July 2016, the Respondent paid to the Claimant €4,784,081.74. The reason why it retained payment of €225,107.07 was that it considered that part of the work was not compliant with the project specifications. Actually, this deduction related to *"Item 8 of the Schedule of Payment/Contract Amount Breakdown (Staging Platform Electronic Perimeter Surveillance)"*, and not, as misrepresented by Claimant, to *"charges allegedly incurred by GCPI in extending the Letter of Credit"*. Eventually, after *"additional installations"* were *"executed"* by the Claimant, the Respondent was satisfied that the work executed was compliant with the contact specifications and the outstanding balance of €225,107.07 was included in Interim Payment Certificate No. 33, which was paid by the Respondent;

891.2    the Respondent paid the full certified amounts for Interim Payment Certificates Nos. 20 and 33 (€2,141,491.55 and €1,046,455.22), as per its instructions to the Trade Bank of Iraq of 4 August 2015 and 7 March 2017.

### The Post-Hearing Correspondence

892.    On 10 December 2018, the Claimant sent a letter to the Tribunal, alleging that the Respondent, in its Reply Post-Hearing Submissions of 28 November 2018, had improperly introduced new arguments in respect of the Claimant's Letter of Credit claim. In that regard, the Claimant submitted that:

Dr. Robert Gaitskill QC
President
ICC Case No. 21785/ZF                    229
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

892.1   In the arbitration, Archirodon claims reimbursement of:

    (i)    US$410,991.80 in relation to amounts improperly deducted by the Respondent's bank from Interim Payment Certificates Nos. 20 and 33 due to charges allegedly incurred by the Respondent in extending the Letter of Credit beyond the Time for Completion. The deductions were improperly made from Interim Payment Certificates Nos. 20 and 33. In summary, the Engineer certified an amount of €2,141,491.55 in relation to Interim Payment Certificate No. 20, however, the Respondent's bank only paid the Claimant €2,055,577.76 in relation to Interim Payment Certificate No. 20, amounting to a deduction of €85,913.79. As for Interim Payment Certificate No. 33, the Respondent's bank only paid €721,377.21 out of the €1,046,455.22 certified by the Engineer in respect of Interim Payment Certificate No. 33, amounting to a deduction of €325,078.01.

    (ii)    US$45,993.62 (€38,446.56) in relation to a payment required to be made by the Claimant to the Respondent's bank in order to extend the validity of the Letter of Credit beyond the Time for Completion. In fact, after the deduction made to Interim Payment Certificate No. 33, the Respondent's bank refused to pay the Claimant the amounts to be certified in respect of Interim Payment Certificate no. 34 unless and until the Claimant paid it an amount of US$45,993.62 to cover the charges of extending the Letter of Credit beyond the Time for Completion.

892.2   The fact that the Respondent authorised the payments in respect of Interim Payment Certificates Nos. 20 and 33 is irrelevant in circumstances where the Claimant did not receive the full certified amounts for them, due to the deduction of charges which should have been paid by the Respondent, but were, instead, deducted from the Claimant's payments.

892.3   There is no dispute between the Parties or the quantum experts as to whether the mentioned amounts were deducted or incurred. Therefore, the Tribunal only needs to decide whether the Respondent and the Respondent's bank were entitled to deduct the costs of extending the Letter of Credit from the Claimant's certified payments. If they were not, then the Tribunal must order that Archirodon be reimbursed the

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.

relevant amounts.

892.4    The Respondent has sought to advance a new case in relation to the Letter of Credit claim in its Reply Post-Hearing Submissions, where, for the first time, it refers to deductions made to Interim Payment Certificate No. 30 and asserts that: *"This deduction relates to 'Item 8 of the Schedule of Payment/Contract Amount Breakdown (Staging Platform Electronic Perimeter Surveillance)', and not, as misrepresented by Claimant, to 'charges allegedly incurred by GCPI in extending the Letter of Credit"*. In the Claimant's opinion, not only is this a new argument which has never been included (in any way) in any of the Respondent's previous submissions, but it is also incorrect and misleading. Archirodon does not assert that the deductions to Interim Payment Certificate No. 30 were related to charges allegedly incurred by GCPI in extending the Letter of Credit. In fact, the deductions relating to the Letter of Credit were made from Interim Payment Certificates Nos. 20 and 33. As set out in the Claimant's letter to the Engineer dated 4 December 2016, the Claimant's complaints as they relate to Interim Payment Certificate No. 30 arise out of the fact that, due to GCPI's interference with the payment certification process, the deduction for *"Staging Platform Electronic Perimeter Surveillance"* was made twice, meaning that there was a delay in payment of certified amounts. Interim Payment Certificate No. 30 is only relevant in that it demonstrates GCPI's persistent interference with the payment certification process. Thus, Interim Payment Certificate No. 30 is unrelated to the Claimant's Letter of Credit Claim.

893.    On 12 December 2018, the Respondent answered the Claimant's letter of 10 December 2018, disputing its admissibility as an unsolicited submission, for which the Claimant had not sought leave, filed after the completion of the exchange of the Parties' post-hearing briefs, and which therefore should be disregarded. In any case, the Respondent made the following comments on the points raised by the Claimant:

893.1    The Claimant's two claims for (a) alleged cost of letter of credit (in the amount of US$45,993) and (b) alleged deduction from payments of IPC Nos. 20 and 33 (in the amount of US$410,992 – as indicated in the Post-Hearing Brief – or €410,992 – as indicated in the letter of 10 December 2018) are new claims, which it made for the first time in its first Post-Hearing Submissions. Such claims are inadmissible and must be rejected. Indeed, these two claims had not been made by the Claimant in its previous submissions, and, in particular, the amount of US$303,058,484 claimed by the Claimant in its Pre-Hearing Submissions did not include any such amount, and

the Claimant did not seek to amend its prayer for relief to introduce these new claims in this arbitration. It only did so for the first time in its Post-Hearing Submissions submitted on 2 November 2018.

893.2   Furthermore, as to the merits of these claims:

(i)   The Claimant now admits that the "*amounts certified under Interim Payment Certificate No. 30*" that the Respondent allegedly "*failed to pay*" do not "*relate to charges allegedly incurred by GCPI in extending the Letter of Credit beyond the Time of Completion*". In fact, the portion of the Interim Payment Certificate No. 30's payment relating to the staging platform electronic perimeter surveillance that had been withheld by the Respondent due to the Claimant's failure to meet the contractual specification (€225,107.07) had been re-instated in the Interim Payment Certificate No. 33 and paid by the Respondent. The Claimant's allegation that this amount has been deducted twice is entirely unsubstantiated and plainly wrong and, in fact, not even advocated by Mr Wishart, who does not identify any outstanding due balance for the Interim Payment Certificate No. 30.

(ii)  The Claimant now admits that it is not the Respondent which made certain alleged deductions for the Letter of Credit charges, but the Trade Bank of Iraq. In fact, the Respondent paid the full certified amounts for the Interim Payment Certificate Nos. 20 and 33 as per its instructions to the Trade Bank of Iraq of 4 August 2015 and 7 March 2017.

894.  On 13 December 2018, the Claimant replied the Respondent's letter of 12 December 2018, noting as follows:

894.1   The Respondent did not dispute the fact that it introduced in its Reply Post-Hearing Submissions a new case regarding Archirodon's Letter of Credit claim.

894.2   The Letter of Credit claim is not a "new claim" and was included in the Claimant's submissions and evidence, including the Reply to the Statement of Defence, the document entitled "*Impact on Contract Price*", exhibited thereto, Mr Shebl's Second witness Statement, the document entitled "*L/C Extension Charges*", attached thereto, Mr Wishart's First Expert Reports of 15 May 2018 and Mr Wishart's Reply Expert Report of 15 June 2018.

232

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

894.3   The Claimant claimed in its Pre-Hearing Submissions an amount of *"at least US$303,058,481"* in addition to, amongst other things, *"any other amounts ... to which Archirodon may be entitled under, or in connection with, the Contract"*. The US$303,058,481 clearly referred to the adjustments to the Contract Price claimed by Archirodon and not to the recovery of amounts wrongfully deducted from the Contract Price by the Respondent, as made clear in Mr Wishart's Expert. In any event, Archirodon's claimed amount was later updated by Archirodon in its Post-Hearing Submissions.

894.4   Regarding the currency of the Letter of Credit claim, and for the avoidance of doubt, the Claimant claims:

(i)   US$45,993.62 (€378,446.56) in relation to a payment required to be made by Archirodon to GCPI's bank in order to extend the validity of GCPI's Letter of Credit beyond the Time for Completion; and

(ii)   €410,991.80 in relation to amounts improperly deducted by GCPI's bank from Interim Payment Certificate Nos. 20 and 33 due to charges allegedly incurred by GCPI in extending the Letter of Credit beyond the Time for Completion.

894.5   The Interim Payment Certificate No. 30 does not form part of the Claimant's Letter of Credit claim and is only relevant to the Claimant's claim for financing costs in respect of delayed payments. Whilst the Claimant maintains that the amounts deducted from the Interim Payment Certificate No. 30 were deducted twice due to the unlawful interference of the Respondent with the certification process, the Claimant accepts that the deducted amounts were eventually paid, albeit late and following several complaints from the Claimant. The Claimant's position with regards to the Interim Payment Certificate No. 30 is, therefore, unchanged and entirely consistent with Mr Wishart's Expert Report.

894.6   Whether the deductions from the Interim Payment Certificate Nos. 20 and 33 were made by the Respondent or the Respondent's bank, the Trade Bank of Iraq, is a matter for the Respondent and is irrelevant to the Letter of Credit claim. The Respondent was obliged, in accordance with GC 14.7, to pay the amounts certified. It failed to do so. The reason for the Respondent's breach of the Contract in this

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

233

regard may be related to the actions of the Respondent's bank, but this does not, in any way, affect the Respondent's obligation and its breach of such obligation.

On 28 February 2019, the Tribunal addressed the Parties with a number of questions, for which the Parties' input was requested. With regard to the Letter of Credit claim, the Tribunal wrote the following:

> *"The Parties will recall the correspondence of December 2018, culminating in the Claimant seeking redress in its letter of 13.12.18 for sums ( USD 45,993.62 and EUR410,991.80) it says it did not receive (or was itself obliged to pay to the bank) because the Respondent had decided, without contractual justification, to oblige the Claimant to bear the cost of the Respondent choosing to pay by way of letters of credit (see Contract Agreement Art.4). Please will the Parties/their experts confirm that these figures represent sums incurred by the Claimant and arising from the use by the Respondent of letters of credit to make payment. Are they sums withheld by the Respondent and/or sums required by the bank, all in respect of the letters of credit being used/extended as part of the payment process?".*

On 6 March 2019, the Claimant informed the Tribunal that the Parties had discussed the Tribunal's question. With respect to the Letter of Credit claim, the Tribunal was advised as follows:

> *"the Claimant and the Respondent confirm that all amounts included in the Letter of Credit Claim represent sums incurred by the Claimant and/or deducted from its certified payments and arising from the use by the Respondent of letters of credit to make payment."*

### The Evaluation of the Tribunal

The Letter of Credit claim raises a number of issues, which include objections to its admissibility. Actually, the Claimant is eventually claiming reimbursement from the Respondent of US$45,993.62 and €410,991.80 for charges incurred with regard to the extension of the Letter of Credit opened by the Respondent: the first amount is described to correspond to a payment directly made by the Claimant to the Respondent's bank; the second is indicated to be the amount deducted from payments due (and only partially paid) under the Interim Payment Certificates No. 20 and 33. The Respondent objects to the admissibility of the claim, because the Claimant had originally referred to Interim Payment Certificates No. 30 and 36, and because the amounts claimed had not been included in the amount sought in the request for relief.

The Tribunal notes that, even though the Claimant made reference in its Reply to the Statement of Defence dated 19 September 2017 (at its § 453) to the Interim Payment Certificates No. 30 and 36, the documents provided by the Claimant together with the

234

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

mentioned Reply, and chiefly Exhibit C-251 detailing the charges for the extension of the Letter of Credit, referred to Interim Payment Certificates No. 20 and 33 as the Interim Payment Certificates which had been only partially paid, leaving the total amount of €410,991.80 unpaid, and mentioned US$45,993.62 to correspond to the charge directly paid by the Claimant to the Respondent's bank. In addition, issues relating to deductions from Interim Payment Certificates No. 20 and/or 33 (and not No. 30 and 36) due to the Letter of Credit extension had been raised by the Claimant with the Engineer and the Respondent *inter alia* on 6 October 2016 (Exhibit C-236), on 4 December 2016 (Exhibit C-238) and 20 August 2017 (Exhibit C-248). In the same way, the Tribunal remarks that the deductions from Interim Payment Certificates No. 20 and 33 were discussed by the Parties' experts on quantum. As a result, the Tribunal does not find the reference to Interim Payment Certificates No. 20 and 33 contained in the Claimant's post-hearing submissions to be inadmissible, as they were based on prior submissions and on documents on file.

899.    At the same time, notes that a request for reimbursement of those amounts was always not only discussed, but also included in the Claimant's pleadings. In fact, Mr Wishart, in its tables quantifying the Claimant's claims (see the table of 11 July 2018, prepared for the hearing), under Item S19 mentioned expressly US$45,994 as part of the Claimant's claim. In addition, the amounts unpaid under Interim Payment Certificates No. 20 and 33 were considered in light of the way the claims were quantified by Mr Wishart: Original Contract Amount + Cost & Financial Claims – Total Amount Paid. And the Total Amount Paid was calculated net of the deductions from Interim Payment Certificates No. 20 and 33. Therefore, the Tribunal finds that, to the extent the Claimant requested that the Respondent be ordered to pay the Original Contract Amount (net of the portions already paid), the Claimant has sufficiently claimed the payment of the portions of such amount that had remained unpaid. The claim is therefore admissible.

900.    The question is therefore whether the Claimant's claim is well founded. In the Tribunal's opinion it is.

901.    The Tribunal in fact finds that the Respondent had no contractual justification for charging the Claimant for the use and extension of the Letter of credit it opened under Article 4 of the Contract Agreement. Indeed, the Respondent invoked no contractual basis for its actions: it mentioned the fact that the Letter of Credit had to be extended as a result of the delays incurred because of the Claimant's responsibility, but provided no legal basis for directly and immediately charging the Claimant. The fact, then, that the charges were levied by the bank

**Dr. Robert Gaitskell QC** the Respondent, as submitted by the Respondent in the post-hearing
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

235

correspondence, is no justification, as the Respondent is responsible for the actions of the bank it choose to open the Letter of Credit and pay the Claimant.

In that regard, the Tribunal underlines that under the Contract the Respondent is obliged to pay certified amounts: GC 14.7. The Contract allows no deduction.

In the above circumstances, the Tribunal concludes that the Respondent is required to reimburse the Claimant for those deducted sums, as well as for the expense directly charged to the Claimant by the Respondent's bank. The sums claimed are US$45,993.62 and €410,991.80. The Letter of Credit claim is therefore to be granted.

**Schedule Item 8:  Disruption**

The Schedule states that this claim is for loss of productivity.  The Claimant summarises its claim as follows:

> *"As a result of the three Delay Events, Archirodon also experienced a loss of productivity on the Project.  Archirodon has demonstrated a causal link between the loss of productivity and the Costs claimed.  Accordingly, Archirodon is entitled to the corresponding Costs".*

In the Schedule the Respondent summarises its response and says the claim is global and the Claimant has not taken account of its own failures regarding productivity. It continues:

> *"Lastly, the quantification of the Claimant, which is based on a visual representation that assumes that whenever the progression of volume placed was not linear (and constitutes a visible drop), it was because of one of the three claimed delay events, is over-simplistic and unsubstantiated; there is no evidentiary record that would enable the quantification of disruption costs resulting from each of the allege delay events (excluding disruption allegedly caused by Delay Events Nos. 4 to 7 for which the Claimant is no longer pursuing a claim)."*

In the Tribunal's view the Respondent's objection to the Claimant's reliance upon the visual representation described above is well-founded, and Mr Wishart's comments upon his chart are considered speculative, and evidential support for the claim is lacking.  Accordingly, the claim for disruption fails.

**Schedule Item 9:  Mitigation/Acceleration**

The Schedule summarises the Claimant's case as follows:

> *"As a result of the three Delay Events Archirodon incurred additional Costs undertaking acceleration and mitigation measures to counter, amongst other things, the delaying events including collapses and other failures caused by unforeseeable*

236

Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

*ground conditions and the impact of the Force Majeure event. The measures included increasing staff levels, additional equipment, for example the Rotra barge and increasing salaries. Accordingly, Archirodon is entitled to the additional Costs incurred because of those measures".*

908.    The Respondent's case is summarised in the Schedule as follows:

> *"This claim should be rejected as unparticularised and unsubstantiated, since the Claimant has failed to (i) explain what measures of acceleration it allegedly took, (ii) point to any instruction by GCPI to accelerate, let alone agreement that GCPI would compensate Archirodon for such acceleration, (iii) identify which alleged acceleration measures were linked to Delay Events Nos. 2, 3 and 8 (as opposed to Delay Events Nos. 4 to 7 for which the Claimant withdraw its claims) or other events outside the Respondent's responsibility. It is also excluded as a global claim. Lastly, its quantification is flawed as the Claimant has simply looked at the total costs from the management accounts and deducted all the amounts previously claimed under other heads of claim".*

909.    In the Tribunal's view there is a paucity of evidence demonstrating that particular accelerating/ mitigation steps were taken to deal with particular delays. The Respondent's criticisms are broadly accepted, particularly to the effect that (see the quotation in the paragraph immediately above) there is insufficient particularity of acceleration and is a global claim. Accordingly, the claim fails.

### Schedule Item 10:  Financing Costs

910.    The Schedule summarises the Claimant's claim as follows:

> *"Archirodon planned for the Project to be cash positive. The Delay Events had an enormous impact on Archirodon's finances as Archirodon had to spend many millions of dollars on, amongst other things, additional materials. Consequently, Archirodon had to borrow funds to complete the Project; Archirodon is therefore entitled to claim the financing charges of these additional Costs".*

911.    In the Schedule the Respondent states:

> *"This is a global claim which must be rejected for lack of causation, as the Claimant has to date not attempted to link the financing costs claimed to each of the three alleged delay events (Nos. 2, 3 and 8), and in any event, stands to be dismissed if the Tribunal dismisses any of the three delay claims (even in part). Furthermore, this claim constitutes a claim for indirect loss which is excluded by Clause GC 17.6. Lastly, its quantification remains unsubstantiated as there is no evidence for the interest rate of 4% on which it is based".*

912.    Financing charges appear to have been claimed on the whole of the Contract Sum rather than on the additional cost related to the soil conditions (the only one of the three primary claims upon which the Claimant succeeded).

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

237

In any event, such financing charges are prima facie an indirect loss and so precluded by Clause 17.6. Clause 17.6 includes the following: "*Neither Party shall be liable to the other Party for loss of use of any Works, loss of profit, loss of any contract or for any indirect or consequential loss or damage which may be suffered by the other Party in connection with the Contract ...*".

Accordingly, the claim fails on the basis that financing costs are considered by the Tribunal to amount to an indirect loss (Respondent's Reply to Claimant's Post-Hearing Brief, paragraph 352).

Pre-Award Interest

In paragraph 604(f)(v) of the Claimant's Post Hearing Brief it seeks pre-award interest.

915.1    Accordingly, by email of 28 February 2019 the Tribunal raised the following question: "*Q2: Pre-award interest: The Claimant's PHB at 604(f)(v) has requested pre-award interest. In the event that the Tribunal were to award such interest upon what basis do the parties contend that the calculation should be made? What particular rates and periods are proposed?*"

915.2    In response, on 6 March 2019 the Parties stated:

> "*Question 2: the Claimant confirms that its claim for pre-award interest is included in its claim for financing charges which has been addressed by the Parties in their respective submissions. The Claimant claims financing charges/pre-award interest at a rate of 4% per annum for years 2013-2016 and 4.9% per annum for 2017 up to the date of the award (see Claimant's Post-Hearing Submissions, paras 551 – 557). The Claimant's claim for financing charges/pre-award interest is calculated on the basis of simple interest. For completeness, the Claimant notes that Mr Wishart's calculation of financing costs as set out in document D93A, page 2581.1 is up to the end of June 2018 and will require updating, subject to the Tribunal's decision. The Respondent refers to its position on the merits and quantum of this claim (including the period applicable assuming that the Respondent would be responsible for Delay Events Nos. 2, 3 or 8), as set out in Section 6.4 of the Respondent's Pre-Hearing Submission and 6.5 of its Post-Hearing Submission.*"

915.3    The Tribunal considers that the issue of pre-award interest, and all questions of commencement dates, should be deferred to a subsequent award so that the parties can address the issue in detail.

238

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

### Schedule Item 11: Loss of Currency Depreciation

916.    The Schedule summarises the Claimant's claim as follows:

> "*The Costs which Archirodon seek in relation to its depreciation claim are the increased Cost of purchasing and paying for materials and labour in Dollars as a result of the drastic depreciation of the value of the Euro against the Dollar. Archirodon accept and agreed to take the commercial risk of the Euro depreciating during the original period of the Works, subject to any delay for which Archirodon was responsible (for which Archirodon would bear the currency risk). However, the Works were substantially delayed due to matters for which GCPI is responsible for and thus bears the risk and consequences*".

917.    The Respondent's case is summarised in the Schedule as follows:

> "*This is a global claim which must be rejected for lack of causation, as the Claimant has failed to link the loss for currency depreciation claimed to each of the three alleged delay events (Nos. 2, 3 and 8), and in any event, stands to be dismissed if the Tribunal dismisses any of the three delay claims (even in part). Furthermore, this claim constitutes a claim for indirect loss which is excluded by Clause GC 17.6 and in any event is not a "Cost" incurred in the sense of GC 1.9, 4.12, 13.7 or 19.4(b). Lastly, its quantification is flawed as it wrongly relies on the Schedule of Payments (as opposed to the Cashflow Statement on which the Contract Price was based) and assumes that the Respondent is fully responsible for all the delays to the Project*".

918.    In the Tribunal's view this alleged loss is too remote, claimed on the whole Contract Sum in circumstances where there has only been recovery in respect of Delay Event 3.  This is little evidence of actual incurred loss. In any event, it is an indirect loss for the purposes of Clause 17.6. (See paragraph 914 above.) Accordingly, the claim fails.

### Schedule Item 12: Head Office Overheads

919.    The Schedule summarises this claim as follows:

> "*Because of Delay Events Nos. 2, 3 and 8, the Al Faw Project took longer than the 18 months originally planned which had considerable consequences for the offices supporting the Al Faw Project, including that the Archirodon's office and management personnel had less time to work on other projects. Accordingly, Archirodon is entitled to recover the additional overhead Costs it incurred*".

920.    The Respondent's case is summarised in the Schedule, where it states the claim is global, and it goes on:

> "*Furthermore, this claim constitutes a claim for indirect loss which is excluded by Clause GC 17.6. Lastly, its quantification remains unsubstantiated as there is no evidence for the Home Office Overheads of 6.27% on which it is based*".

**Dr. Robert Gaitskell QC**'s view there appears to be a paucity of evidence that if the Claimant's

President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

239

resources had not been employed on this job they would have been able to be used on other jobs. In any event, this is prima facie an indirect loss, which fails pursuant to Clause 17.6. (See paragraph 914 above.)

## Schedule Item 13:  Profit

922. The Schedule summarises the Claimant's claim thus:

> "*Archirodon included a 15% profit level in its Closing Form and Contract Price. Archirodon maintains that the profit level included in the Contract Price is reasonable and should the Tribunal consider that Archirodon is entitled to profit this is the percentage to apply*".

923. The Schedule summarises the Respondent's contentions, and includes the following:

> "*Furthermore, Clauses GC 4.12, 13.7 and 19.4(b) exclude the recovery of profit. Lastly, the Claimant cannot claim profit on the basis of the rate of 15% on which its tender price was allegedly based as GCPI agreed to a lump sum Contract Price and could not have bene aware that Archirodon had included such a high profit margin and as Iraqi law excludes the recovery of damage which could not have been anticipated at the time of entering into a Contract (Article 169(3) of the Iraqi Civil Code)*".

924. The Tribunal's view is that the only financial recovery permitted in respect of Delay Event No. 3 is as shown above in paragraphs 682 et seq.  in relation to that item, and no further financial compensation is permitted.  Hence, this claim fails.

## Schedule Item 14:  Sponsor Fees

925. The Schedule summarises the Claimant's claim thus:

> "*Archirodon is required to have a UAE sponsor in order to carry out business in the UAE. The Sponsor Agreement provides for a 1% fee to be paid on all revenues that arise from the Al Faw Project. If, therefore Archirodon is successful in the Arbitration and is paid the amounts it is seeking to recover from GCPI it will be required to pay 1% of those funds to the sponsor and therefore is claiming these Costs in this Arbitration*".

926. The Schedule summarises the Respondent's case, including the following:

> "*Furthermore, this claim constitutes a claim for indirect loss which is excluded by Clause GC 17.6. Lastly, the Claimant has failed to explain why the Respondent should reimburse to the Claimant a 1% sponsor fee on the basis of any additional sum awarded to the Claimant in the arbitration and indeed, the Respondent could not be liable to compensate the Claimant for it without having been made aware of the existence of an agreement at the time of entering the Contract (Article 169(3) of the Iraqi Civil Code)*".

240

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

927.    The Tribunal considers the evidence available on this claim, a brief contract document with redactions, as unsatisfactory. The Respondent was not made aware of it, so it is an unforeseeable claim. In any event it is an indirect loss, and fails by reason of Clause 17.6. (See paragraph 914 above.)

**Schedule Item 15:  Post Award Interest**

928.    The Schedule summarises the Claimant's claim thus:

> *"Archirodon reserves its right to claim simple interest at a rate of 5% in respect of delay to the payment of the Final Award. Archirodon seeks a declaration from the Tribunal that it can request a separate award for post-award interest should GCPI fail to pay the amounts due under the Final Award".*

929.    The Schedule summarises the Respondent's contentions thus:

> *"In its Post-Hearing Submission, the Claimant admits that Iraqi law does not permit the Tribunal to award post-award interest prospectively in its Final Award but submits a new request (made for the first time in the Post-Hearing Submission) for a declaration from the Tribunal that it is entitled to request a separate, future award. The Respondent objects to this belated request for declaratory relief. It is not permissible for the Claimant to request a declaration of entitlement to bring a future, potential claim, which has not been submitted as a claim in these arbitration proceedings: this is effectively a new claim which, pursuant to the ICC Rules (Article 23(4)), cannot be admitted without approval of the Tribunal; moreover, following the issuance of the Final Award, the Tribunal will be* functus officio *such that the Claimant's purported reservation will have no effect".*

930.    In the Tribunal's view this future claim has no status within the present arbitration, particularly since (as quoted immediately above), the Claimant accepts that Iraqi law does not permit post-award interest. The claim fails.

## X.    COSTS

Costs will be dealt with in the next award. The Parties have supplied details of their costs to date.

## XI.    OVERALL RECOVERY

931.    As noted above, the Claimant succeeds only in respect of Event No. 3, and then only in respect of certain of those sub-claims. As regards financial recovery determined in this Partial Final Award for Event 3, as set out above the Claimant is entitled as follows.

931.1    The Claimant is entitled to be paid **US$57,491,157** in respect of additional quantities of material placed because of the Unforeseeable settlement and penetration that

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

241

occurred (Claim B.01).

931.2    The Claimant is entitled to be paid **US$12,884,996** in respect of collapses (Claim B.02).

The Claimant is entitled to an **extension of time of 726 days** in relation to Delay Event 3 (the only extension to which it is entitled).  That period is calculated as follows (see Section VII above, where Mr Cookson's Time Periods are accepted):

932.1    40 days in Time Period 1 (8 December 2012 – 22 March 2014).

932.2    10 days in Time Period 2 (23 March 2014 – 17 June 2014).

932.3    37 days in Time Period 3 (18 June 2014 – 20 September 2014).

932.4    97 days in Time Period 4 (21 September 2014 – 28 December 2015).

932.5    542 days in Time Period 5 (29 December 2015 – 18 July 2017).

As shown in paragraph 856 above, the total prolongation award to the Claimant is **US$ 21,563,154,** comprising:

933.1    Period 1: US$1,819,692.40

933.2    Period 2: US$844,351.70

933.3    Period 3: US$3,314,272.40

933.4    Period 4: US$7,199,090.20

933.5    Period 5: US$8,385,748.10

As regards the Letters of Credit, as noted above the Claimant is entitled to recover the total sum of **US$45,993.62 (€38,446.56) and €410,991.80**.

As noted in paragraph 603 of the Claimant's Post Hearing Brief, the Award is to be expressed in Euros. Accordingly, by email of 28 February 2019 the Tribunal raised the following question for the Parties:

> "*Question 4: The figures used by the Parties in the various submissions are sometimes in US dollars and sometimes in Euros. The Claimant in its para 603 of its PHB seeks awards in Euros. Please will the parties discuss this point amongst themselves and if both agree on Euros as the appropriate currency, please will they agree on an exchange rate to be applied in the event that a particular sum is awarded where the sum has been expressed in submissions in US dollars.*"

By email of 6 March 2019 the Parties responded as follows:

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

242

> *"Question 4: the Claimant and the Respondent agree that the award should be denominated in Euros and that the exchange rate to be applied in the event that a particular sum is awarded where the sum has been expressed in US dollars is the European Central Bank's exchange rate as at the date of the Final Award."*

937. Accordingly, for the purposes of the next award the parties should provide the appropriate Euro figures for the sums recovered. In the meantime the sums are awarded in the currency claimed (US Dollars) and are payable forthwith.

938. As noted in paragraph 92 above, the Claimant's Post-Hearing Submissions of 2 November 2018 set out the relief sought by the Claimant at that date:

> *"Archirodon respectfully requests the Tribunal to:*
>
> g)     *declare that the Works were completed for the purposes of GC10 on 18 July 2017;*
>
> h)     *declare that Archirodon is entitled to extensions of the Time for Completion (both under the Contract and as a matter of Iraqi law) of, 1,137 days (in addition to the 61 day extension granted for Delay Event No. 1) or such other period as the Tribunal determines to be appropriate; or alternatively*
>
> i)     *that Archirodon was entitled to complete the Works within a reasonable time and that it has completed the Works within a reasonable time;*
>
> j)     *accordingly, declare that no delay damages are owing from Archirodon to GCPI;*
>
> k)     *declare that in the vent of non-payment of the Final Award, in whole or in part, by GCPI within 30 days of the date of the Final award, Archirodon is entitled to make a claim to the Tribunal and to seek a further award or awards for interest on any unpaid amount of the Final Award at a rate of 5%;*
>
> l)     *award Archirodon, and require GCPI to pay to it:*
>
> > vi)     *at least Euros 291,268,406 corresponding to the additional costs incurred and losses suffered by Archirodon as a result of the Delay Events described above (which Archirodon is entitled to both under the Contract and as a matter of Iraqi law);*
> >
> > vii)     *reimbursement of the delay damages erroneously levied on it by the Engineer and GCPI totalling Euros 20,416,650.60;*
> >
> > viii)     *any other amounts or damages to which Archirodon may be entitled under, or in connection with, the Contract;*
> >
> > ix)     *all costs and expenses (including, but not limited to, costs payable to the Tribunal, ICC, legal fees and expenses, and experts' and witnesses' fees and expenses and other in-house personnel) incurred*

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

243

> *by Archirodon in connection with the preparation for and conduct of this arbitration pursuant to Article 37 of the ICC Rules; and*
>
> x)    *interest or financing charges on any amounts payable by GCPI to Archirodon from such date as is determined by the Tribunal until the date of the Award; and*
>
> g)    *grant Archirodon such other or varied relief as the Tribunal deems just and appropriate in the circumstances."*

The outcome of this award is as follows, by reference to that request for relief:

939.1    As regards item a): Archirodon is not entitled to the declaration that it is entitled to 1,048 days extension of time. As noted in paragraph 932 above, it is only entitled to an extension of time of 726 days.

939.2    As regards item b): Archirodon is not entitled to complete the works within a reasonable time.

939.3    As regards item c): Archirodon is not entitled to a declaration that there are no delay damages owing from Archirodon to GCPI.

939.4    As regards item d): Archirodon is not entitled to a declaration that the Works were completed for the purposes of GC10 on 18 July 2017.

939.5    As regards item e) i): Archirodon is not entitled to the sum of US$303,058,481.

939.6    As regards item e) ii): Archirodon is not entitled to the reimbursement of delay damages in the sum of Euros 20, 416,650.60.

939.7    As regards item e) iii) the Respondent is ordered to pay the Claimant, Archirodon, the following sums. As noted in paragraph 603 of the Claimant's Post-Hearing Brief, the Award is to be expressed in Euros. The Parties are to provide the exchange rate for the necessary conversion, as noted in paragraphs 936 and 937 above.

(i)    **US$57,491,157** in respect of additional quantities of material placed because of the unforeseeable settlement and penetration that occurred (Claim B.01).

(ii)    **US$12,884,996** in respect of collapses (Claim B.02).

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

(iii)    **US$21, 563,154** in respect of prolongation.

(iv)    **US$45,993.62 (€38,446.56) and €410,991.80** in respect of the Letters of Credit.

939.8    As regards item e) iv) in this Partial Final Award no determination is made as regards costs and expenses.

939.9    As regards item e) v): in this Partial Final Award no determination is made as regards pre-award interest. Archirodon's claims for financing charges and post award interest are rejected.

939.10    As regards item f): in this Partial Final Award Archirodon is not awarded any other relief.

## XII.    **DISPOSITIVE PART**

940.    Now we, the Arbitral Tribunal appointed herein, having conducted this arbitration reference, and held the hearing described herein, and considered all the submissions, both written and oral, now determine, find, hold and decide as follows for the purposes of this Partial Final Award. All questions of costs (including as to ICC costs) and pre-award interest are reserved to a further Award. As noted in paragraphs 936 and 937 the sums awarded below are payable in Euros at the European Central Bank's exchange rate at the date of the Final Award. Save for the award of the relief identified below, the Claimant's other requests for relief, as noted in paragraphs 938 and 939 above, are rejected.

941.    The Respondent is ordered to pay the Claimant forthwith:

941.1    **US$57,491,157**

941.2    **US$12,884,996**

941.3    **US$21,563,154**

941.4    **US$45,993.62** and **Euro 410,991.80**

941.5    **It is declared that the Claimant is entitled to a time extension of 726 days.**

942.    Pre-award interest and costs are reserved to a future award or awards.

**Dr. Robert Gaitskell QC**
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General  Company for Ports of Iraq (Iraq)

245

Place of Arbitration: Geneva, Switzerland.

Mr Andrew White QC
Co-arbitrator

Date: 4 June 2019

Avv Professor Luigi Fumagalli
Co-arbitrator

Date: 4 June 2019

Dr Robert Gaitskell QC
President

Date: 4 June 2019

THIS PHOTOCOPY IS HEREBY
CERTIFIED TO BE A TRUE COPY
OF THE ORIGINAL DOCUMENT
Geneva, the

− 5 DEC. 2019



Dr. Robert Gaitskell QC
President
ICC Case No. 21785/ZF
Archirodon Construction (Overseas)
Company S.A. (Panama)
v.
General Company for Ports of Iraq (Iraq)

246