UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED,<br><br>Petitioner,<br><br>v.<br><br>GENERAL COMPANY FOR PORTS OF IRAQ, *et al.*,<br><br>Respondents. | Civil Action No. 22-1571 (JEB) |

**MEMORANDUM OPINION**

Petitioner Archirodon Construction (Overseas) Company Limited filed this action to recognize and enforce an arbitration award against Respondents General Company for Ports of Iraq (GCPI), the Ministry of Transport of the Republic of Iraq, and the Republic of Iraq itself. The case arises from a contractual dispute regarding the design and construction of a staging pier and breakwater for the Al Faw Grand Port in Iraq.  On November 25, 2019, a tribunal of the International Court of Arbitration of the International Chamber of Commerce in Geneva, Switzerland, issued an award in favor of Petitioner.  Archirodon now moves to enforce the award under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201, *et seq.*, which codifies the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention).  Although Respondents received a summons, the Petition, and notice of suit in October 2023, they have never appeared.  As confirmation of the award is appropriate, the Court will grant the Petition.

I.      **Background**

The underlying dispute arose out of a November 22, 2012, contract between Archirodon and GCPI — "a department of the [Iraqi] Ministry of Transport" — for the design and construction of a staging pier and breakwater for the Al Faw Grand Port in Iraq. See ECF No. 1 (Pet.), ¶¶ 6, 14; ECF No. 1-4 (Contract) at 4–5. GCPI agreed to pay Archirodon a lump sum of €204,166,506.38 for its work, and Archirodon agreed to complete the project within eighteen months from the commencement date. See Pet., ¶ 16. The contract also contained an arbitration clause, which stipulated the parties' intention to submit any disputes to the International Chamber of Commerce in Switzerland for arbitration. Id., ¶ 19. The Iraq Minister of Transportation Hadi Al Ameri signed the contract on behalf of GCPI. Id., ¶ 20.

During construction, Archirodon experienced a number of delays related to the access road to the construction site, the soil-settlement rate at the site, and foreign-workforce recruitment. Id., ¶¶ 21–24. As a result, it did not complete construction of the staging pier and breakwater by the deadline. Id., ¶ 25. As these complications arose, the parties could not agree on whether Archirodon was entitled to extensions of time and reimbursement of additional costs or whether GCPI was instead entitled to impose contractual delay damages. See ECF No. 1-2 (Final Award), ¶¶ 88–111.

To resolve these differences, the parties commenced arbitration proceedings on March 24, 2016, in the International Court of Arbitration of the International Chamber of Commerce sitting in Geneva. See Pet., ¶ 26. The arbitration tribunal, consisting of three arbitrators, unanimously rendered a foreign arbitral award of €82,944,276.76, in addition to $7,490,565.74 in costs and expenses, in favor of Petitioner on November 25, 2019. Id., ¶¶ 37–39. The tribunal also held that Archirodon was not entitled to pre-award interest since such claim had been raised

too late in the proceedings. See Final Award, ¶ 22.5. GCPI has refused to pay the award to Archirodon. See Pet., ¶ 4.

Archirodon then filed this action pursuant to Section 207 of the FAA on June 3, 2022, to confirm the arbitral award against GCPI and also impose liability on two additional parties, the Ministry of Transport and the Republic of Iraq. See Pet., ¶¶ 1, 54, 67. Petitioner effected service on Respondents in October 2023. See ECF Nos. 12 (First Certificate of Service), 13 (Second Certificate of Service), 14-2 (GCPI First Return Receipt); 15-2 (Ministry of Transport First Return Receipt); 16-2 (Iraq Return Receipt). Although no Respondent has filed an answer to the Petition, the Court nonetheless proceeds with a full analysis.

**II.     Legal Standard**

Judicial review of arbitral awards is "extremely limited." Kurke v. Oscar Gruss & Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006). "Courts . . . do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). A court is thus not "authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Id. at 36; see Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 599 (1960) (holding award should not be rejected simply because court's "interpretation of the contract is different from arbitrator's").

A federal court must instead confirm an award even if it "is convinced [the arbitrator] committed serious error." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (quoting Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000)). An award, in other words, is legitimate so long as the "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Id. "It is only when the

arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable." Id. (quoting Enter. Wheel, 363 U.S. at 597) (quotation marks omitted).

### III.   Analysis

The Court first considers its jurisdiction to entertain the Petition. It next addresses grounds for non-enforcement, joint and several liability, and the proper calculation of the Award.

### A.   Jurisdiction

#### 1.   *Subject-Matter Jurisdiction*

There are two prerequisites for this Court's subject-matter jurisdiction here. "First, there must be a basis upon which a court in the United States may enforce a foreign arbitral award; and second, [Respondents] must not enjoy sovereign immunity from such an enforcement action." Diag Human, S.E. v. Czech Republic-Ministry of Health, 824 F.3d 131, 134 (D.C. Cir. 2016) (quoting Creighton Ltd. v. Gov't of the State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999)).

As to the first, the Federal Arbitration Act codifies the New York Convention into U.S. law. See 9 U.S.C. §§ 201–08. It provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." Id. § 203. An arbitral award between non-U.S. parties, like the one at issue here, "falls under the Convention" as long as it "arise[s] out of a legal relationship, whether contractual or not, which is considered as commercial." Id. § 202.

There is no doubt that the Award arises out of such a relationship and thus falls under the Convention. The fact that Iraq was not a signatory to the New York Convention at the time of the final award is immaterial. "If the place of the award is in the territory of a party to the

4

Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration." BCB Holdings Ltd. v. Gov. of Belize, 110 F. Supp. 3d 233, 243 (D.D.C. 2015) (cleaned up).  The arbitral tribunal issued the Award in Switzerland, and Petitioner seeks enforcement in the United States.  As both countries are parties to the New York Convention, that Convention applies.  See, e.g., id. (reaching same conclusion based on similar facts).

With respect to the second prerequisite, Petitioner contends that Respondents are not entitled to sovereign immunity because this matter falls within the Foreign Sovereign Immunities Act's exception for arbitral enforcement.  See 28 U.S.C. § 1605(a)(6); Chevron Corp. v. Ecuador, 795 F.3d 200, 204 (D.C. Cir. 2015) (agreeing that under Section 1605(a)(6), no sovereign immunity where "a foreign state has agreed to arbitrate," "there is an award based on that agreement," and "the award is governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards").  More specifically, Petitioner's argument seems to be that even though it was GCPI that submitted to arbitration — not the Ministry of Transport or the Republic of Iraq — the Ministry and Republic are also liable for the award against GCPI, and hence the Court has subject-matter jurisdiction over them pursuant to the arbitration exception.

Because that argument premises jurisdiction upon the acts of GCPI, not the Ministry's or Republic's own acts, Petitioner must overcome the "general rule that agencies and instrumentalities of a foreign nation are presumed to be separate from . . . the foreign state." GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia, 822 F.3d 598, 605 (D.C. Cir. 2016) (cleaned up); TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005) (explaining that presumption of independence "applies to the question of subject matter

5

jurisdiction under the FSIA"). As the Supreme Court explained in Bancec, that presumption follows from "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations." First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 626–27 (1983). In short, "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." Id.

There are generally two parts to the analysis under Bancec. First, a court determines whether a respondent "is the sort of entity to which the presumption of separateness applies" — *i.e.*, whether the foreign sovereign has made a "decision to establish [the] instrumentality with a juridical entity distinct from the sovereign itself." Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic, 2020 WL 1935554, at *2–3 (D.D.C. Apr. 22, 2020) (quoting DRC, Inc. v. Republic of Honduras, 71 F. Supp. 3d 201, 209 (D.D.C. 2014)). Second, it assesses whether such a presumption is overcome, either because the entity in question "'is so extensively controlled by its owner that a relationship of principal and agent is created' or because 'recognition of the instrumentality as an entity apart from the state would work fraud or injustice.'" Id. (quoting Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847–48 (D.C. Cir. 2000)). The question at this stage, then, is whether Petitioner has shown that jurisdiction over the Ministry of Transport and the Republic of Iraq is proper under the FSIA's arbitration exception in light of those entities' relationship to GCPI. The answer is yes.

Start with the Ministry of Transport. The Court need not delve into the question of whether the Ministry is entitled to a presumption of separateness from GCPI here because, even if it is, that presumption would be overcome by the agency relationship between the two. See Entes Indus. Plants, 2020 WL 1935554, at *6 (presumption of separateness overcome "[w]here

6

the sovereign exercises control in such a way as to make a separate instrumentality its agent" such that "the sovereign can be amenable to suit under ordinary agency principles"); see also Transamerica, 200 F.3d at 848; Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F. 2d 438, 446–47 (D.C. Cir. 1990).

"[A] sovereign need not exercise complete dominion over an instrumentality . . . in order to establish a relationship of principal and agent." Transamerica, 200 F.3d at 849. That said, a principal-agent relationship cannot arise unless "[1] the parent has manifested its desire for the subsidiary to act upon the parent's behalf, [2] the subsidiary has consented so to act, [3] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and [4] the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." Id. (citing Restatement (Second) of Agency § 1 (1958)). No "mechanical" formula determines whether such a relationship exists; the question "is inherently fact specific." Id. (cleaned up); see also GSS Grp. Ltd., 822 F.3d at 605 ("[E]xplaining the degree of control necessary to find agency is challenging.").

Here, GCPI acted as an agent of the Ministry of Transport, and the Ministry controlled the Al Faw construction project from start to finish. See Pet., ¶¶ 57–65. GCPI is a "department of the Ministry of Transport." Id., ¶ 6. The official tender announcement stated that "[t]he Iraqi Ministry of Transport / General Company for Ports of Iraq (GCPI)" were announcing the tender and that the Ministry of Transport had nominated "the fully owned organi[z]ation [GCPI] to act as implementing agency." Id., ¶ 58. Initially, the Ministry reviewed the contract with Archirodon, and it was ultimately signed by "Hadi Al Ameri, Minister of Transportation." Id., ¶ 59. Throughout construction, GCPI sought guidance from the Ministry of Transport on basic

administrative support.  Id., ¶ 60.  When Archirodon requested extensions of time and reimbursement for additional costs, Ministry officials responded and told Archirodon that senior Ministry officials would need to participate in any discussions to "bind our party."  Id., ¶¶ 61–65.  These actions and statements evince the relationship between GCPI and the Ministry of Transport; the Ministry had direct oversight and control over GCPI.

As for the Republic of Iraq, the Court agrees with Petitioner that jurisdiction is proper under the first Bancec inquiry: the Ministry of Transport — GCPI's principal — is an inseparable part of the Republic, not the sort of entity to which the presumption of separateness attaches.  Id., ¶ 67.  Generally, to determine whether such a presumption attaches, "courts can look for certain characteristic features of independence, which include: creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies."  Entes Indus. Plants, 2020 WL 1935554, at *3 (cleaned up).  Those traits, however, "should [not] be evaluated rigidly or without an appreciation of context."  Id.

A context-sensitive application of those criteria here indicates that the Ministry of Transport is not a "separately constituted juridical entit[y]" from the Republic of Iraq with "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies."  Bancec, 462 U.S. at 623–25.  No meaningful distinction can be drawn between the Ministry of Transport and Iraq itself.  Iraq's own statutory law regards each Ministry "as the meaning of the word 'Government.'"  See ECF No. 1-18, Exh. B (Iraq's Law of Executive Authority Article 1 Paragraph 2 English Translation); Pet., ¶ 69.  Indeed, other

8

courts have held — in different but analogous contexts — that comparable Iraqi ministries are integral components that perform core sovereign and regulatory functions. See, e.g., Wye Oak Technology, Inc. v. Republic of Iraq, 2019 WL 4044046, at *20 (D.D.C. Aug. 27, 2019) (finding that Ministry of Defense is an "integral component" of Republic of Iraq), vacated on other grounds, 24 F.4th 686 (D.C. Cir. 2022); Servaas, Inc. v. Republic of Iraq, 653 F. App'x 22, 24–25 (2d. Cir. 2011) (drawing "no meaningful legal distinction" between Ministry of Industry and Republic of Iraq); cf. Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 151–53 (D.C. Cir. 1994) (holding that Bolivian armed forces are governmental, and thus part of Bolivia itself); Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (holding that Iranian "Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent"). Similarly, the Ministry of Transport and Iraq are one and the same. The Court thus has subject-matter jurisdiction over the Ministry and Iraq under the FSIA's arbitration exception.

      That exception aside, Petitioner also contends — for the avoidance of jurisdictional doubt — that Respondents have, in any event, waived sovereign immunity under the FSIA. The Court agrees that, in light of the relationships discussed above, Respondents have effected an implicit waiver of their immunity. See 28 U.S.C. § 1605(a)(1) (excepting from FSIA protection any "foreign state [that] has waived its immunity either explicitly or by implication") (emphasis added). The D.C. Circuit has found an implied waiver of sovereign immunity when "a foreign state has agreed to arbitration in another country." Foremost-McKesson, 905 F.2d at 444. Here, GCPI — acting for the Ministry and Iraq — contractually agreed to arbitration in Switzerland, and thus neither it, the Ministry, nor Iraq can rely on immunity to avoid suit. See Pet., ¶ 19.

    2. *Personal Jurisdiction*

The FSIA authorizes the exercise of personal jurisdiction over a Respondent whenever subject-matter jurisdiction exists under 28 U.S.C. § 1330(a) and service of process has been made in accordance with Section 1608.  See 28 U.S.C. § 1330(b); Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (explaining under FSIA that "subject matter jurisdiction plus service of process equals personal jurisdiction") (citation omitted).  To facilitate service of process, the FSIA sets forth various ways service may be effected on different types of foreign entities.

Section 1608(a) lists four methods, in ranked order, specific to serving "a foreign state or political subdivision of a foreign state."  The summons and complaint may be delivered, first, "in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision," id. § 1608(a)(1), or, second, "in accordance with an applicable international convention on service of judicial documents."  Id. § 1608(a)(2).  If neither of those methods is available, plaintiffs must attempt service through a third method, "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  Id. § 1608(a)(3).  As a last resort, if service cannot be made "within 30 days" pursuant to the third method, plaintiffs may have the Court Clerk send the packet to the Secretary of State for transmittal "through diplomatic channels to the foreign state."  Id. § 1608(a)(4).

Section 1608(b), conversely, lists three methods for serving an "agency or instrumentality of a foreign state."  As under Section 1608(a), the summons and complaint may be delivered, first, "in accordance with any special arrangement for service," id. § 1608(b)(1), or, second, "to

an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States" or "in accordance with an applicable international convention on service of judicial documents." Id. § 1608(b)(2).  If service cannot be made using any of those approaches, the summons and complaint — along with translations — may be delivered "as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request," id. § 1608(b)(3)(A); "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served," id. § 1608(b)(3)(B); or "as directed by order of the court consistent with the law of the place where service is to be made." Id. § 1608(b)(3)(C).

Petitioner has successfully effected service on GCPI, the Ministry of Transport, and the Republic of Iraq.  Specifically, it served Iraq under Section 1608(a), and — out of an abundance of caution — it served GCPI and the Ministry of Transport under both Section 1608(a) (treating them as foreign states or political subdivisions thereof) and Section 1608(b) (treating them as agencies or instrumentalities of a foreign state).  The Court briefly walks through those analyses.

Beginning with Section 1608(a), service was not feasible on any of the Respondents under the first or second methods because there is no special arrangement for service between the United States and Iraq, nor is service permitted on Iraq pursuant to any applicable international convention on service of documents.  See id. § 1608(a)(1)–(2); see also U.S. Dept't of State, Bureau of Consular Affs., Iraq Judicial Assistance Information (Mar. 29, 2018), https://perma.cc/ZAX4-AUJD.  Petitioner, accordingly, turned to mail service.  On October 5, 2023, the Court Clerk sent copies of the summons, the Petition, and notice of suit — together with translations of each — to the Minister of Foreign Affairs in Baghdad for each of the Respondents.  See First Certificate of Service.  DHL delivered those materials on October 11,

11

2023. See GCPI First Return Receipt, Ministry of Transport First Return Receipt), Iraq Return Receipt. Service was therefore effected under Section 1608(a)(3).

As to Section 1608(b), service could not be made on GCPI or the Ministry of Transport under either of the first two approaches partly for the same reasons explained above: no special arrangement for service between the United States and GCPI or the Ministry exists, see id. § 1608(b)(1), service is not permitted on those entities pursuant to any applicable international convention on service of documents, and the Court is not aware of any officer or agent authorized to receive service on their behalf in the United States. See id. § 1608(b)(2). Petitioner thus asked the Court Clerk to mail the summons, complaint, and translations to GCPI and the Ministry of Transport pursuant to Section 1608(b)(3)(B). See ECF No. 14-1 (Service Request); ECF No. 15-1 (Service Request). She did so on October 5, 2023, see Second Certificate of Service, and DHL delivered the materials on October 26, 2023, thus making service effective. See ECF No. 14-3 (GCPI Second Return Receipt); ECF No. 15-3 (Ministry of Transport Second Return Receipt). No Respondent has contested proper service. Personal jurisdiction is thus proper.

    B. Grounds for Refusal

The Court further agrees with Petitioner that none of the narrow grounds for non-enforcement listed in Article V of the New York Convention, incorporated under 9 U.S.C. § 207, applies here. "[W]hen an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 935 (D.C. Cir. 2007) (citation omitted). As Respondents offer no grounds for non-enforcement and none exist here,

confirmation of the award is mandatory under the New York Convention. See 9 U.S.C. § 207; Pet., ¶¶ 45–52.

    C. Joint and Several Liability

The Court next turns to the question of whether Petitioner is correct that the Ministry of Transport and the Republic of Iraq are jointly and severally liable for the arbitral award against GCPI. See Pet., ¶¶ 57–66. It need not spend long on this, however, because it has already concluded that GCPI acted as an agent of the Ministry of Transport and that the Ministry of Transport is an inseparable component of the Republic of Iraq. Supra Section III.A.1. In light of those relationships, the Ministry and Republic are liable for GCPI's actions. See Transamerica, 200 F.3d at 848 (recognizing that Bancec's analysis applies both for purposes of deciding whether "a foreign sovereign is . . . amenable to suit based upon the acts of such an instrumentality" and for determining if a "foreign sovereign is . . . liable for the acts of an instrumentality of the state"). As a result, the Court concludes that both the Ministry of Transport and the Republic of Iraq are jointly and severally liable for the Final Award along with GCPI.

    D. The Award

        1. *Conversion of Foreign Currencies*

As to the Award itself, Petitioner first requests that the Court convert the damages portion of the Award from euros to U.S. dollars. See Pet., ¶ 75. "Conversion of such foreign currency amounts into dollars at judgment is the norm, rather than the exception." Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria, 932 F. Supp. 2d 153, 158 (D.D.C. 2013), aff'd, 603 F. App'x 1 (D.C. Cir. 2015). Indeed, "a judgment in a foreign currency should be issued only when requested by the judgment creditor." Restatement (Third) of the Foreign Relations Law of the

United States § 823 cmt. b (1987).  Here, Archirodon makes the opposite request; it seeks a dollar judgment.  See Pet., ¶ 75.  The Court thus concludes that Archirodon is entitled to conversion of the foreign-currency portions of its arbitral award into dollars.  The Court will require Petitioner to submit an updated calculation of the Award with the proposed exchange rate for currency conversion.

### 2. Prejudgment Interest

Next, Petitioner requests that the Court impose prejudgment interest on the Award, accruing from the date of the Award until the date of this Court's judgment.  See Pet., ¶¶ 73, 77(c).  "[W]hether to award prejudgment interest falls within the district court's discretion." Cont'l Transfert, 932 F. Supp. 2d at 163 (citation omitted).  Considering "the widely accepted, remedial purpose of prejudgment interest — which is to compensate the injured party for the loss of the use of money he would otherwise have had," courts have recognized that "a presumption exists in favor of such interest."  Id. (cleaned up).  Therefore, "absent any reason to the contrary, prejudgment interest should normally be awarded when damages have been liquidated by an international arbitral award."  Id. at 163–64 (cleaned up).

The Award here did not provide for such interest because Iraqi law does not permit it. See Final Award, ¶¶ 928–30.  The tribunal did not prohibit the claim in subsequent proceedings, however.  Id., ¶ 930.  Courts generally grant such requests on foreign arbitral awards, even when the award does not provide for prejudgment interest.  See, e.g., Cont'l Transfert, 932 F. Supp. at 163–64; Waterside Ocean Navigation Co. v. Int'l Navigation Ltd., 737 F.2d 150, 154 (2d Cir. 1984) (granting request for such interest where award did not provide for it because relevant body of foreign law did not give arbitrators power to do so).  Seeing no reason to stray from this practice, this Court will do likewise.

Petitioner, in addition, asks this Court to award such interest at the U.S. prime rate. See Pet., ¶ 74. That rate is the "the rate that banks charge for short-term unsecured loans to credit-worthy customers." Oldham v. Korean Air Lines Co., 127 F.3d 43, 54 (D.C. Cir. 1997). Although setting the rate of prejudgment interest is "well within the district court's discretion," Forman v. Korean Air Lines Co., 84 F.3d 446, 450 (D.C. Cir. 1996), the D.C. Circuit has "indicated a preference — all else being equal — for the use of prime rate rather than the statutory postjudgment interest rate." Cont'l Transfert, 932 F. Supp. 2d at 165 (citing Forman, 84 F.3d at 450). The use of the prime rate for prejudgment interest in arbitration confirmation proceedings is "customary practice." Id., at 166. Indeed, "the use of the prime rate in the award of prejudgment interest reflects an appropriate exercise of the district court's discretion." Cont'l Transfert, 603 F. Appx. at 5; see also Oldham, 127 F.3d at 54. The Court will follow suit and use the prime rate.

Petitioner also requests that such interest be "calculated on a compound rather than simple basis." Pet., ¶ 74. Since "compounding prejudgment interest annually is standard practice," the Court will do so. See Cont'l v. Transfert, 932 F. Supp. 2d at 166 n.7.

   3. *Post-Judgment Interest*

Archidoron last requests in its prayer for relief that the Court award post-judgment interest, a topic on which the arbitral decision is silent. See Pet., ¶ 77(d). Post-judgment interest is the "interest that accrues following this Court's judgment enforcing the award." Tenaris, S.A. v. Bolivarian Republic of Venezuela, 2021 WL 1177996, at *2 (D.D.C. 2021). Post-judgment "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Courts in this district have accordingly awarded it in civil judgments

confirming foreign arbitral awards. See, e.g., Global Distressed Alpha Fund I LP v. Red Sea Flour Mills Co. Ltd., 725 F. Supp. 2d 198, 203 (D.D.C. 2010).

Congress set forth a federal rate for post-judgment interest in 28 U.S.C. § 1961(a): "[I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." This rate is "mandatory," unless "the parties agree to a different rate by 'clear, unambiguous, and unequivocal language" or "the arbitral award itself 'explicitly state[s] the interest rate to be applied 'post-judgment.'" OI European Grp. B.V. v. Bolivarian Republic of Venezuela, 2019 WL 2185040, at *6 (D.D.C. 2019); Tenaris, 2021 WL 1177996, at * 2 (citations omitted). As neither of these exceptions applies here, the Court will award Petitioner post-judgment interest at the rate set forth in 28 U.S.C. § 1961(a).

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting the Petition to Recognize and Enforce Foreign Arbitral Award. It will also order Petitioner to submit an updated claim calculation and proposed form of judgment.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: January 30, 2024