UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARCHIRODON CONSTRUCTION (OVERSEAS) COMPANY LIMITED,**<br><br>Petitioner,<br><br>v.<br><br>**GENERAL COMPANY FOR PORTS OF IRAQ,** *et al.*,<br><br>Respondents. | Civil Action No. 22-1571 (JEB) |

## MEMORANDUM OPINION

The Al Faw Grand Port in Iraq, which harbors ambitions to become one of the largest ports in the world, already holds the Guinness World Record for the longest breakwater. But its ambitions have come at a cost: specifically, here, a sizable arbitration award rendered in Switzerland for Petitioner Archirodon Construction (Overseas) Company Limited, which contracted with General Company for Ports of Iraq (GCPI) to construct a staging pier and eastern breakwater for the port. Archirodon then brought this action to recognize and enforce that award against Respondents GCPI, the Ministry of Transport for Iraq, and the Republic of Iraq itself. Respondents never appeared in this action. On January 30, 2024, this Court thus granted the Petition and entered judgment in the amount of $119,928,596.4 plus interest.

Archirodon now moves to authorize attachment and execution under the Foreign Sovereign Immunities Act. Finally arriving on the scene, Respondents oppose that Motion. They have also filed Motions to Vacate the Judgment and to Dismiss the case, asserting a range of jurisdictional and procedural defects with the Petition. Finding that none of these objections has merit and that a reasonable time has elapsed since judgment, the Court will deny

1

Respondents' Motions, grant Petitioner's, and thereby authorize the commencement of attachment and execution efforts.

## I. Background

As most of the relevant details of the dispute that gave rise to this suit were recounted in the Court's prior Opinion granting the Petition, see Archirodon Construction (Overseas) Co. Ltd. v. GCPI, 2024 WL 341066, at *1–2 (D.D.C. Jan. 30, 2024), a summary will suffice here. Archirodon contracted with GCPI to design and construct a staging pier and breakwater for the Al Faw Grand Port. See ECF Nos. 1 (Pet.), ¶¶ 6, 14; 1-4 (Contract) at 4–5. The contract contained an arbitration clause stipulating the parties' intention to submit any disputes to the International Chamber of Commerce in Switzerland for arbitration. See Pet., ¶ 19; Contract at 10–11. When a dispute arose over construction delays, the parties accordingly commenced arbitration proceedings in the agreed-upon venue. See Pet., ¶¶ 26–27. A three-judge tribunal unanimously rendered a foreign arbitral award of €82,944,276.76, plus $7,490,565.74 in costs and expenses, in favor of Petitioner. Id., ¶ 39. After GCPI refused to pay, id., ¶ 4, Archirodon filed this action under Section 207 of the Federal Arbitration Act, 9 U.S.C. § 201, *et seq.*, which codifies the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention). Id., ¶ 1. Archirodon seeks to enforce the Award against GCPI as well as against the Ministry of Transport and the Republic of Iraq. Id., ¶¶ 1, 54, 67.

Petitioner served all three Respondents in October 2023, see ECF Nos. 12 (First Certificate of Service), 13 (Second Certificate of Service), 14-2 (GCPI First Return Receipt); 15-2 (Ministry of Transport First Return Receipt); 16-2 (Iraq Return Receipt). None appeared or filed an opposition to the Petition. The Court subsequently granted Archirodon's Petition and entered a judgment awarding Petitioner the full Award amount, plus pre- and post-judgment interest. See ECF No. 17 (Order) at 1.

2

On April 26, 2024, Petitioner moved to authorize attachment and execution against Respondents. See ECF No. 30 (Mot. to Attach). Respondents opposed this Motion and concurrently filed a Motion for Relief from Judgment under Federal Rules of Civil Procedure 60(b)(1) and 60(b)(4) and a Motion to Dismiss under Rule 12(b) for insufficient service, lack of subject-matter jurisdiction, and lack of personal jurisdiction. See ECF Nos. 34 (Attachment Resp.); 35 (Mot. to Vacate); 36 (MTD). All Motions are now ripe.

## II.     Legal Standard

Federal Rule of Civil Procedure 60(b) governs the vacatur of judgments. It lists multiple grounds for relief, only two of which are relevant here. First, Rule 60(b)(1) permits a court to "relieve a party . . . from a final judgment . . . for the following reasons: mistake, inadvertence, surprise, or excusable neglect." Motions thereunder must be filed "within a reasonable time . . . and . . . no more than a year after the entry of the judgment." Fed. R. Civ. P. 60(c)(1).

 Second, Rule 60(b)(4) permits vacatur when the judgment is "void," such as for lack of subject-matter or personal jurisdiction. See United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 271 (2010). Because a Rule 60(b)(4) motion is a collateral jurisdictional attack on a final order, "federal courts . . . generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." Id. The arguable-basis standard does not apply, however, to a foreign-sovereign defendant who never appeared in the original suit and thus has not yet litigated the question of jurisdiction. See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1181–82 (D.C. Cir. 2013). In such circumstances, courts must apply "the traditional understanding of voidness" and give "full consideration" to the sovereign's "jurisdictional objection[s]." Id. at 1181 (emphasis omitted) (quoting Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1545 (D.C. Cir. 1987).

**III.     Analysis**

The Court will first clear away a smattering of procedural issues in the parties' briefing. It next addresses the jurisdictional questions raised by Respondents in their Rule 60(b)(4) Motion before turning to their Rule 60(b)(1) argument that the Court erred by entering a default judgment without first requiring an entry of default. With those issues resolved, the Court concludes with a discussion of Petitioner's Motion to Authorize Attachment and Execution.

   A.   Procedural Miscellany

Archirodon urges the Court to summarily deny Respondents' Motion to Vacate the Judgment as untimely, arguing that filing four months after judgment does not meet Rule 60(c)(1)'s "reasonable time" restriction. See ECF No. 41 (Resp.) at 26–27; see also McMillian v. District of Columbia, 241 F.R.D. 12, 14 (D.D.C. 2006) ("Rule 60(b) motions are almost uniformly denied as untimely when they are filed more than three months after judgment.") (quoting Brannum v. Buriltanu, 1999 WL 680007, at *2 (D.D.C. July 28, 1999)). But Petitioner acknowledges, as it must, that the D.C. Circuit has foreclosed that argument as to Rule 60(b)(4) motions. See Bell Helicopter, 734 F.3d at 1180 (joining "almost every other circuit court of appeals" in "reject[ing] a time limit that would bar Rule 60(b)(4) motions"). Since Respondents submitted their Motion to Vacate under both Rules, the Court will consider both grounds timely raised.

Petitioner next argues that Respondents' Motion to Dismiss is improper because the Court has already entered judgment. See Resp. at 28. As the Court will deny Respondents' Motion to Vacate, a necessary prerequisite before seeking dismissal, Archirodon is technically correct that the Motion to Dismiss is not properly before the Court. That procedural requirement, however, raises a small wrinkle: Respondents' jurisdictional arguments are fleshed out primarily in their Motion to Dismiss, which is then cross-referenced in their Rule 60(b)

4

Motion. To grant Respondents the benefit of their briefing, the Court will therefore treat the Motion to Dismiss as incorporated by reference in the Motion to Vacate.

With those preliminaries out of the way, the Court will now turn to the parties' arguments on the merits.

### B. Jurisdictional Issues

Respondents contend that the judgment in favor of Archirodon should be vacated as void because the Court lacked both subject-matter and personal jurisdiction. See Mot. to Vacate at 5. Jurisdiction in this case is governed by the FSIA and FAA. As applied here, the "interlocking provisions" of these two statutes compress subject-matter and personal jurisdiction into three prerequisites. Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1099 (D.C. 1982). First, "there must be a basis upon which a court in the United States may enforce a foreign arbitral award." Diag Human, S.E. v. Czech Republic—Ministry of Health, 824 F.3d 131, 134 (D.C. Cir. 2016) (quoting Creighton Ltd. v. Gov't of the State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999)); see 9 U.S.C. §§ 201–203. Second, a statutory exception to sovereign immunity must apply. See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). And third, service on the foreign state must be "properly made pursuant to 28 U.S.C. § 1608." Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 442 (D.C. Cir. 1990).

Although Respondents concede that GCPI, as a non-sovereign — unlike the Ministry of Transport or the Republic of Iraq — must meet the higher bar of showing that the Court lacked even an "arguable basis" for jurisdiction, see Mot. to Vacate at 6, the Court will give "full consideration" to the "jurisdictional objection[s]" as to each Respondent in light of its conclusion that GCPI, the Ministry, and the Republic are one and the same for the purposes of FSIA jurisdiction. Bell Helicopter, 734 F.3d at 1181.

5

Even with the benefit of that standard, however, Respondents do not show that the Court lacked either subject-matter or personal jurisdiction over any of them. Because Respondents do not appear to contest the Court's finding that the first prerequisite has been met, see Archirodon, 2024 WL 341066, at *2, the Court will discuss the remaining two before addressing GCPI's separate jurisdictional argument under the Due Process Clause.

1. *Exception to Sovereign Immunity*

The Court previously held that both the Ministry and the Republic were subject to suit under the FSIA's exception for arbitral enforcement. See Archirodon, 2024 WL 341066, at *3–4; 28 U.S.C. § 1605(a)(6). That exception permits suits against foreign sovereigns where "a foreign state has agreed to arbitrate," "there is an award based on that agreement," and "the award is governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards." Chevron Corp. v. Ecuador, 795 F.3d 200, 204 (D.C. Cir. 2015). As the Court previously reasoned, GCPI signed the arbitration agreement as an agent of the Ministry of Transport, which itself is an inseparable part of the Republic, and therefore all three parties entered into the arbitration agreement and fall under the arbitration exception. See Archirodon, 2024 WL 341066, at *3–4.

Respondents resist these conclusions. See Mot. to Vacate at 7. They argue that GCPI did not act as an agent of the Ministry of Transport, and that, even if it did, the arbitration exception cannot apply because neither the Ministry nor the Republic was listed on the agreement. See MTD at 10–22. Neither contention holds water.

Start with the first argument, which is the stronger one. Respondents are right that, as a "general rule," "agencies and instrumentalities of a foreign nation are presumed to be separate from . . . the foreign state." GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia, 822 F.3d 598, 605 (D.C. Cir. 2016) (cleaned up); see TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d

6

296, 301 (D.C. Cir. 2005) (explaining that presumption of independence "applies to the question of subject matter jurisdiction under the FSIA").  Even assuming that GCPI is entitled to a presumption of separateness from the Ministry, however, that presumption may be overcome "if the instrumentality is the sovereign's alter ego," TIG Ins. Co. v. Republic of Argentina, 2024 WL 3573962, at *10 (D.C. Cir. July 30, 2024), either because (1) the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or (2) "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'"  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 848 (D.C. Cir. 2000) (quoting First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 627 (1983)).  "Under either scenario, the actions of the alter ego corporation can be imputed to a sovereign to work a waiver of sovereign immunity."  TIG, 2024 WL 3573962, at *10.  Archirodon has not pursued the latter theory, nor has it claimed that the relationship between the Ministry and GCPI was one of "complete domination."  See Pet., ¶ 56 (quoting Transamerica, 200 F.3d at 849).  Instead, it has argued that the Ministry exercised control over GCPI "in such a way as to make the instrumentality its agent."  Transamerica, 200 F.3d at 849.

      Determining whether a principal-agent relationship exists "is inherently fact specific." Id.  Such a relationship cannot arise, however, unless (1) "the parent has manifested its desire for the subsidiary to act upon the parent's behalf," (2) "the subsidiary has consented so to act," (3) "the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary," and (4) "the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors."  Id.  In addition to these factors, courts have also looked to the so-called "Bancec factors," which include "(1) the level of economic control by the government; (2) whether the

entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." Rubin v. Islamic Republic of Iran, 583 U.S. 202, 210 (2018) (quoting Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1380 n.7 (5th Cir. 1992)). The principal-agent analysis "roughly map[s] onto Bancec factors one through four." Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp., 2024 WL 519583, at *3 (D.D.C. Feb. 9, 2024).

Evaluating these factors anew, the Court declines to disturb its prior determination that GCPI acted as an agent of the Ministry of Transport during the period relevant to this litigation. As the Court previously explained, "[T]he Ministry controlled the Al Faw construction project from start to finish":

> The official tender announcement stated that "[t]he Iraqi Ministry of Transport / General Company for Ports of Iraq (GCPI)" were announcing the tender and that the Ministry of Transport had nominated "the fully owned organi[z]ation [GCPI] to act as implementing agency." [Pet.,] ¶ 58. Initially, the Ministry reviewed the contract with Archirodon, and it was ultimately signed by "Hadi Al Ameri, Minister of Transportation." Id., ¶ 59. Throughout construction, GCPI sought guidance from the Ministry of Transport on basic administrative support. Id., ¶ 60. When Archirodon requested extensions of time and reimbursement for additional costs, Ministry officials responded and told Archirodon that senior Ministry officials would need to participate in any discussions to "bind our party." Id., ¶¶ 61–65.

Archirodon, 2024 WL 341066, at *4. To this list could be added other indicia. For instance, funds for the Al Faw construction project came from the "National Budget of the Republic of Iraq." Contract at 6. As an Iraqi State Company, moreover, GCPI's revenues are not subject to taxation and may be "deposited in the State's treasury," along with a substantial portion of its

8

profits. See ECF 7-2 (Decl. of Sermid D. Al-Sarraf), ¶¶ 24, 52. On top of all this, minutes from a key meeting describes the Ministry as the "Employer" for the project, see Pet., ¶ 61; ECF No. 1-8 (10/15/2015 Minutes) at 1, while the Minister of Transportation himself has enjoyed "veto power over major financial decisions." Al-Sarraf Decl., ¶ 51. All of which may help to explain why GCPI has previously claimed in separate litigation that "the Iraqi Ministry of Transport has full control over GCPI," which is "a government department of the Ministry of Transport" and therefore "(part of) a foreign state body." ECF 7-12 (Hague Proc.) at 1. The Court agrees.

Respondents do not seriously dispute any of the above. Instead, they argue that GCPI is "structured as a commercial entity" with an "independent legal personality"; that the Ministry does not exercise "plenary authority over GCPI"; and that the Ministry has merely exercised its influence as a "sole shareholder." MTD at 16–22. In support of the last contention, Respondents point to multiple meetings that took place between GCPI and Archirodon where no representatives from the Ministry were present. Id. at 20–22.

These arguments do not move the needle. That GCPI is structured as a commercial entity with independent legal status and some modicum of control over its own affairs does not affect whether, with respect to this dispute, it acted as an agent of the Ministry. See TIG Ins. Co. v. Republic of Argentina, 2022 WL 1154749, at *9 (D.D.C. Apr. 18, 2022) (notwithstanding earlier evidence of independence, "relevant time" for principal-agent analysis is when contracts in dispute "were made"), order corrected and superseded, 2022 WL 3594601 (D.D.C. Aug. 23, 2022), aff'd in part, vacated in part, remanded, 2024 WL 3573962 (D.C. Cir. July 30, 2024). The Ministry's involvement in the Al Faw construction project, moreover, far exceeded what would be expected of a sole shareholder. This case is therefore unlike Transamerica and GSS Group, neither of which concerned, as here, the intimate involvement of a government ministry

9

in the management of a commercial contract. See Transamerica, 200 F.3d at 845, 850–53; GSS Group, 822 F.3d at 600, 606–08; cf. Amaplat, 2024 WL 519583, at *7 (finding principal-agent relationship where, among other things, government ministry exerted substantial control over state-owned corporation).

      Respondents cannot avoid this conclusion by observing that the Ministry of Transport and the Republic of Iraq are not listed as parties on the arbitration contract. See MTD at 11–13. GCPI acted as an agent of the Ministry in forming the contract, and it has already been conceded that the Ministry is an inseparable part of the Republic, to which the presumption of separateness does not apply. See ECF No. 42 (Reply) at 7–8. The Ministry and the Republic were therefore parties to the contract under ordinary agency principles. See Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 777 (2d Cir. 1995) ("Traditional principles of agency law may bind a [third party] to an arbitration agreement."); Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd., 902 F. Supp. 2d 87, 97 (D.D.C. 2012) (similar). The Court therefore reaffirms its holding that the Ministry of Transport and the Republic of Iraq are subject to suit under the arbitration exception to the FSIA.

      Before moving to service of process, one last piece of jurisdictional housekeeping is in order. Archirodon has argued — and the Court previously accepted — that jurisdiction could alternatively be established on the theory that Respondents "have effected an implicit waiver of their immunity." Archirodon, 2024 WL 341066, at *5; 28 U.S.C. § 1605(a)(1) (excepting from FSIA protection any "foreign state [that] has waived its immunity either explicitly or by implication") (emphasis added). Given, however, that the D.C. Circuit has declined to "wade into th[ose] murky waters" when the arbitration exception actually applies, Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria, 27 F.4th 771, 775 n.3 (D.C. Cir. 2022) (citing

"significant policy concerns" with waiver exception raised by United States in amicus brief), the Court will follow suit and base its finding of jurisdiction solely on the applicability of the arbitration exception.

2. *Service of Process*

The proper method of service in this case differs by the identity of each Respondent. GCPI concedes that, as an "instrumentality of a foreign state," it need only be served in accordance with 28 U.S.C. § 1608(b). See MTD at 8; Reply at 7–8. Here, that required service "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served." 28 U.S.C. § 1608(b)(3)(B). Service under this section, even if "technically faulty," may be valid if it "gives adequate notice to the foreign state." Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 153 (D.C. Cir. 1994). By contrast, both the Ministry and the Republic must be served under Section 1608(a), which governs service "upon a foreign state or political subdivision of a foreign state" and requires "strict adherence" to its terms. Transaero, 30 F.3d at 154. Here, those terms mandated service "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). All agree that Archirodon attempted service on the Republic under 1608(a)(3) and, "out of an abundance of caution," on GCPI and the Ministry under both Sections 1608(a)(3) and 1608(b)(3)(B). Archirodon, 2024 WL 341066, at *5; see MTD at 4.

Respondents lodge two primary objections to Petitioner's attempts at service. First, they maintain that service was insufficient as to them all because Petitioner utilized DHL, a private mail courier, instead of the U.S. Postal Service. See MTD at 7–8; Reply at 4–7. Second, Respondents contend that the Ministry and the Republic were not properly served because the

11

materials bore only the title, and not the personal name, of Iraq's Minister for Foreign Affairs. See MTD at 6; Reply at 1-4. Both arguments miss the mark.

The former runs headlong into both statutory language and precedent within this Circuit. The relevant provisions of Section 1608 authorize service "by any form of mail requiring a signed receipt" (emphasis added). As Petitioner rightly notes, "That expansive language connotes breadth, not restriction." Resp. at 12 (citing United States v. Gonzalez, 520 U.S. 1, 5 (1997)). It is not the sort of language one would expect Congress to use to narrow the choices available for service. Delivery by DHL is certainly a "form" of mail; indeed, the D.C. Circuit has described DHL as "an express delivery service that moves mail and freight throughout the United States and in many foreign countries." DHL Express, Inc. v. NLRB, 813 F.3d 365, 369 (D.C. Cir. 2016) (emphasis added). Little surprise, then, that courts here — including this one — have consistently found that service by DHL conforms to the requirements of Section 1608(a). See, e.g., Gates v. Syrian Arab Republic, 646 F.3d 1, 4–5 (D.C. Cir. 2011); Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong, 414 F. Supp. 3d 109, 125 (D.D.C. 2019); Schertzman v. Islamic Republic of Iran, 2019 WL 3037868, at *1, *4 (D.D.C. July 11, 2019); Karcher v. Islamic Republic of Iran, 249 F. Supp. 3d 557, 560 (D.D.C. 2017). Respondents' creative attempts to sidestep this authority by invoking out-of-circuit precedent construing service under the Federal Rules, see MTD at 7; Reply at 5, do not persuade the Court to chart a new course on this question. That conclusion holds doubly true as to GCPI, which indisputably received "adequate notice" of the suit. Transaero, 30 F.3d at 153.

Respondents fare little better on their second argument. Here, too, the statutory language works against them — in this case because it nowhere requires that the service packet bear the personal name of the foreign minister. Cf. 28 U.S.C. § 1608(a)(3) (requiring service

12

"addressed . . . to the head of the ministry of foreign affairs of the foreign state concerned"). Rather, as the D.C. Circuit has made clear, the FSIA mandates only that the foreign minister be "identified by name or title." Barot v. Embassy of the Republic of Zambia, 785 F.3d 26, 30 (D.C. Cir. 2015) (cleaned up); see also Gates v. Syrian Arab Republic, No. 06-1500 (D.D.C. 2009), ECF No. 8-1 (DHL receipt addressed only to the title of the foreign minister), aff'd, 646 F.3d at 5 (upholding service); von Pezold v. Republic of Zimbabwe, 2022 WL 4078896, at *3 (D.D.C. Sept. 6, 2022) (quoting Barot's "name or title" language). Archirodon's attempts plainly cleared that bar.

To be sure, as Respondents point out, the Supreme Court has said in *dicta* that the "most natural reading" of Section 1608(a)(3) is that "the service packet must bear the foreign minister's name and customary address." Republic of Sudan v. Harrison, 587 U.S. 1, 11 (2019). But that case did not present the question of whether service "to the head of the ministry of foreign affairs" must bear the minister's personal name, as opposed to merely her title. Id. at 4 ("The question now before us is whether [Section 1608(a)(3)] is satisfied when a service packet that names the foreign minister is mailed to the foreign state's embassy in the United States."). A single passing comment in a case presenting a different question is too slender a reed on which to rest an argument that would require this Court to buck otherwise binding authority.

### 3. Due Process

Loosing the last arrow in their quiver, Respondents assert that the Court lacks personal jurisdiction over GCPI because the Petition fails to identify any contacts with the United States that would satisfy the Due Process Clause. See Mot. to Vacate at 9; MTD at 25–29. Unfortunately for GCPI, the Due Process Clause cannot provide its customary refuge. It is well established within this Circuit that foreign governments do not have due-process rights. See

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96-99 (D.C. Cir. 2002). When an instrumentality like GCPI acts as an agent of a foreign state, it "receives the same due process protection as the sovereign: none." GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 815 (D.C. Cir. 2012).

### C. Default Judgment?

That leaves Respondents' other argument for vacatur on the table: that the Court committed a "mistake" by "issu[ing] a default judgment without first entering default under Rule 55(a)." Mot. to Vacate at 2 (internal citation omitted); Reply at 14–15; see also Fed. R. Civ. P. 60(b)(1); Kemp v. United States, 596 U.S. 528, 533–34 (2022) ("mistakes" include "a judge's errors of law"). Respondents are, of course, correct that an entry of default must precede any default judgment. See Swiss Inst. of Bioinformatics v. Glob. Initiative on Sharing All Influenza Data, 49 F. Supp. 3d 92, 96 (D.D.C. 2014). They also correctly observe that no entry of default was entered on the Court's docket.

This line of attack presupposes, however, that the Court entered a default judgment in the first place. It did not. As its Order states, the Court entered "[j]udgment" — not "default judgment" — in favor of Archirodon. See ECF No. 20 (Order). Indeed, the Court could not have granted a request for default judgment because there was no such motion before it. Its Order instead simply granted Archirodon's unopposed Petition to Enforce its Arbitral Award. See Archirodon, 2024 WL 341066, at *8 (noting that Court will "issue a contemporaneous Order granting the Petition to Recognize and Enforce Foreign Arbitral Award") (emphasis added). To show that there was a mistake meriting vacatur, then, Respondents must demonstrate that it was legal error for the Court to grant the unopposed Petition without going through the procedures for default judgment.

14

This they have not done.  The Federal Rules of Civil Procedure govern proceedings under the FAA "except as [the FAA] provide[s] other procedures."  Fed. R. Civ. P. 81(a)(6).  The FAA, in turn, provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions."  9 U.S.C. § 6 (emphasis added).  The D.C. Circuit has thus held that petitioners seeking to enforce arbitration awards "should proceed under motions practice, not notice pleading."  TermoRios S.A. E.S.P v. Electranta S.P., 487 F.3d 928, 940 (D.C. Cir. 2007).  That respects Congress's policy in the FAA of "expedit[ing] judicial treatment of matters pertaining to arbitration."  World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362, 365–66 (2d Cir. 1965) (citing S. Rep. No. 536, 68th Cong., 1st Sess. (1924); H.R. Rep. No. 96, 68th Cong., 1st Sess. (1924)).  With this understanding, courts of appeals have excused petitioners from complying with the pleading requirements of Rule 12(b), see TermoRios, 487 F.3d at 940; Productors Mercantile E. Industriales, S.A. v. Faberge USA, Inc., 23 F.3d 41, 46 (2d Cir. 1994); O.R. Sec., Inc. v. Pro. Planning Assocs., Inc., 857 F.2d 742, 748 (11th Cir. 1988), as well as — most relevant here — the default-judgment procedures under Rule 55.  See D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 107 (2d Cir. 2006) ("We agree . . . that Rule 55 does not operate well in the context of a motion to confirm or vacate an arbitration award.").

For example, some courts "approach an unopposed petition to confirm an arbitration award as akin to a motion for summary judgment based on the movant's submissions."  Bailey Shipping, Ltd. v. Am. Bureau of Shipping, 431 F. Supp. 3d 359, 364 (S.D.N.Y. 2019) (internal quotation marks omitted); see also, e.g., Accelerated Sols., LLC v. Star Med. Ctr., LLC, 2021 WL 3128540, at *1–2 (E.D. Tex. July 23, 2021) (same).

To be sure, as Respondents rightly point out, this Court and others in this district have generally adhered to Rule 55's procedures when evaluating unopposed petitions to confirm arbitral awards. See Reply at 14–15 (citing cases); GPGC Ltd. v. Republic of Ghana, No. 24-169, ECF No. 16 (D.D.C. Aug. 6, 2024). But a habit does not a legal rule make. It is Respondents' burden to demonstrate that the Court committed an "error[] of law," Kemp, 596 U.S. at 534, in declining to treat Archirodon's Petition as a complaint governed by the default-judgment requirements of Rule 55. Although the Court has typically followed that path, it sees no reason why it must, especially where, as here, Respondents have indicated no prejudice as a result.

    D.  Attachment

Having disposed of Respondents' various objections, the Court may now finally turn to Petitioner's Motion to Authorize Attachment and Execution. Parties may seek to enforce a judgment by attaching certain property of the foreign state used for commercial activity in the United States. See 28 U.S.C. § 1610(a)(6). They may do so, however, only once "the court has . . . determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of" the FSIA. See 28 U.S.C. § 1610(c). That initial step helps "to ensure that a foreign power is always given an opportunity to evaluate and respond to any court judgment entered against it which could subject its property and interests in the United States to attachment or execution." Baker v. Socialist People's Libyan Arab Jamahirya, 810 F. Supp. 2d 90, 101 (D.D.C. 2011) (quoting Agudas Chasidel Chabad of the United States v. Russian Fed'n, 798 F. Supp. 2d 260, 271 (D.D.C. 2011)).

Archirodon argues that the Court should grant this Motion because four months constitutes a "reasonable period of time" since the entry of judgment. See Mot. to Attach at 3–5; 28 U.S.C. § 1610(c). Respondents counter that they were not properly served with notice of the

16

judgment under Section 1608(e) and that, besides, Petitioner's Motion is premature.  See Attachment Resp. at 3–7.  Here, too, Archirodon has the better of the argument.

To start, Section 1608(e)'s service requirement is not applicable to this case because it applies only to default judgments, and, as just explained, no such judgment is at issue here.  See *supra* Part III.C.  Even if it were, Respondents were served with a copy of the judgment the same way they were served with notice of the suit, see ECF No. 29 (Decl. of Alexandra C. Eynon), and the Court has already held that such service was proper.  See *supra* Part III.B.2.

As to whether a "reasonable period of time" has elapsed, the Court, like others in this district, starts by evaluating "the procedures necessary for the foreign state to pay the judgment (such as the passage of legislation), evidence that the foreign state is actively taking steps to pay the judgment, and evidence that the foreign state is attempting to evade payment of the judgment."  Ned Chartering & Trading, Inc. v. Republic of Pakistan, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (citing H.R. Rep. 1487, 94th Cong., 2d Sess. 1, 30 (1976)).  Here, the thin evidence that the parties have presented indicates that Respondents have taken no steps to pay the judgment, resting instead on their intent to challenge the basis for the Court's jurisdiction.  See ECF No. 30-2 (Decl. of Robert Kry, Exh. A (email correspondence between counsel)) at 1 (indicating that Respondents will oppose Motion to Authorize Attachment only because they were not "properly served, and the Court lacks jurisdiction"); Attachment Resp. at 7 (similar).  But the intent to challenge the Court's judgment does not toll the clock for the purposes of Section 1610(c)'s reasonable-time requirement, which starts running from the entry of judgment.  See Owens v. Republic of Sudan, 141 F. Supp. 3d 1, 10–11 (D.D.C. 2015) (requirement does not "give foreign states an automatic stay of execution pending the resolution of postjudgment motions").

Respondents have, moreover, presented no other argument to explain the four-month — now eight-month — delay in paying up.  They point, instead, to cases in which parties (including Respondents, apparently) have dragged their feet for even longer.  See Attachment Resp. at 6–7 (citing Wye Oak Tech., Inc. v. Republic of Iraq, 2023 WL 7112801, at *1 (D.D.C. Oct. 27, 2023) (10 months), and Teco Guatemala Holdings, LLC v. Republic of Guatemala, 2020 WL 2934951, at *2 (D.D.C. June 2, 2020) (6 months)).  As their own authorities nevertheless reveal, "[T]he sweep of the case law supports Petitioner's contention that even a few months is sufficient to satisfy 1610(c)'s 'reasonable period of time' requirement, especially when the defendant has offered no evidence that it is making efforts to satisfy the judgment."  Teco Guatemala Holdings, 2020 WL 2934951, at *2; see Saint Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela, 2021 WL 6644369, at *2 (D.D.C. July 13, 2021) (4 months); Warmbier v. Democratic People's Republic of Korea, 2019 WL 11276677, at *2 (D.D.C. Apr. 9, 2019) (3.5 months); Owens, 141 F. Supp. at 9 (3 months); Ned Chartering, 130 F. Supp. 2d at 67 (1.5 months).  Because the delay in this case sits comfortably within that range, and Respondents have offered no evidence that they are making efforts to satisfy the judgment, the Court finds that the prerequisites of Section 1610(c) are met and will accordingly grant Archirodon's Motion.

### IV.     Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order denying Respondents' Motions to Vacate the Judgment and to Dismiss the case and granting Petitioner's Motion to Authorize Attachment and Execution.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 16, 2024